**In re WASHINGTON PUBLIC POWER SUPPLY SYSTEM SECURITIES LITIGATION.**

**MDL No. 551.**

United States District Court, D. Arizona.

Nov. 16, 1990.

Paul M. Bernstein, Chairperson, Bernstein, Litowitz, Berger & Grossmann, New York City, for plaintiff Henry Puchall.

Melvyn I. Weiss, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff Joseph Harris.

Michael J. Meehan, Molloy, Jones & Donahue, P.C., Tucson, Ariz., for class plaintiffs.

Richard W. Clary, Cravath, Swaine & Moore, New York City, Michael Mines, Ex-officio, Betts, Patterson & Mines, Seattle, Wash., H. Michael Clyde, Brown & Bain, Phoenix, Ariz., Harold R. Tyler, Jr., Patterson, Belknap, Webb & Tyler, New York City, for plaintiff Chemical Bank.

James R. Irwin, Shidler, McBroom, Gates & Lucas, Seattle, Wash., for plaintiff Frankel Estate.

James J. Hagan, Simpson Thacher & Bartlett, New York City, liaison counsel, for East Coast defendants.

Cyrus Noe, Clearing–Up, Seattle, Wash., for Clearing Up.

Michael E. Kipling, Graham & Dunn, Seattle, Wash., for various class plaintiffs.

Allan K. Peckel, New York City, for plaintiffs David Gold and Marvin Frankel.

Jay Robert Stiefel, Berger & Montague, P.C., Philadelphia, Pa., for plaintiff Rosalyn Mirotznik.

Klari Neuwelt, Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff Morris Massry.

Lawrence A. Sucharow, Goodkind, Labaton & Rudoff, Robert Schachter, Zwerling, Schachter & Zwerling, New York City, for plaintiff Paul J. Bonseigneur.

Gerald Rodos, Barrack, Rodos & Bacine, Philadelphia, Pa., for plaintiff Dr. Howard Sheldon.

Samuel P. Sporn, Schoengold & Sporn, P.C., New York City, for plaintiff Jack Schroeder.

Paul F. Bennett, David B. Gold, P.C., San Francisco, Cal., Stephen P. Hoffman, Pomerantz, Levy, Haudek, Block & Grossman, New York City, for plaintiff Leonard Laub.

Bruce K. Cohen, Meredith & Cohen, P.C., Philadelphia, Pa., for plaintiff Louis Brazen and 776 Broadway.

Daniel W. Krasner, Wolf, Haldenstein, Alder, Freeman & Herz, New York City, for plaintiff-intervenor Schein.

Harvey Greenfield, Irving Malchman, Kaufman, Malchman, Kaufmann & Kirby, New York City, for plaintiff Bryna Stepak.

Barry F. Schwartz, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for plaintiff Danny S. Fruchter.

Jules Brody, Stull, Stull & Brody, New York City, for plaintiff Lawrence Zucker.

Jack L. Block, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for Martin Woolin.

Guido Saveri, Saveri & Saveri, San Francisco, Cal., Jeremiah F. Hallisey, Hallisey &

Johnson, P.C., San Francisco, Cal., for plaintiff the Doctors Company.

Michael B. Hyman, Much, Shelist, Freed, Denenberg Ament & Eiger, P.C., Chicago, Ill., for plaintiff Ruth C. Sigmund, Trustee of Arthur W. Sigmund Residuary Trust and the Arthur W. Sigmund Marital Trust.

Albert R. Malanca, Donald S. Cohen, Kenneth G. Kieffer, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Wash., and Seattle, Wash., lead counsel for Washington Public Utilities Group, certain individual defendants and liaison counsel for West Coast defendants.

Edwin J. Wheeler, Wheeler & Huss, Tacoma, Wash., for Town of Steilacoom, Wash.

James P. McNally, Ione, Wash., for Pend Oreille.

Richard A. Nelle, Blaine, Wash., for City of Blaine, Wash.

Jacob L. Smith, Smith & Rosellini, Lynden, Wash., for City of Sumas, Wash.

Julian C. Dewell, Anderson Hunter, Everett, Wash., for Orcas Power & Light Co.

David F. Jurca, Linda Cochran, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Columbia defendants and certain individual defendants.

R.L. Marceau, Marceau, Karnopp, Peterson, Noteboom & Hubel, Bend, Or., for Cent. Elec. Co-op., Inc.

Dennis K. Bromley, Robert Gordon, Pauline O. Fox, Pillsbury, Madison & Sutro, San Francisco, Cal., for Snohomish Group.

Robert D. Stewart, David J. Lenci, Culp, Guterson & Grader, Seattle, Wash., Daniel R. Murdock, James L. Stengel, Donovan, Leisure, Newton & Irvine, New York City, for Washington Public Power Supply System.

Ralph K. Nickerson, Goldendale, Wash., for Public Utilities Dist. #1 of Klickitat County, Wash.

Rockne Gill, J. Laurence Cable, Bernard Ryan, Schwabe, Williamson & Wyatt, Portland, Or., Larry S. Gangnes, John Tomlinson, Paul Swanson, Lane, Powell, Spears & Lubersky, Seattle, Wash., for Oregon Public Entities and certain individual defendants.

R. Erick Johnson, P. Daniel Lindahl, Ronald E. Bailey, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for City of McMinnville, Or., City of Drain, Or. and Alan H. Jones.

Peter R. Mersereau, Rankin, VavRosky, Doherty, MacColl & Mersereau, Portland, Or., for City of Springfield, Or., City of Milton–Freewater, Or., Steve Loveland and J.R. Criswell.

Dwight A. Halstead, Prosser, Wash., for Benton Rural Elec. Ass'n.

Everett B. Clary, Gwen Whitson, O'Molveny & Myers, Los Angeles, Cal., for Certain Washington Public Power Supply System Director defendants.

G. Edward Fitzgerald, Gibson, Dunn & Crutcher, Los Angeles, Cal., Michelle Coyle, Gibson, Dunn & Crutcher, Seattle, Wash., for certain Participants' Committee member defendants.

John D. Lowery, Thomas Burt, Thomas Hamerlinck, David Brenner, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for Small Utilities Group.

Herbert Gelman, Gelman, Courture & Pate, Tacoma, Wash., for Alder Mut. Light Co.

Malcolm S. Harris, Jack Orr, Michael Charneski, Harris, Orr & Wakayama, Seattle, Wash., for member non–participants and Public Utility District No. 1 of Ferry County, Wash., Public Utility District No. 1 of Kittitas County, Wash., Roger Sparks, Richard Windsor, Clair Hildebrandt, William Kuehne and Harold Jenkins.

Camden M. Hall, Stellman Keehnel, Foster, Pepper & Shefelman, Seattle, Wash., for member non–participants and City of Seattle, Wash.

David B. Hatton, Civil Div., U.S. Dept. of Justice, Portland, Or., J. Christopher Kohn, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Washington, D.C., for U.S., Bonneville Power Adm.

Steven J. Palmer, Leavy, Schultz & Sweeney, Pasco, Wash., for Frankin County PUD No. 1.

Bennet A. McConaughy, Foster, Pepper & Shefelman, Seattle, Wash., for City of Richland.

David A. Bennett, David Robbins, Bennett & Bigelow, Seattle, Wash., for Law Firm defendants.

Irwin J. Sugarman, Robert Abrahams, Schulte, Roth & Zabel, New York City, and Chris Robert Youtz, Sirianni & Youtz, Seattle, Wash., for Houghton, Cluck, Coughlin & Riley.

Otto G. Klein, Peter Danelo, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for United Engineers & Constructors, Inc., Ebasco Services Inc. and R.W. Beck and Associates.

Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, John F. Kruger, Karr Tuttle Campbell, Seattle, Wash., for United Engineers & Contractors, Inc.

Peter J. Nickles, Covington & Burling, Washington, D.C., for Ebasco Services Inc.

Roy J. Moceri, Steve Todd, Reed, McClure, Moceri, Thonn & Moriarty, Seattle, Wash., for R.W. Beck & Associates.

James J. Hagan, Simpson Thacher & Bartlett, New York City, Jerry B. Edmonds, Margaret A. Sundberg, Williams, Kastner & Gibbs, Seattle, Wash., Thomas Chandler, Dan Cavett, Chandler, Tullar, Udall & Redhair, Tucson, Ariz., for Blyth Eastman Paine Webber Inc.

Herbert M. Wachtell, Peter C. Hein, Wachtell, Lipton, Rosen & Katz, New York City, for Merrill Lynch Pierce Fenner & Smith, Inc., Salomon Brothers, Inc., Smith Barney Harris Upham & Co., Inc. and Prudential–Bache Securities, Inc.

Philip C. Potter, Jr., Davis Polk & Wardwell, New York City, for Smith Barney Harris Upham & Co., Inc.

Leonard Joseph, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Prudential–Bache Securities, Inc.

Richard A. Cirillo, Rogers & Wells, New York City, for Merrill Lynch.

Ronald E. McKinstry, Bogle & Gates, Seattle, Wash., for Underwriter defendants.

P.B. Konrad Knake, White & Case, New York City, for Rating Agency defendants with William M. Dallas, Jr. and for Moody's Investors Service, Inc.

William M. Dallas, Jr., Sullivan & Cromwell, New York City, for Rating Agency defendants with P.B. Konrad Knake, and for Standard & Poor's Corp.

## ORDER—ATTORNEYS' FEES AND EXPENSES

WILLIAM D. BROWNING, Chief Judge.

This Order addresses the petitions of plaintiffs' counsel for attorneys' fees and expenses in this action. Initial fee petitions were filed in early 1989 prior to hearings held on April 11 and 12, 1989, in the United States District Court in Seattle, Washington, concerning the fairness, reasonableness and adequacy of settlements reached in this massive multi-district securities litigation. *See Notice of Settlements and Settlement Hearings and Class Certification* at 12, February 6, 1989. On September 5, 1989, in an opinion that recounted the history of this litigation, the Court approved the settlements that were the subject of the April 1989 hearings.[1] *In re Washington Public Power Supply System Secur. Litigation,* 720 F.Supp. 1379 (D.Ariz.1989). The Court reserved jurisdiction over the attorneys' fee petitions and over matters concerning the allocation and distribution of settlement proceeds among various claimants to the settlement funds. On July 24, 1990, after notice to all Class members and known bondholders, and after extensive briefing, a hearing was held in New York City concerning the allocation of settlement proceeds among claimants to the fund, other than these petitioning attorneys. The Court's decision regarding the allocation of settlement proceeds among

---

**1.** That decision is currently the subject of several appeals to the Court of Appeals for the Ninth Circuit.

and between Class members and Chemical Bank on behalf of the Bond Fund was rendered the following month.[2] (Order dated August 15, 1990.)

## CONTENTS

| | |
|---|---:|
| THE FEE AND EXPENSE PETITIONS | 1078 |
| The Petitioners | 1079 |
| Class Counsels' Petition | 1080 |
| AMBAC Petition | 1082 |
| The Haberman Petitions | 1082 |
| LEGAL STANDARDS | 1082 |
| METHODS OF FEE DETERMINATION | 1084 |
| Percentage–Based Fee Awards | 1084 |
| Blended Lodestar Analysis | 1087 |
| Fee Enhancements—The Use of Multipliers | 1088 |
| DETERMINATION OF THE LODESTAR | 1091 |
| General Comments Regarding the Fee Petitions | 1092 |
| Class Counsels' Fee Petition | 1092 |
| Haberman and AMBAC Petitions | 1094 |
| GUIDELINES USED IN REVIEWING THE PETITIONS | 1094 |
| The Time and Labor Required | 1094 |
| Paralegal Time and Labor | 1097 |
| The Novelty and Difficulty of the Questions | 1097 |
| The Results Obtained and Amount Involved | 1097 |
| The Rates Charged | 1099 |
| Paralegal Rates | 1100 |
| The Nature of the Fee | 1101 |
| The Desirability or Undesirability of the Case | 1101 |
| Preclusion of Other Employment | 1101 |
| The Nature and Length of the Professional Relations with the Client | 1102 |
| Time Limitations Imposed | 1102 |
| Awards in Similar Cases | 1102 |
| EXPENSE REIMBURSEMENT REQUESTS | 1102 |
| LODESTAR FEE AND EXPENSE AWARDS | 1103 |
| Bernstein Litowitz Berger & Grossmann | 1103 |
| Milberg Weiss Bershad Specthrie & Lerach | 1112 |
| Shidler McBroom Gates & Lucas | 1128 |
| Barrack, Rodos & Bacine | 1135 |
| Berger & Montague, P.C. | 1140 |
| David B. Gold, P.C. | 1145 |
| Goodkind, Labaton & Rudoff | 1149 |
| Graham & Dunn | 1155 |
| Harvey Greenfield | 1159 |
| Hallisey & Johnson | 1162 |
| Kaufman Malchman Kaufmann & Kirby | 1164 |
| Meredith & Cohen, P.C. | 1166 |
| Molloy, Jones & Donahue, P.C. | 1168 |
| Much Shelist Freed Denenberg Ament & Eiger, P.C. | 1171 |
| Allan Peckel and Rabin & Silverman | 1174 |
| Pomerantz Levy Haudek Block & Grossman | 1176 |
| Sachnoff Weaver & Rubenstein, Ltd. | 1180 |
| Saveri and Saveri | 1185 |
| Schoengold & Sporn, P.C. | 1187 |
| Stull, Stull & Brody | 1191 |
| Wolf, Block, Schorr & Solis–Cohen | 1193 |
| Wolf Haldenstein Adler Freeman & Herz | 1196 |
| Wolf Popper Ross Wolf & Jones | 1201 |
| Zwerling, Schachter & Zwerling and Prince, Kelley, Newsham & Marshall, P.S. | 1206 |
| WPPSS Litigation Fund | 1209 |

---

**2.** That decision, also, has been appealed.

SUMMARY OF CLASS COUNSEL AWARDS ................................................ 1211
 Attorney Lodestar Summary ................................................ 1211
 Paralegal Lodestar Summary ................................................ 1212
 Expense Reimbursement Summary ................................................ 1213
CHEMICAL BANK EXPENSES ................................................ 1213
AMBAC INDEMNITY CORPORATION COUNSEL (FOLEY & LARDNER) ................................................ 1220
HABERMAN COUNSEL ................................................ 1223
 Winthrop Stimson Putnam & Roberts ................................................ 1225
 Smith Smart Hancock Tabler & Middlebrooks ................................................ 1228
GORDON THOMAS HONEYWELL ................................................ 1228
AWARDS ................................................ 1228
INTEREST ................................................ 1229
ORDER ................................................ 1229
FINAL JUDGMENT ................................................ 1230

---

### THE FEE AND EXPENSE PETITIONS

The initial fee petitions, filed in connection with the April 1989 hearings, encompass counsels' request for payment for work performed from the inception of this litigation through early 1989. A number of petitioning firms have since submitted supplemental reports for work done after the period covered by their initial petitions. The Court advised counsel that the amounts of fees and expenses reported in those supplemental reports, for work performed through December 31, 1989, would also be deemed petitioned for unless counsel objected promptly. (Minute Order, April 2, 1990.)

On June 5, 1990, Class counsel moved for relief from the April 2, 1990, Minute Order. The Court has considered Counsel's belated arguments and will not grant the relief requested. The Court has reviewed the nature of the work reported in the supplemental petitions and has determined, however, that an award for some of the work reported therein should not be considered, nor made, at this time. I will therefore defer consideration of certain undertakings until such time as a supplemental fee petition is filed. Deferral has been made, in particular, for work that clearly involved efforts related to on-going insurance litigation, as opposed to work more directly stemming from the settlement of MDL 551, or from the fee petitions that are the subject of this Order. The work of each attorney for which consideration has been deferred is indicated herein.

With the exception of some post-petition work that has been deferred for the Court's future consideration, therefore, today's Order contemplates the aggregate of the amounts reported in both the initial petitions and in supplemental reports.[3] The period of time encompassed by this Order, thus, extends from pre–1983 through December 1989—more than seven years.

It is understatement to say that this fee petition is, like the litigation itself, massive. The total amount sought at this time out of the settlement proceeds is slightly in excess of $162,327,340.[4] Of that amount, ap-

---

3. Reports continue to be filed quarterly by several firms. They reflect work connected with this primary litigation, as well as related work.

4. This amount excludes requested interest. In the Notice of Settlements and Settlement Hearings, Class counsel advised that they would seek interest on the amount of fees and expenses awarded from the date of such award until the date of its distribution. In their initial petition, counsel requested interest on the amounts they petitioned for. No rate or inception date were specified in that request, however. Subsequently, Class counsel requested interest on their fee award from January 1, 1990, at the rate earned by the Settlement Fund. Additionally, the amount reported herein has not been adjusted to reflect the application, to the total amount of Class counsels' supplemental reports for work done after the cutoff of the initial petitions

proximately $54 million represents expenses amassed in connection with the litigation. The remaining $108 million request is for attorneys' and paralegal fees. The petitions reflect a total of nearly 205,000 hours of work performed by more than 340 different attorneys and approximately 250 paralegal employees. Described differently, the reported hourly figure converts to roughly one hundred working man-years.

During the past months, the Court has methodically and painstakingly scrutinized the voluminous materials submitted by the petitioning firms in support of their reported fees and expenses. Numerous requests for explanatory information were made, and several Orders were issued requiring additional data. Various memoranda, declarations and affidavits submitted in support of and in opposition to the fee petitions have been studied. Relevant caselaw has been exhaustively analyzed.

The amounts awarded herein will undoubtedly be viewed as both too generous and too restrictive by Class members, attorneys, objectors and others. My determinations reflect a tremendous amount of work, attention to detail and concern for fairness to all parties. As is to be expected, difficult and demanding decisions were required. Many decisions were subjective and not capable of calculation. They were not, however, arbitrary.

I am keenly aware of the exceptional ability and industry of counsel in this case. Class Plaintiffs' Lead counsel commanded the respect of the Court and all others. It should be beyond cavil that there is no imputation or implication of dishonesty or overreaching in connection with these fee applications. The question of supportability has been the overriding consideration throughout. In cases such as these, years intervene between the fee generating event and its review by the court. Memories fade, so it is impossible to re-create accurately the exact nature of services rendered if they are not adequately described

at or near the time performed. There is also a lack of periodic review of services and charges that normally marks the attorney-client relationship and the attendant lack of ability of the client to question charges when events are fresh. Likewise, the attorney lacks the opportunity to justify charges when specific events are fresh in his or her own mind.

If there is a message in the Court's treatment of the fees requested, it is that the requests were inadequately documented. Future common fund applicants should note that the awarding court will necessarily require comprehensive documentation of time spent on specific tasks in order to discharge its fiduciary duty to Class members. The court must apply scrutiny such that its decisions will be presented to Class members, counsel and any reviewing court as a reasoned and objective analysis and resolution.

*The Petitioners*

Thirty-two different law firms have applied for reimbursement of fees and/or expenses. Twenty-five of these firms participated, to one degree or another, as counsel for the Class Plaintiffs in this litigation. Initially, these firms submitted a joint petition for fees and expenses. These twenty-five firms will be referred to herein as "Class counsel."

Included with the petition of Class counsel is a request for reimbursement of expenditures made by the "WPPSS Litigation Fund" ("Litigation Fund" or "Fund"). This Fund was established and operated by Class counsel early in the litigation. It was managed by an attorney from one of the petitioning Class counsel firms. The Fund was established by means of monetary assessments of twenty-three of the firms that have filed a joint petition for fees. Litigation Fund expenditures were of two primary types: (1) reimbursement to Class counsel for litigation expenses reported to the Fund, and (2) payment of other litigation expenses.

through December 31, 1989, of a multiplier such as that utilized by Class counsel in their initial

petition.

One other petition for reimbursement of expenses is before the Court. An application for more than $51 million was filed by Class counsel on behalf of Chemical Bank, the Bond Fund Trustee. The requested amount represents reimbursement sought, in large part, for expenses paid by Chemical in connection with the establishment and operation of a Data Center in Seattle, Washington, and a Trial Support Service facility in Tucson, Arizona, pursuant to an agreement between Chemical and Class counsel. This agreement, and the operations and expenditures it concerned, are discussed more fully herein in the section entitled "Chemical Bank Expenses."

An additional petition was submitted for payment for work done on behalf of AM-BAC Indemnity Corporation (formerly MGIC Indemnity Corporation), one of the Class members in the MDL 551 litigation. These petitioners will be referred to as "AMBAC counsel."

Another six law firms have submitted petitions for work done primarily in connection with litigation that was undertaken in the state courts of Washington and reported under the caption *Haberman v. Washington Public Power Supply System*, 109 Wash.2d 107, 744 P.2d 1032 (1987), *mod. Haberman v. Washington Public Power Supply System*, 750 P.2d 254 (Wash.1988), *app. dismd. American Express Travel Related Services Co. v. Washington Public Power Supply System*, 488 U.S. 805, 109 S.Ct. 35, 102 L.Ed.2d 15 (1988). These firms represented various plaintiffs, some of whom were Class members in MDL 551, in the state court litigation.

*Class Counsels' Petition*

Class counsel submitted several documents in connection with their fee application. The "Declaration of Lead Counsel in Support of the Proposed Settlements and Class counsel's Joint Application for Fees and Reimbursement of Expenses" was submitted by Lead Counsel in the litigation: Paul M. Bernstein, of the law firm of Bernstein Litowitz Berger & Grossman; Melvyn I. Weiss, of Milberg Weiss Bershad Specthrie & Lerach; and James R. Irwin, of Shidler McBroom Gates & Lucas. This Declaration was submitted in support of the Court's approval of both the proposed settlements and of the joint application of Class counsel for an award of fees and reimbursement of expenses.

Accompanying the Declaration of Lead Counsel were twenty-five separate "Declarations of Each Plaintiffs' Class Counsel Re Lodestar and Expenses." The declarations contain information regarding the hours, rates and expenses of each law firm, and the WPPSS Litigation Fund, that requested reimbursement in the initial petition.

A third document, "Memorandum of Points and Authorities in Support of Application for Award of Fees and Reimbursement of Expenses of Class Plaintiffs' Counsel," accompanied by the "Declaration of Melvyn I. Weiss in Support of Memorandum of Points and Authorities in Support of Application for Award of Fees and Reimbursement of Expenses of Class Plaintiffs' Counsel" was also submitted with Class counsels' initial petition. Additionally, in February, 1989, Class Plaintiffs Counsel submitted "Class Plaintiffs' Memorandum Regarding the Legal Standards Governing the Award of Attorney's Fees" to the Court. That memorandum has today been made part of the record. Together, the documents described above comprise Class counsels' petition.

To supplement and support its petition, every firm was required to submit copies of the contemporaneous records reflecting the amount of time and the nature of each activity undertaken by each individual petitioning attorney and paralegal for which payment is sought. Furthermore, throughout the course of the litigation, beginning in the fall of 1984, all firms that anticipated the possibility of applying to the Court for an award of attorneys' fees were required to provide the Court with a bi-monthly report indicating the billing rate and number of hours worked on the litigation for every attorney or paralegal in the firm ("Lodestar Reports"). In October, 1989, counsel were ordered to continue to submit similar reports, on a quarterly basis, for work done

subsequent to the initial petition. Those reports, for work reported through December 31, 1989, have been deemed by the Court, and are referred to herein, as "supplemental petitions." All of these documents have today been sealed and made part of the record of this litigation. They are not be opened except under Order of this Court. Many of the records, particularly those that meet the criteria of proper fee applications, contain accounts of petitioning attorneys' undertakings that are, arguably, work product. The Court has been careful, in this Order, not to divulge sensitive information. It will not expose counsels' methods and tactics, suggested and revealed within those records, unnecessarily.

At the time of the initial application, Class counsels' petition was supported by a reported lodestar of $33,271,203.[5] Class counsel requested a fee award of $102,992,-564, noting that the amount was approximately 3.1 times the reported lodestar.

Counsel proposed that the award be distributed among the twenty-five Class counsel firms in a manner reflecting lead counsel's appraisal of a number of factors relevant to each petitioning firm's contribution to the litigation. The following table shows the amount that lead counsel proposed to distribute to each firm. Following each firm's proposed share is the multiplier by which the firm's reported lodestar amount was increased to arrive at the firm's proposed share.

| Firm | Fee Requested | Multiplier |
|---|---|---|
| Bernstein Litowitz Berger & Grossman | $ 26,796,240 | 3.83 |
| Milberg Weiss Bershad Specthrie & Lerach | 31,702,554 | 3.53 |
| Shidler McBroom Gates & Lucas | 15,450,697 | 3.24 |
| Molloy, Jones & Donahue | 968,073 | 2.95 |
| Graham & Dunn | 2,625,005 | 2.65 |
| David B. Gold | 3,271,912 | 2.36 |
| Berger & Montague, P.C. | 2,576,678 | 2.36 |
| Wolf Popper Ross Wolf & Jones | 2,392,767 | 2.36 |
| Saveri & Saveri | 2,237,409 | 2.36 |
| Zwerling, Schachter & Zwerling | 1,541,776 | 2.36 |
| Wolf Haldenstein Adler Freeman & Herz | 1,488,920 | 2.36 |
| Goodkind, Labaton & Rudoff | 1,208,489 | 2.36 |
| Meredith & Cohen | 920,085 | 2.36 |
| Barrack, Rodos & Bacine | 918,961 | 2.36 |
| Sachnoff, Weaver & Rubenstein | 891,302 | 2.36 |
| Wolf, Block, Schorr & Solis–Cohen | 829,231 | 2.36 |
| Pomerantz Levy Haudek Block & Grossman | 748,456 | 2.36 |
| Much Shelist Freed Denenberg Ament & Eiger | 699,083 | 2.36 |
| Schoengold & Sporn | 677,712 | 2.36 |
| Kaufman, Malchman & Kirby | 393,758 | 2.36 |
| Stull, Stull & Brody | 230,813 | 2.36 |
| Hallisey & Johnson/O'Brien & Hallisey | 99,617 | 2.36 |
| Prince, Kelley & Newsham (by Zwerling) | 25,798 | 2.36 |
| Allan K. Peckel | 3,816,661 | 1.97 |
| Harvey Greenfield & Franco Asia | 480,567 | 1.57 |
| TOTAL Class counsel | $102,992,564 | |

The amount initially requested for attorneys' fees was also described as "constituting" 13.6% of the settlement fund. Class counsel urge that the requested award is appropriate whether the Court adopts an approach approving such a "percentage-of-

5. In this context, the term "lodestar" refers to the sum of the products obtained by multiplying each attorney's reported hours worked by his or her reported hourly rate. After a number of corrections, the reported figure was recalculated by the Court as $33,266,665.71. This amount increased, as a result of the supplemental petitions, to a final reported lodestar, as of December 31, 1989, of $34,257,384.

the-fund" award, or whether it approves an award based upon use of their reported lodestar enhanced by a multiplier.

In addition to Class counsel's request for fees, the petitioning firms also requested reimbursement of $2,336,438 for expenses incurred in connection with the litigation. That figure increased to $2,482,584.40 as a result of additional work reported through December 31, 1989.

*AMBAC Petition*

The law firm of Foley & Lardner petitions the Court for fees and expenses in connection with its representation of AMBAC Indemnity Corporation. Foley & Lardner seeks an award of fees for attorney and paralegal services on behalf of this Class member totalling $134,886. The firm also requests reimbursement for expenses amounting to $9,964.

*The Haberman Petitions*

The *Haberman* petitioners represented plaintiffs in the Washington state courts.

Four firms petition for their representation of individual bondholders. Collectively, the four firms are referred to herein as *"Haberman* Plaintiffs' Counsel." Two other firms seek recovery of fees and expenses for work done on behalf of *Haberman* Plaintiff Intervenors—American Express Travel Related Services Company, Inc., American Express Bank, Ltd., Fireman's Fund Company, The American Insurance Company and Associated Indemnity Corporation and United States Trust Company of New York, as Trustee. Together, these firms are referred to as *"Haberman* Intervenors' Counsel."

The *Haberman* petitioners and the amounts sought by each firm are indicated in the following table. In some instances the amounts in initial petitions have been adjusted for mathematical corrections and/or to reflect supplemental petitions submitted.

### HABERMAN COUNSEL

| Haberman Plaintiffs' Counsel | Fee Requested | Expenses Requested |
| --- | --- | --- |
| Jaffe & Schlesinger | $1,134,185.00 | $232,268.00 |
| Ginsburg, Feldman, and Bress | 644,621.00 | 75,218.32 |
| Ferguson & Burdell | 246,696.25 | 31,118.11 |
| Weinstein, Hacker, Yost, Berry, & Matthews | 65,513.00 | 2,815.00 |
| Haberman Intervenors' Counsel | | |
| Winthrup, Stimson, Putnam & Roberts | 1,106,257.25 | 173,558.00 |
| Smith Smart Hancock Tabler & Middlebrooks | 343,695.00 | 55,791.13 |
| TOTAL Haberman Counsel | $3,540,967.50 | $570,768.56 |

These last seven firms seek fees amounting to reported lodestar amounts. They seek neither a multiplier of such amounts nor a particular percentage of the settlement reached in MDL 551.

## LEGAL STANDARDS

■ The ordinary rule in the American legal system precludes prevailing litigants from collecting attorneys' fees from the losing party. *Alyeska Pipeline Service Co. v. Wilderness Soc.,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). There are exceptions to this rule, however. One

exception, long entrenched, permits proper allowances to persons who have instituted proceedings for the benefit of a general fund. *Trustees v. Greenough,* 105 U.S. 527, 535–36, 26 L.Ed. 1157 (1882). Courts possess equitable powers to permit persons recovering a fund for the benefit of others to recover costs, including attorneys' fees, from the fund itself. *Alyeska,* 421 U.S. at 257, 95 S.Ct. at 1621. The fund amassed as a result of the settlement of the MDL 551 securities class action litigation under Fed. R.Civ.P. 23 meets the requirements of this "common fund" exception to the general

American rule that would otherwise require every litigant to bear his or her own attorneys' fees.

Under the common fund doctrine, an attorney may be awarded fees and costs in recognition of efforts that resulted in the creation, preservation or protection of a fund that benefits the class whom the attorney represents. The attorney's fees and expenses are paid out of the fund. Without such compensation, the beneficiaries of the fund would enjoy its benefits without sharing the costs of acquiring it. To avoid such unjust enrichment, the costs of creating or preserving the common fund are shared by the entire class that has benefitted by the attorney's representation. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 661 (9th Cir.1985), citing *Pawlak v. Greenawalt*, 713 F.2d 972, 981 (3rd Cir.1983).

■ The Court acts as a fiduciary, a guardian of the rights of absent class members, in deciding an award of attorneys' fees in a class action. *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir.1977) (*"Grinnell II"*); *In re Capital Underwriters, Inc. Secur. Litigation*, 519 F.Supp. 92, 98 (N.D.Cal.1981); *In re Equity Funding Corp. Secur. Litigation*, 438 F.Supp. 1303, 1325 (C.D.Cal.1977). Characteristically, defendants have no adversarial interest in fee petitions and no further interest in a fund that is composed of their contributions to settle an action.[6] Plaintiffs' counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial court judge to act with "a jealous regard to the rights of those who are interested in the fund" in determining what a proper fee award is. *Trustees*, 105 U.S. at 536.

■ The common fund doctrine permits the Court to "make fair and just allowances for expenses and counsel fees to [those] parties promoting litigation." *Id.*

The doctrine requires such awards to be made with moderation, *id.*, and to reflect the reasonable value of the attorneys' services that resulted in the benefits conferred on the class. *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 165 (3d Cir. 1973), *aff'd in part*, 540 F.2d 102 (3d Cir. 1976) (*"Lindy I"*); *Manual for Complex Litigation, Second*, § 24.12 (1985).

The Court has a great deal of discretion in deciding the amount of fees to be awarded. That discretion is not unrestricted, however. It must be exercised soundly, supported by meaningful reasoning, and be based on sufficient information. *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69 (9th Cir.1975); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 838 (9th Cir.1982); *Lindy I*, 487 F.2d at 166). Above all, the awarded fee must be reasonable. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley I")*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Just as the Court must avoid awarding "windfall fees," it must avoid any appearance of having done so. *Detroit v. Grinnell Corp. ("Grinnell I")*, 495 F.2d 448 (2nd Cir.1974); *Equity Funding*, 438 F.Supp. at 1325.

The determination of a reasonable fee requires the Court to assess the reasonableness of the amount requested in light of several somewhat conflicting rationales. First, fee awards must be adequate to ensure that attorneys will be motivated to undertake representation in class action litigation. *Equity Funding*, 438 F.Supp. at 1325; *Feuerstein v. Burns*, 569 F.Supp. 268, 271 (S.D.Cal.1983). At the same time it must be recognized that the opportunity to represent the class as lead counsel is judicially determined. Class representation is also characterized, in part, as containing an element of public service. This is particularly true of litigation such as this, which arose in the context of the federal securities laws. Those laws are remedial in nature, and private lawsuits to effectuate their statutory purpose of protecting inves-

---

6. This case presents perhaps the "rare" instance in which objections by Class members to fee petitions have been voiced. *See, Rothfarb v. Hambrecht*, 649 F.Supp. 183, 237 (N.D.Cal.1986).

tors are both necessary and important. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 2628–29, 86 L.Ed.2d 215 (1985); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

## METHODS OF FEE DETERMINATION

Courts have used different methods in making fee determinations. Some courts have awarded petitioning counsel a percentage of the fund. Others have adhered to the lodestar approach developed in *Lindy I* and refined in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. ("Lindy II"),* 540 F.2d 102 (3d Cir.1976), multiplying the hours worked by the normal billing rate of the attorneys and adjusting the result, through the use of a "multiplier," for "contingency" or "quality" considerations. This Circuit approves an approach that entails examination, in an orderly lodestar analysis, of factors referred to as the *"Kerr* guidelines." These guidelines were adopted "as appropriate factors to be considered in the balancing process required in a determination of reasonable attorney's fees." *Kerr,* 526 F.2d at 70. The approach that incorporates their consideration in the court's determination of a reasonable fee is described as a "blend" of lodestar and *Kerr* analysis. *Moore,* 682 F.2d at 838–40.

Class counsel urge this Court to adopt either the percentage-of-recovery or a "lodestar/multiplier" approach in making its fee award.

### Percentage–Based Fee Awards

■ Class counsel request a fee that is approximately 13.6% of the settlement fund. They contend that this would be a reasonable fee. Counsel suggest that the percentage method could be employed here either to determine their fee or, alternatively, to confirm the propriety of the amount they request. (The requested amount can also be computed by applying the requested multiplier to Class counsels' reported lodestar.) It is the first suggestion—use of the percentage method to *determine* a fee—that this section addresses.

A number of factors preclude use of this method. First, a variety of circumstances reveal that the percentage sought by Class counsel is, in fact, an artificial and fallacious figure. Class counsels' requested fee actually represents a percentage of the amount of settlement funds that were projected to exist at a future time. Defendants' settlement contributions amounted to a pre-interest total of approximately $690 million. The amount of fees requested by class counsel in this petition is approximately 14.9% of that pre-interest settlement amount. As a result of interest earnings, the settlement fund was expected to be approximately $757 million by December 1989.[7] That figure, thus, included some $67 million in interest. *It* was the amount used by class counsel to compute the requested percentage, however. As a result of continued accrual of interest after the date selected by Class counsel, the fund has substantially increased, and the percentage derived by comparing the amount requested to the increasing fund has correspondingly decreased.[8] Thus, even if the Court were to award the *amount* requested, using Class counsels' approach of applying the pre-interest amount of an award to an after-interest amount of the fund, the *percentage* calculated would be constantly diminishing. The Court rejects the "mov-

---

7. This date was optimistically projected as the date of likely distribution. *See In re Washington Public Power Supply System Secur. Litigation,* 720 F.Supp. at 1391 n. 6.

8. Class counsel have requested interest from January 1990 on the fee award commensurate with the interest earned on the settlement funds. *See* footnote 4. Thus, assuming a grant of interest on Counsel's award from January 1990, the percentage computed by comparing the increasing amount of any award to the increasing amount of the settlement fund would theo-

retically remain constant after that date. Because the 13.6% requested was initially based upon an already-increased settlement fund, however, such a comparison would be both artificial and inconsistent. Furthermore, as a result of the allocation to Chemical Bank of the *first* $43.5 million interest earned on the settlement fund after January 1, *1990,* the percentage awarded to Class counsel, expressed as a percent of funds available to the Class, would actually grow larger, during that initial earning period.

ing-target" aspect inherent in this approach, and further concludes that, ignoring other relevant factors, 14.9% more accurately describes the percentage of fees actually requested by Class counsel.

Other relevant factors also render Counsels' percentage computation fallacious. As a result of the allocation to Chemical Bank of $50 million of the settlement fund's principal, *See* Order dated August 15, 1990, fair treatment would require use of a figure amounting to $640,000,000, not $690,000,000, in computing the percentage to which Class counsels' request equates. This would further enlarge the percentage actually requested. Even this would not result in a valid figure, however. Class counsel petition for payment of a substantial amount of paralegal fees through the Chemical Bank expense reimbursement request. A determination of the total amount of fees requested by Class counsel would require inclusion of amounts that are related to paralegal fees in that petition. Similarly, fees petitioned for and awarded herein to non-Class counsel firms for work done on behalf of Class members would also require inclusion. Addition of these amounts to Class counsel's petition would significantly increase the requested percentage. Thus it would be misleading to contend that Class counsels' request even amounts to just 14.9% of the settlement fund.

Undeniably, application of an appropriate percentage to the settlement fund would provide an uncomplicated solution to this undertaking. A number of considerations preclude such a simplistic approach, however. Foremost among them is the requirement in this Circuit that the Court conduct an analytical evaluation to determine a reasonable fee.

Further, even assuming a percentage-based methodology were acceptable here, the Court finds insufficient guidance to prescribe an appropriate percentage. There is no rationale that would sustain the use of 13.6% (or 14.9%) as precisely the

appropriate percentage. Independent of other considerations, a figure of 16.3%, or 3.6%, or 36.1%, might just as well be urged. All of these numbers are arbitrary. Given the variances in the sizes of settlement funds, Class counsels' data, intended to demonstrate that the percentage they request is far less than the norm, aptly demonstrate the virtually impossible task of setting any particular percentage as a *proper* one.

While many sources indicate that a fee in the range of 20% to 40% may be typical, *see, e.g., In re TSO Financial Litigation,* Nos. 87–7903, 87–7961, 87–8302, 1989 WL 80316 (E.D.Pa.1989), or that, for example, 25%, or 30%, may be an appropriate "benchmark," *e.g., Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989), *citing Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 692 (M.D.Ala.1988); *In re Activision Secur. Litigation,* 723 F.Supp. 1373 (N.D.Cal. 1989), it cannot go unnoticed that the immense size of the settlement fund in this action far exceeds the amount of settlement funds in virtually all similar cases that counsel have cited and/or that the Court has reviewed. Just one percent of the settlement in this action is the equivalent of nearly seven million dollars. Every adjustment of .1% (1/10th of one per cent) in an applied percentage would result in a fee variance amounting to approximately $700,-000. A 5% modification in the percentage selected to compute an award would equate to a fee increase or decrease of almost $35,000,000.

Fee awards frequently do not fall in the "typical" range.[9] There is abundant authority that suggests that, as the amount of a settlement fund increases, the percentage of an award should decrease. The proper extent of a corresponding decrease has not been satisfactorily resolved, however, and the Court has found no authority that address a potentially appropriate percentage where the settlement fund is as

---

**9.** Even when fee awards are in, or exceed, the range, the circumstances are frequently quite different from those in this case. In one opinion cited in Counsel's brief, for example, a fee

equal to 50% was agreed to because counsels' requested lodestar would have exceeded the settlement fund. *Howes v. Atkins,* 668 F.Supp. 1021 (E.D.Ky.1987).

extraordinarily large as it is here. In the absence of specific guidance requiring the application of an appropriate percentage to a given settlement amount, thus, the Court is reluctant to apply *any* percentage in order to determine a fee award. That 20% to 45% of the fund may have been awarded in the "overwhelming number" of common fund situations suggests little if anything about what might be an appropriate award in this *uncommon* case.

The recommendation of the Third Circuit Task Force dictates against use of a percentage-based fee in this case. The Task Force, chaired by the Honorable H. Lee Sarokin, United States District Court Judge for the District of New Jersey, appointed Professor Arthur Miller of Harvard, as its Reporter. The Task Force recommended that, upon counsels' motion, or on the court's initiative, a percentage fee arrangement should be established, after arm's length negotiations, by the court and counsel early in the litigation. *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (1985). No motion was made by MDL 551 Class counsel, when the Task Force report was published, when the Class was certified, or at any other time during the litigation to establish a percentage fee arrangement satisfactory to the Court. The time to negotiate such an arrangement has passed. The element of contingency, crucial to such negotiations, is absent, and the incentives to be gained from the establishment of such a percentage have been foregone.

Furthermore, the Task Force observed that a pre-negotiated percentage would involve a sliding scale, dependent on the ultimate amount recovered, and would decrease with corresponding increases in the fund. In a footnote, the Task Force noted that negotiated percentage ranges might include relatively small percents. As an example, the Task Force cited the *Agent Orange* settlement, noting that plaintiffs' attorneys in that litigation were awarded over $10 million, a fee that equalled only about *six* percent of the settlement fund. *Id.* at 256. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y.1985), *aff'd in part and rev'd in part In re "Agent Orange" Product Liability Litigation*, 818 F.2d 226 (2d Cir.1987).[10] Here, the Court is faced with a fee request nearly ten times the *Agent Orange* award and a settlement sum about four times as large.

Class counsel also do not acknowledge the impact of existing fee agreements on other courts' decisions to grant percentage-based fee awards. Typically, the cases in which a fee was determined in this manner arose from situations in which a contingency fee arrangement provided guidance and supported a percentage-based fee award. *See, e.g., Graulty*, 886 F.2d 268; *Kirkorian v. Borelli*, 695 F.Supp. 446, 455 (N.D.Cal.1988). Such a situation does not characterize this litigation.

Counsel rely on a footnote in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), in attempting to persuade the Court that the percentage method is the "proper approach" to computing fees in common fund cases.[11]

---

**10.** The fee award in *Agent Orange* was not determined by the percentage-based method. Rather, the court conducted a thorough and laborious lodestar analysis. *See also Edmonds v. United States*, 658 F.Supp. 1126 (D.S.C.1987), in which a 5½% to 6% award for fees and costs on an approximately $22,000,000 fund was considered the "very minimum" reasonable.

**11.** *Blum* was a civil rights action, under Title 42 U.S.C. § 1988. The opinion reviewed the legislation authorizing the award of attorney's fees under the statute. The Court observed that "Congress directed that attorney's fees be calculated according to standards currently in use under other fee-shifting statutes:
'it is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights involved may be nonpecuniary in nature. The appropriate standards, see *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), are correctly applied in such cases as [citations omitted]. These cases have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys.'"
*Blum*, 465 U.S. at 893, 104 S.Ct. at 1546. The *Kerr* factors, required by the Ninth Circuit, are likewise based upon *Johnson v. Georgia Highway*.

The *Blum* footnote appears in a section of the opinion observing the general unacceptability of a fee enhancement for "results obtained" in litigation. The footnote appears to have been intended to demonstrate that use of a percentage-based fee could result in inadequate compensation to attorneys in federal civil rights litigation, where a fund might be small relative to the amount of effort required by attorneys to generate the fund.[12] Application of a percentage in such situations would not only result in insufficient compensation, but would also discourage 42 U.S.C. § 1988 litigation. *See Rothfarb*, 649 F.Supp. at 185 n. 1.

The *Blum* footnote indicates the Supreme Court's recognition that the percentage of recovery approach may have legitimate application in appropriate common fund cases. This may be so, for instance, where pre-existing contingent fee agreements provide for a specific percentage recovery. *See e.g. Graulty*, 886 F.2d at 272; *Kirkorian*, 695 F.Supp. at 446. It does not mandate such an approach. In appropriate circumstances, determination of reasonable compensation for creating a common fund may be accomplished by multiplying the number of hours reasonably spent by a reasonable hourly rate, and then enhancing that figure, if necessary, to account for the risks associated with the representation. *Graulty*, 886 F.2d at 272.[13] Where special circumstances indicate that a percentage recovery would be too large in light of the time spent on the case, or other relevant factors, the use of a benchmark percentage may properly be supplanted by a lodestar calculation. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990). This action, the amount of the settlement, and the accompanying fee and expense petitions, are replete with special circumstances that dictate against the application of a percentage. *See Florida v. Dunne*, 915 F.2d 542 (9th Cir.1990).

Finally, although the Ninth Circuit has not disapproved the use of the percentage of recovery approach in an appropriate case, *Kirkorian*, 695 F.Supp. at 455, it has certainly approved, if not required, the blending of the *Kerr* guidelines in a lodestar analysis in multidistrict securities actions such as this. *Moore*, 682 F.2d at 840 (approving the district court's blended approach in *Capital Underwriters*); *See also, Donnarumma v. Barracuda Tanker Corp.*, 79 F.R.D. 455, at 462 and n. 12 (C.D.Cal.1978).

*Blended Lodestar Analysis*

■ The Ninth Circuit has repeatedly held that it is an abuse of discretion for a district court to award fees without considering the *Kerr* guidelines. *Moore*, 682 F.2d at 838. The guidelines enumerate factors that should be considered in awarding fees. The court's consideration of at least some of the twelve guidelines helps to assure a meaningful review of fee applications. The twelve *Kerr* factors are:

(1) the time and labor required

(2) the novelty and difficulty of the questions involved

(3) the skill necessary to perform the legal services properly

(4) the preclusion of other employment by the attorney due to acceptance of the case

(5) the customary fee

---

12. Footnote 16 says: "Nor do we believe that the *number* of persons benefited is a consideration of significance in calculating fees under § 1988. Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation. Presumably, counsel will spend as much time and will be as diligent in litigating a case that benefits a small class of people, or, indeed, in protecting the civil rights of a single individual." *Blum*, 465 U.S. at 900, 104 S.Ct. at 1550.

13. *Graulty* did not present the appropriate circumstances for several reasons. First, a contingent fee agreement provided for a 30% award on a portion of the settlement awarded to certain estates (approximately $1.4 million). An fee award amounting to about 7% of the remaining common fund portion of the settlement (approximately $3.3 million) was therefore unreasonable. Further, it would have been virtually impossible to determine the number of hours expended to create the common fund that comprised 70% of the gross settlement.

(6) whether the fee is fixed or contingent

(7) time limitations imposed by the client or circumstances

(8) the amount involved and the results obtained

(9) the experience, reputation and ability of the attorneys

(10) the "undesirability" of the case

(11) the nature and length of the professional relations with the client, and

(12) awards in similar cases

*Johnson v. Georgia Highway,* 488 F.2d 714 (5th Cir.1974), adopted by the Ninth Circuit in *Kerr,* 526 F.2d at 69–70.

Application of these factors in the context of a lodestar analysis eliminates flaws that would exist if, instead, an independent application of either approach were undertaken. Use of the lodestar framework provides structure that is given flexibility through incorporation and consideration of the *Kerr* factors in the analysis. Use of the lodestar framework helps, for example, to avoid improper effects of redundancy in the *Kerr* guidelines. Use of the *Kerr* guidelines permits a meaningful evaluation of the reasonableness of the hours worked and the rates charged that is not achieved in a "pure" lodestar approach. Blending of the two methods thus permits a systematic and substantive analysis resulting in a determination of a lodestar figure that reflects the number of hours reasonably worked and the reasonable rates at which the hours were worked. *See Moore,* 682 F.2d at 839–41. A strong presumption exists that this figure represents a reasonable attorneys' fee. *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098; *Jordan v. Multnomah County,* 815 F.2d 1258, 1263 (9th Cir.1987).

Although the lodestar will normally provide full and reasonable compensation, in rare cases, marked by exceptional success, an enhanced award may be justified. *Blum,* 465 U.S. at 901, 104 S.Ct. at 1550. In such rare cases, the lodestar figure may

be adjusted as necessary in the circumstances. *Id.* at 888, 104 S.Ct. at 1543. Review of *Kerr* factors that are not subsumed in the lodestar remains, in this circuit, the appropriate procedure for considering a request for an adjustment to the lodestar. *See, e.g., Cunningham v. County of Los Angeles,* 879 F.2d 481, 486 (9th Cir.1988), *cert. den. Cunningham v. County of Los Angeles,* 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990); *Miller v. Los Angeles County Board of Education,* 827 F.2d 617, 621 (9th Cir.1987). Upward adjustments, or enhancements, to the lodestar are generally made through the use of multipliers.

Fee Enhancements—the Use of Multipliers

Historically, courts have stated a variety of reasons for their use of multipliers to adjust lodestar fee determinations. In *Blum* the Supreme Court narrowed the number of factors that had previously been used to support such adjustments in several important ways.[14]

*Blum* invalidated the use of a multiplier to support an upward adjustment of the lodestar to reflect the novelty and complexity of the issues and the special skill and experience of counsel. The Court observed that these considerations are fully reflected in a lodestar analysis: the former in the number of billable hours recorded by counsel, the latter in the reasonableness of counsel's hourly rates. *Blum,* 465 U.S. at 898–99, 104 S.Ct. at 1548–49.

Similarly, the "quality of representation" is also generally reflected in the reasonable hourly rate of counsel, and thus in the lodestar. *Id.* An upward adjustment for "quality" is appropriate only in the "rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to what one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'." *Id.* at 899, 104 S.Ct. at 1549. The level of performance necessary to qualify for a quality multiplier must be particularly outstanding where, as

---

**14.** Although *Blum* was a civil rights action, the opinion concerned the reasonableness of attorneys' fees. Much of the Court's reasoning is applicable to a common fund action such as this, where the requirement exists that, above all, attorneys' fees must be reasonable.

here, a limited fund is available. *Capital Underwriters*, 519 F.Supp. at 102.

Appraisal of the "results obtained," which is a particularly relevant consideration in civil rights litigation where a plaintiff succeeds only on some of his claims, is also generally subsumed in the lodestar figure. *Blum*, 465 U.S. at 900, 104 S.Ct. at 1549–50. It is measured by the benefit accruing to the client as a result of the attorneys' services. *See, e.g., Donnarumma*, 79 F.R.D. at 461. The *Kerr* "results obtained" factor is equivalent to the "degree of success" attained in litigation. Both criteria are therefore subsumed within the lodestar and ordinarily should not be used separately to justify an adjustment to it. *Cunningham*, 879 F.2d at 486.

The Ninth Circuit has adopted the *Blum* standards, and recognizes that each of these considerations is contemplated in the blended lodestar analysis. The results of the appraisal of all of the foregoing factors are subsumed within the lodestar, and the factors may not act as independent bases for adjustments of that presumably reasonable figure. *Cunningham*, 879 F.2d at 487, *Cabrales v. County of Los Angeles*, 864 F.2d 1454 (9th Cir.1988). Thus, after *Blum*, an adjustment of a fee award by use of a multiplier will be justified only in rare, exceptional instances. *Chalmers v. Los Angeles*, 796 F.2d 1205, 1215 (9th Cir.1986), *amd. Chalmers v. Los Angeles*, 808 F.2d 1373 (9th Cir.1987), *and* on remand *Chalmers v. Los Angeles*, 676 F.Supp. 1515 (C.D.Cal.1987).

Further refinement of factors that might justify use of a multiplier were delineated by the Supreme Court in *Delaware Valley I* and *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley II")*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). Like *Blum*, these opinions concerned statutory fee questions, but insofar as they address the reasonableness of a fee award, the decisions are applicable here. *See Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175 (9th Cir.1988).

The first *Delaware Valley* opinion further resolved the question of whether a court may enhance a fee award to reflect superior quality of representation. The opinion dealt with a post-*Blum* fee award in which an upward adjustment had been granted because it "was 'the rare case where the fee applicant offer[ed] specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional" ' " *Delaware Valley I*, 478 U.S. at 556, 106 S.Ct. at 3094. The Court reversed the application of multipliers, observing that the justification for multiplication—"the 'superior quality' of counsel's performance,"—was fully reflected in the lodestar. *Id.* at 567, 106 S.Ct. at 3089. Justice White observed that the fee-shifting statutes, including the one in question, were "not designed as a form of economic relief to improve the financial lot of attorneys." *Id.* at 565, 106 S.Ct. at 3098. The comment is applicable, also, to the federal securities laws.

The second *Delaware Valley* opinion dealt with the issue of whether the attorney for a prevailing plaintiff should or may be awarded separate compensation for assuming the risk of not being paid. *Delaware Valley II*, 483 U.S. at 715, 107 S.Ct. at 3081. That risk—the risk of losing—is determined by the amount the law is unsettled on the issues and the likelihood that the facts could be decided adversely for the plaintiff. *Id.* at 715–16, 107 S.Ct. at 3081–82. The risk is often described as a "contingency risk," and "contingency multipliers" have generally been the courts' means of adjusting a lodestar fee for such a risk.

The Ninth Circuit has provided a clear statement of the Supreme Court's decision in *Delaware Valley II*:

[A] majority of the Court held that enhancing a fee award for contingency is permissible if two prerequisites identified in Justice O'Connor's concurrence are met.... First, the fee applicant must establish that "without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" [Citation omitted.] Second,

any enhancement for contingency must reflect "the difference in market treatment of contingent fee cases *as a class*, rather than ... the 'riskiness' of any particular case." ... The fee applicant bears the burden of proving the degree to which the relevant market compensates for contingency. [Citation omitted.]

*Fadhl v. San Francisco*, 859 F.2d 649, 650 (9th Cir.1988) (*quoting Delaware Valley II*, (footnote and citations omitted). Justice O'Connor's concurring opinion constitutes the Court's holding in *Delaware Valley II. See Fadhl*, 859 F.2d 650 n. 1.

The record should provide evidence, and the trial court should specifically find, that plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market without an enhancement for risk. *Delaware Valley II*, 483 U.S. at 731, 107 S.Ct. at 3089–90.[15] The record does not reveal such a situation in this case. It is undeniable that most law firms would lack the economic and professional stamina necessary to sustain the long, uncompensated involvement required by this litigation. Nonetheless, the deliberate, almost aggressive, efforts to obtain and maintain instrumental roles in this litigation, demonstrated by the numerous firms whose time records are before the Court, is also irrefutable. Absent evidence to the contrary, the Court cannot find that substantial difficulties would have been encountered by these plaintiffs. The record indicates otherwise.

Any enhancement for risks unique to the case—i.e. the existence of new and novel issues, the protraction of litigation, the tenacity of defendants—should be reflected in the number of hours expended and in the hourly rates. They are impermissible bas-

es on which to increase an already reasonable lodestar. *Id.*

As with other enhancements, "enhancement for the risk of nonpayment should be reserved for exceptional cases where the need and justification for such enhancements are readily apparent and are supported by evidence in the record and specific findings by the courts." *Delaware Valley II*, 483 U.S. at 728, 107 S.Ct. at 3088 (*citing Blum*, 465 U.S. at 898–901, 104 S.Ct. at 1548–1550).

Finally, delay in payment is not an appropriate consideration for a risk enhancement. Delay in payment is, however, appropriately recognized in one of two ways: the fee award can be based on current rates, or the historically-based fee can be adjusted to reflect its present value. *Delaware Valley II*, 483 U.S. at 716, 107 S.Ct. at 3081–82.

In sum, after these three recent Supreme Court opinions, the Court's discretion to grant an enhancement or to apply a "multiplier" to a reasonable lodestar fee has been severely restricted. This case presents unique circumstances, however.

■ While I am keenly aware of the authorities holding that a multiplier is not a commonly accepted vehicle by which to enhance fees or reward counsel for their skill in handling novel and complex issues, I am mindful of the result obtained in this case and the fact that the quality of representation was exceptional. I have lived with this case for over five years. I have observed counsel in a variety of situations both first hand and through the quality of work presented throughout. I have observed the intensity of representation by defense counsel and I know that defendants' attorneys were of the highest quality that could

---

**15.** This requirement was met in *Fadhl*, where the evidence was clear that plaintiff had encountered extraordinary difficulty in retaining counsel. She had approached 35 attorneys before one agreed to represent her in the Title VII case. Additionally, such cases were economically unappealing to the local bar and required added compensation to attract competent counsel. *Fadhl*, 859 F.2d at 651.

The requirement was also met in *Hasbrouck v. Texaco, Inc.*, 879 F.2d 632 (9th Cir.1989),

where the district court indicated in its opinion and order that "it was impressed with testimony 'that competent counsel would not undertake representation of plaintiffs in [contingent fee antitrust cases] if they were *only* paid their regular hourly rates....'" Thus, without an adjustment for the risk of losing, plaintiffs "would have faced substantial difficulties in finding counsel in the local or other relevant market." *Id.* at 637, quoting *Delaware Valley II.*

have been arrayed against the resources of Class counsel.

This was a case of overwhelmingly unique proportions, in terms of the amount at issue, as well as the duration of time, numbers of witnesses, numbers of documents, and related matters that demanded the attention to minute detail of Class counsel. It was a rare and exceptional case involving extraordinary services on behalf of Class plaintiffs. I observed counsels' uncommon dedication and timely attention to the affairs of the Class. It became clear, during the development and course of the litigation, that the undertaking was vastly greater than had been anticipated by counsel when they originally sought and obtained the designation of lead counsel. Lead counsel were precluded from taking a lead role in other class action litigation during the near seven year pendency of this case. Consistent with professional responsibility, counsel unwaveringly fulfilled their duty of fidelity to the Class and obtained a result which is, at the very least, sufficient to satisfy the requirements regarding fairness of the settlement. For these reasons I believe that a fee enhancement, for the work of certain attorneys, is neither inappropriate nor proscribed.

A number of attorneys dedicated significant portions of their professional careers to this litigation. Some literally lived with the litigation for more than five years. They underwent personal hardships in the form of long and tedious hours, separation from families, relinquishment of community involvement, and renunciation of other professional pursuits. They devoted themselves to the action, and I believe it became, for some, more than just the mundane object of their work. It engrossed and absorbed their intellects, their energies and their talents. They championed the cause of Class members in the face of commanding and vastly outnumbering opposition. They maintained their tenacity in the face of uncertain victory. All of this was done with absolutely no guaranty of payment. They succeeded admirably. I believe their commitment is worthy of an award that reflects, not only the hours they reasonably worked, but also the unmeasur-able but substantial endurance, dedication and deprivations they experienced. The attorneys I deem deserving of monetary remuneration for these intangible aspects of the litigation effort will be indicated, through application of a multiplying factor to their lodestar award, at the conclusion of my lodestar determinations for each applicable firm.

## DETERMINATION OF THE LODESTAR

Determination of the lodestar under the blended method begins by equating the first factor in the lodestar approach, "hours spent," with the "time and labor required" element of the *Kerr* factors. Consideration of the novelty and difficulty of the questions involved will be subsumed in my determination of the required time and labor, in accordance with the guidance provided by the Supreme Court and the Ninth Circuit. The skills necessary to conduct the litigation and the experience, reputation and abilities of the attorneys will weigh heavily in my evaluation of the reasonableness of the rates reported by counsel. The amount involved and results obtained, the nature of the fee, and the desirability or undesirability of the case will also be considered in connection with the appropriate rates and the establishment of a reasonable lodestar. *See, Moore*, 682 F.2d at 839–40 n. 12, *Copeland v. Marshall*, 641 F.2d 880, 890 (D.C.Cir.1980).

I will undertake this process, after some comments about the fee petitions in general. I will then set out certain broad guidelines that were used in reviewing the petitions. Thereafter, I will discuss each firm's separate petition and will indicate, for the work of each attorney for whom payment has been requested, my decisions regarding the hours reasonably expended and the reasonable rate or rates. The sum of these individual attorney lodestar amounts, for each firm, will constitute the firm's reasonable lodestar award for attorney work. Thereafter, in a similar manner, I will indicate my decisions regarding each firm's petition for reimbursement for work done by paralegals and/or law clerks. Finally, I will consider and indicate my deci-

sions regarding the expense petitions of every firm, the WPPSS Litigation Fund, and Chemical Bank.

*General Comments Regarding the Fee Petitions*

 Counsel bear the burden of submitting adequately-documented fee applications. Those who fail to, do so at their own risk. *Equity Funding,* 438 F.Supp. at 1327. The burden of proving entitlement to fees out of a common fund rests on the petitioner. *Capital Underwriters,* 519 F.Supp. at 102. Attorneys undertaking representation in common fund cases—including many of those attorneys and firms whose petitions are now before me—have long been on notice of the critical importance of maintaining accurate time records. *E.g., Donnarumma,* 79 F.R.D. at 464; *In re Continental Illinois Secur. Litigation,* 572 F.Supp. 931 (N.D.Ill.1983); *Capital Underwriters,* 519 F.Supp. at 104; *In re Fine Paper Antitrust Litigation,* 98 F.R.D. 48 (E.D.Pa.1983), *affd. in part and revd. in part In re Fine Paper Antitrust,* 751 F.2d 562 (3rd Cir.1984); *Rothfarb,* 649 F.Supp. 183. Lead counsel firms involved in this litigation have been admonished by other courts regarding the necessity of providing adequate documentation of attorneys' time. *E.g., Feuerstein v. Burns,* 569 F.Supp. 268; *Continental Illinois,* 572 F.Supp. 931. In countless opinions of other district and appellate courts, moreover, other petitioning firms have similarly been advised of this need. The requirement is neither novel nor unduly burdensome.

What *is* unduly burdensome, however, is the task that is left to a court as a result of vague, imprecise, illegible, meaningless and generally inadequate records reflecting counsels' undertakings. The records before this Court contain, to one degree or another, a multitude of such infirmities. The Court has struggled with the records, and has given counsel much latitude in its review. Nonetheless, bearing in mind the burden that rests on counsel, in my analysis I have resolved the uncertainties that remained, where the records were simply inadequate to do otherwise, against peti-

tioners and in favor of Class member claimants to the settlement fund.

*Class Counsels' Fee Petition*

Class counsel submitted several documents with their initial fee application. The Declaration of Lead Counsel is primarily a detailed description of the history of this litigation. A small portion of the document, pages 113 to 120, concerns Class counsels' $103 million fee request. The twenty-five separate Lodestar Declarations contain, for each petitioning Class counsel firm, seven or eight paragraphs that provide the following limited and repetitive information:

1. The declarant's firm affiliation and reason for the declaration.

2. The firm's relation to the litigation. Generally, petitioning firms are counsel of record for one of the class representatives. A number of class representatives have more than one firm as counsel of record.

3. A brief description of charts, attached as Exhibits A, and a statement that the charts were prepared from contemporaneous, daily time records regularly prepared and maintained by the firm.

4. A statement that Exhibits B contain a brief biography of the firm.

5. The firm's total number of hours spent on the litigation and the total "lodestar" amount for attorneys' and paralegal time.

6. The total amount spent in connection with the litigation, and information (sometimes in a separate paragraph) regarding the firm's contribution and/or reimbursement from the WPPSS Litigation Fund. Following this is a short list of the categories and amounts of disbursements for which reimbursement is sought.

7. A statement that "[t]he expenses incurred ... are reflected on the books and records of the firm. These books and records are prepared from expense vouchers and check records and are an accurate recordation of the expenses incurred."

Exhibits A to these declarations contain lists of each firm's attorneys, paralegals, and law clerks who worked on the litigation, their total hours (generally through March 1989), their billing rates (generally as of August 1988), and the multiplied "lodestar" for each. The charts also contain a breakdown of reported hours among the following ten categories.

(A) Preparation of Pleadings, including preparation of complaints and related research;

(B) Document discovery;

(C) Depositions, interrogatories, and related work;

(D) Preparation of motions and briefs;

(E) Court appearances and preparation;

(F) Expert related work and damages;

(G) Lead counsel duties and class administration, including proof of claim procedure and communications with class members;

(H) Trial and trial preparation;

(I) Settlement analysis, negotiations and documentation;

(J) Appellate work.

Except for a very broad indication of the general orientation of the work of the applicants, these charts provide little meaningful information. They were prepared after-the-fact, through a review of time records, at the time the fee petitions were prepared. In at least some cases, the categorization was done by clerical employees. For reasons that will become evident, the accuracy of any such summary prepared in retrospect from the petitioning firms' time records is dubious, at best. Several firms did not categorize all employees' time and at least one firm substituted even less meaningful categories than the standard ten.[16]

Even assuming any real accuracy in the categorization, the amount of time included in each of the ten categories encompasses time spent in that general litigation area, regardless of the nature of any particular activity. A given category, therefore, includes time that may have been spent on research, reading, review, drafting, telephone conversations, discussions, meetings, travel, and myriad other tasks. No summary was provided to describe the amount of time applicants spent in any of those activities, although daily time records often provided such a description.

One perhaps valid conclusion can be drawn from a compilation of all Class counsels firms' time categorization summaries: At the time the initial petitions were filed, over half of Class counsels' time on this litigation involved discovery, depositions and expert witness work. An additional 17% of applicants' time related broadly to the preparation of pleadings, motions, and briefs. About 13% of their time was attributed to preparation for and attendance at court hearings and trial. Approximately 10% of attorney and paralegal time was spent by 19 petitioning firms on "lead counsel duties and administration of class matters."[17] Settlement activities absorbed about 5½% of the time charged.

Exhibits B to the individual Class counsel firms' declarations vary significantly in both size and content. They contain biographical information regarding the legal activities of some of the petitioning attorneys and of the firms themselves.

In addition to the exceedingly abbreviated information supplied in class counsels' declarations and in the bi-monthly "Lodestar Reports" that had been submitted under seal throughout the litigation, petitioning firms were required provide the Court with copies of contemporaneous records prepared to reflect the expenditure of every attorneys' time. Those detailed records, supplemented by the declarations and bi-monthly reports, and aided by my familiarity with the lawyers and litigation, were used to determine the nature of the work and the reasonableness of the time and labor expended by Class counsel attorneys, paralegals, and law clerks.

---

**16.** One firm accounted for half its summarized time simply as "meetings, correspondence or conferences" and "miscellaneous."

**17.** The majority of this time was charged by five firms. However, significant amounts of time were allocated by other firms to this category, as well.

*Haberman and AMBAC Petitions*

The fee petitions submitted by *Haberman* counsel and by the law firm of Foley and Lardner vary, both among themselves and compared to Class counsels' rather uniform declarations. Those petitions contained some of the best, and some of the worst, documentation submitted. They will be discussed, to the extent necessary, subsequently.

## GUIDELINES USED IN REVIEWING THE PETITIONS

The amount received as a result of the settlements in this litigation was enormous. The time investment and skill levels required to achieve the sum were correspondingly high. The petitions request payment for more than 200,000 hours of work performed by almost 600 different attorneys and paralegals, not counting those paralegals whose work is reflected in the Chemical Bank expense reimbursement request. The task of determining the reasonableness of the hours and work claimed has not been easy. It has been aided by certain guidelines, however.

*The Time and Labor Required*

The overriding principle guiding review of these petitions was that the attorneys' efforts must have provided a benefit to Class members. In order to be eligible for payment of fees out of it, the work must have been undertaken to create, protect or preserve the common fund.

The vast size and scope of this litigation were responsible for much duplication in effort. Numerous separate complaints were filed by many petitioning law firms on behalf of claimants who ultimately became class representatives. Prior to consolidation of the cases, the naming of lead counsel, and the resultant coordination of efforts, thus, a certain amount of duplication was unavoidable. Reasonable amounts of time charged in connection with the preparation and filing of the multiple number of complaints have accordingly been allowed. Needless duplication of effort was unjustified, however, and I have reduced many such time charges, both before and after consolidation, accordingly.

Document discovery accounts for vast portions of the time charged. This aspect of the litigation, which began in earnest in 1984, was immense. Many of the attorneys petitioning herein worked for months on end in connection with plaintiffs' review of tens of thousands of documents produced by the many defendants in this action. The Court is, of course, realistic about the nature of document discovery and, in a similar vein, deposition preparation. I have not penalized counsel engaged in these pursuits simply for their use of generic terminology to describe their work in connection with such endeavors. Certain reductions have been made to the amounts of time charged to such activities, however, to reduce obviously excessive reported hours to reasonable, productive, amounts.

 More than 300 depositions of fact and expert witnesses were taken. Many were brief; others went on for weeks. A vast amount of preparation time was charged, sometimes inexplicitly, for these sessions. Some reductions have been made where time records were too indefinite, or where time charges appeared unreasonable. Occasional reductions have been made where it appeared that too many attorneys charged time for attendance at depositions, or where attorneys charged time for their attendance where it had no ostensible purpose. Time spent in depositions of class representatives, in preparation for them, and on summarization of them, was generally deemed to have accrued to the benefit of the Class, and was allowed. Many time charges that related only to a firm's client and were of no apparent benefit to the Class as a whole, have been disallowed, however.

 In connection with discovery and depositions, and with other events, counsel did enormous amounts of travelling. Occasionally, attorneys noted that they worked en route. Sometimes it was evident that the full amount of lapsed time was not recorded by the attorney. As a rule, however, recorded hours clearly reflected the entire duration of time that attorneys were in transit. With a few exceptions, stem-

ming from specific time entries that required different treatment, therefore, travel time has been reduced by 50%. I am mindful that travel demands took attorneys away from their families and other aspects of their practices, and that travel exacts a toll when regularly undertaken. I do not mean to make light of the fact that many attorneys often worked for significant periods of time while in transit. Rather, I am taking a common sense approach to the effectiveness of work, often conducted after a full day's endeavor, that was accomplished in transit. I believe that the percentage allowance more fairly represents the benefit to the Class of the time and effort expended by Counsel while in the distracting and disruptive process of transit. While the result may be somewhat harsh for a few attorneys, or, for others, on a few occasions, that impact is more than offset by the many instances in which little or no work was done in transit.

For similar reasons, time charged for conferences and meetings conducted over meals has been reduced in many instances by approximately 50%.

■ Inadequate documentation was perhaps the single major cause of the Court's modifications to the requested time and tasks. Many contemporaneous entries were deemed unreasonable, and have been adjusted to reflect reasonable amounts of time for necessary work. Time charges have been disallowed in their entirety in many instances. For example, time simply accounted for as "t/c" or "tel call" or "discussion" or "meeting," where absolutely no other information was provided regarding either the subject matter or other participant (or participants) in the activity, has not been valued as having provided any measurable benefit to the class.

Time attributed only to "review of pleadings" or "read papers" or to similar review of other generically named, or unnamed, documents has been discounted or disallowed altogether in many cases. While it is acknowledged that, for example, Lead

Counsel were required to stay generally informed about everything that occurred in the litigation, the same need did not exist for other Counsel, particularly those whose time charged in the action involved *only* such activities. Therefore, excessive or inessential expenditures of time on such activities have been eliminated.

■ Significant reductions have been made in the amounts of time charged by several dozen senior members of a number of petitioning firms. Occasionally these reductions eliminated such partners' lodestar charges in their entirety. The action was clearly top-heavy with senior level partners whose involvement was frequently unnecessary and inappropriate. Nearly 20% of the petitioning attorneys had rates in excess of $250 an hour. Approximately 40% were partners in their firms. Many such individuals contributed little or no work of ostensible value to the litigation. Usually their time records were inexplicit. Sometimes they were incomprehensible. Generally, they were among the most unsatisfactory and substandard ones submitted. In many instances, several (sometimes more) senior level partners of a single firm charged time for what were clearly simple conversations regarding the "status" or "progress" of the litigation. Often these individuals reported absolutely no involvement in the litigation aside from such conversations or occasional review of papers. The Court certainly appreciates the need and value to be derived by counsels' interaction. Vast amounts of such interaction occurred among and between co-counsel who were actively involved in, and informed about, the litigation. Most such charges have been approved. Nonetheless, the extent of intra-firm (and occasionally inter-firm) communications involving senior level members of petitioning firms who contributed little or no measurable input to the case, was clearly immoderate, excessive, and unacceptable. When viewed as a whole, the time records suggest abusive and reprehensible billing practices in this regard.[18]

18. Because of the duplication inherent in most of the conversations reported by such individu-

als, credit has often been received for the time,

The length of time charged to particular tasks was regarded bearing in mind the status of the individual undertaking the task. Occasional reductions were made to the amount of time charged where work was undertaken by a senior level attorney who, because of his or her level of expertise, should have accomplished the work in less time than what was charged.

"Block" entries where many hours in a single day were attributed to, for example, "document review," have been scrutinized for reasonableness. Block entries for periods in excess of a day have generally been reduced and occasionally disallowed entirely in accordance with counsels' unmet burden of showing that the time was reasonably spent to the benefit of the Class.

One of the greatest difficulties encountered in analyzing the reasonableness of time spent by counsel on their diverse activities stemmed from the almost routine practice of listing multiple undertakings and attributing a single amount of time to them. The practice is improper and could result in the disallowance of applicants' requested payments. However, it is fair that attorneys receive payment for the work they did that resulted in the benefits bestowed on the Class. If the Court were to impose the fitting penalty for this imprudent timekeeping practice in this case, few attorneys would receive payment for anything approaching the amount of time they report. Recognizing that the burden is on the attorney to provide adequate time records, the Court contemplated the merits of returning counsels' records and requiring proper supporting documentation. An attorney's after-the-fact review and reflective judgment as to the time actually devoted to each different undertaking would not have been more reliable, in my view, than my own, however. The aging daily records contain the most detailed information now available. I therefore used my judgment in determining whether the total time attributed to multiple itemized tasks reflected a reasonable amount of time for the described tasks. Where it did not, the time charge was accordingly reduced.

I have eliminated or reduced many time charges where descriptions accompanying the recorded hours were essentially meaningless.[19] Charges by attorneys who were not significantly involved in the litigation effort, where the activity tended only to provide the inactive attorney with general information, were also disallowed. Charges with no description of any kind of activity have naturally been disallowed. Where an undertaking was insufficiently described, but apparently valid, it was viewed in the context of the attorney's surrounding charges, and reasonable allowance was made after contemplating any meaning that could be derived in the larger context.

■ Time charged to prepare Counsels' lodestar reports, to prepare the fee petitions, to respond to requests for meaningful information supportive of amounts requested, and to urge approval of the firms' fee petitions has been disallowed. Time charges to these activities varied dramatically among petitioning firms. Some firms charged little or no time. Other firms charged exorbitant amounts, particularly in view of the sparse amount of meaningful information provided. While such charges may be appropriate in the context of, for example, bankruptcy and statutory fee cases, they are inappropriate in common fund cases such as this, because such undertakings confer no benefit on the Class. *Nucorp,* 764 F.2d at 661–62; *Grinnell II,* 560 F.2d at 1102; *Lindy II,* 540 F.2d at 111. Lead Counsel have, however, been permitted reasonable allowances for their work in coordinating the efforts of Class counsel who seek remuneration for their activities in the litigation.

A number of mathematical errors in counsels' bi-monthly reports and in the summary data presented in the Declarations, were corrected. This Order reflects

---

albeit in connection with the participation of another, more involved, attorney.

**19.** The Court does not refer here to counsels' use of initials and acronyms. Such "personalized" entries, while bothersome, were ultimately comprehensible.

those corrections without necessarily identifying them. A necessary amount of testing was done to verify that reported lodestar totals were supported by daily time entries. Where disparities were identified, appropriate adjustments were made to the reported amounts.

Finally, it must be recognized that it is not possible for a court to evaluate every hour or portion thereof that is claimed in a fee petition such as this. Although the Court reviewed every individual's time records with care and thoroughness, it did not scrutinize every individual entry. Separately described time charges in these attorneys' contemporaneous time records ranged from 1/10th of an hour to more than 20 hours in a given day. Where fee applications are voluminous, as they are here, it has been recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in the application. *Arizona v. Maricopa County Medical Soc.*, 578 F.Supp. 1262, 1269 (D.C.Ariz.1984), quoting *New York Asso. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983).

Courts have utilized and approved percentage cuts as a realistic means of "trimming fat" from fee petitions. *Id.* This Court has, where necessary, adopted such a practice. Such reductions have been made only where abusive timekeeping practices were, in my judgment, clearly evident and extreme. The percentages selected to achieve the reductions in such cases varied according to the nature and/or extent of the abuse. The reductions decreased the time charges for reported activities to reasonable amounts.

### Paralegal Time and Labor

Paralegal work has been considered separately in determining the lodestar of each firm. The work of law clerks was assessed with that of paralegals, which it more closely resembled, rather than with the work of attorneys. In reviewing the approximately 27,000 hours of reported paralegal and law clerk work, I applied guidelines much akin to those applicable to attorneys' time records. The general standard consistently applied was whether the individual's work provided a benefit to the Class.

Secretarial, librarian or clerical work was occasionally included in the time records of paralegal personnel. Most firms did not charge time for such tasks, but where they did it has generally been disallowed. Firm members' billing rates take into account the cost of such work, along with that of other office personnel, expenses and profit. *See Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989). Clients are not billed for these kinds of undertakings; the Class should not pay for them, either.

### The Novelty and Difficulty of the Questions

The total amount of time charged for particular undertakings was not viewed in isolation. The issues in the case were neither straightforward nor simple. Many unsettled legal issues were involved. Difficult factual questions challenged plaintiffs' counsel, and new ground was broken on countless matters. The complexities created by the presence of more than one hundred defendants complicated every undertaking and necessitated enormous amounts of counsels' time in every activity from service through settlement. Plaintiffs' claims against these multiple defendants varied, and defendants' legal positions were even more diverse. Successful conduct of the lawsuit required the participation of many highly skilled and specialized attorneys as well as great expenditures of time because of the new and difficult problems encountered. Those skill levels and time expenditures are reflected by the lodestar.

### The Results Obtained and Amount Involved

In determining fee awards in class actions, it is especially important that judges not be unduly influenced by the monetary size of the settlement. *Grinnell II*, 560 F.2d at 1099. A sizable settlement can reflect a number of factors in addition to the prestige, skill and vigor of Class counsel. *Id.* Thus, it is imperative that

the amount of this settlement—the measure of the results obtained in the litigation—be viewed from the proper perspective and in the context of all relevant circumstances.

The settlement sum, over $690 million before interest, is enormous. As a means of appraising the results of this litigation, however, the settlement figure cannot merely be contemplated in isolation. To be meaningful in the instant context, the settlement amount potentially accruing to the benefit of the Class must be adjusted to reflect several allocations of portions of the fund to non-Class members. It must be reduced to reflect the allocation of $50 million of principal to Chemical Bank for the Bond Fund, agreed to by Class counsel in the Plan of Allocation. This amount partially recognizes Chemical Bank's role throughout the litigation and its contribution to the achievement of settlement. It must also be recognized that, although some prior interest earnings accrued to the benefit of the Class, Class members will see virtually no benefit from interest earned on the settlement fund since January 1, 1990, until after $43.5 million additional interest has been earned by the fund.[20] That amount, plus any subsequent interest earned by it and by the other $50 million allocated to Chemical, is dedicated under the Allocation Plan to the Bond Fund. Thus, a fairer statement may be

that the relevant sum—the amount available to Class members and to counsel for their fees and expenses—is approximately $590 million plus some interest.[21] The amount is still extremely high.

High, too, were the losses that brought about this litigation. Ignoring interest lost on Class members' investments (itself an enormous amount), and accepting calculations utilized by Counsel in the Allocation Plan, Class Plaintiffs' reported losses on the $2,250 million ($2.25 billion) Supply System Project 4/5 bonds at issue approach $1,470 million ($1.47 billion)[22]. Because the bonds were purchased for the interest they promised, this calculation gravely understates the monetary devastation that many Class members feel.[23]

In addition to observing that the amount received in settlement was substantial, and certainly unprecedented in sheer size, therefore, the Court is faced with the inescapable fact that the extraordinary amount appears far more modest when viewed in relation to the injuries sustained by Class members, particularly those many individuals who invested their life savings. Depending on the time of distribution, pre-Termination Class members are expected to recover only about 40% of their computed, "allowable" losses. Post-termination purchasers will recover only about 24% of theirs.[24] Class members' recoveries will

**20.** Under the Allocation Plan, Chemical Bank will receive the first $43.5 million earned after January 1, 1990, on the total settlement fund (which includes interest earned prior to January 1, 1990) less $175 million. The Court ordered that $175 million be set-aside to accommodate the pending fee and expense petitions when the Allocation Plan was developed. That figure appeared to accommodate the maximum amount of fees and expenses then requested. Interest earned on the $175 million has not been requested by Chemical Bank, and interest earned on any differential between $175 million and the amount actually awarded for fees and expenses will, under the Allocation Plan, be available for distribution to Class members. Class counsel have petitioned for interest earned by the $175 million on the amount of fees and expenses awarded them.

**21.** Counsel are expected to request additional fees for litigation undertaken in connection with assigned insurance rights. Additional settlement sums may be generated as a result of

that litigation, as well. The Court's assessment of the amount involved is confined to the settlement sum and fee petitions now before it, with due recognition that the *potential* for additional sums as a result of insurance litigation was one of the results obtained in the primary MDL 551 settlements.

**22.** The Plan assumes a selling price of $22 for bonds unsold as of June 15, 1983. The Allocation Plan also ignores foregone interest in calculating losses.

**23.** The measure of damages was never fully resolved in this litigation, and there was very real potential for a jury award, if any, at substantial variance with Class members' perceived losses.

**24.** This figure, referred to as "allowable losses" in the Plan of Allocation, is the difference between the purchase and actual or imputed selling price. The percentages have limited mean-

not include any amount attributable to lost interest on their investments. The recoveries are fair, adequate and reasonable, however, in light of the claims and defenses in this action.

*The Rates Charged*

Petitioning firms, with few exceptions, report firm members' services at rates that were in effect in August 1988. Where attorneys left a firm prior to submission of the petition, the last rate of the attorney was used to develop the firm's reported lodestar. Both kinds of rates will be referred to, for convenience, as "current" at the time the petition was filed.[25]

Class counsel say little about these rates except that they are the attorneys' "regular hourly rates" and their "hourly billing rates." I accept Class counsels' declarations that these figures represent the customary fees charged to fee paying clients as of the stated date, and I regard them as representative of rates prevailing in counsels' communities for similar services by attorneys of comparable skill, experience and reputation. As such, the rates requested by Class counsel are, with several significant exceptions discussed hereafter, presumed to be reasonable.

Three attorneys from three law firms were appointed by the Court on September 1, 1983, to act as co-lead counsel for Class Plaintiffs in this litigation. Those three attorneys were instrumental throughout the duration of the litigation. They, and members of their firms, along with counsel for Chemical Bank, dominated the litigation and provided the legal and management skills necessary to the conduct and coordination of this massive action on behalf of Class Plaintiffs. These attorneys, and their firms, were at all times responsive to the Court's needs. They anticipated and accomplished prompt and proper resolution of myriad administrative matters; they coordinated the efforts of Class counsel and, to some extent, of other petitioning firms, on both legal and administrative activities; they provided direction and generally kept the litigation on track.

These three attorneys—Mr. Paul Bernstein of Bernstein Litowitz Berger & Grossman, Mr. Melvyn Weiss of Milberg Weiss Bershad Specthrie & Lerach, and Mr. James Irwin of Shidler McBroom Gates & Lucas—rendered valuable services that required the application of highly specialized skills in excess of those required of other attorneys involved in this action who played lesser roles. Many of those other attorneys' regular billing rates, in comparable markets, approach or exceed the rates of co-lead counsel. I do not question the appropriateness of such attorneys' rates in regular matters in which they have greater autonomy and responsibility. Every firm has provided, in Exhibit B of its Declaration, or elsewhere in the case of non-Class counsel, ample evidence of the fine experience, reputation and abilities of its attorneys. I do not believe, however, that attorneys who undertook lesser roles in this litigation, roles that did not require the utilization of all of the skills that co-lead Counsel were called upon to exercise, should recover at their normal rates, which include a premium for specialized and/or leadership skills that were frequently not required of them in this litigation. As a result, a number of attorneys' rates have been reduced to levels that reflect the more limited skills required here to be utilized by non-lead counsel.

The rates charged by the petitioning attorneys vary tremendously and reflect the range of skill, experience and abilities of the petitioning attorneys. The highest hourly amount requested is $375; the lowest amount is $50. Some rates appear disproportionately low because they were in effect early in the litigation, when the attorney's only work was performed, and have not been increased in petitioners' applications because the attorney subsequent-

ing, in that the settlement sum, upon which they are based, includes interest earnings since July 1, 1990 until a projected date of distribution; the loss figures are, however, fixed, and include no interest. Thus, the longer distribution is delayed, the larger the recovery percentages will become.

**25.** In fact, many firms observe that their rates have increased since August 1988.

ly left the firm. Although there are exceptions, partners' rates generally range from a low of $125 to the high of $375. Associates generally report rates below $200.

Mr. Weiss' regular billing rate at the time the petition was filed was $350 an hour. Mr. Bernstein's rate was $315, and Mr. Irwin's was $200. The disparity among these rates is, in part, attributable to the geographic location of the attorney's firms. Messrs. Weiss and Bernstein were both partners in New York City firms. Milberg Weiss Bershad Specthrie & Lerach also has an office in San Diego, California. Both attorneys, and the members of their firms, had comprehensive experience with securities and class action litigation. Shidler McBroom Gates & Lucas is located in Seattle, Washington, where this action was centered. Mr. Irwin and members of his firm have had significant leadership experience in a variety of legal pursuits.

I find that co-lead counsels' regular rates establish a ceiling for rates appropriate for the skills necessary to perform the work undertaken by non-lead counsel in this particular action. Adjustments have been made to the reported hourly rates of such counsel where their regular rates exceed the rates appropriate for their work in the litigation. The adjustments reflect the skills necessary to perform the work that was actually done. They take into consideration, as well, the experience, reputation, ability and geographic area of practice of the particular applicants.

Several other adjustments have been made in appropriate instances in connection with reported rates. It is widely acknowledged, for example, that any given task must be performed by an individual with the skills appropriate to the particular activity. *See, e.g., Equity Funding,* 438 F.Supp. at 1330; *Fine Paper,* 98 F.R.D. at 83. Evaluation of the reported work included a determination that it had been done by an individual whose abilities and experience were commensurate with the task. The extreme example of abuse of this principle occurs where a senior partner undertakes a task that could, and should, be accomplished by a paralegal, or a clerical employee, but nonetheless charges the time at senior partner rates. Some instances of this kind of abuse were identified in some firms' time records. Other less dramatic instances indicating similar misuse of personnel were reflected, as well. In such cases I have reduced the rate of the individual performing the tasks to reflect a rate appropriate to such undertakings.

Adjustments to requested rates were also made in several other circumstances. A number of attorneys provided services as associates for some period of time. Subsequently, they became partners in the same firm. Because the nature of work undertaken by an associate differed (or should have differed) from that undertaken by a partner, the fee petitions for such attorneys have been adjusted to reflect the hours worked as an associate at a rate commensurate with associate rates current for the firm at the time the petition was made, rather than at the partner rates that were generally petitioned for.

Adjustments were also made to reflect more consistent and reasonable rates in a few situations where attorneys left petitioning firms but continued to do significant work in the litigation for other extant and active Class firms. I believe the worth of such attorneys' work, to the former firm and to Class members, should be determined consistent with the way it would have been determined had the attorney not changed firms. Thus, I have applied a presumed current rate to the hours reported by the former firms for the work of such persons, rather than the individuals' reported last-earned rates at the firms.

*Paralegal Rates*

Nearly all firms included paralegal and law clerk work in their reported lodestar calculations. The hourly rates used to derive the firms' reported lodestars for such work ranged from $20 to $85 per hour. These amounts reflect billing rates, rather than the cost of the services. They have generally been accepted as reflecting reasonable amounts for allowable work performed. *See Missouri v. Jenkins,* 109 S.Ct. at 2472.

*The Nature of the Fee*

 The sixth *Kerr* factor—whether fee is fixed or contingent—is to be considered in setting the lodestar. This circuit has recognized that there is a vast amount of confusion in the case law regarding contingent fees and contingent, or contingency, adjustments to the lodestar. *Chalmers*, 796 F.2d at 1212 n. 4. Contingency adjustments are different from contingency fee arrangements. *Id.* There was no contingency fee arrangement in this case. Nor, clearly, was there a fixed fee. Nonetheless, receipt of any fee was clearly contingent on plaintiffs' receiving a jury award or upon resolution of the litigation through settlement. This condition is typical of class action securities litigation such as that practiced routinely by most petitioning firms. Their customary rates presumably reflect this fact. It can be fairly assumed that this litigation would not have been pursued by these knowledgeable and experienced attorneys unless, in their view, there was distinct probability that they would recover at least an amount necessary to compensate them for their efforts. Some of the earliest undertakings in this litigation included Counsels' investigation into the insurance coverage of defendants. That coverage was ultimately the source of much of the settlement proceeds. Settlement efforts were, according to counsels' time records, undertaken early, as well.

While there has been delay associated with payment for counsels' work in this action, much as in contingent fee litigation, the impact of that delay has been largely diminished through the use of current rates in the fee petition. Use of those rates, augmented by the application of interest on the fee award retroactive to January 1, 1990, will, in my view, eliminate relevant negative economic effects of delayed payment. Because I have determined to utilize current rates in computing the lodestar, delay in Counsels' receipt of payment has been fully compensated through the date of the initial petition. I further consider the rates utilized herein to be reasonable as of the date of this Order. Increases in the billing rates of petitioning firms subsequent to August 1988 have accordingly been disregarded.

Finally, counsel must recognize that the amount of time required to assess this fee application was caused, in large part, by the morass of information they provided. The absence of meaningful summaries, the submission of inadequate and disorganized time records, and the almost complete absence of supporting documentation for expense reimbursement requests greatly aggravated and increased the Court's work and time requirements, which are constrained because of finite resources. Furthermore, because of the pending appeal of the merits, neither the settlement fund nor the fee award may yet be distributed.

Thus, this *Kerr* factor, if applicable at all, does not impact my lodestar determination, except perhaps to leave it unchanged.

*The Desirability or Undesirability of the Case*

 Time records indicate that involvement this case was highly desirable to many of these applicants. This type of litigation is the bread and butter of many petitioning firms. There was no want of Counsel seeking the opportunity to lead the litigation efforts, and no apparent lack of personnel to maintain the undertaking. Tremendous potential for considerable work and sizable fees existed. The predictable delay in receipt of payment, characteristic of such cases, was substantially offset through Chemical Bank's funding of most of the litigation expenses and many of the legal endeavors. The WPPSS Litigation Fund, implemented by counsel, also minimized the monetary investment required of two of the three co-lead counsel firms. Most firms' involvement in this litigation, it can be anticipated, can and should make impressive additions to their biographies. For all of these reasons, this factor does not negatively impact the lodestar.

*Preclusion of Other Employment*

 Lead counsel were required not to accept a lead counsel position in any other case until the conclusion of the MDL litigation. Lead counsel and the seven attorneys

who composed the "Core Group" [26] that managed particular areas of the case under their direction dedicated all or much of their professional lives to this litigation for almost six years. Their time records reflect this commitment.

### The Nature and Length of the Professional Relations with the Client

This *Kerr* factor has no particular relevance in this class action. It may, perhaps, explain the involvement of several firms whose members were presumably approached by private clients in connection with bond purchases.

### Time Limitations Imposed

■ Time limitations impacted this litigation, just as they do any lawsuit. Deadlines were frequent, but the Court always attempted to allow adequate time. Discovery was massive, but a multitude of attorneys took part in it. Chemical Bank's participation, and its maintenance of the Data Center, aided Class counsel's discovery efforts immeasurably. Generous briefing schedules were authorized and the Court willingly extended deadlines when Counsel requested. Vast numbers of depositions were taken in a relatively short period of time, but countless attorneys were available to prepare for and take them. Certainly there was a greater *number* of deadlines and crises, and more marathon work sessions, than in a typical action, but the legion of attorneys available to cope with those circumstances was correspondingly great. Undeniably, the matter was difficult, wearing and time consuming. Those conditions are reflected in the lodestar through the number of man-hours worked. *See Delaware Valley II*, 483 U.S. at 730, 107 S.Ct. at 3089.

### Awards in Similar Cases

The protracted amount of time required, the considerable number of attorneys and paralegals involved, the vast scope of discovery, the extraordinary expenses incurred, the immense settlement fund, and the enormous amount of fees generated in this case greatly surpass those of nearly every other case of its type. I find that contemplation of this *Kerr* factor is not, therefore, particularly helpful. There are few, if any, truly similar cases; I have found *no* cases with similar fee or expense requests.

### EXPENSE REIMBURSEMENT REQUESTS

In addition to the requests for payment out of the settlement fund for the work of attorneys and paralegals, counsel seek to recover money expended in connection with their representation of Class members throughout the course of the litigation.

By far, the most significant portion of litigation expenses was borne by Chemical Bank, under an agreement with counsel for Class Plaintiffs. The petition for those expenses amounts to more than $51,700,000. My decisions regarding that petition are indicated in the section entitled "Chemical Bank Expenses," which appears at the conclusion of the following lengthy section contemplating the fee and expense petitions of the petitioning Class counsel law firms.

Aside from the expenditures of Chemical Bank that benefitted Class members, each of the petitioning law firms seeks to recover expenses incurred in connection with its own efforts on behalf of Class members. The firms' initial petitions for recovery of these expenses were inadequate. Little, if any supporting information was provided to document the reported expenses. Most were described in the firms' declarations by a single word or phrase, many of which had little or no meaning.

Although the succinct and uninformative presentation of Class counsel firms' petitions was uniform, there were vast incon-

**26.** These attorneys were: Alan Schulman and Len Simon of Milberg Weiss Bershad Specthrie & Lerach; Jeffrey Klafter of Bernstein Litowitz Berger & Grossman; Steve Berman for Bernstein Litowitz Berger & Grossman and Shidler McBroom Gates & Lucas; David Binney of Shidler McBroom Gates & Lucas; Mike Kipling of Graham & Dunn; and Allan Peckel. In addition, Michael Meehan of Molloy Jones & Donahue was named a member of the "Core Group" after the case was transferred to Tucson.

sistencies among the categories and groupings of expenses. Sometimes large reimbursements, for expenditures described only as "miscellaneous," were requested. Sometimes dissimilar expenses were combined in a single reported sum. The requested reimbursements were complicated by disparate and deficient reporting of counsels' "contributions" or reimbursements to and/or from the WPPSS Litigation Fund, and by the skeletal information initially provided by the Litigation Fund itself.

The Court required supplemental information to support a number of reported expenditures and, in some cases, all of the required information was still not provided. A number of mathematical errors had to be corrected, and submitted documentation did not always support categories or amounts initially reported. Overall, the expense reimbursement requests submitted by Class counsel were appalling. It is somewhat incredible that many of these firms would provide such inferior documentation to support their often substantial requests.

When the petition was submitted, the twenty-five Class counsel firms and the WPPSS Litigation Fund requested, in the Declaration of Lead Counsel, a total of $2,336,438 for expenses. Additional information submitted with supplemental lodestar reports and corrections of errors in the initial petition adjusted the total amount requested through December 31, 1989, to $2,482,584.40.

The following chart indicates the amounts sought by Class counsel and by the WPPSS Litigation Fund, through December 31, 1989, in accordance with the broad nature of the expenses, after reclassification by the Court. Figures have been rounded to the nearest hundred dollars.

| Nature of Expense | Amount Requested |
|---|---|
| Travel, Hotels, Meals | $1,268,100 |
| Reproduction and Printing | 395,500 |
| Postage, Express Mail, Delivery | 218,800 |
| Research Services | 180,500 |
| Telephone | 172,100 |
| Court, Transcript and Witness Fees | 139,600 |
| Overtime Payroll Expense | 59,100 |
| Temporary Personnel, Word Processing | 25,700 |
| Supplies and Publications | 17,500 |
| Legal Services | 4,200 |
| Miscellaneous | 1,500 |
| TOTAL | $2,482,600 |

A number of normal litigation expenses do not appear above. Many expenditures, such as expert fees, were funded in whole or in part by Chemical Bank. They will be discussed subsequently.

In addition to the preceding, substantial expense reimbursement requests were also submitted by *Haberman* and AMBAC counsel.

## LODESTAR FEE AND EXPENSE AWARDS

Beginning with co-lead counsel firms, and proceeding alphabetically, the following sections reflect the results of the Courts's analyses and decisions regarding each Class counsel firm's reasonable attorney and paralegal lodestar award. Immediately following those decisions is a discussion of each firm's expense reimbursement request and allowance. Amounts awarded for expenses have been rounded to even dollar amounts. Although all reported information has been painstakingly examined, the discussion focuses on those requests that have been disallowed by the Court as a result of its review. Following the discussion of Class counsel firms, the Court discusses the expense petition of Chemical Bank and, finally, the requests of AMBAC counsel and the *Haberman* petitioners.

## BERNSTEIN LITOWITZ BERGER & GROSSMANN

The New York City law firm of Bernstein Litowitz Berger & Grossmann ("Bernstein Litowitz") applies for an award of fees for the work of fourteen attorneys whose rates at the time of the petition ranged from $115 to $315 an hour. When the petition was submitted, the firm reported a total of 30,021.5 attorney hours worked, for a reported attorney lodestar total of $6,877,697.50. Subsequent reports for work performed after March 10, 1989, raised the firm's reported total attorney hours to 30,775.25 (approximately 15 work-years), and its attorney lodestar to $7,090,526.25. None of this firm's supplemental

reported time through December 31, 1989, will be deferred for later consideration. Substantially all reported hours pertained directly to the primary MDL 551 litigation and settlement and are therefore contemplated in connection with this petition.

The firm's involvement in the litigation began in February 1983 and continues at this time. The firm is counsel of record for plaintiff Henry Puchall, one of the class representatives in the action. Mr. Paul Bernstein of the firm was named Chairman and co-lead counsel for Class Plaintiffs in September 1983. Members of the firm, particularly Mr. Bernstein, took lead roles throughout the litigation.

With few exceptions, the firm's daily time records were handwritten by each petitioning attorney, rendering the Court's evaluation of each person's participation somewhat time-consuming. With a few minor exceptions, the firm's reported number of hours was supported by the cumulative amounts recorded on its individual members' daily time tickets.

### Paul M. Bernstein

Bernstein Litowitz Berger & Grossmann petitions for 12,232 hours at the rate of $315 an hour, for a total lodestar of $3,853,080 for the work of Paul Bernstein, co-lead counsel throughout the duration of the litigation. The Court was deeply saddened to learn of the death of Mr. Bernstein in August of this year. His leadership in this litigation was invaluable, and his courtesy in all matters before the Court was exceptional. The number of hours Mr. Bernstein worked in the litigation was exceeded by the hours of only one other attorney. Few days passed during the course of this litigation that Mr. Bernstein did not work on it. He frequently worked six, and occasionally seven, days a week. His daily time tickets reflect amounts of less than one hour to more than fourteen hours worked in a day. Typically his daily charges averaged between four and six hours, though many days' charges, when

the litigation was particularly intense, exceeded that range.

Regardless of the number of tasks reported in a single day, only one total time amount was indicated for that day's work. Because Mr. Bernstein undertook numerous different tasks in a given day, this practice made the Court's appraisal of the reasonableness of any of Mr. Bernstein's individual activities somewhat difficult and necessitated the Court's use of estimates for the time devoted to separately listed tasks.[27] His work descriptions were relatively specific, however, and this facilitated the process somewhat.

The type of work performed by Mr. Bernstein covered the spectrum of activities undertaken by attorneys in the litigation. It included virtually all functions, from research through settlement negotiations. He was involved, to some degree, in nearly every activity that transpired. Although he engaged, to a limited extent, in discovery and deposition activities, in preparation of briefs, and in other kinds of work that are appropriately performed by more junior attorneys, most of Mr. Bernstein's time was properly dedicated to management of the litigation efforts. The Court does not fault him for his broad participation, which provided him, as co-lead counsel, the necessary ability to monitor and direct the combined efforts of Class counsel. He participated in nearly all hearings, and, in his role of lead Counsel, was responsive to the Court's requests and solicitous of its needs. He undertook to coordinate the efforts of other Class counsel firms to ensure compliance with the Court's orders. Although the subject matter of telephone conversations was often not specified in his time records, the names of the individuals with whom he spoke were routinely disclosed and meaningful. Legal papers were generally identified by name, and the activity undertaken in connection with them (drafting, revising, reviewing, etc.) was normally indicated and appropriate to his role. His other activities were also meaningfully described.

---

**27.** Mr. Bernstein cannot be singled out for this practice. It was the norm for almost all petitioning attorneys in all firms.

Except for the following, the Court is satisfied that the number of hours reported by Mr. Bernstein reflects a reasonable amount of time expended to properly fulfill the significant and demanding leadership role that he assumed in this litigation.

Mr. Bernstein undertook a substantial amount of travel, particularly between New York and Seattle. When he traveled he generally indicated in his time records that he worked on specific matters en route. The Court's review of his daily time records, which, because of Mr. Bernstein's practice of combining all activities into a single daily time charge, necessitated approximations of the amount of time spent travelling, indicates that he requests payment for more than 675 hours spent in transit. The Court has reduced this figure by 338 hours, in accordance with the guidelines previously described. The Court is of the opinion, for the reasons stated, that the lodestar amount attributable to the 338 hour reduction (in excess of $100,000) should not be borne by Class members because of the distractions and disruptions inherent in travel, even if work is performed.

The Court has reduced by 30 hours, for similar reasons, the amount of time reportedly spent by Mr. Bernstein at lunch and dinner conferences with co-counsel.

Finally, more than 250 hours were charged by Mr. Bernstein to Class members for work done in connection with Class counsel's fee petition. All but 25 hours of this time will be disallowed in accordance with the guidelines adhered to in the Court's review. The Court finds that 25 hours represents a reasonable time allowance to achieve the necessary coordination associated with Class counsel's petitions. The remainder of the time charged not only provided no benefit to Class members; it provided only the minimum amount of information necessary to the Court, and then only after it was specifically requested.

In accordance with the foregoing, Mr. Bernstein's lodestar, based on 11,639 hours reasonably spent at his customary fee of $315 per hour, is $3,666,285.

*Jeffrey Klafter*

██ Bernstein Litowitz petitions for 8,609.25 hours at the rate of $185 an hour for the work of Jeffrey Klafter, a partner. The computed lodestar reported for Mr. Klafter's work is $1,592,711.25.

Mr. Klafter was an associate in the firm from the time he began working on the litigation until he became a partner in early 1988. His rate as an associate was between $130 and $160 per hour. He was a member of the "core group."

Vast amounts of Mr. Klafter's work involved preparation for and participation in depositions. Much time was spent analyzing documents. At the time of his advancement to partner, he had completed most of his work in this action. The level of the work performed by Mr. Klafter was not altered significantly thereafter. Much of his later work involved research and drafting of memoranda. The Court believes that $175 per hour, the high associate rate at the time of the firm's petition, is a fair and reasonable rate for Mr. Klafter's work throughout the litigation.

Mr. Klafter listed a variety of activities for a single amount of time, though it was not unusual for him to prepare more than one such ticket if he undertook numerous activities in a given day. Charges of 9 to 13 hours were typical, and time charges on many days exceeded even those amounts. Much of Mr. Klafter's work was conducted in the company of other attorneys who also charged time for the same activities.

The Court's review indicates that there is a grave probability that both overstatement of time productively spent and/or excessive expenditures of time are reflected in Mr. Klafter's time records. This is consistently suggested, whether the charge is for a relatively brief task such as a telephone call, or for a 14-hour day preparing for depositions. Thus, the Court will reduce by 15% the total number of hours otherwise allowed for Mr. Klafter's work. This reduction will result in a reasonable figure for the time spent by Mr. Klafter on activities that provided a benefit to Class members.

The following reductions, in accordance with the guidelines previously described, are also regarded as reasonable: fifty percent of estimated travel time, 189 hours; fifty percent of meal conferences with co-counsel, 45.25 hours; 13.5 of 14 hours charged on 6/27/84 for two telephone calls with co-counsel; 6.5 hours charged to the preparation of time reports; and 8 hours spent doing paralegal level tasks on 11/4/83, 3/23/84 and 4/26/84. These 8 hours will be paid at a rate of $50 per hour.

In accordance with the foregoing, Mr. Klafter's lodestar, based on 7,095 hours reasonably spent at the firm's associate rate of $175 per hour, is $1,241,625. In addition, the paralegal work referred to above will be paid in the amount of $400. The total lodestar award for the reasonable value of the work performed by Mr. Klafter is, thus, $1,242,025 for 7,103 hours work benefitting Class members.

### Steve W. Berman

Mr. Steve Berman became an associate of the Bernstein Litowitz firm in March 1986, when he left Shidler McBroom Gates & Lucas. The Bernstein firm petitions for payment for 6,924 hours of work performed by Mr. Berman at the rate of $155 an hour, for a total lodestar amount of $1,073,220. Separately Shidler McBroom Gates & Lucas petitions for an additional 4,650 hours at an hourly rate of $120, or $558,000, for Mr. Berman's work. Like Mr. Klafter, Mr. Berman was a member of the "core group" and spent a vast amount of time in deposition-related work. Mr. Berman was extensively involved in the preparation of numerous briefs and participated in several Court hearings. Many of his daily charges exceed 8 hours, and charges of between 9 and 14 hours are relatively frequent. The single daily sum of time indicated generally includes various tasks.

Mr. Berman charged at least 587.5 hours in travel time, frequently indicating that he "worked en route." Although Mr. Berman's time tickets generally include travel time in a single figure, along with other work performed during the day, it is evident that he routinely charged Class members for the total amount of time he spent in transit. A number of trips occurred in November 1988 and January 1989, between Tucson, Arizona, the trial site, and Seattle, Washington, the location of Mr. Berman's office. His time entries indicated no specific purpose for these frequent trips, and the Court has therefore disallowed payment for 45 hours of travel time in that period. The remaining 542.5 hours spent in transit will be reduced by 50% in accordance with the Court's guidelines for review of these fee petitions.

Nearly 80 hours were charged to activities associated with counsels' fee petition work. The Court will allow 8 of these hours, as a reasonable estimate of the time necessary for Mr. Berman's work, as a member of the co-lead counsel firm of Bernstein Litowitz, to consolidate and coordinate the fee petitions of co-counsel.

Some 31 hours of "wind up" work at the Seattle data base in January 1989 will be allowed at a paralegal rate of $50.

 The routine appearance of extremely large daily time charges suggests, for Mr. Berman as it did for Mr. Klafter, a standard practice that involved the recording of "clocked hours" rather than restricting time charges to the actual time productively spent on essential litigation activities of benefit to Class members. Thus, a reduction of 12% of the balance of 6,504.75 otherwise allowable attorney hours will be made, reducing to 5,724 the total number of hours reasonably charged to work of benefit to Class members during the three years that Mr. Berman worked for the Bernstein Litowitz firm. These hours will be allowed at the rate of $155 per hour, for a total fee for attorney work of $887,220. In addition, the firm will receive payment for 31 hours of Mr. Berman's work at a paralegal rate of $50, for a total of $887,770.

### Rochelle F. Hansen

 Bernstein Litowitz petitions for 1,908.5 hours at the rate of $165 an hour, for a total lodestar of $314,902.50 for work done by Rochelle Hansen, an associate.

Ms. Hansen's time was largely spent on document production and review, and in preparation for depositions. She also worked on several briefs, fielded telephone calls from Class members, and assessed correspondence and claim information. Her daily time charges for these activities were relatively modest.

Ms. Hansen charged approximately 54 hours to work related to timekeeping and time reporting activities between September 1984 and February 1989. Six hours of this time will be allowed, at a paralegal rate, as reasonable and necessary to the administrative activities of lead counsel.

■ A two-hour deduction will be made for time charged on 5/2/85 to a conference call with the Court. The call was attended by other attorneys in the firm, and Ms. Hansen's presence was presumably unessential to Class members. An additional 10.5 hour reduction in the time charged will be made to adjust for the recurring inadequate entries of "review correspondence," "correspondence," or "review mail," included in the activities listed on Ms. Hansen's daily time tickets. This reduction has not taken into account those entries where a purpose was included in the description, or where a particular document or documents of relevance to the litigation were identified.

In accordance with the foregoing, Ms. Hansen's lodestar, based on 1,842 hours reasonably spent at an associate rate of $165 per hour, is $303,930. In addition, the firm will receive $300 for 6 hours allowed for the paralegal tasks identified above.

*Max W. Berger*

■ Bernstein Litowitz petitions for 358.75 hours at the rate of $275 an hour, for a total lodestar of $98,656.25 for time charged by Max Berger, a partner.

It is difficult to perceive that substantial benefit accrued to Class members as a result of Mr. Berger's described activities. In 1983, his time records indicate that he spent approximately 30 hours solely on "review of case" and review of "newspaper articles," "SEC documents," and "Complaint." Thereafter, almost all remaining time was attributed to "consideration," "strategy," "discussion," "conference" or "meeting." Other participants in these reported deliberations were rarely mentioned. When they were, they were generally other partners in the Bernstein Litowitz firm. The subject matter of the conversations or reflections concerned the "status of the case," "developments," "settlement prospects," "staffing" and other general themes. Most conversations, from early 1985 onward, concerned prospects for settlement of the litigation. A number of charges were to "settlement review," "strategy re: settlement" or, often, simply to "settlement."

Mr. Berger's time charges to the above activities almost invariably ranged from .5 to 2 hours, and such amounts were charged regularly until the conclusion of the litigation. He also read several memoranda, Court orders and other documents.

The Court does not mean to disparage the importance of settlement negotiations, or indeed the value of settlement strategy, to this litigation. It was, after all, ultimately resolved in that fashion. However, the Court is unable to conclude that the thought processes and conversations evidenced by Mr. Berger's inexplicit time records substantially contributed to the achievement of those goals. It is, however, probable that some advantage arose out of his communications with Mr. Bernstein that led to the settlements ultimately achieved. The Court will grant what it perceives to be a reasonable allowance for such presumed benefit.

For Mr. Berger's settlement efforts, the firm of Bernstein Litowitz is awarded the sum of $22,000, representative of 80 hours of his time reasonably expended to the benefit of Class members.

*Edward A. Grossmann*

■ Bernstein Litowitz petitions for 298 hours at the rate of $260 an hour, for a total lodestar of $77,480 for work done by Edward Grossmann, a partner.

According to his time records, the value to Class members of Mr. Grossmann's involvement in this litigation was limited. A significant portion of his time was charged

to conferences with co-lead counsel, particularly his partner, Mr. Bernstein. Generally, the subject matter of the "conference" was provided but no other work was performed by Mr. Grossmann in the subject areas. He appears to have drafted some interrogatories and worked on at least one brief. He also participated in and prepared for several depositions and assisted in the development of proof of claim procedures.

Assessment of Mr. Grossmann's time records was made difficult because of his frequent omission of verbs. It was impossible to discern *what* he did with various documents that were simply named as the entire daily time entry. For example, on 12/9/87 one hour was charged to "letter of credit w/ underwriters." On 1/23/87, 1.5 hours were charged to "memo in support to [illegible] member of absent class deponents." The Court was unable to determine whether he read, reviewed, drafted or discussed such documents. Accordingly, time for such entries, unless it was described in the context of other days' entries within the time period, was not allowed.

The Court will allow, as reasonable, 80 hours of time charged by Mr. Grossmann to reported undertakings at the rate of $260 per hour, as follows:

For conferences with co-counsel on various matters where other work was not performed by Mr. Grossmann—8 hours. This time is permitted in recognition of the benefit from such discussions that may have accrued to the other, more involved participant, generally Mr. Bernstein, and thereby to Class members.

For work on interrogatories—3 hours. This is a reasonable amount of time for an attorney of Mr. Grossmann's level to spend on such a task.

For work in opposition to motion to dismiss—4 hours, for the reason stated above.

For work on the complaint against rating agencies—3 hours.

For work done in connection with depositions—40 hours.

For work done in connection with proof of claim procedures, including time spent in meetings with the Settlement Master,

Professor Junius Hoffman. Such meetings were also attended by Mr. Bernstein.—18 hours.

For insurance-related work in May and June of 1989—4 hours.

The reasonable lodestar value of Mr. Grossmann's work is, accordingly, $20,800.

### Ronald Litowitz

Bernstein Litowitz petitions for 130.25 hours at the rate of $275 an hour, for a total lodestar of $35,818.75 for time charged by Ronald Litowitz, a partner.

Assessment of Mr. Litowitz' time records, hindered by their near illegibility, led the Court to the conclusion that the activities of this Bernstein Litowitz partner provided little or no meaningful benefit to Class members. Charges of .25 to 1 or, occasionally, more hours were routinely made to activities described only as, for example, "conf w PMB re progress of case," "meet w EAG & PMB," "conf w PMB re en banc brief on § 17," "settle conf w PMB," "w PMB re settle w U [presumably Underwriters]" and "TC w PMB re settle." Similarly, Mr. Litowitz' occasional Court attendance, his brief appearance at a deposition, and his occasional review of memoranda or other documents cannot be seen as having provided any ostensible benefit to Class members.

While the input of Mr. Litowitz in their frequent conversations may well have been worthwhile to Mr. Bernstein, the Court will not, and cannot, based on the information before it, assume that the work reported by Mr. Litowitz benefitted Class members in any other substantial way. An allowance of $9,900 will be awarded for 36 hours of Mr. Litowitz' time in recognition of the value his counsel provided Mr. Bernstein, and thereby the Class.

### Lawrence C. Browne

Bernstein Litowitz petitions for 92.5 hours at the rate of $175 an hour, for a total lodestar of $16,187.50 for work done by Lawrence Browne, an associate.

Mr. Browne's work primarily involved research and drafting of legal memoranda. The time is adequately described and the time charges are reasonable for the nature

of the work. The firm is awarded the lodestar amount reported.

### James L. Kainen

Bernstein Litowitz petitions for 101 hours at the rate of $115 an hour, for a total lodestar of $11,615 for work done by James Kainen, an associate. Mr. Kainen's work was undertaken early in the litigation and included initial research and communications regarding the initiation of the action and the preparation of a complaint. Some of his work also concerned document discovery.

With the exception of 1.25 hours charged to an in-house conference on the last day he worked on the litigation, and a 1.5 hour adjustment to reflect agreement with the supporting documentation provided to the Court, the reported lodestar amounts are considered reasonable and beneficial to Class members. The firm is awarded $11,298.75 for 98.25 hours of Mr. Kainen's work.

### Joseph B. Mellicker

Bernstein Litowitz petitions for 39.25 hours at the rate of $135 an hour, for a total lodestar of $5,298.75 for work done by Joseph Mellicker, an associate.

Mr. Mellicker's work involved research and preparation of memoranda, and is reasonable as reported.

### Penny P. Domow

Bernstein Litowitz petitions for 31 hours at the rate of $140 an hour, for a total lodestar of $4,340 for work done by Penny Domow, an associate.

Ms. Domow's involvement in the case was short-lived and inconsequential. Although her practice of allocating time amounts to each listed activity was both unusual and commendable, much of her time reviewing mail and other unspecified documents and conferring with co-counsel was of no apparent benefit to Class members. For her research regarding judicial recusal, of perhaps potential conceivable value to Class members, the Court will allow 4 hours at her reasonable rate, for a lodestar of $560.

### Michael J. Meagher

Bernstein Litowitz petitions for 30.5 hours at the rate of $140 an hour, for a total lodestar of $4,270 for work done by Michael Meagher, an associate.

Mr. Meagher's work involved research on various subjects. Ten hours of his work appears to have concerned only the Bernstein firm's client, rather than Class members overall. The Class will not be charged for this work, which provided no apparent benefit to its members.

Sixteen hours is a reasonable allowance for the remainder of research conducted by this attorney. Mr. Meagher's lodestar is, accordingly, $2,240.

### Richard A. Speirs

Bernstein Litowitz petitions for 16 hours at the rate of $135 an hour, for a total lodestar of $2,160 for work done by Richard Speirs, an associate.

Most of Mr. Speirs' work involved pertinent research and will be allowed. However, 3.5 hours charged to his review of the complaint appears excessive and redundant, given the nature of his subsequent research, and 2 hours of his time devoted to discussions with others in the firm about unrelated or unspecified topics cannot be assumed to have benefitted the class.

Bernstein Litowitz is awarded $1,417.50, the reasonable value of 10.5 hours of Mr. Speirs' research time.

### Daniel L. Berger

Bernstein Litowitz petitions for 4.25 hours at the rate of $185 an hour, for a total lodestar of $786.25 for work done by Daniel Berger, a partner.

Except for one hour, payable at a paralegal rate for lead counsel administrative tasks, Mr. Berger's involvement in this action was insubstantial and provided no apparent benefit to Class members. For his distribution of a Court Order to lead counsel, the firm will receive $50.

The following table summarizes the foregoing lodestar awards determined reasonable for compensable work of attorney members of the Bernstein Litowitz firm.

## BERNSTEIN LITOWITZ BERGER & GROSSMANN ATTORNEY

| | HOURS | | LODESTAR | |
|---|---|---|---|---|
| Attorney | Request | Award | Request | Award |
| Bernstein | 12,232.00 | 11,639.00 | $3,853,080.00 | $3,666,285.00 |
| Klafter | 8,609.25 | 7,103.00 | 1,592,711.25 | 1,242,025.00 |
| Berman | 6,924.00 | 5,755.00 | 1,073,220.00 | 887,770.00 |
| Hansen | 1,908.50 | 1,848.00 | 314,902.50 | 304,230.00 |
| Berger, M. | 358.75 | 80.00 | 98,656.25 | 22,000.00 |
| Grossmann | 298.00 | 80.00 | 77,480.00 | 20,800.00 |
| Litowitz | 130.25 | 36.00 | 35,818.75 | 9,900.00 |
| Browne | 92.50 | 92.50 | 16,187.50 | 16,187.50 |
| Kainen | 101.00 | 98.25 | 11,615.00 | 11,298.75 |
| Mellicker | 39.25 | 39.25 | 5,298.75 | 5,298.75 |
| Domow | 31.00 | 4.00 | 4,340.00 | 560.00 |
| Meagher | 30.50 | 16.00 | 4,270.00 | 2,240.00 |
| Speirs | 16.00 | 10.50 | 2,160.00 | 1,417.50 |
| Berger, D. | 4.25 | 1.00 | 786.25 | 50.00 |
| Totals | 30,775.25 | 26,802.50 | $7,090,526.25 | $6,190,062.50 |

I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of the following individuals. An increase of their lodestar awards will accordingly be made as indicated.

For the work of Mr. Bernstein, the firm will receive a multiple of 1.4 times the lodestar amount, for a total award of $5,132,799.

For the work of Mr. Klafter, the firm will receive a multiple of 1.2 times the lodestar amount, for a total award of $1,490,430.

For the work of Mr. Berman, the firm will receive a multiple of 1.2 times the lodestar amount, for a total award of $1,065,324.

*Paralegals*

In addition to the hours reported for attorney members of the firm, Bernstein Litowitz Berger & Grossmann applies for an award for the work of a law clerk and 15 paralegals on the litigation. When the petition was submitted, a total of 2,248.25 paralegal hours were reported. The figure increased to 2,441.25 hours with the submission of supplemental reports for work performed through December 31, 1989. Rates ranging from $35 to $80 per hour were utilized in determining the lodestar for the work of these people. Their reported lodestar, as of December 31, 1989, amounted to $129,640.

The firm's single law clerk reported 473.5 hours at a rate of $80 per hour, primarily for research and writing on several legal topics pertinent to the litigation. The work was adequately described and appropriately documented in daily time records. The time charges and rate were reasonable and the work will be allowed at the reported lodestar amount of $37,880.

Over half of the remaining reported lodestar (approximately 1,000 hours with a lodestar of $52,450) entailed work associated with time reporting and the firm's fee petition. The amount requested for this work is excessive, in addition to being of dubious benefit to Class Members. In recognition of the work that the firm did in connection with the coordination and administration of time and expense reporting in its role of lead counsel, however, the Court will allow a reasonable lodestar of 400 hours at a rate of $50 an hour, or $20,000, for this work.

For the remainder of work done by the paralegal staff of Bernstein Litowitz, the Court will allow a lodestar of $47,500 for 950 hours reasonably accruing to the bene-

fit of Class Members. Several time entries reflecting work descriptions including such things as "mailing" or "administrative" have been disallowed.

## Paralegal Award

For paralegal work undertaken by the law clerk and staff of Bernstein Litowitz, thus, a reasonable lodestar of $105,380 for 1,823.5 hours will be awarded.

## Expenses

Bernstein Litowitz reported a gross amount of $386,425.40 in expenses in connection with the firm's litigation activities.

## Travel

Over half of the firm's expenditures— more than $201,000—were made in connection with out-of-town travel. Although the expenses were initially inadequately supported, excellent documentation was subsequently submitted to substantiate the amount requested for reimbursement of firm members' out-of-town travel expenses. The information was sufficient to permit the Court to determine and assess the nature and purpose of all such expenditures. The amounts claimed included air travel, hotel and meals for attorneys working out of town. Apartment rentals in both Seattle and Tucson were also included when counsel were required to be in those locations for extended periods of time. The rental of such facilities was cost-effective compared to the use of hotels. The Court finds that the firm's travel expenditures were necessary to the litigation effort and approves them.

## Local Meals and Transportation

■ A separate category of expenses totalling approximately $8,400 was reported for firm members' and employees' local meal and transportation expenses. Many of those expenditures appeared to be incurred by individuals in connection with overtime work. Others were charged by firm members who either worked through lunch, went to lunch together (where time records indicated that they sometimes "conferred" or "met" about the litigation), or worked extended hours in their home location. Such meal charges will not be paid by Class members. Overtime meals, if firms elect to pay for them, are an expense of operation. Local meal expenses of professional firm members, particularly in the absence of more formal meeting arrangements than those evidenced by the firm's records, are personal expenses. They will not be charged to the Class. A deduction of $4,535 for such meal charges identified in the firm's supporting documentation will accordingly be made.

## Communications

The second highest type of expense incurred by the Bernstein Litowitz firm— more than $100,000—involved the costs of postage, couriers, overnight delivery, telephone and telefax communications. Although seemingly high, the costs arose as a result of the firm's position as co-lead counsel. They will not be subjected to reduction.

## Overtime

■ Bernstein Litowitz reports a total of $13,260 in overtime expense. This cost of the firm's operation will be disallowed. Just as secretarial and clerical services are not proper subjects for payment by Class members, neither are surcharges associated with such services. In making its determination that billing rates were reasonable for this firm—and for other firms—the Court took into consideration the need to pay such overhead expenses.

## Reproduction

■ A further deduction will be made to the amounts reported by Bernstein Litowitz, as it will be made for most other firms, for the expense of photocopying.[28] Initially, the firm imposed a charge of 15

28. The reductions that have been made are necessarily somewhat subjective. A number of factors have been contemplated in determining the amounts deemed reasonable. They include the firm's per-page rate or rates charged, the time periods during which those rates were charged, the time periods during which the firm's litigation activities took place, the firm's activities in the litigation, and the volume of copying reflected by requested amounts. Although most firms have established a "cost" per page for photocopying, the Court finds that the rates were generally excessive in the context of this litigation.

cents per page for in-house copies. The charge increased in January 1987 to 20 cents, and again in March 1989 to 25 cents. The Court considers the per-page charges, and the resulting $44,200 assessment to Class members, excessive. That this amount may be charged to regular clients by the firm, or that it is "standard" in the firm's area of practice, is not controlling. Class members will not be assessed an amount that produces a clear and unwarranted profit for the firm. While it is not possible—either for the Court or counsel— to establish a "true" cost for photocopying in this action, a reasonable allowance of approximately $26,500 for in-house copying expense of Bernstein Litowitz will be permitted.

## Other

The remaining expenses of Bernstein Litowitz are relatively moderate, reasonable in the circumstances, and will be allowed.

### Expense Award

In accordance with the above, an award of $350,930 will be made to Bernstein Litowitz for expenses reasonably incurred by the firm through December 31, 1989, in connection with the MDL 551 litigation.

### WPPSS Litigation Fund

In its initial petition, Bernstein Litowitz requested reimbursement net of amounts that had already been reimbursed to the firm by the WPPSS Litigation Fund. After a correction to the amount initially reported, the firm reported recovery of $133,681.43 from that Fund.

In a single figure reflecting the total "Reimbursement of Certain Liaison Costs to Executive Committee," the WPPSS Litigation Fund separately applied for reimbursement, out of settlement funds, of more than $225,000 previously reimbursed to Bernstein Litowitz and Shidler McBroom. The Court has more properly contemplated the propriety of reimbursement of these expenditures, out of settlement funds, in connection with each firm's petition, however. Bernstein Litowitz contributed $40,000 to the Litigation Fund. It was reimbursed a greater amount for expenses reported to the Fund during the litigation. Thus, the firm is a debtor of the Fund. Repayment of $93,681.43 is accordingly to be made, concurrent with the firm's receipt of payment for its approved expenses out of the MDL 551 settlement fund.

## MILBERG WEISS BERSHAD SPECTHRIE & LERACH

The New York City and San Diego law firm of Milberg Weiss Bershad Specthrie & Lerach ("Milberg Weiss") applies for an award of fees for the work of forty-eight attorneys whose rates at the time of the petition ranged from $90 to $350 an hour. When the petition was submitted, the firm reported a total of 34,584.35 attorney hours worked, for a reported lodestar of $8,766,924.25. By letter dated March 15, 1989, accompanied by a revised lodestar report, the firm corrected its initially reported figures to reflect 34,738.30 attorney hours and an attorney lodestar of $8,792,655.25. Subsequent reports of work performed after the cutoff of the initial (corrected) petition raised the firm's reported total attorney hours to 36,212.35, and its attorney lodestar to $9,148,776. These last figures, which reflect several minor corrections, include work performed by some of the firm's attorneys in connection with related insurance litigation. In response to Class counsel's motion requesting relief from its April 2, 1989 Order, the Court will defer consideration of hours reported by six attorneys in the Milberg Weiss firm for work that was primarily undertaken in connection with insurance litigation. The individual amounts of these deferrals are addressed in the following sections. Consideration of a total of 552 hours for work done prior to December 31, 1989, has been deferred.

The Milberg Weiss firm was, like Bernstein Litowitz Berger & Grossmann, instrumental throughout the litigation. Mr. Melvyn Weiss of that firm was co-lead counsel and provided a forceful presence throughout, particularly in settlement efforts. The firm is counsel of record for plaintiff Dr. Joseph Harris, a class representative.

The firm's daily time records, initially prepared for each attorney on typed monthly summary sheets, were modified during the course of this litigation. Since July 1984 the firm's daily time records have been computer-generated. The firm provided its records to the Court in batches, without consolidating in a single location the complete records for each separate petitioning attorney. Orderly review of the work of any attorney, thus, was time-consuming and difficult. The Court is dismayed that a firm with the experience and prominence of Milberg Weiss would present such disorderly supporting documentation for a fee petition of this size. As was true of all other petitioning Class counsel firms, no meaningful summarization identifying specific activities and amounts of time spent on them by each attorney was provided. The generalized categorization summaries prepared by these firms were superficial and not helpful in the Court's review.

*Melvyn I. Weiss*

Melvyn Weiss reports a total of 8,121.15 hours worked through December 31, 1989, at a rate of $350 an hour, for a reported lodestar of $2,842,402.50. Of these totals, Mr. Weiss requests that the Court defer consideration of 342 hours reported in supplemental petitions for the period 3/11/89 through 12/31/89, representing a reported lodestar of $119,700. Over half of Mr. Weiss' supplemental hours during that period of time involve activities that are inextricably related to the primary MDL litigation—in particular to the settlement hearing and the fee application that is the subject of this Order. All 189.5 hours of his reported time, and a corresponding lodestar of $66,325, for work done through May 12, 1989, have therefore been contemplated in connection with this Order. Consideration of the reasonableness of the remaining 152.5 hours recorded between May 18, 1989 and December 31, 1989, however, will be deferred. These hours may be petitioned for later. In sum, this Order contemplates a petition for 7,968.65 hours at a lodestar, based on rates reported at the time the initial petition was submitted, of $2,789,-027.50.

Mr. Weiss' first time entry in this litigation preceded 1983. One of three primary co-lead counsel for Class Plaintiffs, Mr. Weiss made frequent Court appearances and was actively occupied in trial preparation. He had significant involvement with potential expert witnesses, and was particularly instrumental in negotiations and achievement of the action's settlement. His activities in related litigation continue at the present time. His reported lodestar was the third highest in the litigation. His time recording practices, unfortunately, reflect a number of shortcomings.

■ Many time entries indicated only vague or generalized descriptions of the activities he performed. "Review documents" and "review correspondence," for instance, were the only descriptions provided to account for much of his time. Countless hours were reported, in amounts generally ranging from 15 minutes to two hours, for telephone calls. Usually, the individuals with whom Mr. Weiss spoke were indicated (often only by initials), but the subject matter was rarely specified. Most often his conversations were with co-counsel, frequently Mr. Bernstein. Frequent intra-office conferences were similarly recorded. Many times these communications represented the only work reported in a single day on the litigation. The Court estimates that well in excess of 1,000 hours of Mr. Weiss' time in the litigation was charged to such inadequately described telephone conversations. The lodestar cost to Class members for 1,000 hours of Mr. Weiss' time is $350,000. For such a sum, it is not unreasonable to expect Mr. Weiss to have recorded at least a brief explanation of the subject matter of the conversations. The time charges for these calls were clearly rounded to reflect even intervals. The Court believes that, while the conversations undoubtedly occurred, and while they were probably primarily essential to the litigation, it is reasonable, both because of the inadequate information provided and because of the cumulative impact of plainly upward rounding, that Mr. Weiss' petition for insufficiently documented telephone calls be reduced by 100 hours. A greater

reduction, though clearly appropriate (and made) for other counsel in this litigation whose timekeeping practices were similarly defective, is not justified in Mr. Weiss' case. The Court recognizes and acknowledges the importance, in his role as lead counsel, of maintaining effective communication with co-counsel regarding valid litigation efforts. It assumes the remainder of time charged in the above manner is within the zone of reasonableness. In any future petitions, however, more specific descriptive information will be expected.

 In addition to verbal communications, Mr. Weiss participated in numerous other litigation activities. He participated, generally to an appropriately limited extent, given his seniority, in discovery activities, document review and in the preparation of briefs. He attended a surprisingly large number of depositions, frequently charging 10 to 12 hours a day during such periods. Over the three-month period between April and June of 1985, for example, in excess of 300 hours were charged by Mr. Weiss for his preparation and attendance at depositions that were also attended by other co-counsel. In one four-day period in September 1985, 41 hours were charged to "attended depos in Seattle." Over 150 hours in July of 1986 were charged to a deposition. Because he consolidated multiple daily activities under one hourly sum, it was impossible for the Court to determine precisely the total number of hours so charged. Nonetheless, given his leadership position in this litigation and his commensurate high hourly rate, the Court believes that his time charges for these activities were excessive. A 100–hour reduction will be made to reduce to a reasonable level Mr. Weiss' overall time charged for preparation and attendance at depositions, many of which were properly conducted by more junior counsel at lower billing rates. The significant remainder of time permitted for Mr. Weiss' appearances is allowed in order to recognize the importance of deposition testimony to Plaintiffs' case in this action.

Mr. Weiss undertook a great deal of travel in the litigation. Although he generally charged the full extent of travel time, on occasion fewer hours were charged to the litigation than the trips required. In accordance with the previously established criteria, a reduction of 360 of the 720.5 hours attributed to Mr. Weiss' travel time charges will be made.

Similarly, a reduction of 10.25 hours has been made to eliminate inefficacious time charged for meal meetings.

 At least 187 hours were charged by Mr. Weiss in connection with Plaintiffs' fee application through the hearing date. Ignoring the firm's requested multiplier of 3.52, the charge to the Class for this time would exceed $65,000. With the requested multiplier, the Class would be assessed more than $230,000 for these efforts. Either result would be offensive. For his work as lead counsel on fee matters associated with the consolidated petition of Class counsel, the Court will permit payment for approximately 20 hours.

Finally, the documentation provided to the Court for Mr. Weiss' work encompassed 60.6 hours fewer than the lodestar number of hours reported for Mr. Weiss. This amount accordingly has been deducted from the lodestar hours reported.

In accordance with the foregoing, after the deduction of 797.85 hours, Mr. Weiss' lodestar for compensable work, based on 7,170.80 hours reasonably spent at his customary rate of $350 per hour, is $2,509,780.

*Alan Schulman*

 Milberg Weiss reports a total of 11,889.55 hours at the rate of $235 an hour, for a total lodestar of $2,794,044.25 for work done by Alan Schulman, a partner. This Order contemplates only 11,709.55 of his hours, with a corresponding lodestar value of $2,751,744.25. Consideration of 180 hours worked between 10/11/89 and 12/31/89 by Mr. Schulman, primarily in connection with related insurance litigation, has been deferred.

Mr. Schulman came to Milberg Weiss in 1984 from the law firm of Graham & Dunn, where he had also been active in this litigation. Graham & Dunn separately petitions for 1,126.2 hours for work performed by Mr. Schulman at a partner rate of $115 per

hour. The combined total of time reported for Mr. Schulman in the MDL litigation since 1983, excluding his continuing work in related insurance actions, thus, exceeds 13,000 hours. His time worked in this lawsuit, exceeds that of any other attorney, and probably sets a number of similar records outside this litigation arena, as well.

Mr. Schulman was an associate in the Milberg Weiss firm prior to September 1985. The firm's petition and computed lodestar, submitted at his current partner level rate, did not take into consideration the change in the nature of work and responsibilities that accompany such a change in status. For compensable work Mr. Schulman performed until September 1985, therefore, the firm will receive a lodestar award based upon a current hourly associate rate of $185. For work performed thereafter, the Court will apply his current partner rate of $235 to his compensable hours.

A member of the "core group," Mr. Schulman was deeply involved with discovery matters, particularly with document review and, more extensively, depositions. He also actively and intensively participated in brief writing and other motion work, occasionally in group sessions that involved other Class counsel. Although they contain somewhat generalized descriptions, and combine various tasks under a single daily quantity of time, Mr. Schulman's time records are comparatively explicit.

Mr. Schulman infrequently charged fewer than 8 hours on a weekday. He often charged 2 to 5 hours for work done on weekends. On more than 500 occasions, he charged between 10 and 18 hours for a single day's work. Larger charges, including an obviously erroneous one for 29 hours (2/29/88) were also occasionally made. In January 1987, he logged between 12 and 19 hours on 16 of 22 days worked. He did not report any hours the following month. Many entries simply do not reflect a reasonable amount of time for the activities indicated. On 12/18/87, for example, he charged 6 hours for three telephone calls and review of WPPSS mail. On 1/5/88, he charged 5 hours for review of a letter and one telephone call. Such entries are not infrequent. Entries that reflect 10 or more hours for "deposition preparation," or 12 hours for "work on" some other analytical aspect of the litigation are frequent, and generally appear to overstate actual productive endeavors.

Several things are evident to the Court regarding Mr. Schulman's time charges at Milberg Weiss. First, it evident that Mr. Schulman was diligent. Second, it is equally apparent that Class members have been assessed in a manner that reflects the passage of time, rather than the actual conduct of work of a beneficial nature to them. A significant amount of overlap is also apparent in connection with much of the work of Mr. Schulman. Many times several attorneys billed hours for joint undertakings, resulting in excessively high hourly charges. While high staffing levels were clearly essential in this litigation, many joint activities entailed redundancies that should not be passed on to Class members. A reduction of approximately 12% of the hours reported by Mr. Schulman will accordingly be made to adjust his compensable time charges so that they reflect a reasonable and productive amount of time spent on litigation activities. A separate correction of 15 hours will be made to reduce the entry of 2/29/88.

In addition, a reduction of 412.25 of 824.5 hours of travel time reported in Mr. Schulman's time records, apportioned between his time as an associate and his time as a partner with the firm, has been deducted from his reported lodestar total. Similarly, 26.75 hours spent at meals with co-counsel have been disallowed. Finally, 166 of 181 hours attributed to work on the fee and expense petition have been disallowed. The permitted 15 hours are a reasonable allowance for his work relating to the coordination of Class counsels' petitions.

For Mr. Schulman's reported associate hours, Milberg Weiss is awarded $512,-172.50, a reasonable lodestar amount for 2,768.5 compensable hours worked at a rate of $185 per hour. For his time as a part-

ner, the firm is awarded an additional reasonable lodestar amount of $1,641,686.50, for 6,985.9 hours at a rate of $235.

*Leonard B. Simon*

 Milberg Weiss reports a total of 9,616.5 hours at the rate of $235 an hour, for a total lodestar of $2,259,877.50 for work done by Leonard Simon, a partner. Of the total hours reported, 199.75 were for work done after 3/11/89. Most of the subsequent work, however, related to the MDL 551 settlement hearing and fee petition. Therefore, all time reported through December 31, 1989, except for 23.25 hours worked on and after October 24, 1989, will be considered in connection with this Order. The 23.25 hours may be petitioned for in a future petition. Considered herein, thus, are 9,593.25 hours at a reported lodestar of $2,254,413.75.

Like Mr. Schulman, Mr. Simon was an associate of the firm before September 1985. The firm, however, applied for payment for all of his work at a partner rate. For compensable hours worked prior to his change in status, his lodestar award will be based on an associate rate of $185. For time allowed for work thereafter, he will receive his current customary hourly rate of $235.

Mr. Simon was also a member of the "core group." He began working on the case in February 1983. He charged more than 200 hours to work on the first and second amended complaints in the action and, in about five weeks during 1983, charged more than 200 hours for his efforts on briefs in opposition to defendants' motions to dismiss. In late 1985 and early 1986, over 160 hours were recorded for his work on a settlement memorandum. He worked, as well, on a number of other important briefs and memoranda. Other plaintiffs' counsel, including Mr. Schulman, also charged time to all or most of these undertakings. Mr. Simon was heavily involved in discovery work, particularly document review and, later, depositions. He made a number of Court appearances, and interacted with various retained experts.

Mr. Simon's time records are relatively descriptive of his work. For the most part, his time charges are modest and appear reasonable. Many of his long days reflected travel, and deductions have been made to reduce by 50% the 633 hours charged in this manner. Additionally, nearly 119 hours of meal time charges with co-counsel have been reduced, in the same manner, by 50%. The Court does not discern that any appreciable benefit accrued to Class members as a result of 50.5 hours spent by Mr. Simon in the final months of 1988 reading the trial transcript. Finally, 39.5 hours have been disallowed for the portion of the time charged by Mr. Simon for fee work during the post-settlement stage of the litigation.

For Mr. Simon's associate hours, Milberg Weiss is awarded $668,220, a reasonable lodestar amount for 3,612 compensable hours worked at a rate of $185 per hour. For his time as a partner, the firm is awarded an additional reasonable lodestar amount of $1,296,083.75, for 5,515.25 hours at a rate of $235.

*Michael Spencer*

Milberg Weiss petitions for 2,267.25 hours at the rate of $200 an hour, for a total lodestar of $453,450 for work done by Michael Spencer, a partner. All of Mr. Spencer's reported work through 12/31/89, including 8.75 hours reported after the initial petition, will be considered at this time. Mr. Spencer began working for Milberg Weiss in June 1986. Prior to that time he had worked for the law firm of Cravath, Swain and Moore, which represented Plaintiff Chemical Bank in this litigation. Mr. Spencer became a partner in the Milberg Weiss firm on or about July 1, 1987. According to the detailed information provided with the firm's petition, he had worked approximately 1,557 hours for Milberg Weiss at that time. His compensable hours prior to July 1, 1987, will therefore be paid at a current associate rate of $185.

Initially Mr. Spencer indicated, for each of the daily tasks he performed, a separate allocation of time. That commendable practice ceased, however, after a few months at Milberg Weiss, and the Court was once again tasked with the burden of determining the reasonableness of a single

total hourly sum for multiple daily activities grouped together. For the most part, however, even after the modification, Mr. Spencer's charges were moderate and reasonable. Occasionally a large number of hours were charged in a given day, but such charges, when they occurred, appear reasonable for the work performed, which often involved depositions. In addition to deposition work, Mr. Spencer also worked on several important briefs.

A recurring entry in Mr. Spencer's time records concerns his review of incoming mail, materials, paper, documents, and the like. Insofar as they may have provided a benefit to Class members, particularly in 1988, after his involvement in the action was substantially reduced, the time charges for this activity are somewhat excessive. A reduction of 45 of nearly 65 hours so allocated has therefore been made. Additionally, 42.5 associate hours and 27.5 partner hours have been disallowed of the 139 hours of travel time charged. Finally, a deduction of 10 hours has been made for time charged for work on the fee application and for other matters that provided no benefit to Class members.

For Mr. Spencer's associate hours, Milberg Weiss is awarded $280,182.50, a reasonable lodestar amount for 1,514.5 compensable hours worked at a rate of $185 per hour. For his time as a partner, the firm is awarded an additional reasonable lodestar amount of $125,550, for 627.75 hours at a rate of $200. The firm's total lodestar award, thus, for Mr. Spencer's work is $405,732.50.

### Antonia Russo

Milberg Weiss petitions for 966.75 hours at the rate of $150 an hour, for a total lodestar of $145,012.50 for work done by Antonia Russo, an associate. Ms. Russo began working on the case in March 1988. Her work pertained to settlement agreements, and appears largely to have been directed at settlement funding arrangements and controls. She was also involved in the drafting of settlement and escrow agreements, and in the preparation of the Class Notice regarding the fairness hear-

ing. Her time charges were, for the most part, modest. In the few instances that they were not, the reasons are usually evident. The only reduction in the hours reported for Ms. Russo is for 7.25 hours, one-half of the allocated round-trip commutation time between New York and Seattle in January 1988.

For Ms. Russo's work on the litigation Milberg Weiss will receive a lodestar award of $143,925, for 959.5 hours at $150 an hour.

### David J. Bershad

Milberg Weiss petitions for 358.15 hours at the rate of $300 an hour, for a total lodestar of $107,445 for work done by David Bershad, a partner. Mr. Bershad made moderate time charges for his work in the litigation from early 1983 until late 1989. All of Mr. Bershad's reported work through 12/31/89, including 11.5 hours reported after the initial petition, will be considered at this time.

Mr. Bershad's time recording practices were excellent. His undertakings were satisfactorily described and relevant to the litigation effort. His most significant early involvement concerned the deposition of the firm's client, class representative Dr. Joseph Harris. His charges for this time were modest, and will be permitted as having been essential to the Class overall. Later work involved settlement funding arrangements. Again, his time charges were moderate, compatible with his level, and well-explained. The only deduction that the Court believes appropriate is for slightly over 14 hours of time charges for telephone conversations in the final months of 1988 with Mr. Weiss regarding the status of trial, settlement negotiations, and similar matters. While the subject matter was understandably of great interest to Mr. Bershad, the Court is unable to conclude that his time, in addition to that of Mr. Weiss, should be assessed to Class members. Thus a reduction of $4,245 will be made from the reported lodestar.

In recognition of David Bershad's work in this action, the firm of Milberg Weiss will receive a lodestar award of $103,200, representing 344 hours work at his customary rate of $300 per hour.

### George A. Bauer III

Milberg Weiss petitions for 547.55 hours at the rate of $180 an hour, for a total lodestar of $98,559 for work done by George Bauer, an associate. Much of Mr. Bauer's work was performed after the initial petition was submitted. Virtually all of the work appears to relate directly to the primary MDL 551 action, however, particularly to the settlement agreements. It will therefore be contemplated in connection with this Order.

Mr. Bauer's compensable work, which began in January 1989, primarily involved the Class Notice, tax concerns, and escrow arrangements associated with the settlements. The work is adequately described and appropriate and, while the time charges appear to be slightly greater than necessary for some tasks, they are not unreasonable. Several charges, however, will be disallowed as follows: .3 hours for inconsequential tasks in 1985; 6 of 8 hours charged on 12/14/89 and 12/15/89 because the charges were excessive; .75 hour charged on 8/17/89 to circulate a ruling request; and 1.5 hours on 9/7/89 presumably spent reading the Court's opinion on the settlements. It would be unfair to burden the Class for every attorney's review of that Order.

For Mr. Bauer's work through December 31, 1989, Milberg Weiss will receive a lodestar award of $97,020 for 539 compensable hours at the rate of $180 per hour.

### Steven G. Schulman

Milberg Weiss applies for 413.9 hours at the rate of $185 an hour, for a total lodestar of $76,571.50 for work done by Steven Schulman, an associate. Mr. Schulman began working on the litigation in June 1986. He worked on several depositions and did research and drafting in connection with plaintiffs' briefs on several important issues in the case.

█ Some of Mr. Schulman's time charges were not appropriate charges to Class members and will be disallowed. Between October 14 and October 17, 1986, he charged 46 hours for his travel between New York and Seattle and to attend a hearing and a meeting. Although he had done some work on matters that were the subject of the hearing, his presence, considering the attendance and participation of a number of other plaintiffs' counsel, was unnecessary and redundant. All of Steven Schulman's time in this period will be disallowed. Seven hours charged for meal conferences with co-counsel and for other travel will also be deducted. Finally, a reduction of 15.5 hours will be made to adjust for recurring and excessive charges to "review of correspondence," "review of files," and for insufficiently defined "conferences" with other plaintiffs' attorneys.

For Mr. Schulman's work, Milberg Weiss will receive a lodestar award of $63,899 for 345.4 hours of compensable work at the rate of $185 per hour.

### Arnold N. Bressler

Milberg Weiss petitions for 321.75 hours at the rate of $230 an hour, for a total lodestar of $74,002.50 for work done by Arnold Bressler, a partner. Nearly all of Mr. Bressler's time was charged in 1988 and 1989. Although some of his reported time charges evidently pertain, to an indeterminate extent, to insurance litigation in other courts, they also relate directly to settlement agreements made in MDL 551. All time reported through December 31, 1989 will therefore be contemplated at this time.

Mr. Bressler's time records are terse, generally uninformative, and appear to contain consistently excessive charges. Several examples follow:

| | | |
|---|---|---|
| 1/20/88 | S–REVISED LTR OF CREDIT; OC–DJB | 2.5 hrs. |
| 10/13/88 | OCS–AMR/GHC RE COLUMBIA SETTLEMENT | 6.0 hrs. |
| 1/4/89 | T–AMR; OCS–GAB; TS–NIEDERBERGER, PAGNANELLI RE COLLECTION OF L.C'S; REVISED EBASCO LTR CREDIT & LTR AMT | 12.5 hrs. |
| 2/13/89 | L/C COLLECTION | 4.0 hrs. |
| 2/24/89 | T–CIRILLO; T–GOLDSTEIN; L/C'S; S–MHT AGMT; OC–GHC | 6.75 hrs. |
| 3/10/89 | L.C. DOCUMENTS | 4.75 hrs. |
| 4/11/89 | OCS–LM/GAB; TC–JACOBSON/GAB/LM | 3.25 hrs. |

Although the Court was able to decipher the meaning of the various abbreviations, it was unable to conclude that the amounts of time charged to these, and to virtually all other undertakings of Mr. Bressler, were reasonable. The burden of providing satisfactory evidence of compensable work was not met. As a result, but in recognition that some important work, particularly in connection with letters of credit for settlement funds, was apparently performed, an award of approximately 40% of Mr. Bressler's reported hours will be made. The Court believes that its decision to recompense the firm for some of his reported time is fair, and a lodestar award of $29,670 for 129 hours at the requested customary rate of $230 is judged reasonable.[29]

*Jerome M. Congress*

Milberg Weiss petitions for 212.65 hours at the rate of $260 an hour, for a total lodestar of $55,289 for work done by Jerome Congress, a partner.

Mr. Congress' compensable involvement in the case began in mid–1985, when he charged 124 hours for work on a brief opposing the motion of Ernst & Whinney to dismiss Plaintiffs' claims against them. His allowable time for this work will be reduced to 100 hours, a reasonable figure for this type of undertaking for someone at his level. In 1988 Mr. Congress charged Class members for 56.5 hours of work related to the review and revision of a settlement brief. He will be compensated for 40

hours of this time, as well as for 25 hours during 1988 that he worked on expert testimony matters and on briefs related to the Washington State Supreme Court *Hoffer* action. These amounts of time are reasonable for the performance of this sort of work at his level.

For Mr. Congress' work, Milberg Weiss will receive a lodestar award of $42,900 for 165 hours reasonably expended at the hourly rate of $260.

*William S. Lerach*

Milberg Weiss petitions for 113.5 hours at the rate of $325 an hour, for a total lodestar of $36,887.50 for work done by William Lerach, a partner. Mr. Lerach charged time for his involvement in the litigation from February 1983 through December 1985.

Mr. Lerach's time records are not adequate to support the firm's request for compensation for his work. His time entries primarily involve block entries of up to 20 hours of time for weekly intervals. The accompanying work descriptions indicate that his involvement, aside from some initial work drafting complaints, consisted mainly of reading articles, memos, briefs, and holding conversations with other attorneys in the firm regarding organizational matters. Such time, while perhaps important to the firm's planning, was of little benefit to Class members.

**29.** In-town meal charges for Mr. Bressler were also inordinate throughout the period of time involved, including charges on days when no work was reported. They have been disallowed elsewhere.

Recognizing that some benefit accrued to the Class as a result of his review of plaintiffs' brief on motions to dismiss, and from his work drafting complaints, the Court will permit payment for 40 of the hours charged by Mr. Lerach. No payment for the remaining reported time will be allowed. Payment will be made at a rate of $300 per hour, reflecting an adjustment for the relatively insignificant role he played in this particular action. His lodestar is, accordingly, $12,000.

### Elizabeth A. Shollenberg

■ Milberg Weiss petitions for 232.5 hours at the rate of $120 an hour, for a total lodestar of $27,900 for work done by Elizabeth Shollenberg, an associate. All of Ms. Shollenberg's work in the litigation was performed in 1983 and 1984. Much of her work involved the routine review, organization, filing and distribution of documents. Other undertakings, including research, cite checking, proofreading, gathering cases, handling telephone calls and interviewing paralegal candidates, was also of a type properly done by paralegal employees. Although the time expended on these efforts appears to have been reasonable, payment for the work at an attorney rate would not be. Payment will be permitted for all of Ms. Shollenberg's work at a paralegal rate of $50 per hour. For Ms. Shollenberg's 232.5 hours of work, Milberg Weiss is awarded a lodestar fee of $11,625.

### Joyce E. Fitzpatrick

Milberg Weiss petitions for 178.3 hours at the rate of $140 an hour, for a total lodestar of $24,962 for work done by Joyce Fitzpatrick, an associate. Ms. Fitzpatrick worked on the litigation from March 1986 until August 1987. She did research and drafting on constitutional and legislative questions that were of significance in the litigation. Her time charges are moderate, well-described, and above all, reasonable. They will be allowed without adjustment.

### Anita M. Laing

Milberg Weiss petitions for 106.7 hours at the rate of $215 an hour, for a total lodestar of $22,940.50 for work done by Anita Laing, a partner. Ms. Laing became a partner in the firm in 1988. All of her time was charged in 1986 and 1987, when she was an associate, and the work was of a type properly performed by an associate. Her compensable time will therefore be paid at an associate rate of $185 per hour. Ms. Laing's work entailed legal research and drafting of Class Plaintiffs' briefs regarding state law claims. Her time charges are wholly within reason for the work she undertook and her work descriptions are excellent.

For 106.7 hours of Ms. Laing's work, Milberg Weiss will receive a lodestar award of $19,739.50.

### Pamela H. Savoy

Milberg Weiss petitions for 202.2 hours at the rate of $105 an hour, for a total lodestar of $21,231 for work done by Pamela Savoy, an associate. Ms. Savoy worked on the litigation after September 1987. She primarily did legal research in connection with plaintiffs' opposition to summary judgment motions. She drafted a memorandum and motion for reconsideration regarding the appropriate measure of damages in this action. She also did research and drafting for a settlement memorandum. Her time charges for all of this work are reasonable. However, 28 hours spent in January 1989 on research and a memorandum regarding the standards for attorney fee awards will not be charged to Class members.

For Ms. Savoy's compensable work, Milberg Weiss will receive a lodestar award of $18,291 for 174.2 hours of compensable work at the rate of $105 per hour.

### Lawrence Milberg

Milberg Weiss petitions for 54.9 hours at the rate of $295 an hour, for a total lodestar of $16,195.50 for work done by Lawrence Milberg, a partner. Much of Mr. Milberg's work—41 hours—was done in April through June of 1989, after the initial fee petition was filed. However, his work concerned the MDL settlement funds, and will be addressed in this Order. A significant amount of time in this period was charged to discussions, meetings and conversations with other attorneys in the Mil-

berg Weiss firm, in particular Messrs. Bauer and Bressler regarding tax issues associated with the settlement funds. To offset some of the redundancy resulting from charges for such meetings, a reduction of 9 hours will be made. The remaining 32 hours charged by Mr. Milberg for conferences, analysis, and drafting regarding these tax concerns appear reasonable and will be permitted. For numerous minor charges between September 1983 and December 1988, 7 hours of Mr. Milberg's time will be permitted. The remaining 6.9 hours spent in intermittent discussions about nonspecified or general matters, usually with other members of the firm, cannot be said to have benefitted Class members.

For Lawrence Milberg's work on the litigation, the firm of Milberg Weiss is awarded a lodestar fee of $11,505 for 39 hours reasonably worked at his customary rate of $295 per hour.

*Khrishnan Chittur*

Milberg Weiss petitions for 56.75 hours at the rate of $165 an hour, for a total lodestar of $9,363.75 for work done by Khrishnan Chittur, an associate. During the summer of 1988 Mr./Ms. Chittur conducted research, drafted memoranda and communicated with other firm members regarding the admissibility of certain evidence. The reported hours are reasonable for the work done, and a lodestar award will be paid in the amount reported.

*Jeremy Heisler*

Milberg Weiss petitions for 59 hours at the rate of $150 an hour, for a total lodestar of $8,850 for work done by Jeremy Heisler, an associate. For 30 hours of Mr. Heisler's work done in July and August 1983 in connection with the preparation of interrogatories, and for 8 hours of research conducted in October 1986, Mr. Heisler's last work on the litigation, the firm is awarded a reasonable lodestar fee of $5,700. The remainder of time spent in connection with these activities is not considered to have been to the benefit of Class members.

*Wendy K. Goidel*

Milberg Weiss petitions for 80.5 hours at the rate of $95 an hour, for a total lodestar of $7,647.50 for work done by Wendy Goidel, an associate. Ms. Goidel did research and drafting in connection with plaintiffs' opposition to defendants' motion to dismiss, on alter ego liability and on expert testimony issues. Her hours are reasonable for the reported work and will be allowed.

*Jeffrey N. Bernstein*

Milberg Weiss petitions for 28.6 hours at the rate of $165 an hour, for a total lodestar of $4,719 for work done by Jeffrey Bernstein, an associate. In 1983, Mr. Bernstein spent 20 hours working on a memorandum regarding the appointment of lead counsel. This work, while undoubtedly of value to the Milberg Weiss firm, provided no measurable benefit to Class members, and will not be approved. Mr. Bernstein later worked 8 hours on the brief in opposition to defendants' motion to dismiss, and in 1988 spent an hour dictating in-house memos regarding settlement considerations.

For Mr. Bernstein's work, Milberg Weiss is awarded a lodestar of $1,485 for 9 hours of compensable work at the rate of $165 per hour.

*Steven L. Wittels*

Milberg Weiss petitions for 34.7 hours at the rate of $120 an hour, for a total lodestar of $4,164 for work done by Steven Wittels, an associate. Mr. Wittels' time entries contain insufficient explanations of his work. Although he performed legal research, repetitive daily entries provide little elaboration on the subject matter of the research. For the daily entries clustered between 8/27/85 and 9/5/85, the Court will allow 25 of the reported hours based on a reasonable assumption that all of the research during that interval concerned the issue, stated in one daily time entry, of state law claims in the Ernst & Whinney action. More hours are not allowed because the time records do not indicate that the results of the research performed were ever communicated. The research work was Mr. Wittels' final reported involvement in the case. The single

hour charged in June of that year to "legal research" will be disallowed due to inadequate documentation.

For Mr. Wittels' work, the firm is awarded a lodestar of $3,000 for 25 hours of research.

### Keith F. Park

■ Milberg Weiss petitions for 13.5 hours at the rate of $235 an hour, for a total lodestar of $3,172.50 for work done by Keith Park, a partner. Mr. Park was essentially uninvolved in the litigation until May 1988, when he researched this circuit's standards and drafted a portion of plaintiffs' brief in support of partial settlement. The Court believes that this type of work might better have been accomplished by an associate, and will allow 9 of the 12 hours charged by Mr. Park for his undertaking. The 1.5 hours charged in 1984 for a meeting regarding a trial site will be permitted.

For Mr. Park's involvement, Milberg Weiss is awarded a lodestar of $2,467.50 for 10.5 hours reasonably worked at his rate.

### Jared Specthrie

■ Milberg Weiss petitions for 9.5 hours at the rate of $300 an hour, for a total lodestar of $2,850 for work done by Jared Specthrie, a partner. Mr. Specthrie's involvement in the litigation was intermittent and limited to administrative considerations regarding the firm's role in the litigation. Because of the duplication of efforts occurring in such discussions, particularly those with Mr. Weiss, and because of the absence of perceptible benefit to Class members resulting from Mr. Specthrie's limited involvement, no lodestar award will be made for his time.

### Jan M. Adler

Milberg Weiss petitions for 11.95 hours at the rate of $215 an hour, for a total lodestar of $2,569.25 for work done by Jan Adler, a partner. In addition to this time, Ms. Adler reports .5 hour worked on the Enserch litigation in October 1989. The Court's consideration of that time will be deferred. Ms. Adler was an associate of the Milberg Weiss firm when her work on the MDL litigation was performed. Her work was intermittent and involved research and discussions with other members of the firm. Some of the research topics involved subjects that are not appropriately assessable to Class members, and payment for the time spent in May 1983 and in October and November of 1985 will not, therefore, be approved. Milberg Weiss will receive a lodestar award of $1,295 for 7 hours of Ms. Adler's time reasonably charged in this litigation to the benefit of Class members at a current associate rate of $185.

### Frederic F. Nagel III

Milberg Weiss petitions for 17.1 hours at the rate of $150 an hour, for a total lodestar of $2,565 for work done by Frederic Nagel, an associate. Mr. Nagel's charges were for research and related activities. All appear reasonable and necessary and will be permitted.

### George H. Cohen

■ Milberg Weiss petitions for 13.25 hours at the rate of $180 an hour, for a total lodestar of $2,385 for work done by George Cohen, an associate. Nearly all of Mr. Cohen's time, including 1.5 hours reported in supplemental petitions, involved reading settlement agreements and letters of credit and discussing them with other members of the firm. His involvement was irregular and superficial, and the Court does not perceive that any benefit may have accrued to Class members from his limited participation.

### Steven W. Pepich

Milberg Weiss petitions for 16.5 hours at the rate of $140 an hour, for a total lodestar of $2,310 for work done by Steven Pepich, an associate. Mr. Pepich did research on five different occasions on various issues of importance to the litigation. His lodestar is reasonable as reported.

### Steve Soltan

Milberg Weiss petitions for 18.5 hours at the rate of $105 an hour, for a total lodestar of $1,942.50 for work done by Steve Soltan, an associate. Mr. Soltan worked on three occasions in 1988. His time entries provide excellent descriptions of the work

undertaken, which involved research, drafting, analysis and conferences. The work and time are reasonable as reported.

*Richard M. Meyer*

Milberg Weiss petitions for 6.4 hours at the rate of $285 an hour, for a total lodestar of $1,824 for work done by Richard Meyer, a partner. Most of Mr. Meyer's time charges are for vaguely described conferences with other firm members regarding, if any topic was specified, such things as "strategy" or "class issue." These activities cannot be said to have benefitted Class members. He appears, however, to have drafted a letter that merits a lodestar award of $142.50 for .5 hour of his time.

*Martha A. Evans*

Milberg Weiss petitions for 9.8 hours at the rate of $165 an hour, for a total lodestar of $1,617 for work done by Martha Evans, an associate. Ms. Evans did two research projects on relevant issues. The time charged is reasonable.

*Meri McCann*

Milberg Weiss petitions for 8.5 hours at the rate of $135 an hour, for a total lodestar of $1,147.50, for work done by Meri McCann, an associate. Some of the work, reported in November and December 1989, appears somewhat related to insurance litigation, but primarily stems out of plaintiffs' MDL 551 settlement agreement with defendant Ebasco. The Court approves payment for those 7 hours. Work done in March and April 1989 consisted of collating documents and research on bailments. The Court perceives no value to the Class from either undertaking, and declines to authorize any payment for the time.

For 7 hours reasonably spent by Ms. McCann to preserve the settlement fund to the benefit of Class members, Milberg Weiss is granted a lodestar award of $945.

*Julie A. Johnston*

Milberg Weiss petitions for 4.3 hours at the rate of $145 an hour, for a total lodestar of $623.50 for work done by Julie Johnston, an associate. Ms. Johnston's time was devoted to Lexis research and was reasonable. Her lodestar award is for the amount reported.

*Kathryn A. Slezak*

Milberg Weiss petitions for 4 hours at the rate of $130 an hour, for a total lodestar of $520 for work done by Kathryn Slezak, an associate. Her four hours were spent doing damages research, and a lodestar award will be made for the amounts reported.

*John E. Grasberger*

Milberg Weiss petitions for 2 hours at the rate of $235 an hour, for a total lodestar of $470 for work done by John Grasberger, a partner. Mr. Grasberger's time charges, for communications on pertinent matters and for some research, appear reasonable and will be allowed.

*Arthur Mercado*

Milberg Weiss petitions for 4.25 hours at the rate of $90 an hour, for a total lodestar of $382.50 for shepardizing done by Arthur Mercado, an associate. The work was appropriate and a lodestar award is approved in the amount reported.

*William Dato*

Milberg Weiss petitions for 3.75 hours at the rate of $95 an hour, for a total lodestar of $356.25 for work done by William Dato, an associate. The Court is unable to discern any benefit that accrued to the Class from Mr. Dato's intermittent discussions with Mr. Simon. For one hour's research on 8/20/84, however, the Court will approve a lodestar award of $95.

*Edwin J. Mills*

Milberg Weiss petitions for 1.9 hours at the rate of $160 an hour, for a total lodestar of $304 for work done by Edwin Mills, an associate. Mr. Mills did quite a bit of relevant research in the reported time. A lodestar award for the reported amounts is approved.

*Zachary A. Starr*

Milberg Weiss petitions for 1.5 hours at the rate of $135 an hour, for a total lodestar of $202.50 for work done by Zachary Starr, an associate. Mr. Starr charged the time for "legal research" in June of 1985. The proffered description of his work is inadequate to assess its reasonableness and the time will not be paid.

*Jeffrey Abraham*

Milberg Weiss petitions for 2 hours at the rate of $95 an hour, for a total lodestar of $190 for work done by Jeffrey Abraham, an associate. The time was charged on two separate occasions in late 1988, and consisted of review and discussions with Mr. Russo regarding matters that Mr. Russo was working on. No value is deemed to have accrued to Class members as a result of Mr. Abraham's brief ancillary participation.

*Ellen Cohen*

Milberg Weiss petitions for 1 hour at the rate of $185 an hour for associate Ellen Cohen's participation in a conference with four other members of the firm "re complaint" on February 23, 1987. Ms. Cohen's time spent in this discussion cannot have benefitted the Class and will not be paid.

*Sharon L. Mirsky*

Milberg Weiss petitions for .7 hour at the rate of $230 an hour, for a total lodestar of $161 for work done by Sharon Mirsky, a partner. The time charge was for telephone conversations in July 1986 with Mr. Weiss, with someone having the initials LW, and for a conference with Mr. Bauer regarding "research into Class Notice issues." Ms. Mirsky's involvement, which was clearly redundant, is not judged to have provided any benefit to the Class.

*Patricia M. Hynes*

Milberg Weiss petitions for .5 hour at the rate of $300 an hour, for a total lodestar of $150 for some unspecified work done by Patricia Hynes, a partner, in July 1984, in connection with voir dire questions and regarding "expert." The work is of questionable value and cannot reasonably be assumed to have provided any benefit to the Class.

*Dana Roth*

Milberg Weiss petitions for 1.25 hours at the rate of $95 an hour, for a total lodestar of $118.75 for work done by Dana Roth, an associate. The charge, for attendance at a meeting with other attorneys in 1988 to hear Mr. Weiss' report on the case did not benefit the class and will be disallowed.

*Sanford P. Dumain*

Milberg Weiss petitions for .6 hour at the rate of $185 an hour, for a total lodestar of $111 for work done by Sanford Dumain, an associate. Half of Mr. Dumain's work was spent in a conference in March 1985 and will be disallowed as having produced no benefit for Class members. He did research in the other .3 hour. It will be allowed, for a lodestar award of $55.50.

*Eugene Mikolajczyk*

Milberg Weiss petitions for .25 hour at the rate of $215 an hour, for a total lodestar of $53.75 for work done by Eugene Mikolajczyk, a partner. The charge stemmed from a time entry in June of 1983, when Mr. Mikolajczyk was an associate. It was for an internal memo "re Class members." The Court does not believe that any benefit could have been derived by Class members from this isolated 15–minute task, whatever the content of the memorandum may have been.

*Helen J. Hodges*

Milberg Weiss petitions for .25 hour at the rate of $150 an hour, for a total lodestar of $37.50 for work done by Helen Hodges, an associate. The work was described simply as "Lexis Research for LBS." This documentation is not adequate to support an award.

*Alan Mansfield and Ellen Gusikoff*

A total of 195.75 hours reported in supplemental petitions through 12/31/89 by two Milberg Weiss associates, Alan Mansfield and Ellen Gusikoff will not be considered in connection with this Order. The work clearly pertained to insurance litigation and may be included in a subsequent petition.

The table on the following page summarizes the foregoing lodestar awards determined reasonable for compensable work of attorney members of the Milberg Weiss firm.

MILBERG WEISS BERSHAD SPECTHRIE & LERACH ATTORNEY LODESTAR

| Attorney | HOURS Request | HOURS Award | LODESTAR Request | LODESTAR Award |
|---|---|---|---|---|
| Weiss | 7,968.65 | 7,170.80 | $2,789,027.50 | $2,509,780.00 |
| Schulman, A. | 11,709.55 | 9,754.40 | 2,751,744.25 | 2,153,859.00 |
| Simon | 9,593.25 | 9,127.25 | 2,254,413.75 | 1,964,303.75 |
| Spencer | 2,267.25 | 2,142.25 | 453,450.00 | 405,732.50 |
| Russo | 966.75 | 959.50 | 145,012.50 | 143,925.00 |
| Bershad | 358.15 | 344.00 | 107,445.00 | 103,200.00 |
| Bauer | 547.55 | 539.00 | 98,559.00 | 97,020.00 |
| Schulman, S. | 413.90 | 345.40 | 76,571.50 | 63,899.00 |
| Bressler | 321.75 | 129.00 | 74,002.50 | 29,670.00 |
| Congress | 212.65 | 165.00 | 55,289.00 | 42,900.00 |
| Lerach | 113.50 | 40.00 | 36,887.50 | 12,000.00 |
| Shollenberg | 232.50 | 232.50 | 27,900.00 | 11,625.00 |
| Fitzpatrick | 178.30 | 178.30 | 24,962.00 | 24,962.00 |
| Laing | 106.70 | 106.70 | 22,940.50 | 19,739.50 |
| Savoy | 202.20 | 174.20 | 21,231.00 | 18,291.00 |
| Milberg | 54.90 | 39.00 | 16,195.50 | 11,505.00 |
| Chittur | 56.75 | 56.75 | 9,363.75 | 9,363.75 |
| Heisler | 59.00 | 38.00 | 8,850.00 | 5,700.00 |
| Goidel | 80.50 | 80.50 | 7,647.50 | 7,647.50 |
| Bernstein | 28.60 | 9.00 | 4,719.00 | 1,485.00 |
| Wittels | 34.70 | 25.00 | 4,164.00 | 3,000.00 |
| Park | 13.50 | 10.50 | 3,172.50 | 2,467.50 |
| Specthrie | 9.50 | 0.00 | 2,850.00 | 0.00 |
| Adler | 11.95 | 7.00 | 2,569.25 | 1,295.00 |
| Nagel | 17.10 | 17.10 | 2,565.00 | 2,565.00 |
| Cohen, G. | 13.25 | 0.00 | 2,385.00 | 0.00 |
| Pepich | 16.50 | 16.50 | 2,310.00 | 2,310.00 |
| Soltan | 18.50 | 18.50 | 1,942.50 | 1,942.50 |
| Meyer | 6.40 | .50 | 1,824.00 | 142.50 |
| Evans | 9.80 | 9.80 | 1,617.00 | 1,617.00 |
| McCann | 8.50 | 7.00 | 1,147.50 | 945.00 |
| Johnston | 4.30 | 4.30 | 623.50 | 623.50 |
| Slezak | 4.00 | 4.00 | 520.00 | 520.00 |
| Grasberger | 2.00 | 2.00 | 470.00 | 470.00 |
| Mercado | 4.25 | 4.25 | 382.50 | 382.50 |
| Dato | 3.75 | 1.00 | 356.25 | 95.00 |
| Mills | 1.90 | 1.90 | 304.00 | 304.00 |
| Starr | 1.50 | 0.00 | 202.50 | 0.00 |
| Abraham | 2.00 | 0.00 | 190.00 | 0.00 |
| Cohen, E. | 1.00 | 0.00 | 185.00 | 0.00 |
| Mirsky | .70 | 0.00 | 161.00 | 0.00 |
| Hynes | .50 | 0.00 | 150.00 | 0.00 |
| Roth | 1.25 | 0.00 | 118.75 | 0.00 |
| Dumain | .60 | .30 | 111.00 | 55.50 |
| Mikolajczyk | .25 | 0.00 | 53.75 | 0.00 |
| Hodges | .25 | 0.00 | 37.50 | 0.00 |
| Totals | 35,660.35 | 31,761.20 | $9,016,624.25 | $7,655,343.00 |

I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of the following individuals. An increase of their lodestar awards will accordingly be made as indicated.

For the work of Mr. Weiss, the firm will receive a multiple of 1.5 times the lodestar amount, for a total award of $3,764,670.

For the work of Mr. Schulman, the firm will receive a multiple of 1.2 times the lodestar amount, for a total award of $2,584,630.80.

For the work of Mr. Simon, the firm will receive a multiple of 1.25 times the lodestar amount, for a total award of $2,455,379.70.

*Paralegals*

██ In addition to the hours reported for attorney members of the firm, Milberg Weiss applies for an award for the work of 42 paralegals. When the petition was submitted, a total of 3,436.55 paralegal hours were reported. The figure was corrected to 3,474.55 hours, and was subsequently increased to 3,820.05 hours as a result of the submission of supplemental reports for work performed through December 31, 1989. Rates to $80 per hour were utilized in determining the lodestar for the work of these persons, although most rates were either $50 or $65. The reported paralegal lodestar, as of December 31, 1989, amounted to $226,331.50.

Overall, work descriptions for paralegal employees of the Milberg Weiss firm were informative and appropriate. Most of the reported work reflected activities essential to the litigation and beneficial to the Class. Certain undertakings, however, are not deemed to warrant payment as reported. The following deductions have therefore been made.

A total of 538.1 hours with a corresponding lodestar of $33,577 that were reported by ten different paralegals for work involving the review, organization, calculation, compilation and revision of time records, and for the preparation of a brief in support of the fee petition is deemed excessive. The Court will allow 100 hours of the reported time at a lodestar of $6,500. This amount is reasonable, given the firm's position as lead counsel.

Half of 30 hours charged by one employee over a four-day period in 1983 to fly to Seattle and back to file a complaint will be deducted. No award will be made for 35 hours charged by another person in December 1984 that was not described at all. Five of 10 hours charged for a trip to Tucson in April 1989 will be deducted, as will a 3–hour time charge for "new matter—Top Brass Enterprises" in 1985. The preceding deductions will be taken at a rate of $65 per hour.

*Paralegal Award*

Thus, for 3,323.95 paralegal hours reasonably accruing to the benefit of Class Members, Milberg Weiss will receive a lodestar award in the amount of $195,484.50.

*Expenses*

Milberg Weiss reported a gross amount of $819,240.85 in expenses through the end of 1989. This figure reflects reductions of $2,970.47 and $13,407.74, respectively, to the amounts reported in the initial petition and the supplemental report for the period March 8, 1989 through September 30, 1989. The Court was advised by Milberg Weiss of the necessary corrections to the reported amounts. Several additional adjustments were made in connection with the amount of the firm's petition in the course of the Court's review. They will be addressed below.

*Meals, Hotel and Transportation*

A total of $446,646.19, after corrections, was requested by Milberg Weiss for meals, hotel and transportation expenses. Nearly half of the amount requested (over $215,000) was for travel expenses of the firm's members. Also included (improperly) in the "travel" category were some delivery expenses for local messenger service and a significant amount of local transportation expenses. With the exception noted hereafter, acceptable documentation was provided to support the amount requested, and the Court finds the expenditures reasonable. An additional 40% of the above total (nearly $177,000) was expended for hotel accommodations, including some meals, and for rental of an apartment in Seattle in 1985. Again, subject to the following exception, that amount will be allowed.

The exception referred to above consists of sixteen separate entries during 1987 for $90. Each entry indicates $30 and $60, respectively, that was paid out of petty cash to Mr. Weiss for "Lodging & Local Travel" in various or unspecified locations.

A total of $1,440 was reported for such payments during the year. The reporting of these payments, which appear to have been advances for anticipated expenses, is inappropriate and inadequate to support actual expenditures that may have been made. Accordingly, the Court will disallow half of the amount reported, $720.

■ The third type of expenditure included in the above general category included firm members' meals, both in and out of town. Approximately $13,387 was identified over the six-year period for meals that were charged by firm members and staff in their locale. This figure, as is true for other firms where a similar deduction has been taken, does not reflect meal charges that were incurred in connection with formal conferences of counsel, meetings with witnesses, or the like. It does, however, reflect charges for meals taken by employees working overtime, or simply consumed by firm members—alone or together—while they were in town. The charge for such everyday meals will not be assessed to Class members, regardless of the firm's policy of reimbursement.

### Reproduction

Milberg Weiss reports a total of $109,277.72 for in-house photocopy expenses. Initially the firm assessed 18 cents a page for such copies. In July 1985, the per-page charge increased to 20 cents. In July 1988 it again increased to 25 cents. The Court finds the assessment to Class members excessive. It will disallow $49,173 of the requested amount. A reasonable allowance of $60,105 will be awarded.

### Special Secretarial/Word Processing

■ In each of its two supplemental expense reports, Milberg Weiss indicates disbursements totalling $9,227.57 for "Special Secretarial/Word Processing." No other explanation of the expense was provided, and the Court finds that Milberg Weiss has failed to meet its burden of justifying its request for payment of what appears to be a normal expense of operation. The requested reimbursement is therefore disallowed here as it will be elsewhere.

### Staff Overtime

An application was made in the initial petition for reimbursement of $28,750.89 for "Staff Overtime." No additional information was provided to support the requested amount. The Court is not disposed to approve its payment out of settlement funds. The expense of clerical support personnel, whether or not the firm is adequately staffed during normal working hours, is not an appropriate element for an expense award. The request for payment is denied.

### Professional Experts

In its initial fee petition, Milberg Weiss reported a disbursement of $30,543.34 for "Professional Experts." In its supplemental report for the period March 7, 1989 to September 30, 1989, the firm reported an additional $48,297.47 in disbursements with the same description. The firm's requested reimbursement for these two items thus amounted to $78,840.81. In March 1990, the Court requested documentation to support the requested sum. In a subsequent letter, the firm explained that the disbursements were (at least in part) for services rendered by the law firm of Goldfein & Jacobson, which was retained as tax counsel for the settlement fund in MDL 551. The firm had been retained by Class counsel for the purpose of researching and investigating the potential tax liability for interest earned by the settlement fund. In the process of securing the documentation required by the Court, Milberg Weiss determined that the amounts previously requested had been erroneously overstated. The following adjustments have been made to the requested amounts as a result of the information provided.

(1) In its letter of April 11, 1990, the firm indicated that it had previously "included" reimbursement requests of $73,057.40 for amounts paid to Goldfein & Jacobson. The total amount previously reported by the firm for "Professional Experts" was $78,840.81. No information regarding the difference between these figures, $5,783.41, was provided to the Court. While it may represent dis-

bursements for other "professional experts," the amount will be disallowed due to the absence of supporting information. If Milberg Weiss elects to petition for that amount in the future, it may do so, provided comprehensive explanatory information regarding the related expenditure or expenditures accompanies the reimbursement request.

(2) Milberg Weiss indicates that the total amount of its out-of-pocket disbursements to Goldfein & Jacobson was actually $48,297.42. Thus, an additional $24,759.98 of the reimbursement request will be disallowed. This amount, equivalent to the first billing received from Goldfein & Jacobson, was evidently inadvertently requested in both the initial petition and the first supplemental petition.

(3) Milberg Weiss further indicates that it had been reimbursed a total of $15,691.63 by the law firms of Bernstein Litowitz and Shidler McBroom in connection with the $48,297.47 disbursement it petitioned for. Bernstein Litowitz has been awarded $7,845.81 for its payment to Milberg Weiss on behalf of Goldfein & Jacobson's work; Shidler McBroom will similarly receive an award for its $7,845.82 payment. Thus, an additional $15,691.63 will be disallowed of the amounts petitioned for by Milberg Weiss.

After the above adjustments, a total of $32,605.79 will be awarded to Milberg Weiss on behalf of the payments it made to Goldfein & Jacobson.

In its letter of April 11, 1990, Milberg Weiss further indicated that a total of $160,877.92 had been billed by Goldfein & Jacobson for its services through March 1990. Milberg Weiss requested that the Court authorize payment of $72,128.89 to Goldfein & Jacobson, the money to be paid out of proceeds of 1988 settlements. The Court declined to do so, and counsel were so advised.

The Court is unable to discern what, if any, payments have actually been made to

Goldfein & Jacobson in addition to the amounts awarded herein. There exists a difference of $40,451.56 between the net of the two amounts noted immediately above, and the total amount reimbursed to the three petitioning co-lead counsel law firms. There has been no satisfactory evidence provided to the Court, however, that that amount (or any other amount in excess of the total amount awarded) has been disbursed. Therefore, no award for it will be made at this time. Amounts paid to Goldfein & Jacobson for which no award is made at this time may be petitioned for in the future. Any future petitions for reimbursement of payments to the Goldfein law firm are to include proper evidence and computation of disbursements.

*Other*

The remaining items identified for reimbursement by Milberg Weiss are reasonable and will be allowed. These expenditures include postage, various means of communication, delivery services, outside photocopying, court reporting, legal research services and a few vaguely described "miscellaneous" items.

*Expense Award*

In accordance with the foregoing, an award of $671,748 will be made to Milberg Weiss for expenses reasonably incurred by the firm through December 31, 1989, in connection with the MDL 551 litigation.

*WPPSS Litigation Fund*

Milberg Weiss contributed $36,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, it is due a refund from that Fund.[30]

### SHIDLER MCBROOM GATES & LUCAS

The Seattle, Washington law firm of Shidler McBroom Gates & Lucas ("Shidler McBroom") applies for an award of fees for the work of thirty attorneys whose rates range from $50 to $200 an hour. At the time the petition was submitted, the firm reported a total of 27,870.3 attorney

---

**30.** The Court was provided no documentation regarding agreements, if any, among counsel who financed part of the litigation effort through contributions to the Fund. The Court assumes that full reimbursement will be made to each contributor, and that interest earnings, if any, will be distributed pro rata according to each firm's contribution.

hours worked, for a reported lodestar total of $4,415,860.50.[31] Subsequent reports of work performed after the cutoff of the initial petition raised the firm's reported total attorney hours to 28,116.4, and its attorney lodestar to $4,455,061.50. The firm was counsel of record for plaintiff Frankel Estate, one of the class representatives. The firm is no longer actively involved in this litigation, and all of the firm's reported hours will be considered at this time.

In addition to being extremely well organized, the daily time records of each of the petitioning attorneys of Shidler McBroom contain, almost without exception, meaningful descriptions of the work done. Research topics were identified, briefs on which work was reported were named, subject matter and participants in telephone conferences were stated, and activities were specified in connection with indicated documents or events. Determination of the reasonableness of reported activities was greatly facilitated because of the informative nature of the firm's time records.

*James R. Irwin*

James Irwin, a partner in the Shidler firm, was appointed co-lead Counsel by the Court.[32] He became involved in the litigation in February 1983, and was extremely active throughout. For Mr. Irwin's work, Shidler McBroom petitions for 10,866 hours at the rate of $200 an hour, for a total lodestar of $2,173,200. His reported hours were the fourth highest in the litigation; his reported lodestar was fifth highest. Like other lead counsel, he often worked long days and traveled extensively, to New York and elsewhere. He relocated to Tucson, Arizona, where he remained for several months prior to and during the truncated trial.

Mr. Irwin participated extensively, though not excessively, in nearly every facet of the litigation. He took a number of important depositions, defended others, drafted memoranda, reviewed and analyzed many documents, participated in settlement negotiations, and aided the coordination and management of the litigation. His daily time charges reflect moderate and reasonable amounts of time for the work he did. Although his time charges were not allocated among the various projects he frequently worked on in a given day, the descriptive information provided was complete, concise, and properly informative.

■ The only downward adjustments that the Court finds appropriate for Mr. Irwin's undertakings involve the following: a reduction of 354.5 hours, 50% of approximately 709 hours travel time charged; a reduction of 25 hours, approximately half of the time Mr. Irwin charged for meal meetings with co-counsel; a reduction of 33 of nearly 53 hours charged for his work on the fee petition; and a reduction of 6 hours of time charges on 7/25/87 and 7/9/88, when Mr. Irwin reported 21.1 and 19.1 hours respectively. The Court does not suggest that Mr. Irwin did not, in fact, work during those lengthy intervals. It is reasonable to assume that the productive time benefitting Class members from such lengthy sessions, however, is necessarily somewhat less than the clocked duration of time, which presumably was recorded in both instances.

For 10,447.5 hours reasonably worked by James Irwin, the firm of Shidler McBroom is awarded a lodestar fee of $2,089,500.

*David H. Binney*

Shidler McBroom petitions for 9,545.9 hours at the rate of $150 an hour, for a total lodestar of $1,431,885 for work done by David Binney, a partner. Mr. Binney was an associate of Shidler McBroom until the end of 1984, at which time he reported 1,825.8 hours worked. Mr. Binney's compensable hours worked as an associate during the years 1983 and 1984 will be paid at an associate rate, current at the time of the petition, of $130.

---

**31.** Both figures reflect minor mathematical corrections.

**32.** Shidler McBroom Gates & Lucas recently merged with another firm and Mr. Irwin no longer acts as co-lead counsel in this action.

Mr. Binney was a member of the "core group." He began working on the case in February 1983 and was initially intensively involved in document discovery activities. He participated in a number of important depositions, drafted numerous memoranda, and worked on all facets of the litigation, particularly those that concerned plaintiffs' cost and schedule allegations. He undertook substantial amounts of travel, particularly to New York and to Tucson. He relocated to Tucson for the trial, along with Mr. Irwin. The narrative descriptions of Mr. Binney's daily undertakings are appropriate, and the amounts of time spent on the described activities, with the following exceptions, are reasonable.

For 470 hours of travel time charged, a reduction of 235 hours at the appropriate rates will be made. A reduction of 6.4 hours of meal conferences with co-counsel will be taken, and a reduction of 4 hours will be made to reduce a charge of 20.4 hours on 2/28/85. The amount of time charged is considered excessive relative to the benefits provided from the work undertaken. Finally, of 154 hours charged by Mr. Binney to work on the Shidler McBroom time records and on Class counsel's fee petition, 15 will be allowed.

For Mr. Binney's work on the MDL 551 litigation, Shidler McBroom is allowed a reasonable lodestar award of $1,338,089 for 9,161.5 hours of work beneficial to Class members.

*Steve W. Berman*

■ Shidler McBroom petitions for 4,650 hours at an hourly rate of $120, for a lodestar of $558,000, for work done by Steve Berman, an associate, who left Shidler McBroom and began working on the litigation for the Bernstein Litowitz firm in 1986. The requested rate of $120 was Mr. Berman's rate at the time he left the firm. After that time, associate's rates in the firm for similar work increased to a reported high of $130. Although Class counsel firms consistently petition for prior employees' work at the rates actually in effect when they last worked, a practice the Court finds appropriate where persons ceased contributing to the litigation effort,

Mr. Berman's rate with Shidler McBroom will be set at $130 an hour. This adjustment provides Shidler McBroom with a fee award at current rates, consistent with the applications for other attorneys who continued to work on the case.

Mr. Berman began working on the WPPSS litigation in September 1983. Initially he was involved heavily in opposing defendants' motions to dismiss. Thereafter, he was occupied by discovery work, in connection with both document analysis and, later, depositions. Although his time charges often indicate relatively lengthy days, particularly when he travelled or took depositions, there is no general appearance of excessiveness in Mr. Berman's time charges with Shidler McBroom. For the period beginning in August 1985 and continuing through February 1986, however, the Court has reduced the number of hours reported by 17 due to the frequent recurrence of daily time charges that appear to be somewhat in excess of a reasonable amount of time for the activities reported. In addition, Mr. Berman's reported hours with Shidler McBroom have been reduced by 117, 50% of the approximate time he charged for travel.

For Mr. Berman's work with the firm on the MDL litigation, Shidler McBroom is awarded a reasonable lodestar of $587,080 for 4,516 hours.

*Tad Seder*

Shidler McBroom petitions for 1,598.4 hours at the rate of $95 an hour, for a total lodestar of $151,848 (as corrected) for work done by Tad Seder, an associate. Mr. Seder began working on the case in October 1987. His undertakings involved various activities, particularly document review, research and drafting. His time charges are moderate, and his explanations thorough. Mr. Seder did some travelling, and will have 20 hours deducted to eliminate unproductive time charged while in transit. His time will also be reduced by 34.4 hours allocated to work on the fee petition and to his attendance at the settlement and fee hearings, where his presence was not essential.

For Mr. Seder's work on the litigation, Shidler McBroom will receive a lodestar award of $146,680 for 1,544 hours reasonably spent to the benefit of the class.

*Frances E. Pennell*

Shidler McBroom petitions for 681.7 hours at the rate of $95 an hour, for a total lodestar of $64,761.50 for work done by Frances Pennell, an associate. Ms. Pennell's work included extensive research and drafting on a number of important topics. She also defended several depositions. Her time charges were modest, her work adequately described and reasonable. Two hours of travel time for a trip to Portland will be deducted.

For Ms. Pennell's work on the litigation, Shidler McBroom will receive a lodestar award of $64,571.50 for 679.7 hours reasonably spent to the benefit of Class members.

*William H. Gates*

Shidler McBroom petitions for 81.8 hours at the rate of $200 an hour, for a total lodestar of $16,360 for work done by William Gates, a partner.

Mr. Gates' involvement in the litigation was primarily in connection with the firm's participation in the action, and with Washington State legislation pertinent to the case. His time charges sufficiently describe the subject matter of even brief telephone conversations, which generally appear necessary and appropriate to the litigation. The following deductions will be made, however, to Mr. Gates' time charges: 2 hours for his attendance at a hearing in October 1986, an isolated and presumably unnecessary attendance; and 5.5 hours travel time for a trip to New York in 1987.

For Mr. Gates's work on the litigation, Shidler McBroom will receive a lodestar award of $14,860 for 74.3 hours reasonably spent to the benefit of Class members.

*Larry C. Locker*

Shidler McBroom petitions for 145.7 hours at the rate of $80 an hour, for a total lodestar of $11,656 for work done by Larry Locker, an associate. Mr. Locker's work, primarily research, is reflected by good documentation and reasonable time charges. The reported amounts will be awarded.

*David T. McDonald*

Shidler McBroom petitions for 49.4 hours at the rate of $150 an hour, for a total lodestar of $7,410 for work done by David McDonald, a partner. Mr. McDonald's involvement was relatively superficial and sporadic. The necessity of his attendance at a meeting in Phoenix in May 1987, to which more than half of his time was devoted, is not reflected by his time records. Because Mr. Binney attended the same meeting, Mr. McDonald's presence does not appear to have been essential, and the associated time charges will be disallowed. Twenty hours of the remaining time charged will be permitted, however, as the work appears reasonable and beneficial. For Mr. McDonald's compensable work, Shidler McBroom will receive $3,000.

*Kevin J. Harrang*

Shidler McBroom petitions for 91.6 hours at the rate of $80 an hour, for a total lodestar of $7,328 for work done by Kevin Harrang, an associate. Mr. Harrang did research and drafted memoranda on numerous germane issues. His charges were modest and well-explained and are approved as reported.

*Sue Preston*

Shidler McBroom petitions for 81.9 hours at the rate of $75 an hour, for a total lodestar of $6,142.50 for work done by Sue Preston, an associate. Ms. Preston's work involved research on fundamental litigation issues in the summer of 1984. It was reasonable, necessary, and will be permitted as reported.

*Robert W. Heller*

Shidler McBroom petitions for 66.4 hours at the rate of $85 an hour, for a total lodestar of $5,644 for work done by Robert Heller, an associate. Mr. Heller's work involved research into immunity, statute of limitation issues, and other matters asserted in connection with defendants' motions

for summary judgment. His efforts are reasonable as reported.

*Erickson Shirley*

Shidler McBroom petitions for 64.8 hours at the rate of $75 an hour, for a total lodestar of $4,860 for work done by Erickson Shirley, an associate. Mr. Shirley did research on official immunity and on the constitutionality of the "scienter amendment" of the Washington legislature, among other topics. The work was necessary, reasonable, and will be approved as reported.

*Heather L. Coughlan*

Shidler McBroom petitions for 54.7 hours at the rate of $85 an hour, for a total lodestar of $4,649.50 for work done by Heather Coughlan, an associate. For Ms. Coughlan's research on MDL and on the related Sensney action, Shidler McBroom will be allowed the reasonable amounts reported.

*Pamela Nordquist*

Shidler McBroom petitions for 39.6 hours at the rate of $85 an hour, for a total lodestar of $3,366 for research and drafting done by Pamela Nordquist, an associate. Ms. Nordquist's time charges were extremely modest and all time will be allowed as reasonable and necessary.

*Ruthann Martin*

Shidler McBroom petitions for 22.3 hours at the rate of $75 an hour, for a total lodestar of $1,672.50 for work done by Ruthann Martin, an associate. Ms. Martin did basic research. Some of her work appears to border on the type of work more properly performed by a paralegal. All of her charges were reasonable, however, and will be paid at the modest associate rate reported.

*Douglas M. Love*

Shidler McBroom petitions for 30.3 hours at the rate of $50 an hour, for a total lodestar of $1,515 (as corrected) for work done by Douglas Love, an associate. Mr. Love did research on defendants' motion to dismiss and interviewed prospective wit-

nesses. His time charges are reasonable and allowable.

*Linda K. Norman*

Shidler McBroom petitions for 14.7 hours at the rate of $85 an hour, for a total lodestar of $1,249.50 for relevant research and writing done by Linda Norman, an associate. The charges are reasonable and will be allowed.

*Richard B. Dodd*

Shidler McBroom petitions for 4 hours at the rate of $200 an hour, for a total lodestar of $800 for work done by Richard Dodd, a partner. Mr. Dodd's only time charges related to the fee application. No allowance will be awarded.

*William H. Neukom*

Shidler McBroom petitions for 3.1 hours at the rate of $150 an hour, for a total lodestar of $465 for work done by William Neukom, a partner. Mr. Neukom's work concerned case management systems. Because the Shidler McBroom firm was co-lead counsel, the work is considered to have been to the benefit of the Class and will be allowed.

*William T. Pope*

Shidler McBroom petitions for 4.3 hours at the rate of $100 an hour, for a total lodestar of $430 for work done by William Pope, an associate. For miscellaneous research and subpoena matters undertaken by Mr. Pope in 1984, the Court will allow a reasonable lodestar award of $430.

*Peter C. Spratt*

Shidler McBroom petitions for 2.5 hours at the rate of $130 an hour, for a total lodestar of $325 for work done by Peter Spratt, an associate. One hour of Mr. Spratt's time, spent on class representations [sic] research will be allowed as reported. The remaining hour and a half spent processing claim forms will be paid at a paralegal rate of $50. For Mr. Spratt's work, Shidler McBroom is awarded $205.

### Mark G. Olson

Shidler McBroom petitions for 3.8 hours at the rate of $75 an hour, for a total lodestar of $285 for work done by Mark Olson, an associate. The work was clearly done at the request of Mr. Irwin, was pertinent to the settlement of this action, and will be allowed.

### Robert Gomulkiewicz

Shidler McBroom petitions for 3.3 hours at the rate of $75 an hour, for a total lodestar of $247.50 for work done by Robert Gomulkiewicz, an associate. Except for .2 hour the time was appropriately spent on research and will be allowed. The time charged to a discussion with Mr. Seder on Mr. Gomulkiewicz' last day of work on the case will not be paid, however. For Mr. Gomulkiewicz' compensable efforts, Shidler McBroom is awarded a lodestar of $232.50.

### Keith W. Fendrick

Shidler McBroom petitions for 3 hours at the rate of $80 an hour, for a total lodestar of $240 for work done by Keith Fendrick, an associate. For research and a memorandum prepared in May 1985, the Court will allow as reasonable the 2.1 hours charged. No payment will be approved for work reported on 8/8/85, Mr. Fendrick's last work on the case, as it appeared to have no value to the class. For work at the courthouse on 7/9/84, the firm will receive payment at a paralegal rate of $50.

For 2.7 hours of Mr. Fendrick's work, Shidler McBroom will receive a lodestar award of $198.

### G. William Shaw

Shidler McBroom petitions for 2.2 hours at the rate of $100 an hour, for a total lodestar of $220 for work done by G. William Shaw, an associate. Mr. Shaw's involvement in discussions with Mr. Seder does not appear to have been of benefit to Class members, given his lack of participation in any other aspects of the case. Though the subject matter was significant, his participation appears extraneous. No award will be made for his time charges.

### Martin F. Smith

Shidler McBroom petitions for 1.5 hours at the rate of $125 an hour, for a total lodestar of $187.50 for work done by Martin Smith, a partner. Mr. Smith's time charges, in 1984, concerned discussions regarding a deposition and subpoena. His involvement is not viewed as necessary or beneficial to the Class, and no award will be made.

### Joe Adams

Shidler McBroom petitions for 1.4 hours at the rate of $80 an hour, for a total lodestar of $112 for work done by Joe Adams, an associate. The firm will receive an award of $88 for 1.1 hours of Lexis research done by Mr. Adams. No award will be made for his participation in a conference with four other attorneys in June 1988, his only other charge.

### Miriam E. Conner

Shidler McBroom petitions for 1.3 hours at the rate of $75 an hour, for a total lodestar of $97.50 for work done by Miriam Conner, an associate. Ms. Conner's only charge was for faxing documents to the trial site. Her 1.3 hours of work will be paid at a paralegal rate of $50 an hour, for a lodestar of $65.00.

### Joel S. Summer

A charge of .5 hour at the rate of $140 an hour, for a total lodestar of $70, for a conference between Mr. Joel Summer, then an associate of the firm, and Messrs. Bernstein and Irwin does not appear to have been of benefit to the Class and will be denied.

### Scott R. Vokey

Shidler McBroom petitions for .3 hours at the rate of $115 an hour, for a total lodestar of $34.50 for research done by Scott Vokey, an associate. The work appears necessary and will be paid.

The following table summarizes the foregoing lodestar awards determined reasonable for compensable work of attorney members of the Shidler McBroom firm.

## SHIDLER McBROOM GATES & LUCAS ATTORNEY LODESTAR

| Attorney | HOURS Request | Award | LODESTAR Request | Award |
|---|---|---|---|---|
| Irwin | 10,866.0 | 10,447.5 | $2,173,200.00 | $2,089,500.00 |
| Binney | 9,545.9 | 9,161.5 | 1,431,885.00 | 1,338,089.00 |
| Berman | 4,650.0 | 4,516.0 | 558,000.00 | 587,080.00 |
| Seder | 1,598.4 | 1,544.0 | 151,848.00 | 146,680.00 |
| Pennell | 681.7 | 679.7 | 64,761.50 | 64,571.50 |
| Gates | 81.8 | 74.3 | 16,360.00 | 14,860.00 |
| Locker | 145.7 | 145.7 | 11,656.00 | 11,656.00 |
| McDonald | 49.4 | 20.0 | 7,410.00 | 3,000.00 |
| Harrang | 91.6 | 91.6 | 7,328.00 | 7,328.00 |
| Preston | 81.9 | 81.9 | 6,142.50 | 6,142.50 |
| Heller | 66.4 | 66.4 | 5,644.00 | 5,644.00 |
| Shirley | 64.8 | 64.8 | 4,860.00 | 4,860.00 |
| Coughlan | 54.7 | 54.7 | 4,649.50 | 4,649.50 |
| Nordquist | 39.6 | 39.6 | 3,366.00 | 3,366.00 |
| Martin | 22.3 | 22.3 | 1,672.50 | 1,672.50 |
| Love | 30.3 | 30.3 | 1,515.00 | 1,515.00 |
| Norman | 14.7 | 14.7 | 1,249.50 | 1,249.50 |
| Dodd | 4.0 | 0.0 | 800.00 | 0.00 |
| Neukom | 3.1 | 3.1 | 465.00 | 465.00 |
| Pope | 4.3 | 4.3 | 430.00 | 430.00 |
| Spratt | 2.5 | 2.5 | 325.00 | 205.00 |
| Olson | 3.8 | 3.8 | 285.00 | 285.00 |
| Gomulkiewicz | 3.3 | 3.1 | 247.50 | 232.50 |
| Fendrick | 3.0 | 2.7 | 240.00 | 198.00 |
| Shaw | 2.2 | 0.0 | 220.00 | 0.00 |
| Smith | 1.5 | 0.0 | 187.50 | 0.00 |
| Adams | 1.4 | 1.1 | 112.00 | 88.00 |
| Conner | 1.3 | 1.3 | 97.50 | 65.00 |
| Summer | .5 | 0.0 | 70.00 | 0.00 |
| Vokey | .3 | .3 | 34.50 | 34.50 |
| Totals | 28,116.40 | 27,077.20 | $4,455,061.50 | $4,293,866.50 |

---

I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of the following individuals. An increase of their lodestar awards will accordingly be made as indicated.

For the work of Mr. Irwin, the firm will receive a multiple of 1.3 times the lodestar amount, for a total award of $2,716,350.

For the work of Mr. Binney, the firm will receive a multiple of 1.2 times the lodestar amount, for a total award of $1,605,706.80.

For the work of Mr. Berman, the firm will receive a multiple of 1.2 times the lodestar amount, for a total award of $704,496.

*Paralegals*

In addition to the hours reported for attorney members of the firm, Shidler McBroom applies for an award for the work of six law clerks and nine paralegals. When the petition was submitted, a total of 6,813.8 paralegal hours (as corrected) were reported. The figure increased to 6,820.1 hours with the submission of supplemental reports for work performed through December 31, 1989. Rates ranging from $50 to $60 per hour were utilized in determining the lodestar for the work of these individuals. Their reported lodestar, as of December 31, 1989, amounted to $352,336.50.

The time records of these staff members are, like those of attorney members of the firm, excellent. Their work was consistently well described. It was necessary to the

litigation effort and beneficial to Class Members. The firm made effective use of these lower paid personnel. One paralegal, Peter McNeill, spent almost 4,000 hours on the litigation from 1984 through early 1987, performing significant discovery work. No time charges were identified for work related to time and expense reports or for work relating to the fee petition. Nor was other inappropriate work reported.

### Paralegal Award

An award will be made to Shidler McBroom in the reasonable lodestar amount reported, $352,336.50, for paralegal work.

### Expenses

Shidler McBroom reports expenses of $454,103.25 in litigation expenses through December 31, 1989. This figure includes more than $90,000 for expenses that were previously reimbursed by the WPPSS Litigation Fund. It excludes the firm's contribution to the Fund. Unlike most other firms, Shidler provided, with its time records, a schedule of all expenditures, except those that had been previously reimbursed by the Litigation Fund. In addition, at the Court's request, more detailed information was provided to support several types of expenses. All of the information has been reviewed, and only the following two items have been determined inappropriate or inadequately supported.

A total of $1,480.45 was identified by the Court for meals taken by counsel in their own locale where no formal meeting appeared to have taken place. This figure includes $245.75 that was previously reimbursed by the WPPSS Litigation Fund. The amount, which was included in the "Travel and Subsistence" and "Business Meetings" categories, will be disallowed.

Shidler McBroom reported a total of $98,-110.99 in photocopy and printing expenses through December 31, 1989. The figure includes amounts previously reimbursed by the WPPSS Litigation Fund. It reflects outside photocopy expenditures and printing costs, as well as amounts imputed for the cost of in-house copying. The firm allocated a charge of 15 cents per copy through April of 1988, when the per-copy charge was increased to 20 cents. A reduction of $20,000 will be made to reduce the amount assessed to Class members for in-house copies, which is deemed to be excessive. A reasonable allowance of $78,111 will be allowed.

The remainder of expenses reported by Shidler McBroom are reasonable and well-documented. Recovery will be allowed.

### Expense Award

In accordance with the foregoing, an award of $432,623 will be made to Shidler McBroom for expenses reasonably incurred by the firm through December 31, 1989, in connection with the MDL 551 litigation.

### WPPSS Litigation Fund

Shidler McBroom contributed $36,000 to the WPPSS Litigation Fund. It recovered $91,621.53 from the Fund during the course of the litigation. Thus, Shidler McBroom is a debtor of the Fund. Repayment of $55,621.53 is accordingly to be made concurrent with the firm's receipt of payment for approved expenses out of the MDL 551 settlement fund.

## BARRACK, RODOS & BACINE

The Philadelphia, Pennsylvania law firm of Barrack, Rodos & Bacine ("Barrack Rodos") applies for an award of fees for the work of thirteen attorneys whose rates range from $85 to $295 an hour. At the time the petition was submitted, the firm reported a total of 2,147.1 attorney hours worked, for a reported lodestar total of $381,128.75. No supplemental lodestar report was submitted for the period after the initial petition through September 30, 1989. Thereafter, a subsequent lodestar report indicates that members of the firm performed work in October, November and December 1989, in connection with related insurance litigation. This work increased the total number of attorney hours reported to 2,369.6. It increased the firm's attorney lodestar to $425,613.75. The firm is presumably no longer actively involved in the insurance litigation, because it has not submitted additional lodestar reports. It is counsel of record for plaintiff Dr. Howard Sheldon, a class representative.

The generally vague descriptions of services indicated in the supplemental time records for the three months ended 12/31/89 do not permit the Court to reach a conclusion regarding the reasonableness of the reported activities. Therefore, none of the reported time for that period will be considered for a fee award at this time. If the firm wishes to petition later for insurance-related work done during that period, it will be required to provide the Court with substantive information regarding its involvement and contributions to the subsidiary insurance action to enable the Court to make a determination regarding the firm's entitlement to attorneys' fees. In their present fragmentary condition, the time records do not justify any award.

The deficiencies in the supplemental time reports of the Barrack Rodos firm exist, also, in the time records submitted by the firm for its activities throughout the primary MDL litigation. They will be discussed, where applicable, in the following section.

### Gerald J. Rodos

 Barrack Rodos petitions for 357.75 hours at the rate of $275 an hour, for a total lodestar of $98,381.25 for work done by Gerald Rodos, a partner. Mr. Rodos charged time to the litigation from March 1983 through January 1988. His time records provide little meaningful information regarding his activities, and many of his time charges appear quite excessive given his level of seniority. Several examples, typical of most entries, follow:

| | | |
|---|---|---|
| 3/24/83 | Telephone calls and conference | 1.25 hrs. |
| 7/ 5/83 | Analyze consolidated complaint; conference call | 3.5 hrs. |
| 7/19/83 | Conference and telephone calls re: meeting and assignments—Bernstein re: responses to discovery | 2.25 hrs. |
| 8/10/83 | Motion of Gold and correspondence review | 1.75 hrs. |
| 8/16/83 | Telephone calls and analysis of complaints | 2.25 hrs. |
| 10/13/83 | Class committee—brief in opposition to class by defendant | 6.5 hrs. |
| 12/ 7/83 | Telephone calls re: hearing; underwriters allegations; analyze documents | 6.75 hrs. |
| 2/16/84 | Telephone calls re: Smith Barney documents | .75 hr. |
| 9/11/84 | Telephone call re: case—discovery | .5 hr. |
| 11/13/85 | Reply brief; telephone calls | 4.75 hrs. |
| 5/ 8/86 | Report of counsel | 2.0 hrs. |
| 1/ 6/88 | Summary judgment brief; discuss | 3.0 hrs. |

Although some of his time entries take on meaning in context, most remain virtually unexplained. It is evident that Mr. Rodos performed some beneficial work in connection with discovery of defendant engineers and underwriters. He inspected documents, worked on interrogatories, and also did some drafting in response to attorney defendants' motion to dismiss. Most of the remainder of his work, however, was either a duplication of that of other counsel, or was simply too vaguely described to justify any fee award.

For Mr. Rodos' compensable work on the litigation, Barrack Rodos will receive a lodestar award of $19,500 for 100 hours reasonably spent to the benefit of Class members. The lodestar value for 80 of the 100 hours has been computed using a rate of $175 per hour, appropriate given the associate-level nature of the compensable discovery work he did. The remaining 20 hour allowance at his customary rate is intended to recognize the value of his attendance at meetings or in other communications with counsel.

### Edward M. Gergosian

Barrack Rodos petitions for 499.6 hours at the rate of $180 an hour, for a total

lodestar of $89,928 for work done by Edward Gergosian, a partner. While he was an associate, in 1983, Mr. Gergosian charged nearly 35 hours to preliminary matters related to the MDL litigation. He was inactive for ten months, after which, still as an associate, he worked intensively, but intermittently, for about a year on document discovery activities, generally in Washington state. Mr. Gergosian did not charge his travel time. His work on the case ceased in late 1985.

For Mr. Gergosian's preliminary work in 1983, Barrack Rodos will receive an award for 15 hours of work that reasonably provided a benefit to Class members. For his document discovery work, the firm will receive an award for 450 hours reasonably expended. The Court attributes no value to certain telephone calls, nor to status and work assignment memoranda prepared by Mr. Gergosian for his firm.

For Mr. Gergosian's work on the litigation, Barrack Rodos will receive a lodestar award of $72,075 for 465 hours at Mr. Gergosian's final associate rate of $155 per hour.

### Anthony J. Bolognese

Barrack Rodos petitions for 309.5 hours at the rate of $155 an hour, for a total lodestar of $47,972.50 for work done by Anthony Bolognese, an associate. Mr. Bolognese worked on the case between September 1985 and March 1986, and again in December and January of 1987/1988. His time entries contain adequate explanations of the work he did, which consisted of research and drafting plaintiffs' papers in their motion to compel production of SEC transcripts. He also researched and drafted plaintiffs' response to attorney defendants' motion to dismiss. Later, he did research and drafting in response to one defendant group's motion for summary judgment. For a brief period in 1986, Mr. Bolognese reviewed documents of an unspecified nature.

For Mr. Bolognese's work on the litigation, Barrack Rodos will receive a lodestar award of $45,105 for 291 hours reasonably spent to the benefit of Class members. No award will be made for 18.5 hours of inadequately explained document review.

### Leonard Barrack

Barrack Rodos petitions for 135.25 hours at the rate of $295 an hour, for a total lodestar of $39,898.75 for work reported by Leonard Barrack, a partner.

The Court encountered a great deal of difficulty in attempting to make a determination regarding either the nature or the reasonableness of work undertaken by Mr. Barrack. The descriptions accompanying his time charges were frequently meaningless. On at least 20 occasions, for example, Mr. Barrack charged time—a total of more than 22 hours—to, simply, "Discovery," "Plaintiffs' Discovery," or "Discovery Work." Occasionally he identified the other party in telephone conversations; more often he charged time merely to "telephone calls" or "telephone call(s) with counsel." Rarely was any subject matter indicated. When it was, it was vague. Topics such as "re: hearing" or "re: Smith Barney" or "re summary judgment" were stated. Other work descriptions simply indicated the name of a document or letter. Several communications with the firm's client cannot be deemed as having had value to the Class as a whole and will not, therefore, be compensated out of settlement funds.

The Court is unable to determine that any of Mr. Barrack's time reasonably accrued to the benefit of Class members. No award will be made.

### Barbara Gold

Barrack Rodos petitions for 380.5 hours at the rate of $85 an hour, for a total lodestar of $32,342.50 for work done by Barbara Gold, an associate, between October 1984 and July 1986.

Nearly all of Ms. Gold's work involved research, memo drafting and document review. Most of her time entries simply say "review documents" or "document review." The Court was provided little, if any, information as to what documents were being reviewed, or for what purpose. It is therefore unable to conclude that the charges are reasonable. Because the Court believes that her work in connection with a

UCC memorandum was purposeful and of at least potential benefit to Class members, Barrack Rodos will be awarded a lodestar of $9,350 for 110 hours reasonably related to its preparation.

*Leslie B. Molder*

Barrack Rodos petitions for 172.25 hours at the rate of $135 an hour, for a total lodestar of $23,253.75 for work in 1984 done by Leslie Molder, an associate. Essentially all of Ms. Molder's work pertained to the production and review of documents from defendants Smith Barney and United Engineers. Except for a final 2.25 hour charge, the work appears reasonable and necessary and will be paid in the amounts reported.

For 170 compensable hour of Ms. Molder's work on the litigation, Barrack Rodos will receive a lodestar award of $22,950.

*Samuel R. Simon*

Barrack Rodos petitions for 103 hours at the rate of $195 an hour, for a total lodestar of $20,085 for work done by Samuel Simon, an associate. Most of Mr. Simon's work involved the deposition of the firm's client and class representative, Dr. Howard Sheldon. The Court views the depositions of these individuals as having been essential to the litigation as a whole, and finds the 96.5 hours of work done for this purpose to be reasonable. No award for the remaining 6.5 hours, spent on unrelated discussions and document review, will be made, however.

*John G. Narkin*

Barrack Rodos petitions for 102.05 hours at the rate of $160 an hour, for a total lodestar of $16,328 for work done by John Narkin, an associate. Most of Mr. Narkin's time charges pertained to work on motions for summary judgment and appear reasonable. He also did some compensable work on class plaintiffs' answers to interrogatories. Some unrelated charges for file and correspondence review, and for internal conferences regarding a meeting of plaintiffs' counsel will be disallowed.

For Mr. Narkin's work Barrack Rodos will receive a lodestar award of $14,960 for 93.5 hours reasonably spent to the benefit of Class members.

*Timothy Broderick*

 Barrack Rodos petitions for 56.75 hours at the rate of $135 an hour, for a total lodestar of $7,661.25 for work done by Timothy Broderick, an associate. Mr. Broderick's time was all charged in April and May of 1985. His work concerned utility document review and analysis. Largely because of Mr. Broderick's subsequent abbreviated involvement, only 4 of 16.5 hours charged to preparatory review of the case will be permitted. The remaining 40.25 hours of document review, analysis and indexing appear reasonable and will be paid. For Mr. Broderick's work on the litigation, Barrack Rodos will receive a lodestar award of $5,973.75 for 44.25 hours reasonably spent to the benefit of Class members.

*John F. Innelli*

Barrack Rodos petitions for 21.95 hours at the rate of $145 an hour, for a total lodestar of $3,182.75 for work done by John Innelli, an associate. The only charges of substance for Mr. Innelli's work were on three occasions: attendance of an organizational meeting in March 1983; arrangement for service of subpoenas in May 1984; and "document designation" in May 1984. For probable benefit to the Class from these activities, the firm will receive payment for 10 of the 20.5 hours reported for them. Two of those hours, a reasonable amount of time for the subpoena arrangements, will be paid at a paralegal rate of $50 per hour.

For Mr. Innelli's work on the litigation, Barrack Rodos will receive a lodestar award of $1,260.

*Daniel E. Baccine*

Barrack Rodos petitions for 7.5 hours at the rate of $260 an hour, for a total lodestar of $1,950 for work done by Daniel Baccine, a partner. Most of Mr. Baccine's time charges were for reading various documents—i.e., "memorandum from California," "draft of class brief," "discovery responses," and "motions to dismiss." The Court is unable to ascertain what action he

took in connection with a charge to "Petition for leave to issue subpoena duces tecum." A charge of "telephone call client" will not be construed as having provided any value to Class members. None of Mr. Baccine's time charges evidence any necessary work of benefit to the Class, and no award will be made.

*William L. Weiner*

 Barrack Rodos petitions for 1 hour at the rate of $145 an hour, for a total lodestar of $145 for William Weiner's discussion and correspondence to the firm's client regarding a settlement agreement in 1988 in the action. The charge, excessive for a letter in any event, provided no benefit to other Class members, all of whom received an official notice of the settlement. It will not be allowed.

The following table summarizes the foregoing lodestar awards determined reasonable for compensable work of attorney members of the Barrack Rodos firm.

### BARRACK, RODOS & BACINE ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Rodos | 357.75 | 100.00 | $98,381.25 | $19,500.00 |
| Gergosian | 499.60 | 465.00 | 89,928.00 | 72,075.00 |
| Bolognese | 309.50 | 291.00 | 47,972.50 | 45,105.00 |
| Barrack | 135.25 | 0.00 | 39,898.75 | 0.00 |
| Gold | 380.50 | 110.00 | 32,342.50 | 9,350.00 |
| Molder | 172.25 | 170.00 | 23,253.75 | 22,950.00 |
| Simon | 103.00 | 96.50 | 20,085.00 | 18,817.50 |
| Narkin | 102.05 | 93.50 | 16,328.00 | 14,960.00 |
| Broderick | 56.75 | 44.25 | 7,661.25 | 5,973.75 |
| Innelli | 21.95 | 10.00 | 3,182.75 | 1,260.00 |
| Baccine | 7.50 | 0.00 | 1,950.00 | 0.00 |
| Weiner | 1.00 | 0.00 | 145.00 | 0.00 |
| Totals | 2,147.10 | 1,380.25 | $381,128.75 | $209,991.25 |

*Paralegals*

 In addition to the hours reported for attorney members of the firm, Barrack Rodos applies for an award for the work of an undisclosed number of law clerks and paralegals. When the petition was submitted, a total of 146.5 paralegal hours were reported. No supplemental reports were submitted for additional work performed by these persons. A rate of $60 per hour was utilized in determining the lodestar for their work. Their reported lodestar, as of December 31, 1989, thus amounted to $8,790.

Except for 32 hours charged by paralegals for review of news articles and updates of a media files, the Court finds the services rendered to be reasonable. Most of the work performed by the firm's paralegals or law clerks involved summarization and organization of deposition testimony and is deemed to have benefitted Class Members. Given the firm's limited role in the litigation, however, the disallowed charges are not considered to have provided any external benefit.

*Paralegal Award*

A lodestar award of $6,870 will be made for 114.5 hours of work reasonably undertaken by Barrack Rodos paralegals and law clerks.

*Expenses*

 Barrack Rodos reports expenses totalling $19,552 through December 31, 1989, in connection with the litigation. The firm provided adequate documentation, when ordered to, for $8,150.42 in travel expenses reported by firm members, primarily Mr. Gergosian.

A total of $6,569.42 was charged for "Reproduction/Word Processing." No doc-

umentation was provided to support the amount requested, or the division of charges between the two categories reported together. Initially, the firm charged 20 cents a page for copies. At some unspecified time during the litigation the charge was raised to 25 cents. The Court believes the amount charged to the Class in this combined category is excessive, in view of the firm's limited involvement in the action. It is also inadequately documented. Word processing costs are part of the firm's normal operating expenses. They are not appropriate charges to pass on to the Class. The firm will be granted a reasonable allowance of $2,500 for its in-house photocopy expenses. The remainder of expenses claimed in the category will be disallowed.

Also disallowed, for similar reasons, is $69.00 attributed to "Secretarial Overtime." The remaining charges are reasonable and reimbursement will be allowed.

*Expense Award*

In accordance with the foregoing, an award of $15,414 will be made to Barrack Rodos for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Barrack Rodos contributed $23,500 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## BERGER & MONTAGUE, P.C.

The Philadelphia law firm of Berger & Montague applies for an award of fees for the work of ten attorneys whose rates at the time of the petition ranged from $165 to $350 an hour. When the petition was submitted, the firm reported a total of 4,802.55 attorney hours worked and an attorney lodestar of $1,056,969.50. The firm reported additional work after the initial petition was submitted, and substantially all subsequently reported hours appear to pertain to the primary MDL 551 litigation and settlement. As a result, none of this firm's supplemental reported time through December 31, 1989, will be deferred for later consideration. Subsequent reports for work after the initial petition, after mathematical corrections, raised the firm's reported total attorney hours to 4,914.35 and its attorney lodestar to $1,081,108.50.

Berger & Montague's involvement in the litigation began in February 1983. The firm's members continued to accumulate time charges to the litigation through its conclusion. The firm is counsel of record for plaintiff Rosalyn Mirotznik, one of the class representatives.

Berger & Montague's time records are remarkably deficient. It is virtually inconceivable that a firm that has been engaged in the practice of complex and class action litigation for nearly 20 years would submit a request for an amount of money in excess of $2.5 million dollars (after its requested multiplier) supported by documentation as inferior as that provided. Almost without exception, the time records of members of the firm provide indefinite, non-specific, uninformative and generally inadequate information to permit a determination of the reasonableness of any individual's work. Consistently, subject matter, names, locations, issues and topics are omitted. The only positive aspect of firm members' timekeeping practices is that many attorneys separately entered the time spent on different undertakings within a given day. Despite the records' shortcomings, the Court has struggled to assess the work reported in them, the most detailed record available. The results of this evaluation follow.

*Jay R. Stiefel*

 Berger & Montague petitions for 3,258.65 hours at the rate of $215 an hour, for a total lodestar of $700,609.75 for work done by Jay Stiefel, a partner. Mr. Stiefel first reported work in early 1983. Mr. Stiefel often made numerous daily time entries, charging between .25 and 10 or more hours for his time. Following are characteristic time entries for some of his reported work:

| 5/22/84 | Responses to Discovery | .50 |
| 5/22/84 | Inspection/Analysis Conference | .25 |
| 5/22/84 | Responses to Discovery Inspect./Analysis | 9.00 |
| 8/30/84 | Pleadings Inspection/Analysis | 1.50 |
| 8/30/84 | Brief/Memo of Law Inspection/Analysis | 1.00 |
| 8/30/84 | Notice Telephone | .50 |
| 8/30/84 | Responses to Discovery | .50 |
| 8/30/84 | Correspondence Inspection/Analysis | .25 |
| 12/3/84 | Response to Discovery Inspect./Analysis | 3.00 |
| 12/3/84 | Depositions Conference | .75 |
| 12/3/84 | Depositions Conference | .25 |
| 12/3/84 | Depositions Preparations | 7.50 |
| 2/19/85 | Responses to Discovery Inspect./Analysis | 9.00 |
| 2/19/85 | Notice Inspection/Analysis Conference | .50 |
| 2/19/85 | Depositions Conference | 1.75 |
| 2/19/85 | Depositions Telephone | .75 |
| 3/28/85 | Depositions Telephone | .50 |
| 3/28/85 | Depositions Telephone | 5.00 |
| 3/28/85 | Depositions Preparation | 2.50 |
| 3/28/85 | Depositions Telephone | .25 |
| 3/28/85 | Depositions Conference | 7.50 |
| 1/28/86 | Interview/Invest. Telephone | .50 |
| 1/28/86 | Order/Judgment Conference | 2.00 |
| 1/28/86 | Legal Research Inspection/Analysis | .25 |

The above entries are representative of Mr. Stiefel's time recording practices throughout most of the litigation. For a brief period in 1985, an effort was made to provide more descriptive information, but even those work entries are lacking in substance. The time reports submitted for post-petition work are also somewhat more descriptive of Mr. Stiefel's undertakings. Most of those entries describe time spent on fee and expense petitions. Given the petition's defectiveness, and the lack of value to Class members, all such work will be denied in full.

The Court has no doubt that Mr. Stiefel worked on the litigation. His time records indicate that he was somewhat heavily involved in Class Plaintiffs' discovery efforts. He appears to have worked extensively on responses to motions to dismiss. He also took part in depositions. He clearly spent a great deal of time on the telephone, over correspondence, reading and conversing. The firm's expense documentation, submitted after the Court required supporting documentation for the firm's $79,000 request, sheds some light on the nature and purposes of Mr. Stiefel's discovery activities. He made a number of trips and was involved with document production efforts in New York, Seattle, Richland, Portland and Boston, at times supervising, at other times reviewing the produced documents. He also defended the depositions of a number of class representatives.

For Mr. Stiefel's work on the litigation, Berger & Montague will receive a lodestar award of $415,000 for 2,000 hours reasonably spent to the benefit of Class members on compensable activities for which sufficient understanding can be fathomed. Five hundred hours have been credited at an associate rate of $185 because Mr. Stiefel was an associate until September 1, 1984. Additionally, the Court observes that Mr. Stiefel's partner-level billing rate is somewhat high, given the nature of much of the discovery work he undertook after his advancement. Recognition of this disparity has been factored into the Court's determination of the reasonableness of the time allowable for an award. The Court believes that the award is fair—both to the firm and to the Class. Just as Class members should not bear the cost of work not

to their benefit, counsel should not provide services that are not sufficiently remunerated.

### Stephen D. Ramos

Berger & Montague petitions for 786.85 hours at the rate of $185 an hour, for a total lodestar of $145,567.25 for work done by Stephen Ramos, an associate. Mr. Ramos worked on the litigation from October 1984 until December 1985. He also appears to have charged time in October and November 1989 for compiling information regarding the firm's expense reimbursement request.[33]

Mr. Ramos' time entries are no better than Mr. Stiefel's. Most of the descriptions of his work read simply "inspect documents" or "depositions preparation" or else contain other similarly vague explanations. A number of time entries contain no explanation at all. The Court was again aided somewhat by travel expense records, which indicate that Mr. Ramos spent some time in Seattle in December 1984 on document discovery. He also made a number of trips to New York in 1985 to work on plaintiffs' case against defendant Ebasco. For Mr. Ramos' compensable discovery work on the litigation, Berger & Montague will receive a lodestar award of $70,300 for 380 hours reasonably spent to the benefit of Class members. Any greater award is simply not justified by the submitted documentation.

### David Berger

 Berger & Montague petitions for 281.25 hours at the rate of $350 an hour, for a total lodestar of $98,437.50 for work done by David Berger, a partner. Although Mr. Berger's customary billing rate may be $350 an hour, the Court does not believe that his ancillary role in this litigation was sufficient to warrant such a rate. As a result, Mr. Berger's compensable hours will be paid at a rate of $300 an hour, an amount that is more commensurate with the lesser responsibilities of non-lead counsel.

 Mr. Berger's time records contain all of the defects described above. They contain other flaws as well. Some day's entries contain multiple explanations that are assumed to be in error. On December 1, 1983, for example, the firm's time records show Mr. Berger as having worked 8 hours on "agmnt/evidnty hrg.—court appearance" and 8 hours on "agmnt/evidnty hrg.—preparation." The following day, 8 and 4 hours, respectively, were similarly charged. Another 4 hours were charged to "review—conference" on the same day. Expense documentation submitted under order reflects a number of trips to New York and elsewhere for time periods on which no time charges were made.

Time entries for Mr. Berger's reported work typically are for 1 or 2 hour amounts, though 1.5, 2.5, and sometimes more hours are also reported. Routinely, the time is charged to "pleadings," "review," "preparation," "meeting," "opinion," "inspection/analysis," and "financing." Sometimes his time entries read "Review—Telephone" or "Review—Conference," or the like, and are for a quarter or half hour. Some time is charged for travel and for Court appearances. The Court is unconvinced that Mr. Berger made any significant contribution to the litigation effort. The lack of subject matter and total absence of specificity regarding his time expenditures force a conclusion that his involvement was almost exclusively for his own, or his firm's, benefit, rather than for the benefit of the Class. For organizational efforts on behalf of his firm's involvement in discovery work, however, the Court will approve a payment of $7,500, based on the appearance in his time records of 25 hours for work that reasonably accrued to the benefit of Class members.

### Sherrie Savett

 Berger & Montague petitions for 258.75 hours at the rate of $275 an hour, for a total lodestar of $71,156.25 for work done by Sherrie Savett, a partner. Time records provided the Court reflect only

work by the person on the litigation.

---

**33.** The firm's final lodestar report shows 10.10 hours work for S.D. Ramos. It reflects no prior

255.25 hours of entries. Once again, vagueness and generalization characterize the descriptions of Ms. Savett's undertakings. Most of her time was charged before August 1984. Piecing together the firm's expense records with its contemporaneous time reports reveals that Ms. Savett participated in the early aspects of case planning and discovery work. Many hours—an excessive amount, given Ms. Savett's seniority and correspondingly high rate—were charged to "inspection/analysis" of "documents" and "pleadings." For Ms. Savett's early efforts, that reasonably provided a benefit to Class members, the firm will receive an award of $22,000 for 80 hours of work generally reflected by the firm's time records, at a rate of $275 per hour.

*Ruthann Gordon*

Berger & Montague petitions for 284.25 hours at the rate of $195 an hour, for a total lodestar of $55,428.75 for work done by Ruthann Gordon, a partner. Like Mr. Stiefel, Ms. Gordon advanced to partnership during the litigation. Nearly all of her work in the case was charged while she was an associate, however. Her compensable time will therefore be awarded at a current associate rate of $185 per hour.

Ms. Gordon's time records indicate that she primarily inspected documents. She charged approximately 70 hours travel time, and the firm's expense documentation indicates that she spent time in Washington, D.C., Seattle and Portland reviewing defendants' produced documents. Although her time entries frequently do not correspond to the dates of travel indicated on the firm's expense records, the Court recognizes that Ms. Gordon performed compensable discovery services. For her work on the litigation, Berger & Montague will receive a lodestar award of $31,450 for 170 hours reasonably spent to the benefit of Class members.

*Gary Cantor*

Berger & Montague petitions for 19.35 hours at the rate of $215 an hour, for a total lodestar of $4,160.25 for work done by Gary Cantor, a partner. Mr. Cantor charged 18.75 hours to the following general topics: inspection/analysis, conference, brief/memo of law, legal research, case planning, telephone, analysis, dictate/draft, agmnt/evidnty hrg., preparation, notice, review/redraft/amend, correspondence, and inspect documents. Absent any other information the Court cannot say that any of this time, spread over the course of the litigation, reasonably benefitted Class members or was even helpful to the litigation effort. Two later brief telephone conversations regarding the deposition of a damages expert are similarly not perceived as having been beneficial. No award will be ·made.

*Stanley R. Wolfe*

Berger & Montague petitions for 8.75 hours at the rate of $275 an hour, for a total lodestar of $2,406.25 for work done by Stanley Wolfe, a partner. Mr. Wolfe's time, all spent early in the litigation, was apparently devoted to discussions with other attorneys. It is not deemed to have provided any benefit to Class members. No award will be made.

*Daniel X. Berger*

Berger & Montague petitions for 9.5 hours at the rate of $225 an hour, for a total lodestar of $2,137.50 for work done by Daniel Berger, a partner. All but one of Mr. Berger's time entries are for "conference—review." Charges range from .5 to 1.5 hours, and were made in 1983. The single exception is for a like entry that adds "conf-DB re status of Matt." No benefit to Class members can, or will, be discerned from any of Mr. Berger's reported work.

*Karen S. Orman*

Berger & Montague petitions for 4.5 hours at the rate of $165 an hour, for a total lodestar of $742.50 for work done by Karen Orman, an associate. Ms. Orman charged 4.5 hours for "brief/memo of law—legal research" in September 1983. There is no indication of the subject that was researched, or the memorandum in connection with which the work was done. Because the work corresponded with Mr. Stiefel's work on motions, however, the Court will permit a portion of the charge.

For 2.25 hours of Ms. Orman's research at $165 per hour Berger & Montague is awarded $371.25.

*Alan M. Sandals*

Berger & Montague petitions for 2.5 hours at the rate of $185 an hour, for a total lodestar of $462.50 for work done by Alan Sandals, a partner. Mr. Sandals was an associate in 1983 when he charged .5 hour to "brief/memo of law—legal re-search," and an additional 2 hours to mo-tion/petition—closing documents." The Court will not make any award for the minimal amount of unspecified research. Unable to discern any meaning for the re-maining work, the Court will disallow it, as well.

The following table summarizes the fore-going lodestar awards determined reason-able for compensable work of attorney members of the Berger & Montague firm.

### BERGER & MONTAGUE, P.C. ATTORNEY LODESTAR

| Attorney | HOURS Request | HOURS Award | LODESTAR Request | LODESTAR Award |
|---|---|---|---|---|
| Stiefel | 3,258.65 | 2,000.00 | $ 700,609.75 | $415,000.00 |
| Ramos | 786.85 | 280.00 | 145,567.25 | 70,300.00 |
| Berger, David | 281.25 | 25.00 | 98,437.50 | 7,500.00 |
| Savett | 258.75 | 80.00 | 71,156.25 | 22,000.00 |
| Gordon | 284.25 | 170.00 | 55,428.75 | 31,450.00 |
| Cantor | 19.35 | 0.00 | 4,160.25 | 0.00 |
| Wolfe | 8.75 | 0.00 | 2,406.25 | 0.00 |
| Berger, Daniel | 9.50 | 0.00 | 2,137.50 | 0.00 |
| Orman | 4.50 | 2.25 | 742.50 | 371.25 |
| Sandals | 2.50 | 0.00 | 462.50 | 0.00 |
| Totals | 4,914.35 | 2,557.25 | $1,081,108.50 | $546.621.25 |

*Paralegals*

■ In addition to the hours reported for attorney members of the firm, Berger & Montague applies for an award for the work of 22 law clerks and/or paralegals. When the petition was submitted, a total of 736.2 paralegal hours were reported. The figure increased to 748.6 hours with the submission of supplemental reports for work performed through December 31, 1989. Rates ranging from $35 to $60 per hour were utilized in determining the lode-star for the work of these people. Their reported lodestar as of December 31, 1989, after correction of several extension errors in the original petition, amounted to $35,-318.50.

The time records for these individuals almost invariably contain imprecise descrip-tions of the work they undertook. One law clerk charged nearly all of his or her time (154.75 hours) to "Inspect documents Inter-view/Invest." Another charged a signifi-cant amount of time (over 200 hours) to "Brief/Memo of Law," "Inspection/Analy-sis," "Legal Research" or "Attorneys Fees." Yet another charged more than 115 hours for "Brief/memo of Law Legal Re-search." Occasional entries that appear to be more explicit have little or no meaning to the Court. "Read Shipulchian Order" or "Helped JRJ" or "Legal Research Jenkins-case for JRS," for instance, shed no light on the reasonableness of the reported work.

*Paralegal Award*

The Court is clearly unable to undertake a meaningful review of the reported under-takings. Nonetheless, it is apparent that some work was done that related to the litigation. In an effort to strike a balance, the Court will allow a reasonable lodestar award for 300 hours, approximately half of the time remaining after eliminating time charged for whatever work was done in connection with attorneys' fees. The award will be made at a rate of $50 per hour, for a total of $15,000.

*Expenses*

Berger & Montague reports expenses totalling $79,284.55 through December 31, 1989, in connection with the MDL 551 litigation. The largest single item, Travel, accounts for approximately 75% of the firm's expense reimbursement request. Included in that category is a total of $433.95 in various charges that were insufficiently supported by time and expense records, unnecessarily undertaken by more than one member of the firm, or otherwise associated with activities that had no benefit to Class members. The remainder of travel expenses were incurred in connection with firm members' compensable activities and will be allowed.

For reasons previously stated, reimbursement for an "Overtime" charge of $191.46 will not be awarded. Nor will $4,200 of $8,423 charged for in-house photocopying. The 25 cent per page charge assessed by the firm is deemed excessive.

*Expense Award*

In accordance with the foregoing, an award of $74,459 will be made to Berger & Montague for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Berger & Montague contributed $25,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## DAVID B. GOLD, P.C.

The San Francisco law firm of David B. Gold applies for an award of fees for the work of eleven attorneys whose rates at the time of the petition ranged from $75 to $315 an hour. At the time the petition was submitted, the firm reported a total of 9,620.75 attorney hours worked, for a reported attorney lodestar of $1,381,270. No subsequent reports were submitted.

The firm's involvement in the litigation began in March 1983. It is counsel of record for plaintiff Leonard Laub, one of the class representatives. Firm members were heavily involved in discovery work.

Although the firm initially distinguished between partners and associates in its lodestar reports, it ceased to do so in 1984.

*Lynn Ibara*

The Gold firm petitions for 4,838.25 hours at the rate of $135 an hour, for a total lodestar of $653,163.75 for work done by Lynn Ibara. Ms. Ibara began working on the case in June 1985. Her work with the Gold firm continued until January 1988. During that period, it appears that all of her work efforts were directed at this litigation. During the two and a half years, her normal monthly time charges exceeded 165 hours. Her daily charges, with few exceptions, consistently ranged between 7 and 9 hours. She often worked 6 days a week. Much of the work undertaken by Ms. Ibara was plainly tedious and intense. For months on end, she reviewed, analyzed, and categorized, according to legal issues in the case, the contents of documents produced by many different defendants and obtained from governmental agencies and news sources. She also prepared for and attended a number of depositions during the period, and analyzed and compiled deposition testimony regarding various legal issues central to the case. Her work descriptions were quite specific. The source of documents and the nature of the work she did in connection with their review are generally identified. Time entries are only infrequently the same two days in a row, and many days have multiple entries, indicating a change in the nature of work she undertook.

The Court recognizes the imperative need for this kind of work, arduous as it may have been. Ms. Ibara's billing rate is relatively moderate, her timekeeping practices were meticulous, and a lodestar award for her work will be allowed as reported, except for the following deductions: (1) 51.25 hours spent in July 1986 when she searched court transcripts for a particular quotation made by one defendant's counsel. Such a task could have been done, if at all, by a non-lawyer; (2) 10.5 hours spent in attendance at court hearings in December 1985. Her presence provided no benefit to

the Class and should not have been charged to them. No award will be made for either activity.

For Ms. Ibara's work on the litigation, the Gold firm will receive a lodestar award of $644,827.50 for 4,776.5 hours reasonably spent to the benefit of Class members.

*Timm A. Verduin*

■ The Gold firm petitions for 3,277 hours at the rate of $110 an hour, for a total lodestar of $360,470 for work done by Timm Verduin. Mr. Verduin appears to have been Ms. Ibara's predecessor in the firm's intensive discovery efforts. His work with Gold began in August 1983 and continued for almost two years, until May 1985. Initially, Mr. Verduin did research and drafted memoranda on a number of topics, including plaintiffs' responses to defendants' motions to dismiss. He prepared document requests for discovery purposes, and early in 1984 began to inspect documents produced, particularly by the utility defendants. With several intervals devoted to the preparation of legal memoranda, he continued to do document inspection and review. Beginning in May 1984, and continuing for the next year, Mr. Verduin charged between 8.5 and 10 hours a day, virtually every weekday. On Saturdays, and occasionally Sundays, he charged between 2 and 6 or more hours, usually for document review. For long intervals each daily time entry was an exact replica of prior days' entries. Most often the description of his work was simply " 'Phase 1' document review in Seattle" or "Phase 2 document analysis." Sometimes more information was provided. Review of Mr. Verduin's repetitious time entries strongly suggests that they reflect some overstatement of time spent to the benefit of Class members. Between June and November of 1984, for example, over 100 daily time entries repeatedly indicated that Mr. Verduin worked exactly 8.5 hours. It is not reasonable to accept that every day, day after day, a minimum of exactly 8.5 hours of beneficial legal work was efficiently and effectively performed. The Court does not suggest that Mr. Verduin was not present for the time intervals indicated. It merely suggests that it is reasonable to conclude that the charged time periods include nonproductive, as well as productive, activities. A reduction of approximately 5% of his otherwise compensable time will therefore be made. Because Mr. Verduin's billing rate and level are low, no greater reduction is necessary to adjust his lodestar to a reasonable figure for the work he undertook. In addition to the above, a reduction of 17 hours will be made for Mr. Verduin's charges for work on time and expense reports and for preparation of a report summarizing his activities in the litigation.

For Mr. Verduin's work on the litigation, the Gold firm will receive a lodestar award of $340,670 for 3,097 hours reasonably spent to the benefit of Class members.

*Paul F. Bennett*

■ The Gold firm petitions for 676.25 hours at the rate of $250 an hour, for a total lodestar of $169,062.50 for work done by Paul Bennett. Mr. Bennett began working on the litigation in March 1983. His initial work, performed as an associate, involved the drafting of a motion regarding the appointment of lead counsel, work on an amended complaint, and on plaintiffs' opposition to motions to dismiss. For his initial undertakings through October 1983 on these matters, the Court will allow 150 of approximately 284 hours charged. This amount of time is reasonable, given the redundance of efforts among law firms, and within the Gold firm itself. Both Mr. Bennett and Mr. Gold attended hearings during the period. Further, there was negligible value to Class members regarding counsel's positions concerning the appointment of lead counsel. The allowable time will be awarded at a rate of $200 per hour because Mr. Bennett was an associate at the time.

After October 1983, Mr. Bennett's work efforts turned towards plaintiffs' claims against Bonneville, motion and brief writing, and discovery. For his work on these matters through March 1984, for which more than 370 hours are reported, the Court will allow 315 hours of Mr. Bennett's time at the $200 per hour associate-level rate utilized above. Again, there is some

redundancy between Mr. Bennett's work and that of Mr. Gold, and others, during the period. Both men attended a hearing, for example, in March 1984. Mr. Roberts of the firm also worked on the same briefs. The reduction in Mr. Bennett's reported time offsets some of the attendant duplication of effort, as well as the resulting duplication of cost, to Class members.

After March 1984, Mr. Bennett's involvement was greatly curtailed. Only a meeting attended in July regarding document production matters appears to have had any real value to the class, and only the 10 hours charged for his participation in it will be allowed, again at an associate rate reflecting his level at the time.

For Mr. Bennett's work on the litigation, the Gold firm will receive a lodestar award of $95,000 for 475 hours reasonably spent to the benefit of Class members.

### David B. Gold

The Gold firm petitions for 426.75 hours at the rate of $315 an hour, for a total lodestar of $134,426.25 for work done by David Gold. Although Mr. Gold was relatively occupied by the litigation until the end of 1984, he was scarcely involved at all thereafter. His early work involved background and preliminary organizational matters. Later he worked on briefs, did research, and maintained communication with other counsel. For this type of work, Mr. Gold's normal billing rate is excessive. His compensable time will be paid at a rate of $300 per hour, somewhat more commensurate with his role in the litigation.

Mr. Gold's time records are relatively informative. Although the frequent absence of verbs made it somewhat difficult to determine what actions he undertook, his time charges were generally moderate and suggest that his work was not unreasonable. Many of his early efforts were directed at the consolidation of complaints. He reviewed and analyzed a number of documents, generally specified in his time records, and conducted some pertinent research concerning certain defendants. His charges were rather consistently moderate, and reasonable for the nature of the efforts indicated. Generally he charged between .75 and 2 hours for such work. He generally indicated both the other parties and the subject matter of telephone calls. No excesses nor inappropriate charges in this regard were identified. The Court believes that the number of hours charged to "reply brief re stay of execution" (or synonymous descriptions) was somewhat high, however, and has reduced the amount of time reported for this activity to 10 hours, a reduction of 26 of the hours so-charged. Between May and October 1984, 16.5 hours accumulated for various telephone calls, conferences, and review of documents. The Court finds 8 hours sufficient for these events. Similarly, a reduction of 12 of approximately 25 hours spent analyzing briefs on motions to dismiss will be made. The remainder of time will be allowed.

For Mr. Gold's work on the litigation, the Gold firm will receive a lodestar award of $114,075 for 380.25 hours reasonably spent to the benefit of Class members.

### John W. Allured

The Gold firm petitions for 150.25 hours at the rate of $225 an hour, for a total lodestar of $33,806.25 for work done by John Allured. Mr. Allured's involvement in the litigation occurred in June through August 1988, when he prepared for and participated in the deposition of several damages experts. The depositions were also attended by Mr. Simon of Milberg Weiss, who was extremely involved in that aspect of the litigation. Mr. Allured's work, as a result of the presumably secondary nature of his involvement, will be valued at a reasonable lodestar amount of $20,000, arrived at by valuing 125 hours of his time at a reasonable rate for the undertaking of $160.

### Gary Roberts

The Gold firm petitions for 118 hours at the rate of $130 an hour, for a total lodestar of $15,340 for work done by Gary Roberts. Mr. Roberts worked in March and April 1984. Much of his time related to research and drafting opposition briefs in connection with plaintiffs' motions for a stay and appointment of a receiver. Mr. Bennett also worked on those briefs. For

Mr. Robert's work, the firm will receive an award for 90 hours at the reported rate. No award will be made for work that he did later regarding judicial recusal, nor for two additional half-hour charges to unrelated matters.

For Mr. Robert's work on the litigation, the Gold firm will receive a lodestar award of $11,700 for 90 hours reasonably spent to the benefit of Class members.

### Carolyn Morris

The Gold firm petitions for 100.25 hours at the rate of $75.00 an hour, for a total lodestar of $7,518.75 for work done by Carolyn Morris. Ms. Morris did research on a number of relevant issues in the summer of 1983. She also prepared revisions to the first amended complaint and worked on interrogatories. For 94 hours of work on these matters, the Gold firm will receive an award of $7,050. No award will be made for research regarding fee applications nor for general reading about the case during the period.

### George Donaldson

The Gold firm petitions for 31.25 hours at the rate of $225 an hour, for a total lodestar of $7,031.25 for work done by George Donaldson. In 1983, Mr. Donaldson charged 14 hours for work done in connection with the appointment of lead counsel. This work was repetitious of that done by others in the firm, and was of little value to Class members. It will be disallowed. In 1984, he prepared for and attended a meeting regarding deposition scheduling. His time charges include travel to and from Seattle. Five hours will be allowed for preparation and attendance at the meeting. None of the other miscellaneous time charges will be paid.

For Mr. Donaldson's work on the litigation, the Gold firm will receive a lodestar award of $1,125 for 5 hours.

### Richard A. Rogoff

The Gold firm petitions for 2 hours at the rate of $180 an hour, for a total lodestar of $360 for work done by Richard Rogoff. Mr. Rogoff's two time charges, for miscellaneous tasks and conversations in 1983, cannot be assumed to have accrued to the benefit of Class members and will be disallowed.

### Richard D. Harmon

The Gold firm petitions for .25 hour at the rate of $215 an hour, for a total lodestar of $53.75 for work done by Richard Harmon. Mr. Harmon's single charge, for "work re researching issues in preparation for Ninth circuit" is too vague and too isolated to justify payment. Payment for his time will be denied.

### Mark A. Stump

The Gold firm petitions for .5 hour at the rate of $75 an hour, for a total lodestar of $37.50 for research on court rules done by Mark Stump in 1983. This reasonable charge will be allowed.

The following table summarizes the lodestar awards for compensable work of attorney members of the Gold firm.

## DAVID B. GOLD, P.C. ATTORNEY LODESTAR

| Attorney | HOURS Request | HOURS Award | LODESTAR Request | LODESTAR Award |
|---|---|---|---|---|
| Ibara | 4,838.25 | 4,776.50 | $653,163.75 | $644,827.50 |
| Verduin | 3,277.00 | 3,097.00 | 360,470.00 | 340,670.00 |
| Bennett | 676.25 | 475.00 | 169,062.50 | 95,000.00 |
| Gold | 426.75 | 380.25 | 134,426.25 | 114,075.00 |
| Allured | 150.25 | 125.00 | 33,806.25 | 20,000.00 |
| Roberts | 118.00 | 90.00 | 15,340.00 | 11,700.00 |
| Morris | 100.25 | 94.00 | 7,518.75 | 7,050.00 |
| Donaldson | 31.25 | 5.00 | 7,031.25 | 1,125.00 |
| Rogoff | 2.00 | 0.00 | 360.00 | 0.00 |
| Harmon | .25 | 0.00 | 53.75 | 0.00 |
| Stump | .50 | .50 | 37.50 | 37.50 |
| Totals | 9,620.75 | 9,043.25 | $1,381,270.00 | $1,234,485.00 |

## Paralegals

In addition to the hours reported for attorney members of the firm, the Gold firm applies for an award for the work of ten law clerks and paralegals. When the petition was submitted, a total of 138.5 paralegal hours were reported. No additional work was reported. Rates ranging from $45 to $60 per hour were utilized in determining the lodestar for the work of these persons. Their reported lodestar, as of December 31, 1989, amounted to $7,016.25.

The work of these individuals is adequately explained. A deduction of 66 hours, with a corresponding lodestar of $3,631.25, will be made to eliminate time charged almost exclusively for work on time and expense reports, however.

## Paralegal Award

For the remaining 72.5 hours reasonably spent on activities of benefit to the Class, a lodestar of $3,385 will be awarded to the Gold firm.

## Expenses

The Gold firm reports expenses totalling $87,131.57 through December 31, 1989, in connection with the MDL 551 litigation. Travel, including the rental of a Seattle apartment during the discovery phase of the litigation, accounts for the majority— nearly 80%—of the firm's reported expenses. The Gold firm was required to provide supporting documentation for the amount requested in its initial fee petition. The firm did not provide much of the information that was specifically requested by the Court, however. As a result, tedious examination of time and expense records associated with various amounts, dates, and firm members was necessary. In that examination, $3,769.39 was identified that was inadequately documented and not apparently associated with compensable activities. It will be disallowed.

In addition, $2,294 of $9,177.68 in photocopy charges will be disallowed for reasons discussed previously. The firm charged 15 cents a copy through October 1988 and 20 cents a copy thereafter.

A charge of $797.31 for "Special Secretarial" will be disallowed, also for reasons previously discussed. Finally, a charge of $391.50 attributed to "Miscellaneous" will be disallowed. The firm adequately described a $9.60 reimbursement specifically requested for telecopy charges and a $12.50 request for legal costs/filing fees. It would not have been too great a burden to have provided some explanation for this request for nearly $400. The Court does not question that the money was expended by this, or other, firms. It is unable to determine without descriptive information, however, that the expenditure (or expenditures) constituted an appropriate charge for Class members to bear.

## Expense Award

In accordance with the foregoing, an award of $79,880 will be made to the Gold firm for litigation expenses reasonably incurred in this action through December 31, 1989.

## WPPSS Litigation Fund

The Gold firm contributed $23,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## GOODKIND, LABATON & RUDOFF

The New York City law firm of Goodkind, Labaton & Rudoff ("Goodkind") applies for an award of fees for the work of eighteen attorneys whose current rates at the time of the petition ranged from $85 to $320 an hour. At the time the petition was submitted, the firm reported a total of 2,090.4 attorney hours worked, for a reported attorney lodestar total of $406,039.90. No subsequent work was reported.

The firm's involvement in the litigation began early in 1983 and continued through the end of 1988. The firm is counsel of record for plaintiff Debra Bonseigneur as Executrix for the Estate of Paul J. Bonseigneur, one of the class representatives. The daily time records provided to the Court consist of two different types of computer printouts: one reflecting time

worked before April 1984; the other reflecting firm members' efforts thereafter.

*Robert S. Schachter*

Goodkind petitions for 759.9 hours at the rate of $210 an hour, for a total lodestar of $159,579 for work done by Robert Schachter, a partner. Mr. Schachter began working on the litigation for Goodkind in March 1983. He worked for the Goodkind firm until the end of 1984, after which he joined the firm of Zwerling, Schachter and Zwerling, where he continued to work on the litigation. He initially worked on the complaint of Ms. Bonseigneur, executrix of the estate of Paul Bonseigneur. During 1983, in addition to work on behalf of the firm's client, he worked on consolidation of the complaints, class certification, appointment of lead counsel, document requests, interrogatories, and several motions. He attended several Court hearings and maintained communication with co-counsel. By late 1983 he had become involved with the administration of the WPPSS Litigation Fund, which would occupy much of his time later on. Mr. Schachter's time charges are generally reasonable and moderate, often totalling less than an hour for a number of specified tasks. The descriptive information provided is sufficient to provide an adequate perception of the work he did, although a general over use of the phrase "attention to" precludes any real understanding of much of his actual work. Telephone conversations are often described only as having taken place with "adversary" or with "co-counsel." Generally, however the subject matter of such calls is specified. After March 1983, with the change in the firm's time recording system, Mr. Schachter's work descriptions became more meaningful. Although he continued to be involved with discovery work, his attention frequently turned to the Litigation Fund.

In addition to a reduction of 12 hours for a portion of Mr. Schachter's early work on behalf of the firm's client that cannot be said to have benefitted the entire class, the Court will allow all but 29.9 hours of the time reported for Mr. Schachter's work with the Goodkind firm. Those hours have been deducted to correct several duplicate entries, to eliminate an entry for 11.9 hours described simply as "adjustment," and to reduce the time charged for June 1983 travel and for a May 1984 trip to Seattle.

For Mr. Schachter's work on the litigation, Goodkind will receive a lodestar award of $150,780 for 718 hours reasonably spent to the benefit of Class members.

*Stuart D. Wechsler*

Goodkind petitions for 184.8 hours at the rate of $320 an hour, for a total lodestar of $59,136 for work done by Stuart Wechsler, a partner. Many of Mr. Wechsler's time charges are extremely excessive for work of the type he did. Much of his activity is poorly described, and none of his work justifies assessing Class plaintiffs at his customary rate.

On March 5, March 6, and March 7, 1983, Mr. Wechsler charged 43.6 hours to preparation and/or research of his client's complaint. On March 8, 1983, he charged 9 hours to "telephone/co-counsel." On March 10, 1983, he charged 14.3 hours to "conf/firm atty research var tel calls" (6 hours) and "review file telephone client" (8.3 hours). Excessively large time charges continued thereafter for in-house conferences with other attorneys, telephone calls, file review, research, unspecified review and, frequently, totally undescribed activities. Because the time charges were plainly excessive for the work described, and because some of the initial complaint work duplicated or was otherwise of no benefit to the Class as a whole, the Court will allow as reasonable only 60 of 171.7 hours reported by Mr. Wechsler through July 1984.

After July 1984, Mr. Wechsler charged only small amounts of time for sundry reviews, conferences, and telephone calls. One fifth of 15 hours reported over the next three years lacked any work description. The remaining 12 hours appear to have had little potential or real value to the Class. Only 3 hours of the reported time charges in that period will be permitted as having been reasonable and of probable benefit to the Class.

For Mr. Wechsler's work on the litigation, Goodkind will receive a lodestar award of $18,900 for 63 hours reasonably spent to the benefit of Class members. Because of his ancillary role in the litigation, a rate of $300 per hour has been used to value Mr. Wechsler's time.

### Marc H. Fryburg

Goodkind petitions for 516.8 hours at the rate of $145 an hour, for a total lodestar of $74,936 for work done by Marc Fryburg, an associate. Mr. Fryburg charged time to the litigation from September 1983 through September 1985. Work descriptions for his early involvement are generally inadequate. Frequently, "research" or "conf/firm atty" or "analyze" is the only explanation offered to account for 4 or more hours of time in a given day. It is clear that he did some limited early work on interrogatories and document requests and inspection of documents produced by Moodys, Standard and Poors, and Prudential Bache. The Court will allow 90.2 of the hours charged by Mr. Fryburg through the end of March 1984 as reasonable, given the descriptions of the work he accomplished. Very little credit is given for his frequent charges for conferences with the firm's attorneys or for other inadequately explained activities during the period.

After March 1984 Mr. Fryburg continued discovery work, prepared for and took part in depositions. The firm's work records indicate that he charged 398.3 hours for additional work. A deduction of 45 hours will be made for the following time reported during that period where the entries appear erroneous, unreasonable, or otherwise unacceptable: various generalized conferences with Mr. Schachter and a law clerk "re: summary judgment," repetitive descriptive entries for a single day, time charged to "misc," time charged without any description, and 15.1 hours charged to "adjustments."

For Mr. Fryburg's work on the litigation, Goodkind will receive a lodestar award of $64,307.50 for 443.5 hours reasonably spent to the benefit of Class members.

### William A. Kass

Goodkind petitions for 131 hours at the rate of $250 an hour, for a total lodestar of $32,750 for work done by William Kass, a partner. Mr. Kass reported 262.8 hours worked on the firm's lodestar reports as of August 31, 1984. Thereafter, his previously reported work was reduced by slightly over 50%, and the firm petitions for only that amount. Although the firm has offered no explanation for the reduction in its petition, it is evident from the detailed billing report submitted that Mr. Kass' time charges were excessive and of questionable merit. Nearly all of his work, which began in March 1983, was charged to "research" or "review file." Few exceptions exist. Where they do, substance is lacking. The only reported work of conceivable value to Class members consists of some time charged to research regarding factual findings in connection with plaintiffs' response to defendants' motions to dismiss. For 8 hours of this work, which the Court assumes provided some benefit to Class members, Goodkind is awarded a lodestar fee of $2,000.

### Robert I. Harwood

Goodkind petitions for 93.9 hours at the rate of $270 an hour, for a total lodestar of $25,353 for work done by Robert Harwood, a partner. Mr. Harwood made a court appearance in July 1983. He will be awarded 11 of approximately 15 hours related to preparation, travel and the appearance itself. Thereafter, for reasonable amounts of time spent on depositions, proof-of-claim procedures, settlement, notice and tax issues, the firm will receive an award for 78 hours reasonably spent. A small deduction has been made to offset administrative charges for time and expense reporting and for the firm's administration of its contribution to the WPPSS Litigation Fund.

For Mr. Harwood's work on the litigation, Goodkind will receive a lodestar award of $24,030 for 89 hours reasonably spent to the benefit of Class members.

### Linda Sweet

Goodkind petitions for 103.8 hours at the rate of $140 an hour, for a total lodestar of

$14,532 for work done by Linda Sweet, an associate. Ms. Sweet charged time to the action between April and June 1987. Her time was exclusively directed towards obtaining adequate proof-of-claim documentation for deficient claims submitted by bondholders and Class members. Her work descriptions are complete and meaningful, the time appears reasonable, and the petitioned time, except for a small deduction for commuting time charged, will be allowed as reported.

Goodkind will receive $14,420, a reasonable lodestar amount for 103 hours of Ms. Sweet's work.

*Michael Sullivan*

Goodkind petitions for 102.9 hours at the rate of $90 an hour, for a total lodestar of $9,261 for work done by Michael Sullivan, an associate. Mr. Sullivan worked on the case in 1983. His time charges indicate that he did research and worked on the complaint, a memo and a motion. He also revised and reviewed document requests and drafted interrogatories. His charges do not indicate anything more specific regarding the work he did. His work appears to largely duplicate that of that of Messrs. Schachter and Wechsler. Except for his work on document requests and interrogatories, the Court concludes that any allowance for his inadequately described undertakings would be improper.

For 7.3 hours of Mr. Sullivan's time, Goodkind will receive a reasonable lodestar award of $657.

*Diane T. Zilka*

Goodkind petitions for 54.2 hours at the rate of $160 an hour, for a total lodestar of $8,672 for work done by Diane Zilka, an associate. Ms. Zilka's work was done in March and April 1988. She charged approximately 6 hours to miscellaneous discussions and review regarding the settlement. The remainder of her work was charged to "Bondholder Assistance Program." No further information was provided. The Court believes that Ms. Zilka's work, particularly given her lack of involvement in the litigation prior to this

time, could have been performed by a paralegal. Since her work descriptions fail to contradict this perception, Ms. Zilka's work will be paid at a rate of $50 per hour.

For Ms. Zilka's work on the litigation, Goodkind will receive a lodestar award of $2,710 for 54.2 hours reasonably spent to the benefit of Class members.

*Marc Isaacs*

Goodkind petitions for 87.2 hours at the rate of $95 an hour, for a total lodestar of $8,284 for work done by Marc Isaacs, an associate. Mr. Isaacs did discovery work in February 1984. Although his time records do not indicate where he did the work, the firm's expense information, required by the Court, shows that he went to Seattle. Mr. Isaacs charged 8 hours travel time on February 12 and February 18. In addition, he charged an additional 2.5 hours preparing to travel. While in Seattle, he charged 10.5 hours each day for five days for travel and discovery work. Considering that this work, along with some additional preparation, was the only work done by Mr. Isaacs, the Court believes it is reasonable to allow 50 of the 87.2 hours charged, for work that presumably accrued to the benefit of Class members.

For Mr. Isaacs' discovery work, Goodkind will receive a lodestar award of $4,750 for 50 hours reasonably spent.

*Jeffrey A. Gallant*

Goodkind petitions for 27.6 hours at the rate of $270 an hour, for a total lodestar of $7,452 for work done by Jeffrey Gallant, a partner. Most of Mr. Gallant's time was charged in December 1988. Prior to that, in 1983, he had one 3–hour charge for "attention to discovery" and another small charge for in-house communications. The 1988 time charges primarily involved research, in-house discussions and review regarding tax issues related to the settlement fund, although 6 hours were simply charged to "WHOOPS," or in one instance, "WHOOPS JHR." For the reasonable value of Mr. Gallant's work, Goodkind will receive a lodestar award of $2,700 for 10

hours reasonably spent to the benefit of Class members.

### John H. Riley

Goodkind petitions for 13.5 hours at the rate of $180 an hour, for a total lodestar of $2,430 for work done by John Riley, an associate. Mr. Riley charged all of his time in December 1988, when he did research and prepared a memo regarding taxes. It is evident that the work related to Mr. Gallant's undertakings in the same time frame. Mr. Riley's time charges are reasonable and will be allowed as reported.

### Lawrence A. Sucharow

Goodkind petitions for 6.9 hours at the rate of $270 an hour, for a total lodestar of $1,863 for work done by Lawrence Sucharow, a partner. Mr. Sucharow's time charges consist of 7 time entries. Two, in 1983, were for in-house discussions for which no topic was stated. The remaining charges were for arrangements for administrative work, for discussions, and for other undefined attention to tax issues in December 1988. None of Mr. Sucharow's work will be compensated. It was redundant and indefinite and cannot be deemed of value to Class members or to the litigation effort overall.

### Jonathan M. Plasse

Goodkind petitions for 3 hours at the rate of $240 an hour, for a total lodestar of $720 for work done by Jonathan Plasse, a partner. Mr. Plasse charged his time for reviewing a Class Notice in September 1987, and for discussing it with Mr. Schachter. Isolated, and excessive as it is, the charge for this redundant review will be disallowed.

### Richard K. Rosenblum

Goodkind petitions for 2.4 hours at the rate of $200 an hour, for a total lodestar of $480 for work done by Richard Rosenblum, a partner. Mr. Rosenblum's time was spent in March 1983 working on a draft agreement regarding a guaranty of credit. Presumably his work was strictly for the firm's benefit, and will be disallowed.

### Edward Labaton

Goodkind petitions for 1 hour at the rate of $320 an hour, for a total lodestar of $320 for work done by Edward Labaton, a partner. Mr. Labaton conferred with the firm's attorneys in March 1983. No conceivable benefit accrued to the Class as a result of this ill-defined discussion. The charge will not be allowed.

### Joseph V. Sternberg

Goodkind petitions for .5 hour at the rate of $270 an hour, for a total lodestar of $135 for work done by Joseph Sternberg, a partner. In April 1988, Mr. Sternberg received a telecopy and conferred with two attorneys. The activity does not warrant reimbursement at this rate. It will be paid at a paralegal rate, however, and Goodkind will receive a lodestar award of $25.

### Dana Mark

Goodkind petitions for .6 hour at the rate of $170 an hour, for a lodestar of $102 for a December 1988 charge for "JAG/Settlement Fund" by Dana Mark, an associate. The firm will receive no compensation for Mr. Mark's isolated participation in this activity.

### Ruth Goodstein

Goodkind petitions for .4 hour at the rate of $85 an hour, for a total lodestar of $34 for work done by Ruth Goodstein, an associate. Half of this time was charged for undefined "research" early in the litigation. An explanation for the other 12 minutes' work for which the firm requests payment was not located. No time will be allowed.

The following table summarizes the lodestar awards for compensable work of attorney members of the Goodkind firm.

## GOODKIND, LABATON & RUDOFF
### ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|----------|--------|--------|--------------|--------------|
| | Request | Award | Request | Award |
| Schachter | 759.90 | 718.00 | $159,579.00 | $150,780.00 |
| Wechsler | 184.80 | 63.00 | 59,136.00 | 18,900.00 |
| Fryburg | 516.80 | 443.50 | 74,936.00 | 64,307.50 |
| Kass | 131.00 | 8.00 | 32,750.00 | 2,000.00 |
| Harwood | 93.90 | 89.00 | 25,353.00 | 24,030.00 |
| Sweet | 103.80 | 103.00 | 14,532.00 | 14,420.00 |
| Sullivan | 102.90 | 7.30 | 9,261.00 | 657.00 |
| Zilka | 54.20 | 54.20 | 8,672.00 | 2,710.00 |
| Isaacs | 87.20 | 50.00 | 8,284.00 | 4,750.00 |
| Gallant | 27.60 | 10.00 | 7,452.00 | 2,700.00 |
| Riley | 13.50 | 13.50 | 2,430.00 | 2,430.00 |
| Sucharow | 6.90 | .00 | 1,863.00 | 0.00 |
| Plasse | 3.00 | .00 | 720.00 | 0.00 |
| Rosenblum | 2.40 | .00 | 480.00 | 0.00 |
| Labaton | 1.00 | .00 | 320.00 | 0.00 |
| Sternberg | .50 | .50 | 135.00 | 25.00 |
| Mark | .60 | .00 | 102.00 | 0.00 |
| Goodstein | .40 | .00 | 34.00 | 0.00 |
| Totals | 2,090.40 | 1,560.00 | $406,039.00 | $287,709.50 |

*Paralegals*

In addition to the hours reported for attorney members of the firm, Goodkind applies for an award for the work of 16 law clerks, paralegals and legal assistants. When the petition was submitted, a total of 2,158.1 paralegal hours were reported. Additional work was not reported. Rates ranging from $20 to $65 per hour were utilized in determining the lodestar for the work of these people. Their reported lodestar, as of December 31, 1989, amounted to $106,728.

Most of the work reported by these individuals was adequately described and reasonable. The following will not be allowed, however: 49.8 hours charged by four different people for work on time and expense reports; 29 hours, recorded by two persons, that lacked descriptive information; 8 of 16 hours charged by one person in four separate entries for a single day; and 41 of 82 hours of "travel" time charged by two people for local commuting. The corresponding lodestar for these 127.8 hours, $5,655, will be deducted.

*Paralegal Award*

An award of $101,073 will be made to the Goodkind firm for work that was of benefit to Class Members.

*Expenses*

■ Goodkind reports expenses totalling $31,595.51 through December 31, 1989, in connection with the MDL 551 litigation. Of this amount, $147.95 was previously reimbursed to the firm by the WPPSS Litigation Fund.

Goodkind reported a total of $11,250.66 for Transportation, Meals and Hotels. The firm was required to provide additional information in support of the requested reimbursement. Included in this category was $106.55 in personal automobile parking, mileage and toll costs for Mr. Schachter for an unspecified number of late nights worked between April and October 1983. The charge is not an acceptable one for assessment to Class members, and it will be disallowed. An additional charge of $957.68 for meal, subway, and taxi expenses in connection with overtime worked by the support staff between March 1983 and March 1984 will be partially disallowed. In the absence of sufficient supporting information, the Court will allow $250 of the

lump sum charged. This amount is deemed reasonable for transportation expenses included in the figure. The remaining $707.68 is assumed to pertain to local meal expenses and will not be awarded. Finally, $350.33 that was separately attributed to taxis, subway and meals in a category headed "Miscellaneous" will be disallowed for lack of supporting information.

The firm reported $9,258.64 for in-house duplicating expenses. Most of the charges, incurred prior to mid–1984, were assessed at a rate of 10 cents per page. In 1984, the firm increased its per-page charge to 20 cents, where it remains. The court will allow $8,500 of the requested amount as a reasonable allowance.

For reasons previously described, a $4,145.19 charge for Overtime and a $62.23 "Miscellaneous" expense will not be allowed. The firm requested reimbursement for a 60 cent item, and for $5.50 in special printing costs. The amount requested for unexplained miscellaneous expenditures could have been at least equally well described.

*Expense Award*

In accordance with the foregoing, an award of $25,465 will be made to Goodkind for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Goodkind contributed $16,000 to the WPPSS Litigation Fund. It recovered $147.95 from the Fund during the course of the litigation. Thus, the firm is due a refund from that Fund net of the previous compensable reimbursement.

GRAHAM & DUNN

The Seattle law firm of Graham & Dunn applies for an award of fees for the work of eleven attorneys. Three of the eleven attorneys began working on the litigation late in 1989 and worked exclusively on related insurance litigation. The Court will not, therefore, undertake consideration of any of their work at this time. Three other attorneys worked both on the MDL litigation and on a related insurance action. Consideration of a fee award for the portions of their work that pertained to the insurance litigation will also be deferred until such time as a new petition is filed for it. This Order will indicate the deferred work for each of the latter three attorneys. Approximately 215 hours of attorney work has been deferred and may be petitioned for later at appropriate rates.[34]

At the time the petition was submitted, the firm reported a total of 7,353.9 attorney hours worked, for a reported attorney lodestar total of $978,253.50.[35] Subsequent reports for work performed after March 10, 1989, raised the firm's reported total attorney hours, including those hours for which consideration has been deferred, to 7,703.4 and its reported attorney lodestar to $1,052,891. The firm's supplemental lodestar reports reflect rate changes for several attorneys. The rates in effect in August 1988 will be used by the Court to determine fee awards for work considered in this Order, however, consistent with the treatment given other firms. Corrections to hours initially reported have also been made where appropriate.

The firm's involvement in the litigation began in January 1983 and continued through the end of 1989. The firm is counsel of record for several class representatives. Very early in 1983 the firm began to coordinate its efforts with other class counsel and was quite actively involved. After the appointment of lead counsel, the firm's activities declined significantly.

Aside from the changes to the initial petition amounts noted above, the firm's time reports are good and generally contain adequate explanations of the work done by the firm's members.

*Michael E. Kipling*

Graham & Dunn petitions for 5,381.6 hours for work done by Michael Kipling, a

---

34. The three who worked exclusively on insurance litigation are Attorneys Velling, Gordon and Koblentz. Messrs. Frederickson, Kipling and Pym worked on both actions.

35. The figures reported for 5 attorneys and 2 paralegals for time worked through 12/31/88 were changed on an attachment to a later lodestar report.

partner. The initial petition was submitted at a rate of $140 an hour. The Court will defer consideration of 73.7 hours reported for insurance litigation work done in November and December 1989. Mr. Kipling's reported lodestar, for 5,307.9 hours of work on the primary MDL action, is thus adjusted to $743,106.

Mr. Kipling worked as an associate from June 1983 until August 1985. Compensable work done during that interval will therefore be paid at an associate rate of $120. During the period the firm reported 1,818 hours of his work on the case.

Mr. Kipling's descriptive narratives accompanying his time charges are informative and generally complete. Documents were named, individuals were specified, and the subject matter of his undertakings was usually identified. His time charges were modest and reasonable for the nature of work he did. He was a member of the "core group" of attorneys, and was heavily involved in document discovery work, in depositions and in the preparation of a number of memoranda concerning issues significant to the litigation. There is no indication of overstatement of the work intervals for his undertakings. His time charges varied from day to day, and fluctuated significantly and realistically. Many days' time charges for document review, for example, were well below eight hours. Long days were also worked, particularly during depositions. Overall, Mr. Kipling's recorded time entries appear reasonable and valid. They are satisfactory as stated. The only deductions that the Court has identified for Mr. Kipling's time charged to the litigation involve the following: 119 of approximately 240 hours included in his work descriptions for travel, 40 of which were reported while he was an associate. An additional 35 hours charged in 1989 for work on the firm's time and expense reports and on Class counsels' fee petition will also be disallowed. The reasons for disallowance of these charges have been stated previously.

For Mr. Kipling's work on the litigation, Graham & Dunn will receive a lodestar award of $685,986 for 5,153.9 hours reasonably spent to the benefit of Class members.

*Alan Schulman*

Graham & Dunn petitions for 1,190.4 hours at the rate of $115 an hour, for a total lodestar of $136,896 for work done by Alan Schulman. Mr. Schulman was a partner of the firm until March 31, 1984, when he left the firm to join Milberg Weiss. The firm's initial petition erroneously understated Mr. Schulman's hours at 1,126.2. Mr. Schulman, a member of the "core group," worked on the litigation from early 1983 and remains active today. His rate when he left Graham & Dunn will be adjusted in computing the firm's lodestar award, as it was for Mr. Berman's work at Shidler McBroom before he joined Bernstein Litowitz. Mr. Schulman's compensable time with Graham & Dunn will be paid at a rate of $130 per hour to recognize the continued value of his efforts to Class plaintiffs in a manner consistent with that given the work of other attorneys who continued to work on the litigation and whose current rates were utilized in the petition. This treatment will also recompense Graham & Dunn more equitably.

Throughout the time he worked for Graham & Dunn, Mr. Schulman's time charges were well explained, moderate and reasonable. He regularly specified the names of individuals, documents and the subject matter of conferences and telephone calls. A number of rather lengthy days, including one in which he charged 22.5 hours, reflected the inclusion of travel time, for which a 50% deduction of 45 hours will be made. An additional deduction of 15 hours will be made to offset what appears to be excessive time charges for his work over a two and a half week period in December 1983 on the Second Amended Complaint. During that interval at least 146 hours were charged by Mr. Schulman, often in 12 to 16 hour blocks of time. A final deduction of 10 hours will be made for time charged on 10/18/83 for which no description was provided.

For Mr. Schulman's work on the litigation, Graham & Dunn will receive a lodestar award of $145,652 for 1,120.4 hours

reasonably spent to the benefit of Class members.

*Thomas K. Daglish*

Graham & Dunn petitions for 591.7 hours at the rate of $95 an hour, for a total lodestar of $56,211.50 for work done by Thomas Daglish, an associate. Mr. Daglish worked on the case from July through November of 1984. His primary work was document review and, like other attorneys so occupied, his work descriptions reveal little else about the intense undertaking. Prior to this work, he engaged in some research and studied the background of the litigation. His daily charges for the discovery work generally ranged between 4 and 8 hours, and the Court perceives neither excessiveness nor overstatement of productivity in them.

For Mr. Daglish's work on the litigation, Graham & Dunn will receive a lodestar award of $56,211.50 for 591.7 hours reasonably spent to the benefit of Class members.

*Bruce M. Pym*

Graham & Dunn petitions for 232.7 hours, as corrected, at the rate of $165 an hour, for a total lodestar of $38,395.50 for work done by Bruce Pym, a partner. An additional 3.3 hours reported in supplemental lodestar reports for work done in connection with related insurance litigation will not be considered at this time and may be petitioned for later.

Nearly all of Mr. Pym's work on the case occurred prior to August 31, 1984. He was instrumental in class counsels' early organizational efforts. His work descriptions are excellent and his time charges for enumerated activities were extremely moderate and unquestionably reasonable. Often as little as .1 hour was charged for review of specified documents, conferences with class or opposing counsel, and similar undertakings. Although many of his time charges exceeded such amounts, his work descriptions and time charges were, without identified exception, exemplary. A deduction of 8 hours will be made, to adjust his travel time charges by 50%, and a further reduction of .4 hours is necessary to eliminate a duplicate entry for 4/18/83.

For Mr. Pym's work on the litigation, Graham & Dunn will receive a lodestar award of $37,009.50 for 224.3 hours reasonably spent to the benefit of Class members.

*Fred O. Frederickson*

Graham & Dunn petitions for 70.4 hours at the rate of $140 an hour, for a total lodestar of $9,856 for work done by Fred Frederickson, a partner. An additional 28.8 hours were reported for Mr. Frederickson's work on insurance litigation at the end of 1989. The Court will defer assessment of that work until such time as a petition including it is filed.

Mr. Frederickson's work in MDL 551 was almost all undertaken in the final months of 1983. He primarily undertook research and prepared a memorandum in connection with immunity issues raised in defendants' motions to dismiss. Except for 14 hours charged on 9/30/83 and 10/1/83, for which no description was provided, the Court will allow Mr. Frederickson's time as reasonable.

For Mr. Frederickson's work on the litigation, Graham & Dunn will receive a lodestar award of $7,896 for 56.4 hours reasonably spent to the benefit of Class members.

*Douglas C. Berry*

Graham & Dunn petitions for 61.1 hours at the rate of $120 an hour, for a total lodestar of $7,332 for work done by Douglas Berry, a partner. Mr. Berry was an associate when his work was done in 1984, and compensable hours will therefore be awarded at a current associate rate of $95. His work primarily involved research on fundamental legal issues and his time will be allowed as reported.

For Mr. Berry's work on the litigation, Graham & Dunn will receive a lodestar award of $5,804.50 for 61.1 hours of associate level work reasonably done to the benefit of Class members.

*Irvin W. Sandman*

Graham & Dunn petitions for 23.1 hours, as corrected, at the rate of $125 an hour, for a total lodestar of $2,887.50 for work done by Irvin Sandman, a partner. Mr. Sandman's work, involving research on class actions was reasonable. It was done

while he was an associate and will be paid at his high associate rate of $100.

For Mr. Sandman's work on the litigation, Graham & Dunn will receive a lodestar award of $2,310 for 23.1 hours reasonably spent to the benefit of Class members.

### Gary D. Robbins

Graham & Dunn petitions for 11.1 hours at the rate of $75 an hour, for a total lodestar of $832.50 for work done by Gary Robbins, an associate. Mr. Robbins inspected defendants' documents on two occasions. While his involvement was limited, the work was important, adequately described, and will be allowed as reported.

The following table summarizes the lodestar awards for compensable work of attorney members of the Graham & Dunn firm.

### GRAHAM & DUNN ATTORNEY LODESTAR

| Attorney | HOURS Request | Award | LODESTAR Request | Award |
|---|---|---|---|---|
| Kipling | 5,307.90 | 5,153.90 | $743,106.00 | $685,986.00 |
| Schulman | 1,190.40 | 1,120.40 | 136,896.00 | 145,652.00 |
| Daglish | 591.70 | 591.70 | 56,211.50 | 56,211.50 |
| Pym | 232.70 | 224.30 | 38,395.50 | 37,009.50 |
| Frederickson | 70.40 | 56.40 | 9,856.00 | 7,896.00 |
| Berry | 61.10 | 61.10 | 7,332.00 | 5,804.50 |
| Sandman | 23.10 | 23.10 | 2,887.50 | 2,310.00 |
| Robbins | 11.10 | 11.10 | 832.50 | 832.50 |
| Totals | 7,488.40 | 7,242.00 | $995,517.00 | $941,702.00 |

I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of the following individuals. An increase of their lodestar awards will accordingly be made as indicated.

For the work of Mr. Kipling, the firm will receive a multiple of 1.1 times the lodestar amount, for a total award of $754,-584.60.

For the work of Mr. Schulman, the firm will receive a multiple of 1.2 times the lodestar amount, for a total award of $174,-782.40.

### Paralegals

In addition to the hours reported for attorney members of the firm, Graham & Dunn applies for an award for the work of five paralegals, a secretary and a librarian. When the petition was submitted, a total of 283.05 paralegal hours were reported. The figure increased to 304.75 hours with the submission of supplemental reports for work performed through December 31, 1989, and as a result of several adjustments to originally reported amounts. Rates ranging from $30 to $50 per hour were utilized in determining the lodestar for the work of these individuals. The final reported lodestar for the work of these persons, as of December 31, 1989, amounted to $12,394.

The firm's time records indicate that the work of these individuals was, for the most part, appropriate and reasonable. Most tasks were necessary to the litigation effort and beneficial to Class Members. The exception is for 28.2 hours, with a corresponding lodestar of $860, for time spent by two individuals on time and expense reports. No award will be made for that time.

### Paralegal Award

For 276.55 allowable hours, a lodestar award of $11,534 will be made to Graham & Dunn.

### Expenses

Graham & Dunn reports expenses totalling $64,388.52, after mathematical corrections, through December 31, 1989, in connection with the MDL 551 litigation. This figure includes approximately $11,776 that was previously reimbursed by the WPPSS Litigation Fund. It also reflects subse-

quent expenses of $1,961.55 reported after the initial petition was submitted.

According to the initial petition, approximately half of the firm's expenses, $32,-184.14, was for travel, meals and lodging. Sufficient documentation was provided on request to support the majority of claimed expenses in these categories. A deduction will be made, however, for $835.58 for which documentation was not forthcoming. An additional deduction of $350 will be made to offset the amount charged for firm members' local meals. A portion of this amount—$183.44—was previously reimbursed by the WPPSS Litigation Fund.

Graham & Dunn reported $12,946.65 in photocopy charges through December 31, 1989. In addition to this amount, the WPPSS Litigation Fund reimbursed the firm nearly $6,000 for copy costs. Of this, $3,087.36 was paid to the firm for duplication of 25,728 documents, at a 12 cent per copy cost, in 1983. The remainder appears to have been paid, at a rate slightly over 9 cents, on a contract basis. The firm indicates that it has consistently charged 15 cents for copies. These charges are slightly excessive, and $2,125 of the total will be disallowed.

 This firm requests reimbursement of "miscellaneous" charges totalling $229.11. No explanatory information was offered to illuminate the nature of these expenses, although the firm identified the purpose of smaller expenditures requested in other categories. The request will be disallowed. In addition, a $14.00 charge for chocolates purchased for secretarial personnel, previously reimbursed to Graham & Dunn by the WPPSS Litigation Fund, is an inappropriate expenditure for Class members to pay, and will be disallowed.

Finally, overtime payments totalling $348.50 that were reimbursed by the Litigation Fund will also be disallowed for reasons previously indicated.

*Expense Award*

In accordance with the foregoing, an award of $60,486 will be made to Graham & Dunn for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Graham & Dunn contributed $25,000 to the WPPSS Litigation Fund. It recovered reimbursements of $11,776.54 from the Fund during the course of the litigation. The firm is accordingly due a refund of $13,223.46 from that Fund.

## HARVEY GREENFIELD

The New York City firm of Harvey Greenfield applies for an award of fees for the work of four attorneys whose rates at the time of the petition were $150 and $375 an hour.[36] At the time the petition was submitted, the firm reported a total of 830.75 attorney hours worked, for a reported attorney lodestar of $304,725. No subsequent reports were submitted for work performed thereafter.

Harvey Greenfield's involvement in the litigation began in May 1983 and continued through February 1989. His firm, along with Kaufman Malchman, is counsel of record for class representative Bryna Stepak. Mr. Benjamin Asia and two partners in the Seattle firm of Franco, Asia, Bensussen & Coe, for whose work Mr. Greenfield seeks compensation, charged time to the action prior to October 1984.

*Harvey Greenfield*

 Mr. Greenfield petitions for 800.5 hours at the rate of $375 an hour, for a total lodestar of $300,187.50. Mr. Greenfield's role in this litigation was extremely limited. Among his more substantive activities was drafting in connection with the complaint on behalf of class representative Stepak. He also prepared answers to interrogatories, reviewed certain underwriter documents, attended the deposition of his client, read other papers and correspondence related to the case, and spent a vast

---

**36.** The Greenfield petition purports to be for the work of two individuals. Three different attorneys actually reported work petitioned for by Mr. Greenfield under the name of Benjamin Asia.

amount of time on the telephone with other attorneys, particularly Mr. Malchman, of Kaufman, Malchman and Kirby, and, to a lesser extent, Mr. Klafter of Bernstein Litowitz Berger & Grossmann. His activities in this litigation, where his role was patently minor, and his involvement relatively superficial, do not justify his customary hourly rate. A rate of $300 is sufficient to compensate Mr. Greenfield for work reasonably undertaken that accrued to the benefit of Class members.

■ Mr. Greenfield's daily time records indicate that between May 19 and July 19, 1983, he spent approximately 40 hours in telephone conversations with other attorneys. Several hours were charged for his review of news articles about the case, and for review of several court decisions. Approximately 13 hours were spent drafting the 14–page complaint of Ms. Stepak. Thereafter, in July and August, he charged approximately 6 hours for review and drafting answers to interrogatories. The remaining 68 hours charged in that time period were mainly for telephone conversations, although review of some of plaintiffs' papers, articles and reports, and several meetings with counsel were also indicated.

Early in the litigation, time entries occurred almost daily, and averaged between .5 and 2.5 hours. On one day, Mr. Greenfield charged 10 hours for reviewing two motions and background papers. Another 4 hour daily charge was assessed for his review of *New York Times, Wall Street Journal,* and *Washington Post* articles. These types of charges continued through-

out his involvement. Some of his more poorly described and excessive time entries include an 11.5 hour charge on 11/25/83 for "review: defs reply brief re: mot to dismiss;" a 13.75 hour charge on 5/8/84 for "review: Class & Chemical complaints & instructions, Laz firm;" and countless charges of between .5 and 4 or more hours for "telecon:...."

Although the subject matter of Mr. Greenfield's frequent telephone conversations was often succinctly stated in his time records, the subjects were imprecise and not momentous, and there is little indication that Mr. Greenfield undertook actions that may have furthered the litigation effort as a result of these myriad lengthy calls. The nebulous information provided does not meet the burden of demonstrating otherwise, and the Class should not be assessed for time that relatively inactive counsel spent simply discussing events in the litigation.

Although the Court was able to identify some undertakings that accrued to the benefit of the Class, for which he will be compensated, most of Mr. Greenfield's activities appear to have yielded no value to Class members and will not be remunerated.

Mr. Greenfield will receive a fee award for the following activities in the indicated hourly amounts. The allowable hours reflect reasonable amounts of time for such work when performed by an attorney with his experience. In all cases they reflect reductions in excessive amounts charged by Mr. Greenfield.

| | |
|---|---|
| Drafting complaint: | 10 hours |
| Answering Interrogatories: | 3 hours |
| Drafting memo in response to motion to dismiss, including review and preparation: | 7 hours |
| Work regarding stipulations of dismissal of Underwriter defendants | 15 hours |
| Document discovery/review work done in May through December 1984: | 50 hours |
| Preparation, attendance and followup work associated with Stepak deposition (March through November 1985): | 45 hours |
| Communications with co-counsel, including telephone conversations, meetings, review of papers, pleadings, memoranda, etc. | 30 hours |

For Mr. Greenfield's work on the litigation, he will receive a lodestar award of $48,000 for 160 hours reasonably spent to the benefit of Class members.

### Benjamin Asia

Mr. Greenfield petitions for an award based upon 30.25 hours at the rate of $150 an hour, for a total lodestar of $4,537.50 for work of Benjamin Asia, Seattle counsel. The firm of Franco, Asia, Bensussen & Coe, of which Mr. Asia is a partner, provided the Court with bi-monthly lodestar reports and with detailed, but undated descriptions of Mr. Asia's work and the work of two other members of the firm. The reports evidence 26.5 hours of Mr. Asia's work, 2 hours' work by Edward Bensussen and 1 hour's work by Albert Franco, all of which was completed before 8/31/84.

Mr. Asia researched local rules, attended to Mr. Greenfield's admission in Washington and arranged for service of papers. He prepared an amended complaint and conferred with Mr. Greenfield regarding status of various matters. Mr. Asia's time reporting was thorough, and the Court concludes that 10 hours of his work was beneficial to the Class and not redundant with the work of Mr. Greenfield. The remainder of his time was attributable to administrative arrangements or to review of papers, non-compensable given the truncated involvement of the firm. The three hours charged by Messrs. Bensussen and Franco were for status conferences among the four attorneys, and will not be compensated.

For Mr. Asia's work on the litigation, Mr. Greenfield will receive a lodestar award of $1,500 for 10 hours reasonably spent to the benefit of Class members.

The following table summarizes the foregoing reasonable lodestar awards for compensable work reported by Mr. Greenfield.

### HARVEY GREENFIELD ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Greenfield | 800.50 | 160.00 | $300,187.50 | $48,000.00 |
| Asia, et al. | 30.25 | 10.00 | 4,537.50 | 1,500.00 |
| Totals | 830.75 | 170.00 | $304,725.00 | $49,500.00 |

### Paralegals

In addition to the reported attorney hours worked, Mr. Greenfield applies for an award for a paralegal for one day's work in connection with the preparation of a report. The reported lodestar, at a rate of $60 per hour, amounted to $540.

### Paralegal Award

A reasonable allowance of $480 for 8 hours will be awarded for this isolated assistance to Mr. Greenfield.

### Expenses

The law firm of Harvey Greenfield reports expenses totalling $10,622.85 through December 31, 1989, in connection with the MDL 551 litigation. Of this, $395.25 was previously reimbursed by the WPPSS Litigation Fund.

The Greenfield firm's largest single expense request, $3,761.40, was for Reproduction. Included in the figure is a total of approximately $800 in off-premises copying, half of which was the amount previously reimbursed by the Litigation Fund. The firm initially charged 15 cents per copy. The rate increased in 1987 to 20 cents. A reasonable allowance of $2,000 will be awarded for photocopy expenses. The remainder of the amount requested for in-house copying, $967.40, will not be granted.

■ Reimbursement for "Lunch Conferences" totalling $745.90 was also requested. This charge was almost exclusively for 15 meals charged for Mr. Greenfield's meetings with class representative Stepak. In some instances the event was not reflected at all in Mr. Greenfield's time records. On other days, however, the

luncheon occurred in connection with the class representative's deposition. The Court will allow reimbursement for approximately half of the charges reported for such meetings, $170, in recognition of the benefit the Class obtained from the deponent's testimony. The remainder of charges will not be paid out of Class funds, however.

A request of $739.50 for "Local Transportation" appears in Mr. Greenfield's petition. No explanation of this request was proffered, and the Court is unable to envision what it was for, given the nature of the firm's involvement. A reasonable award of $150 will be allowed for Mr. Greenfield's transportation to the site of the deposition, meetings and the like. The remainder will be disallowed.

An undocumented charge of $205 for "Miscellaneous" will also be rejected. Requested expenses of $121.70, $157.53 and $178.40 were sufficiently described. Some information regarding this inexplicit charge should have been also.

*Expense Award*

In accordance with the foregoing, an award of $8,285 will be made to Harvey Greenfield for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Mr. Greenfield contributed $11,000 to the WPPSS Litigation Fund. He recovered reimbursement of $395.25 from the Fund during the course of the litigation. Thus, his firm is due a refund of the remaining amount, $10,604.75.

### HALLISEY & JOHNSON

The San Francisco law firm of Hallisey & Johnson applies for an award of fees for the work of five attorneys whose rates at the time of the petition ranged from $125 to $195 an hour. When the petition was submitted, the firm reported a total of 255.75 attorney hours worked, for a reported attorney lodestar of $41,992.50. No subsequent reports for work performed after the initial petition were filed.

The firm's involvement in the litigation began in August 1983. Along with Saveri and Saveri, the firm is counsel of record for The Doctors Company, one of the class representatives. Very little time was charged by members of the firm after August 1984. The firm's daily time records consist of hand written time tickets.

*Jeremiah F. Hallisey*

Hallisey & Johnson petitions for 140.25 hours at the rate of $195 an hour, for a total lodestar of $27,348.75, for work done by Jeremiah Hallisey, a partner. Mr. Hallisey spent approximately 25 hours in August 1983 conferring with his client and other attorneys; researching local rules; reviewing state court cases, previously-filed complaints and other pertinent documents; and working on the complaint of the Doctors Company. Thereafter, he continued to do research and prepared a memorandum for submission to the Court, presumably concerning the appointment of lead counsel. In September Mr. Hallisey did some work on the question of pendent jurisdiction in connection with plaintiffs' response to motions to dismiss. He prepared for and participated in some early discovery of Participant defendants in 1984 and maintained communication with other counsel regarding depositions. Many of his communications were with Mr. Guido Saveri of Saveri & Saveri.

Much of Mr. Hallisey's work did not benefit of the Class as a whole, and therefore does not merit an award from the settlement fund. Although many of his time slips indicate that he stayed somewhat informed about events, very few indicate any activity aside from participation in discussions or occasional review of correspondence and other papers. In the absence of more extensive involvement, these activities do not merit an award such as that sought.

The following work is deemed to merit compensation in the indicated number of reasonable hours: Research and preparation of complaint, 20 hours; work on pendent jurisdiction in connection with plaintiffs' responses to motions to dismiss, 10 hours; review of Participants' documents

in Seattle, 15 hours; conferences and meetings with co-counsel regarding depositions, discovery, motion to dismiss, 12 hours; review of plaintiffs' correspondence and attachments, 5 hours. The remainder of Mr. Hallisey's time charges are either inadequately explained or are otherwise inappropriate charges to Class members given his brief and minimal involvement.

For Mr. Hallisey's work on the litigation, Hallisey & Johnson will receive a lodestar award of $12,090 for 62 hours reasonably spent to the benefit of Class members.

### Philip Neumark

Hallisey & Johnson petitions for 106.5 hours at the rate of $125 an hour, for a total lodestar of $13,312.50 for work done by Philip Neumark. Mr. Neumark's time charges, much like Mr. Hallisey's, reflect conferences with co-counsel, frequently Mr. Lamont of Saveri & Saveri, work on a memorandum regarding the organization of Class counsel, and review of unnamed "incoming documents" and other papers. Many of his activities clearly provided little or no benefit outside the firm and will be disallowed.

Some undertakings were appropriate, however, and merit a reasonable award as follows: proofreading and editing the firm's complaint, 2.5 hours; background research on the claims, 5 hours; work on responses to interrogatories, 5 hours; research and drafting regarding pendent jurisdiction in response to defendants' motions to dismiss, 20 hours; research regarding state claims and municipalities, 8 hours; work in connection with the Milton deposition, 4.5 hours.

For Mr. Neumark's compensable work on the litigation, Hallisey & Johnson will receive a lodestar award of $5,625 for 45 hours reasonably spent to the benefit of Class members.

### Don B. Kates

Hallisey & Johnson petitions for 8.25 hours at the rate of $150 an hour, for a total lodestar of $1,237.50 for work done by Don Kates. Mr. Kates' time charges include approximately 7.5 hours of research regarding pendent parties, which will be allowed. Several time entries, for in-house discussions, a telephone call, and other research do not merit payment out of Class funds.

For Mr. Kates' work on the litigation, Hallisey & Johnson will receive a lodestar award of $1,125 for 7.5 hours reasonably spent to the benefit of Class members.

### Charlene H. Johnson

Hallisey & Johnson petitions for .5 hour at the rate of $125 an hour, for a total lodestar of $62.50 for Charlene Johnson's participation in a strategy conference regarding a court appearance. No value is deemed to have accrued to the Class from this isolated involvement.

### Robert Murphy

Hallisey & Johnson petitions for .25 hour at the rate of $125 an hour, for a total lodestar of $31.25 for Robert Murphy's handling of two telephone calls in July 1983 regarding the Doctors Company WPPSS bondholdings. These calls concerned the firm's client, and no value can be said to have accrued to the Class from them.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Hallisey & Johnson firm.

### HALLISEY & JOHNSON ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Hallisey | 140.25 | 62.00 | $27,348.75 | $12,090.00 |
| Neumark | 106.50 | 45.00 | 13,312.50 | 5,625.00 |
| Kates | 8.25 | 7.50 | 1,237.50 | 1,125.00 |
| Johnson | .50 | 0.00 | 62.50 | 0.00 |
| Murphy | .25 | 0.00 | 31.25 | 0.00 |
| Totals | 255.75 | 114.50 | $41,992.50 | $18,840.00 |

*Paralegals*

In addition to the hours reported for attorney members of the firm, Hallisey & Johnson applies for an award for the work of two paralegals. A rate of $50 per hour was utilized in determining the lodestar for their work. The reported lodestar, as of December 31, 1989, amounted to $275 for 5.5 hours. The reported work involved review, letter-writing and revisions of a brief.

*Paralegal Award*

An award of $275 will be allowed to Hallisey & Johnson for paralegal work.

*Expenses*

Hallisey & Johnson reports expenses totalling $2,460.74 through December 31, 1989, in connection with the MDL 551 litigation. With the exception of a $608.60 charge for "Research Literature," the expenses are reasonable as reported and will be allowed. A reasonable allowance of $150 will be awarded for the procurement of research materials.

*Expense Award*

In accordance with the foregoing, an award of $2,002 will be made to Hallisey & Johnson for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Hallisey & Johnson contributed $11,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

### KAUFMAN MALCHMAN KAUFMANN & KIRBY

The New York City law firm of Kaufman Malchman Kaufmann & Kirby ("Kaufman Malchman") applies for an award of fees for the work of three partners whose rates at the time of the petition ranged from $265 to $300 an hour. When the petition was submitted, the firm reported a total of 557.5 attorney hours worked, for a reported attorney lodestar of $157,386.25. No subsequent reports for work performed after the initial petition were filed.

The firm's involvement in the litigation began in the summer of 1983. Very little time was charged after 1984. The firm specializes in class action litigation and, along with the firm of Harvey Greenfield, was counsel of record for class representative Bryna Stepak. The documentation of the work of attorney members of the firm is among the worst submitted to the Court. The contemporaneous time entries, recorded on desk calendars, were terse, generally uninformative and often barely legible. They were poorly organized and difficult to review.

*Irving Malchman*

Kaufman Malchman petitions for 347.25 hours at the rate of $285 an hour, for a total lodestar of $98,966.25 for work done by Irving Malchman, a partner. Mr. Malchman's initial charges, in July 1983, were for preparation of the complaint of class representative Bryna Stepak. Mr. Malchman charged approximately 16.5 hours for this work. The Court will allow 10 hours as reasonable for this undertaking, as it did for Mr. Greenfield's work on the same task. In August, Mr. Malchman charged 12.25 hours for work on answers to defendants' interrogatories. The Court will allow 4 hours of his time for this work, which was also undertaken by Mr. Greenfield. One hour will be allowed for Mr. Malchman's work preparing Underwriter stipulations in January 1984. For work done in January through March of 1984 inspecting Ebasco documents, he will be allowed a reasonable award for 105 of approximately 135 hours charged. Mr. Malchman will be allowed 1.25 hours as a reasonable amount for drafting and revising a deposition notice and subpoena in March and April 1984. For document discovery in Seattle in May of that year, 25 hours is determined to be a reasonable allowance for his participation. For work on a brief in opposition to one defendant group's motion to dismiss in November and December of 1984, 60 of approximately 90 hours charged is deemed reasonable, given Mr. Malchman's seniority. Finally, for meetings and general background review, correspondence and other miscellaneous charges, the Court believes an allowance of

16 hours provides a fair and reasonable award. No other charges are believed to merit an award out of Class funds.

For Mr. Malchman's work on the litigation, Kaufman Malchman will receive a lodestar award of $63,341.25 for 222.25 hours reasonably spent to the benefit of Class members.

*Roger W. Kirby*

Kaufman Malchman petitions for 133 hours at the rate of $265 an hour, for a total lodestar of $35,245 for work done by Roger Kirby. Mr. Kirby's time records provide a classic example of improper documentation. His work, recorded on four time slips, follows:

(1) WHPPS—wks of 1–23 1–30 '84 Review of inventories of 1300 boxes w/view to discovery 65
(2) WHOOPS—last wk 1/84 1st of 2/84 Review of file & index to docs produced by Ebasco 27
(3) WHPPS—8–24–84 Conf w/AKP re disc 1
(4) WHPPS—12–3,4,6,10,11, '84 Research & drafting of brief in opp [illegible] by certain Ds 40

Bi-monthly reports submitted to the Court during the course of the litigation indicate that 28 hours were worked by Mr. Kirby for the period of June 1983 through August 31, 1984. Subsequent bi-monthly reports indicate an additional 40 hours worked between 11/1/84 and 12/31/84, for a reported total of 68 hours. The Court finds no prior evidence of the 65 hours attributed to work described by the first time entry above, and accordingly will disallow all of that ambiguous and improper time charge.

For Mr. Kirby's remaining time charges, Kaufman Malchman will receive a lodestar award of $7,950 for 30 hours that the Court will presume were reasonably spent to the benefit of Class members. Mr. Kirby's inadequate blocking, haphazard descriptions, and generally inferior time keeping practices preclude any greater award.

*Stanley Kaufman*

Kaufman Malchman petitions for 77.25 hours at the rate of $300 an hour, for a total lodestar of $23,175 for work done by Stanley Kaufman. During the period of June through September 1983, Mr. Kaufman charged approximately 5 hours for miscellaneous tasks. Although his charges were modest, some, such as review of news articles and "memo," do not warrant payment. Two hours is a reasonable and appropriate allowance for his early involvement. For research on a section of plaintiffs' brief in response to defendants' motions to dismiss, an allowance of 22 hours is reasonable considering Mr. Kaufman's high hourly rate and status. Four hours will be allowed for time spent in December on a brief, and a total of 16 additional hours will be allowed for miscellaneous meetings, review and communications.

For Mr. Kaufman's work on the litigation, Kaufman Malchman will receive a lodestar award of $13,200 for 44 hours reasonably spent to the benefit of Class members.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Kaufman Malchman firm.

## KAUFMAN MALCHMAN KAUFMANN & KIRBY
### ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Malchman | 347.25 | 222.25 | $ 98,966.25 | $63,341.25 |
| Kirby | 133.00 | 30.00 | 35,245.00 | 7,950.00 |
| Kaufman | 77.25 | 44.00 | 23,175.00 | 13,200.00 |
| Totals | 557.50 | 296.25 | $157,386.25 | $84,491.25 |

*Paralegals*

In addition to the hours reported for attorneys in the firm, Kaufman Malchman applies for an award for the work of two paralegals. A total of 193.75 paralegal hours, at a rate of $50 per hour, and a lodestar of $9,687.50 were petitioned for. Contemporaneous documentation for most of the work, performed in 1983 and 1984, was lacking. Bi-monthly reports indicate that 150 hours related to document production and inspection. That work will be compensated. Payment for the remainder of time, however, will be denied. Some work was inadequately documented, and the remainder pertained to time and expense reporting.

*Paralegal Award*

For paralegal work undertaken to the benefit of Class Members, Kaufman Malchman will receive a reasonable lodestar award of $7,500.

*Expenses*

Kaufman Malchman reports expenses totalling $3,425.89 through December 31, 1989. Most of the charge was for airfare and hotel bills for two trips to Seattle in 1984. The documentation provided to support the request is incomplete. Included in it is one $272 item for "cash." The Court will disallow all but $72.00 of this amount. The $72 is allowed for meal and transportation charges that were not reflected elsewhere in the documentation.

The firm reported $695.60 for photocopy charges. The Court finds that $300 is a reasonable amount for the firm's photocopy requirements, which were not further explained.

An expense of $72.57 was reported for "Transportation." In addition, $107.35 was reported for "Paralegals (taxis, lunches, etc.)." Given the absence of additional information for either amount, and the inappropriate inclusion of charges for meals, a total of $90 will be allowed. The remaining charges in these two categories will not be reimbursed out of Class settlement funds.

*Expense Award*

In accordance with the foregoing, an award of $2,740 will be made to Kaufman Malchman for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Kaufman Malchman contributed $12,500 to the WPPSS Litigation Fund. It recovered no reimbursements from the fund during the course of the litigation. Thus, the firm is due a refund.

## MEREDITH & COHEN, P.C.

The Philadelphia law firm of Meredith & Cohen applies for an award of fees for the work of four attorneys whose rates at the time of the petition ranged from $70 to $225 an hour. At the time the petition was submitted, the firm reported a total of 1,831 attorney hours worked, for a reported attorney lodestar total of $390,396.25. No subsequent work was reported.

The firm's involvement in the litigation began in April 1983 and continued somewhat consistently until early 1986. The firm's involvement stemmed from its representation of plaintiff 766 Broadway, Inc., a class representative. However, the firm became more extensively involved in work on the litigation on behalf of Class mem-

bers than did a number of other firms whose involvement arose from similar contacts. The firm's daily time records provide relatively complete explanations of the work of its attorneys.

### Bruce K. Cohen

Meredith & Cohen petitions for 1,751.25 hours at the rate of $215 an hour, for a total lodestar of $376,518.75 for work done by Bruce Cohen, a partner. Mr. Cohen's early work on the case is reflected by moderate charges for work on the firm's complaint and on interrogatory responses. In September and October 1983, he charged approximately 90 hours for research and drafting in response to defendants' motions to dismiss. By February 1984 he was heavily involved in document discovery work, and his daily charges for this work were commendably moderate and reasonable. His document discovery work continued until late 1984, supplemented by some pertinent research, review and communication time charges. Thereafter he prepared for and engaged in a number of depositions, including that of the firm's client, in addition to continuing document discovery work.

Mr. Cohen's time records are among the best presented to the Court. His daily activities were often separately itemized, with time allocated among different tasks. The numbers of hours charged for his work were consistently reasonable, given the nature of the work undertaken. They do not appear to contain overstatement of productive time such as that seen in the records of other attorneys. Aside from a deduction of 102 hours for approximately 50% of his travel time charged, Mr. Cohen's time appears to have been reasonably and constructively spent to the benefit of Class members.

For Mr. Cohen's work on the litigation, Meredith & Cohen will receive a lodestar award of $354,588.75 for 1,649.25 hours.

### Steven J. Greenfogel

Meredith & Cohen petitions for 64.5 hours at the rate of $195 an hour, for a total lodestar of $12,577.50 for work done by Steven Greenfogel, a partner. Most of Mr. Greenfogel's work involved review of engineer documents, although he also did some research and drafting. One half-hour charge to pick up computer printouts will be disallowed.

For Mr. Greenfogel's work on the litigation, Meredith & Cohen will receive a lodestar award of $12,480 for 64 hours reasonably spent to the benefit of Class members.

### Patricia M. Starner

Meredith & Cohen petitions for 13.75 hours at the rate of $70 an hour, for a total lodestar of $962.50 for work done by Patricia Starner, an associate. Ms. Starner's work involved the inspection of documents and was reasonable. Except for a reduction of 2.25 hours for unproductive time spent in transit, her work will be allowed as charged.

For Ms. Starner's work on the litigation, Meredith & Cohen will receive a lodestar award of $805 for 11.5 hours reasonably spent to the benefit of Class members.

### Joel C. Meredith

Meredith & Cohen petitions for 1.5 hours at the rate of $225 an hour, for a total lodestar of $337.50 for work done by Joel Meredith, a partner. Mr. Meredith's charges were for communications with other Class counsel and for revisions to a draft brief. His charges adequately describe the subject matter of his work, are reasonable and will be allowed.

The following table summarizes the foregoing reasonable awards for compensable work of attorneys in the Meredith & Cohen firm.

MEREDITH & COHEN, P.C. ATTORNEY LODESTAR

| Attorney | HOURS Request | Award | LODESTAR Request | Award |
|----------|---------|-------|---------|-------|
| Cohen | 1,751.25 | 1,649.25 | $376,518.75 | $354,588.75 |
| Greenfogel | 64.50 | 64.00 | 12,577.50 | 12,480.00 |
| Starner | 13.75 | 11.50 | 962.50 | 805.00 |
| Meredith | 1.50 | 1.50 | 337.50 | 337.50 |
| Totals | 1,831.00 | 1,726.25 | $390,396.25 | $368,211.25 |

*Paralegals*

Meredith & Cohen does not apply for an award for paralegal or law clerk work.

*Expenses*

Meredith & Cohen reports expenses totalling $15,537.84 through December 31, 1989, in connection with the MDL 551 litigation. More than 80% of the firm's expenses were for travel costs. Those expenditures were properly documented and reasonable.

In-house copy charges amounting to $1,376.55 were assessed. A rate of 15 cents per page was applied to arrive at this total, which will be reduced to a reasonable allowance of $1,000. The remainder of the firm's charges are reasonable and will be allowed.

*Expense Award*

In accordance with the foregoing, an award of $15,161 will be made to Meredith & Cohen for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Meredith & Cohen contributed $20,500 to the WPPSS Litigation Fund. It recovered no reimbursements from the fund during the course of the litigation. Thus, the firm is due a refund.

## MOLLOY, JONES & DONAHUE, P.C.

The Tucson, Arizona law firm of Molloy, Jones & Donahue, P.C. ("Molloy Jones") applies for an award of fees for the work of seven attorneys whose rates at the time of the petition ranged from $75 to $200 an hour. At the time the petition was submitted, the firm reported a total of 2,007.9 attorney hours worked, for a reported attorney lodestar total of $304,629.50. Subsequent reports for work performed after the initial petition was submitted raised the firm's reported total attorney hours to 2,036.9 and its attorney lodestar to $310,377. All supplemental work reported pertained to the primary MDL action and, therefore, none will be deferred for later consideration.

The firm's involvement in the litigation did not begin until March 1987, when Class plaintiffs began directing attention to needs associated with the venue of the prospective trial. Initially, the Tucson firm was heavily involved in trial site selection matters, though its participation also involved legal matters throughout.

*Michael J. Meehan*

Molloy Jones petitions for 1,057.8 hours at the rate of $200 an hour, for a total lodestar of $211,560 for work done by Michael Meehan, a partner. Mr. Meehan's work included approximately 61 hours related to communications and investigation of trial site and facilities selection matters. These undertakings were adequately described and essential to the litigation effort. Concurrent with site selection concerns, Mr. Meehan spent a moderate amount of time developing an awareness of the legal issues and history of the litigation. He undertook research and prepared a brief on expert discovery. He also prepared several other briefs on timely and important legal issues. His work included jury research and preparation of juror questionnaires, essential to the jury selection process. He prepared for and took part in several depositions, interviewed potential Class witnesses, and participated in

jury selection procedures at trial. Although he was designated a member of the "core group" of attorneys, and was relatively active in the litigation, his involvement was not as intense as that of other members of the group.

Mr. Meehan's work descriptions were consistently meaningful and his time charges were moderate and reasonable for the nature of work performed. He charged no time for fee related matters, and he undertook a great deal of travel. A partial deduction of 75 hours will be made to reduce by approximately half the time so charged.

For Mr. Meehan's work on the litigation, Molloy Jones will receive a lodestar award of $196,560 for 982.8 hours reasonably spent to the benefit of Class members.

*George O. Krauja*

Molloy Jones petitions for 479.1 hours at the rate of $95 an hour, for a total lodestar of $45,514.50 for work done by George Krauja, an associate. Much of Mr. Krauja's work involved interviews with prospective plaintiff witnesses. He also conducted extensive legal research on pertinent securities issues and prepared for and participated in at least one deposition. He researched and prepared memoranda on motions and a stipulation made at trial. He reviewed and summarized various deposition transcripts, daily correspondence and pleadings. Except for a one-hour research charge on 2/29/88, a lodestar award for his work will be allowed for the moderate and reasonable amounts charged.

For Mr. Krauja's work on the litigation, Molloy Jones will receive a lodestar award of $45,419.50 for 478.1 hours reasonably spent to the benefit of Class members.

*Ardner R. Cheshire*

Molloy Jones petitions for 178.9 hours at the rate of $125 an hour, for a total lodestar of $22,362.50 for work done by Ardner Cheshire, an associate. Mr. Cheshire worked primarily on deposition and exhibit review in preparation for trial. His time charges were reasonable and, except for an 8 hour deduction for travel, his time will be allowed.

For Mr. Cheshire's work on the litigation, Molloy Jones will receive a lodestar award of $21,362.50 for 170.9 hours reasonably spent to the benefit of Class members.

*Kenneth P. Krohn*

Molloy Jones petitions for 205.6 hours at the rate of $90 an hour, for a total lodestar of $18,504 for work done by Kenneth Krohn, an associate. All of Mr. Krohn's work involved absent class member depositions and will be allowed.

*D. Michael Mandig*

Molloy Jones petitions for 56.9 hours at the rate of $140 an hour, for a total lodestar of $7,966 for work done by Michael Mandig, a partner. Mr. Mandig attended a hearing and meetings with Class counsel in March 1987 and coordinated and conducted interviews with Class Plaintiffs. Although Mr. Mandig's involvement was considerably limited, his attendance at the meetings and hearing will be allowed because of the firm's late but integral role in the litigation. A deduction of 2.5 hours for travel will be made.

For Mr. Mandig's work on the litigation, Molloy Jones will receive a lodestar award of $7,616 for 54.4 hours reasonably spent to the benefit of Class members.

*Matthew McCoy*

Molloy Jones petitions for 55.6 hours at the rate of $75 an hour, for a total lodestar of $4,170 for work done by Matthew McCoy, an associate. Mr. McCoy's work involved research regarding expert discovery and was reasonable as reported.

*Janet Bostwick*

Molloy Jones petitions for 3 hours at the rate of $100 an hour, for a total lodestar of $300 for work done by Janet Bostwick, an associate. Ms. Bostwick's involvement, limited to two occasions, consisted of review of a status memorandum and brief communications with Messrs. Meehan and Krauja. No benefit to the Class is discerned from these activities, and no allowance will be made for her time.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Molloy Jones firm.

## MOLLOY, JONES & DONAHUE, P.C.
### ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Meehan | 1,057.80 | 982.80 | $211,560.00 | $196,560.00 |
| Krauja | 479.10 | 478.10 | 45,514.50 | 45,419.50 |
| Cheshire | 178.90 | 170.90 | 22,362.50 | 21,362.50 |
| Krohn | 205.60 | 205.60 | 18,504.00 | 18,504.00 |
| Mandig | 56.90 | 54.40 | 7,966.00 | 7,616.00 |
| McCoy | 55.60 | 55.60 | 4,170.00 | 4,170.00 |
| Bostwick | 3.00 | 0.00 | 300.00 | 0.00 |
| Totals | 2,036.90 | 1,947.40 | $310,377.00 | $293,632.00 |

I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of Mr. Meehan. The firm will accordingly receive an award reflecting a multiple of 1.2 times his lodestar amount, for a total award for his work of $235,872.

### Paralegals

In addition to the hours reported for attorney members of the firm, Molloy Jones applies for an award for the work of a number of law clerks and four paralegals. When the petition was submitted, a total of 652.4 paralegal hours was reported for their work. No additional paralegal work was reported. Rates ranging from $25 to $45 per hour were utilized in determining the lodestar for their work. The reported lodestar, as of December 31, 1989, amounted to $23,976.50.

Most of the work of these individuals was sufficiently described and reasonably related to the litigation. A 5 hour deduction will be made for the work of one law clerk described by "No Narrative." An additional 41.1 hours charged for review of correspondence and pleadings, and for some summarization, will also be disallowed. The activity duplicated the work of attorneys in the firm and does not appear to have provided any benefit to Class Members. Finally, 1.8 hours reported by two individuals lacked documentation and will be disallowed.

### Paralegal Award

For paralegal work of benefit to Class Members, a reasonable lodestar award of $22,100.50 for 604.5 hours will be made to Molloy Jones.

### Expenses

Molloy Jones reports expenses totalling $48,923.28 through December 31, 1989, in connection with the MDL 551 litigation. Nearly half of the firm's requested expenses were reported after the initial petition was submitted. They pertain to the period December 30, 1988 through October 12, 1989.

The firm was required to provide documentation to support its members' travel expenses, which initially amounted to $12,111.08. The responsive documentation did not fulfill the requirements set forth in the Court's Order, however. Many of the expense entries simply indicated the name of the attorney who drew a particular round figure amount. Although airfare was discernible, no indication of the nature or magnitude of many expenditures, presumably for hotels, meals and ground transportation, was provided. The information was inadequate to permit a thorough assessment of the reasonableness of amounts reflected in the firm's supporting documentation. A deduction of $500 will accordingly be made to reduce what appear to be unreasonable charges.

Molloy Jones reported in-house photocopy expenses totalling nearly $13,000. Most of the copies were charged in 1989, after the firm's rate had increased from 15 to 20 cents per copy. To offset the excessive charge resulting from application of

this rate, a reduction of $5,200 will be made to the amount requested.

The remainder of the firm's expenses are sufficiently described and reasonable as reported.

### Expense Award

In accordance with the foregoing, an award of $43,223 will be made to Molloy Jones for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

### WPPSS Litigation Fund

Molloy Jones made no contribution to the WPPSS Litigation Fund. It recovered no reimbursements from the fund during the course of the litigation.

### MUCH SHELIST FREED DENENBERG AMENT & EIGER, P.C.

The Chicago law firm of Much Shelist Freed Denenberg Ament & Eiger, P.C. ("Much Shelist") applies for an award of fees for the work of thirteen attorneys whose rates at the time of the petition ranged from $70 to $285 an hour. When the petition was submitted, the firm reported a total of 1,597.4 attorney hours worked, for a reported attorney lodestar total of $291,055.50. No subsequent work was reported.

The firm's involvement in the litigation began in August of 1983. Work continued heavily through 1984 and declined considerably thereafter. The firm is counsel of record for plaintiff Ruth Sigmund, a class representative. The firm's time records are generally good.

### Michael B. Hyman

Much Shelist petitions for 567.6 hours at the rate of $190 an hour, for a total lodestar of $107,844 for work done by Michael Hyman, a partner. Early in 1984 Mr. Hyman did some background review, charging several hours on a number of occasions. He then worked on research and prepared two briefs. In mid–1984 he undertook document discovery work in Washington, Oregon and New York, researched and prepared several memoranda on germane issues, including portions of plaintiffs' brief in response to motions to dismiss. His time charges for the work were reasonable. By 1985 his involvement declined and, although he aided plaintiffs' counsel in preparations for a major deposition, he was not significantly involved thereafter.

Except for a deduction of 35.5 hours, approximately 50% of the amount of time charged for travel, and 2.3 hours of miscellaneous charges after June 1985, Mr. Hyman's work appears reasonable and will be allowed as reported.

For Mr. Hyman's work on the litigation, Much Shelist will receive a lodestar award of $100,662 for 529.8 hours reasonably worked to the benefit of Class members.

### Lawrence Eiger

Much Shelist petitions for 305.4 hours at the rate of $260 an hour, for a total lodestar of $79,404 for work done by Lawrence Eiger, a partner. Mr. Eiger's work descriptions were explanatory and his time charges were reasonable for the work he did, which included initial work on the firm's complaint and coordination of discovery activities with Class counsel. He aided the drafting and revision of several briefs and defended the deposition of class representative Sigmund. His time charges were frequently for brief communications with named individuals regarding specified subjects. There were an abundance of such charges for in-house discussions with the firm's other attorneys, and the Court concludes that a deduction of 20 hours is appropriate to offset the duplication of charges inherent in such communications. A further deduction of 4 hours is necessary to offset an excessive amount of time charged throughout the period of his involvement on staffing and administrative matters. A deduction of 23.8 hours will also be made to reduce travel time charges. On a number of occasions Mr. Eiger noted that he had charged only a portion of his travel time. No deduction has been made in such instances. The practice is appropriate and commendable.

For Mr. Eiger's work on the litigation, Much Shelist will receive a lodestar award of $66,976 for 257.6 hours reasonably spent to the benefit of Class members.

*Steven Kanner*

Much Shelist petitions for 270 hours at the rate of $175 an hour, for a total lodestar of $47,250 for work done by Steven Kanner, a partner. Mr. Kanner did most of his work in the litigation prior to 1987, when he became a partner. His work will therefore be compensated, where appropriate, at an associate rate of $125. Mr. Kanner's work involved document discovery and inspection, research, and drafting of legal memoranda. He attended a hearing regarding a matter with which he was involved. His work descriptions were meaningful and his time charges were not excessive. His work on Class matters ended in June 1984. Thereafter, in 1987, he charged 21.5 hours for work on the Sigmund claim. No award will be made for this work, which did not benefit the entire Class. A deduction of 2.3 hours will be made for a charge on 2/22/83, which appears to be in error, and a reduction of 33.5 hours will be made to offset approximately 50% of Mr. Kanner's travel time charges.

For Mr. Kanner's work on the litigation, Much Shelist will receive a lodestar award of $26,587.50 for 212.7 hours reasonably spent to the benefit of Class members.

*Jill C. Maltezos*

Much Shelist petitions for 153.2 hours at the rate of $90 an hour, for a total lodestar of $13,788 for work done by Jill Maltezos, an associate. All of Ms. Maltezos' work involved research and preparation of a memorandum regarding Class members' claims against the Bonneville Power Authority. The work was reasonable and will be allowed as reported.

*Debra S. Bussert*

Much Shelist petitions for 146.1 hours at the rate of $125 an hour, for a total lodestar of $18,262.50 for work done by Debra Bussert, an associate. Ms. Bussert analyzed crucial documents, did research and drafted a reply memorandum. Her time charges and work descriptions were adequate and reasonable and will be allowed.

*Stuart Weltman*

Much Shelist petitions for 79.3 hours at the rate of $175 an hour, for a total lodestar of $13,877.50 for work done by Stuart Weltman, a partner. Mr. Weltman was an associate when he worked on the MDL litigation, and his compensable hours will therefore be paid at an associate rate of $125 per hour. Mr. Weltman researched and drafted several sections of a brief. His time will be allowed as reported.

For Mr. Weltman's work on the litigation, Much Shelist will receive a lodestar award of $9,912.50 for 79.3 hours reasonably spent to the benefit of Class members.

*Mary Jane Fait*

Much Shelist petitions for 15.3 hours at the rate of $160 an hour, for a total lodestar of $2,448 for work done by Mary Jane Fait, a partner. Ms. Fait was an associate in 1984, and her compensable research work will be paid at a rate of $125 an hour. For Ms. Fait's work on the litigation, Much Shelist will receive a lodestar award of $1,912.50 for 15.3 hours.

*Michael J. Freed*

Much Shelist petitions for 8 hours at the rate of $285 an hour, for a total lodestar of $2,280 for work done by Michael Freed, a partner. Mr. Freed's time charges were for conferences with Mr. Eiger on general matters and for review of pleadings and news articles. His participation is not regarded as having provided any measurable benefit to the Class and no award will be made for it.

*Randi C. Mayer*

Much Shelist petitions for 27 hours at the rate of $70 an hour, for a total lodestar of $1,890 for work done by Randi Mayer, an associate. Ms. Mayer was a law clerk in 1984 when she charged time for work on the litigation. Her numerous work descriptions, which simply indicate "research for [initials]" or "research" are not adequate to permit a meaningful evaluation and her time will be disallowed.

*Anthony Valiulis*

Much Shelist petitions for 8.5 hours at the rate of $195 an hour, for a total lodestar of $1,657.50 for work done by Anthony Valiulis, a partner. Virtually all of Mr. Valiulis' efforts in this action were for in-house discussions regarding staffing,

assignments, memos and research. The intermittent charges, which inherently duplicate time charged by others in the firm, are not viewed as having provided any identifiable benefit to Class members. They will be disallowed.

### George C. Hook

Much Shelist petitions for 6.1 hours at the rate of $160 an hour, for a total lodestar of $976 for work done by George Hook, a partner. Mr. Hook's work descriptions were for in-house conferences, review and study. No benefit is deemed to have accrued to the Class from his involvement.

### Michael Shelist

Much Shelist petitions for 4.3 hours at the rate of $190 an hour, for a total lodestar of $817 for work done by Michael Shelist. Time charges of this partner relate to communications with class representative Sigmund. The work provided no benefit to the Class as a whole, and will therefore be disallowed.

### Miriam Bauer

Much Shelist petitions for 6.6 hours at the rate of $85 an hour, for a total lodestar of $561 for work done by Miriam Bauer, an associate. Ms. Bauer's time charges, for review of background material and of unnamed documents, and for discussions with other members of the firm, provided no ostensible benefit to Class members. No award will be made.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Much Shelist firm.

### MUCH SHELIST FREED DENENBERG AMENT & EIGER, P.C. ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Hyman | 567.60 | 529.80 | $107,844.00 | $100,662.00 |
| Eiger | 305.40 | 257.60 | 79,404.00 | 66,976.00 |
| Kanner | 270.00 | 212.70 | 47,250.00 | 26,587.50 |
| Maltezos | 153.20 | 153.20 | 13,788.00 | 13,788.00 |
| Bussert | 146.10 | 146.10 | 18,262.50 | 18,262.50 |
| Weltman | 79.30 | 79.30 | 13,877.50 | 9,912.50 |
| Fait | 15.30 | 15.30 | 2,448.00 | 1,912.50 |
| Freed | 8.00 | 0.00 | 2,280.00 | 0.00 |
| Mayer | 27.00 | 0.00 | 1,890.00 | 0.00 |
| Valiulis | 8.50 | 0.00 | 1,657.50 | 0.00 |
| Hook | 6.10 | 0.00 | 976.00 | 0.00 |
| Shelist | 4.30 | 0.00 | 817.00 | 0.00 |
| Bauer | 6.60 | 0.00 | 561.00 | 0.00 |
| Totals | 1,597.40 | 1,394.00 | $291,055.50 | $238,101.00 |

### Paralegals

██ In addition to the hours reported for attorney members of the firm, Much Shelist applies for an award for the work of five paralegals. A total of 101.2 paralegal hours were reported for work performed through December 31, 1989. Rates ranging from $50 to $75 per hour were utilized in determining the lodestar for the work of these people. Their reported lodestar, as of December 31, 1989, amounted to $5,568.

Most of the work reported was reasonable and appropriate to the litigation effort. A deduction will be made for .2 hour (12 minutes) reported by one person for "litigation fund assessment." This was the individual's only charge to the litigation. A second deduction of .4 hour, also the sole charge of someone, will be made for opening a file. Neither task is deemed to have been of benefit to Class members.

*Paralegal Award*

For the remaining 100.6 hours of paralegal work, Much Shelist will receive an award of $5,531.

*Expenses*

Much Shelist reports expenses totalling $26,796.22 through December 31, 1989, in connection with the litigation. Included in the category "Travel" was $16,707.39 for which supplemental documentation was requested. The documentation that was provided met the Court's requirements, in that it precisely identified the purpose, nature and amount of all of the assessed charges. Although the Court questions the necessity of one of Mr. Eiger's trips to New York in June 1984, it will not disallow the associated travel and transportation expense. A reduction of $275 will be made, however, to offset excessive "meals & tips" charged in connection with a February 1984 trip to New York by Mr. Kanner. The Court finds that $200 of Class members' funds constitutes a reasonable meal allowance for the trip.

Photocopy charges totalling $2,426.03 were reported by the firm, which charged 15 cents per copy until July 1987 and 20 cents thereafter. An allowance of $1,700 is deemed reasonable.

A deduction of $1,500 will also be made to reduce the firm's $4,574.42 charge for Lexis Research. The amount requested is both excessive and disproportionate to similar charges of other, more active, firms. This firm's use of computer research in connection with this action appears to have been insufficiently controlled.

Finally an unexplained $20 payment to Mr. Stiefel, of the Berger & Montague firm, will not be allowed.

*Expense Award*

In accordance with the foregoing, an award of $24,275 will be made to Much Shelist for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Much Shelist contributed $19,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation and is therefore due a refund.

## ALLAN PECKEL AND RABIN & SILVERMAN

The New York firm of Allan Peckel ("Peckel") applies for an award of fees for the work of three attorneys whose rates at the time of the petition ranged from $160 to $300 an hour. Mr. Peckel was previously a partner in the firm of Rabin & Silverman, which has been dissolved. His petition includes work done by him while he was a member of that firm. The petition also includes time reported for work of two other members of the Rabin & Silverman firm. At the time the petition was submitted, Peckel reported a total of 6,555 attorney hours worked, for a reported attorney lodestar total of $1,934,260. No subsequent work was reported.

The firms' involvement in the litigation began in January 1983 and continued through the end of 1988. The Rabin & Silverman firm, and Mr. Peckel, represented plaintiff David Gold in this litigation. Along with Shidler McBroom, Peckel was also counsel of record for the Frankel Estate, a class representative. Mr. Peckel's daily time records consist of hand-written lists of dates, work descriptions and hours. No daily records were submitted to support the work of the other two petitioning attorneys.

*Allan K. Peckel*

The Peckel firm petitions for 6,316.5 hours at the rate of $300 an hour, for a total lodestar of $1,894,950 for work done by Allan Peckel. Mr. Peckel was a member of the "core group." He began working on the litigation in January 1983, initially preparing a complaint. Many of the time charges recorded by Mr. Peckel are excessive, given the nature of the work, particularly in view of his high billing rate and the corresponding level of expected expertise. The following early examples, paraphrased, are typical of such charges.

Review draft of class motion, telephone & in house conference (3/7/83), 3.25 hrs.

Review of interrogatories, telephone call (3/8/83), 2.25 hrs.

Flew to Seattle (3/30/83), 10 hrs.

Flew back to New York (4/2/83, a Saturday), 10.5 hrs.

2 telephone calls to co-counsel, reviewed index to files & agreement re documents [additional time was also spent reviewing the index] (4/6/83), 3.75 hrs.

Drafting response/reply re consolidation of action (5/2 to 5/10/83) 32.25 hrs.

Received motions to dismiss and consolidated class motion (8/17/83), 2.75 hrs.

Reviewed draft reply brief, 2 telephone calls to co-counsel (10/19/83), 3.75 hrs.

As the litigation progressed, Mr. Peckel's efforts were directed largely towards document discovery and inspection. His charges for this type of work varied, though 5 to 9 hour workdays were typical. Lengthy flight times were consistently charged for travel. Mr. Peckel also spent a great deal of time preparing for depositions, at some of which he variously "sat in," "backed up" or otherwise participated. His time charges throughout the litigation reflect hundreds of "T.C." charges for telephone calls to co-counsel. Only irregularly was any subject matter indicated for these conversations.

The foregoing activities fairly characterize Mr. Peckel's involvement in the litigation. Most of the discovery and deposition work he undertook was not of a type appropriate for compensation at his reported customary hourly rate. Identical discovery work in this litigation was frequently undertaken by associates. Accordingly, a reduction in Mr. Peckel's hourly rate to $195 will be made to adjust for this improper staffing and/or applied rate. In addition, a reduction of 15% of the time charged for all of his work (excluding travel) will be made to offset the consistently excessive charges for the described activities. Finally, the approximately 521 hours charged by Mr. Peckel for travel and meal conferences with co-counsel will be reduced by 75% due to patently excessive charges and the unproductive nature of the activities.

For Mr. Peckel's work on the litigation, his firm will receive a lodestar award of $986,115 for 5,057 compensable hours reasonably spent to the benefit of Class members.

### Kenneth Elan

██ The Peckel firm petitions for 215.5 hours at the rate of $160 an hour, for a total lodestar of $34,480 for work done by Kenneth Elan. Mr. Peckel's declaration in support of his portion of Class counsels' petition indicates that Mr. Elan was previously employed with Rabin & Silverman, where he worked with Mr. Peckel. No contemporaneous daily records or other detailed information was provided to the Court to support Mr. Peckel's petition for compensation for Mr. Elan's work on the litigation.

Reports submitted during the litigation list broad work descriptions for Mr. Elan, including a single entry encompassing 186.5 hours reported for the period February through September 1983. The description of that work, much of which duplicated work reported by Mr. Peckel, included drafting a complaint, legal and factual research, drafting motion papers, drafting answers to interrogatories and conferring with the firm's client and Mr. Peckel. Another 2 hours were reported for March/April 1985, presumably for attending a meeting. In May through August 1986 the bi-monthly report showed that Mr. Elan worked 23.5 hours "substituting estate of Marvin Frankel." Later reports, containing errors, reported additional time for attendance at hearings and meetings.

The bi-monthly reports submitted during the litigation are insufficient to permit appraisal of the reasonableness of reported work. They were intended to provide a monitoring tool for the Court and counsel, and will not be regarded as a substitute for properly prepared daily records. In the absence of contemporaneously prepared documentation of the attorney's time and efforts, and given the apparent redundancy with Mr. Peckel's work of most of the undertakings that may have benefitted the Class, no award will be made for Mr. Elan's inadequately supported petition.

*Stephen Rabin*

Mr. Peckel also petitions for 23 hours at the rate of $210 an hour, for a total lodestar of $4,830 for work done by Stephen Rabin of the Rabin & Silverman firm. Once again, no contemporaneous records were submitted to support the petition. According to a report for the period of February through July 1983, submitted during the litigation, Mr. Rabin's time was spent in organizational meetings and conferences. No award will be made for his inadequately supported time.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of Mr. Peckel.

ALLAN PECKEL AND RABIN & SILVERMAN
ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
| | Request | Award | Request | Award |
| --- | --- | --- | --- | --- |
| Peckel | 6,316.50 | 5,057.00 | $1,894,950.00 | $986,115.00 |
| Elan | 215.50 | 0.00 | 34,480.00 | 0.00 |
| Rabin | 23.00 | 0.00 | 4,830.00 | 0.00 |
| Totals | 6,555.00 | 5,057.00 | $1,934,260.00 | $986,115.00 |

I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of Mr. Peckel. The firm will accordingly receive an award reflecting a multiple of 1.25 times the lodestar amount, for a total award for his work of $1,232,643.75.

*Paralegals*

In addition to the hours reported for attorney members of the firm, Mr. Peckel applies for an award for 33 hours reported for the work of one paralegal at $30 per hour. No daily record of this work was submitted. It was, however, included on the firm's bi-monthly report for the two-months ended February 28, 1985. That report indicates that the paralegal spent 33 hours organizing deposition exhibits.

*Paralegal Award*

The Court will allow Mr. Peckel a reasonable lodestar, $720, for 24 hours of poorly documented paralegal work.

*Expenses*

Allan Peckel reports expenses totalling $39,540.95 through December 31, 1989, in connection with the MDL 551 litigation. Excellent documentation was supplied to support Transportation, Meals and Lodging expenses totalling $34,682.56, and the requested amount will be allowed.

Photocopy expenses of $2,402.46 were reported by Mr. Peckel. Much of the reported photocopy expense was incurred while Mr. Peckel was with the Rabin & Silverman firm. The firm's 10 cent per copy charge is reasonable. Later, many photocopies were provided by outside sources, where charges were moderate. No deduction will be made from the requested amount.

The remaining reasonable expenses will also be allowed.

*Expense Award*

In accordance with the foregoing, an award of $39,541 will be made to Mr. Peckel for expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Mr. Peckel contributed $22,287.43 to the WPPSS Litigation Fund. He recovered no reimbursements from the Fund during the course of the litigation. Thus, his firm is due a refund.

POMERANTZ LEVY HAUDEK
BLOCK & GROSSMAN

The New York law firm of Pomerantz Levy Haudek Block & Grossman ("Pomerantz Levy") applies for an award of fees for the work of twelve attorneys whose rates at the time of the petition ranged from $80 to $300 an hour. At the time the

petition was submitted, the firm reported a total of 1,691.1 attorney hours worked, for a reported attorney lodestar total of $311,369.25. No subsequent work was reported. The firm's involvement in the litigation began in March 1983 and continued into early 1988. Along with the Gold firm, Pomerantz Levy is counsel of record for class representative Leonard Laub.

*Shaheen Rushd*

Pomerantz Levy petitions for 702 hours at the rate of $160 an hour, for a total lodestar of $112,320 for work done by Shaheen Rushd, an associate. In October 1983, Mr. Rushd worked on a Class Notice. Beginning in 1984 he undertook discovery work, reviewing documents of several defendants early in the year. He resumed and intensified the review effort near the year's end. He attended the deposition of class representative Laub, researched and prepared memoranda on discovery and other legal issues in the case, and worked on interrogatories. He drafted a section of a pretrial memorandum in February 1986, and early in 1987 prepared for and attended several depositions. He interviewed a number of Class members in preparation for trial.

Mr. Rushd's work descriptions were detailed and his time charges were reasonable. He did not charge travel time. A deduction of 12 hours is necessary to correct a duplicate entry for Mr. Rushd's attendance at a deposition on 3/17/87. Otherwise, his time will be compensated as reported.

For Mr. Rushd's work on the litigation, Pomerantz Levy will receive a lodestar award of $110,400 for 690 hours reasonably spent to the benefit of Class members.

*Stephen P. Hoffman*

Pomerantz Levy petitions for 386 hours at the rate of $250 an hour, for a total lodestar of $96,500 for work done by Stephen Hoffman, a partner.

Mr. Hoffman's time charges, through 1983, were frequent and small. Most of his post-complaint work that year concerned organizational matters such as the appointment of lead counsel and consolidation of cases. To reduce an excess number of hours spent on the lead counsel question, a reduction of 6 hours will be made to Mr. Hoffman's time.

Most of Mr. Hoffman's work was of a supervisory nature. He charged more than 100 hours for document discovery work in early 1984, however, and later participated in several depositions.

Some of his work descriptions insufficiently portray compensable work, and a reduction of 23 hours will be made for entries such as "clipping," "MDL papers," "re default," "research re WPPSS status," "research," "Notices," "Time & Expense reports," and similar generalized and inappropriate work descriptions, which appear throughout. Additional deductions of 3 hours will be made for time charged for organization of files and administration; 9.5 hours for duplicate entries on 2/15/84 and 12/19/84; and 30 hours for excessive amounts of time charged to "conferences" with other members of the firm or with unnamed individuals.

For Mr. Hoffman's compensable work on the litigation, Pomerantz Levy will receive a lodestar award of $78,625 for 314.5 hours.

*Robert B. Block*

Pomerantz Levy petitions for 139.15 hours at the rate of $300 an hour, for a total lodestar of $41,745 for work done by Robert Block, a partner. Mr. Block's work, which essentially occurred in late 1986 and early 1987, consisted almost exclusively of deposition work. His hourly rate is excessive for this type of undertaking in this litigation, and he will receive an award of $31,250, based on 125 hours allowed at a rate of $250. No other time charges will be compensated as no Class benefit is determined to have resulted from the described tasks.

*Melissa M. Johnson*

Pomerantz Levy petitions for 117.75 hours at the rate of $90 an hour, for a total lodestar of $10,597.50 for work done by Melissa Johnson, an associate. Ms. Johnson's time was divided between research and drafting memoranda on several significant issues, and interviewing potential trial

witnesses. Her time charges were reasonable and her work descriptions adequate. Her time will be compensated as reported.

### Laurence D. Paskowitz

Pomerantz Levy petitions for 105.1 hours at the rate of $160 an hour, for a total lodestar of $16,816 for work done by Laurence Paskowitz, an associate. In July and August 1984, Mr. Paskowitz reviewed and analyzed documents. In June 1986 he researched and drafted a memo on a discovery issue. Aside from a deduction of 10.7 hours for travel, an excess of time charged for attendance at a conference, and an isolated phone call, his time will be allowed.

For Mr. Paskowitz' work on the litigation, Pomerantz Levy will receive a lodestar award of $15,104 for 94.4 hours reasonably spent to the benefit of Class members.

### Jeffrey C. Block

Pomerantz Levy petitions for 80.1 hours at the rate of $115 an hour, for a total lodestar of $9,211.50 for work done by Jeffrey Block, an associate. In late 1987 Mr. Block researched, drafted and revised a brief. He worked on interrogatories and communicated with Class members. An isolated and inadequately explained 3.8 hour charge for "legal research" will not be allowed. Otherwise his work appears reasonable and will be compensated as reported.

For Mr. Block's work on the litigation, Pomerantz Levy will receive a lodestar award of $8,774.50 for 76.3 hours reasonably spent to the benefit of Class members.

### Lloyd M. Green

Pomerantz Levy petitions for 49.5 hours at the rate of $80 an hour, for a total lodestar of $3,960 for work done by Lloyd Green, an associate. Mr. Green's work took place mainly in January 1985, when he prepared a memo regarding a discovery issue. A duplicate charge was reported for one day's work on this task, and an 8.5 hour reduction will be made to offset it. No payment will be awarded for his review of the complaint and sorting of responses to discovery requests in August of the same year.

For Mr. Green's work on the litigation, Pomerantz Levy will receive a lodestar award of $2,720 for 34 hours reasonably spent to the benefit of Class members.

### Andrew Davidovits

Pomerantz Levy petitions for 46.25 hours at the rate of $95 an hour, for a total lodestar of $4,393.75 for work done by Andrew Davidovits, an associate. Mr. Davidovits' only time charges occurred in April 1988 when, after an hour's preparation, he fielded telephone calls from Class members regarding a settlement. Pomerantz Levy will be awarded a fee of $1,900 for 20 hours of Mr. Davidovits' time that is presumed to have been beneficially spent.

### Marc I. Gross

Pomerantz Levy petitions for 35.2 hours at the rate of $220 an hour, for a total lodestar of $7,744 for work done by Marc Gross, a partner. Mr. Gross drafted the firm's complaint, met with co-counsel regarding consolidation of the actions, and prepared a memorandum regarding the same in July and August 1983. His reasonable time will be allowed as reported.

### Stanley M. Grossman

Pomerantz Levy petitions for 23.45 hours at the rate of $290 an hour, for a total lodestar of $6,800.50 for work done by Stanley Grossman, a partner. The terse and essentially meaningless descriptions of Mr. Grossman's involvement in the litigation provide almost no information regarding the reasonableness of his undertakings. His work is variously depicted as "pleadings," "organization," "M/D," "consolidation," and numerous short conferences with other attorneys in the firm. In January 1985 he worked with Mr. Green on a memo and will be granted a reasonable allowance of 3 hours for work in connection with it. No other time will be paid. For compensable work on the litigation reported by Mr. Grossman, Pomerantz Levy will receive a lodestar award of $870.

### Bruce G. Stumpf

Pomerantz Levy petitions for 6 hours at the rate of $200 an hour, for a total lodestar of $1,200 for work done by

Bruce Stumpf, a partner. Mr. Stumpf was an associate in 1983 when he drafted the firm's resume for a motion regarding the appointment of lead counsel. The work was of no ostensible benefit to the Class and will be disallowed.

*Arthur Joseph*

Pomerantz Levy petitions for .6 hour at the rate of $135 an hour, for a total lodestar of $81 for work done by Arthur Joseph, an associate. In August 1985, Mr. Joseph prepared a letter "re: disbursements." The task will not be compensated from Class funds.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Pomerantz Levy firm.

POMERANTZ LEVY HAUDEK BLOCK & GROSSMAN
ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Rushd | 702.00 | 690.00 | $112,320.00 | $110,400.00 |
| Hoffman | 386.00 | 314.50 | 96,500.00 | 78,625.00 |
| Block, R. | 139.15 | 125.00 | 41,745.00 | 31,250.00 |
| Johnson | 117.75 | 117.75 | 10,597.50 | 10,597.50 |
| Paskowitz | 105.10 | 94.40 | 16,816.00 | 15,104.00 |
| Block, J. | 80.10 | 76.30 | 9,211.50 | 8,774.50 |
| Green | 49.50 | 34.00 | 3,960.00 | 2,720.00 |
| Davidovits | 46.25 | 20.00 | 4,393.75 | 1,900.00 |
| Gross | 35.20 | 35.20 | 7,744.00 | 7,744.00 |
| Grossman | 23.45 | 3.00 | 6,800.50 | 870.00 |
| Stumpf | 6.00 | 0.00 | 1,200.00 | 0.00 |
| Joseph | .60 | 0.00 | 81.00 | 0.00 |
| Totals | 1,691.10 | 1,510.15 | $311,369.25 | $267,985.00 |

*Paralegals*

In addition to the hours reported for attorney members of the firm, Pomerantz Levy applies for an award for the work of a law clerk and a paralegal. The firm reported a total of 103.8 paralegal hours, with a lodestar of $6,204, as of December 31, 1989. Most of the work—103 hours—was reported by the paralegal at a rate of $60 an hour. The .8 hour reported for work of a law clerk is not judged to have benefitted Class members, and will not be paid.

*Paralegal Award*

For the Pomerantz Levy firm's paralegal research and writing, an award of 94.5 hours, with a lodestar of $5,670, will be made. The remaining paralegal work involved time and expense reporting and will be disallowed.

*Expenses*

Pomerantz Levy reports expenses totalling $13,837.51 through December 31, 1989, in connection with the MDL 551 litigation. "Trip Expenses" at six locations for $6,631.88 and, separately, "Meals" totalling $367.35 were reported. The firm was required to provide explanatory information for both requests. The amount reported for trip expenses was essentially documented, and most expenses will be permitted. Excluded, however, will be a portion of one presumably local lunch expenditure in April 1987, approximately $40.00, and undocumented expenses of $73.55. Most of the "Meal" expenses were incurred locally at luncheons with other Class plaintiffs' counsel and will be disallowed, along with a small undocumented amount. A reasonable allowance of $90 will be permitted, however, to cover meal costs of deponents and the cost of one out-of-town meal during discovery activities, which was reported in the wrong category.

The firm's in-house photocopy expense, $928.50, was derived through an initial

charge of 10 cents a page. The charge increased to 15 cents in June 1984. A deduction of $95 will be made to reduce the amount charged to a reasonable amount.

A $1,650.16 charge for "Overtime Expenses" will be disallowed in conformity with the treatment accorded other firms that reported and requested payment for similar expenditures.

The remainder of reported expenses appear reasonable and will be allowed.

*Expense Award*

In accordance with the foregoing, an award of $11,701 will be made to Pomerantz Levy for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Pomerantz Levy contributed $17,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## SACHNOFF WEAVER & RUBENSTEIN, LTD.

The Chicago law firm of Sachnoff Weaver & Rubenstein, Ltd. ("Sachnoff Weaver") applies for an award of fees for the work of twenty-three attorneys whose current rates at the time of the petition ranged from $75 to $325 an hour. When the petition was submitted, the firm reported a total of 2,885.75 attorney hours worked, for a reported attorney lodestar of $369,770. No reports for subsequent work were submitted.

The firm's involvement in the litigation began in June 1983 and continued until late 1988. Sachnoff Weaver is counsel of record for class representative Martin Woolin. Like all Class counsel, the Sachnoff Weaver firm provided the Court with bi-monthly reports reflecting the number of hours the firm's personnel had worked on the lawsuit. The final report submitted to the Court during the course of the litigation was for the two months ended February 29, 1988. Accompanying the firm's petition were eleven additional reports for the months of March 1988 through January 1989. Also submitted at that time were 21 "supplemental" reports titled "(NUVEEN ACTION)" that reflected over 130 hours for five of the firm's attorneys for work done during the period June 1983 until October 1986.

Two copies of daily time entries for all of the reported hours were provided to the Court, upon request, after the petition was filed. One copy of the report reflecting the time entries related to the "Nuveen" action was so-titled. A second, otherwise identical, copy was headed "Class Action." No other information was provided to inform, explain, or otherwise request the Court's approval of the "Nuveen" work, with which the Court is essentially unfamiliar. The time reported for work on that action will therefore be disallowed. Petitioned-for work done on the MDL action, but not previously reflected on bi-monthly reports, has been scrutinized for acceptability, and will be allowed as appropriate despite the firm's unexplained failure to provide required bi-monthly reporting of such work.

*Steven A. Buckman*

Sachnoff Weaver petitions for 1,244 hours at the rate of $75 an hour, for a total lodestar of $93,300 for work done by Steven Buckman, an associate. On the firm's bi-monthly reports through 12/31/84, Mr. Buckman was shown to have been a paralegal. On a separate summary report, reflecting time worked through 8/31/84, however, he was listed as an associate. Because the reported rate for Mr. Buckman's work is reasonable, it will be accepted, regardless of his actual status when the work was done. Mr. Buckman did a great deal of document review, designation and "issue coding" of discovery documents. He also did some early analyses of insurance policies, and a comparative analysis of Official Statements. His time charges for the work were reasonable, averaging about 6.5 to 7 hours a day. Deductions of 50.5 hours, 50% of the approximate amount of travel time charged, and 6.5 hours for expense reporting tasks will be made. Those time charges provided no benefit to Class members.

For Mr. Buckman's work on the litigation, Sachnoff Weaver will receive a lodestar award of $89,025 for 1,187 hours reasonably spent to the benefit of Class members.

### Andrew M. Schatz

Sachnoff Weaver petitions for 428 hours at the rate of $170 an hour, for a total lodestar of $72,760 for work done by Andrew Schatz, a partner. Most of Mr. Schatz' MDL 551 work, which began in March 1985, involved depositions, including that of class representative Woolin. His time charges were reasonable, his work descriptions good, and his requested hours will be allowed after deductions of 38.5 hours charged to the Nuveen action and 28 of approximately 56 hours charged for travel.

For Mr. Schatz's work on the litigation, Sachnoff Weaver will receive a lodestar award of $61,455 for 361.5 hours reasonably spent to the benefit of Class members.

### Jack L. Block

Sachnoff Weaver petitions for 273.5 hours at the rate of $220 an hour, for a total lodestar of $60,170 for work done by Jack Block, a partner. Mr. Block's early work involved background review, preparation of the firm's complaint, meetings with other Class counsel, work on interrogatories and general organizational matters. In late 1984 and early 1985 he charged a large amount of time for review of "materials re discovery depositions." He did not otherwise participate in or perform other work in connection with the review, and the Court is unable to discern how the Class may have benefitted from his review. A deduction of 50 of approximately 80 hours so charged will therefore be made. He did not work on the case between April 1985 and July 1986, and 3 hours charged thereafter are not considered to have been of benefit to Class members. Further deductions of 9.25 hours for work on the Nuveen action and 11.75 hours of his travel time will also be made.

For Mr. Block's work on the litigation, Sachnoff Weaver will receive a lodestar award of $43,890 for 199.5 hours reasonably spent to the benefit of Class members.

### Douglas R. Newkirk

Sachnoff Weaver petitions for 348.75 hours at the rate of $150 an hour, for a total lodestar of $52,312.50 for work done by Douglas Newkirk, a partner. Mr. Newkirk was an associate when he worked on the litigation, and he will be compensated at a reasonable rate of $130 for his associate-level work. He worked on briefs, did document review, researched legal issues and analyzed insurance policies. His time charges were moderate and reasonable and, after deductions of 11.25 hours for travel and 2.25 hours charged to the Nuveen action, are approved.

For Mr. Newkirk's work on the litigation, Sachnoff Weaver will receive a lodestar award of $43,582.50 for 335.25 hours reasonably spent to the benefit of Class members.

### Maureen A. Mosh

Sachnoff Weaver petitions for 97.75 hours at the rate of $155 an hour, for a total lodestar of $15,151.25 for work done by Maureen Mosh, a partner. Ms. Mosh worked on plaintiffs' damages case in the summer of 1988. Her work was well described and reasonable. It will be compensated as reported.

### Jeffrey T. Gilbert

Sachnoff Weaver petitions for 76.75 hours at the rate of $185 an hour, for a total lodestar of $14,198.75 for work done by Jeffrey Gilbert, a partner. Mr. Gilbert was an associate in 1983, when he researched and drafted a brief in opposition to a motion to dismiss. A reasonable rate of $130 per hour will therefore be applied to his reported, compensable hours.

For Mr. Gilbert's work on the litigation, Sachnoff Weaver will receive a lodestar award of $9,977.50 for 76.75 hours reasonably spent to the benefit of Class members.

### William Gleeson

Sachnoff Weaver petitions for 75.5 hours at the rate of $160 an hour, for a total lodestar of $12,080 for work done by William Gleeson, a partner. Mr. Gleeson's time was all charged in connection with the

Nuveen action and will accordingly be disallowed.

### David Medow

Sachnoff Weaver petitions for 106.75 hours at the rate of $105 an hour, for a total lodestar of $11,208.75 for work done by David Medow, an associate. Mr. Medow worked on plaintiffs' damages case in July and August 1988. All of his reported work will be compensated.

### Lowell E. Sachnoff

Sachnoff Weaver petitions for 33.25 hours at the rate of $325 an hour, for a total lodestar of $10,806.25 for work done by Lowell Sachnoff, a partner. Mr. Sachnoff initially worked on the firm's complaint. He did some insurance and other discovery planning and review. He researched and partially drafted several memoranda. His work descriptions are adequate and his work will be compensated, though at a rate of $300 per hour, commensurate with his secondary role in the litigation. No award will be made for 4.75 hours charged to the Nuveen action.

For Mr. Sachnoff's work, Sachnoff Weaver will receive a lodestar award of $8,550 for 28.5 compensable hours.

### Bruce Boyd

Sachnoff Weaver petitions for 70.75 hours at the rate of $140 an hour, for a total lodestar of $9,905 for work done by Bruce Boyd, an associate. Mr. Boyd worked on several sections of plaintiffs' briefs in response to motions to dismiss in early 1986. Aside from an unacceptable one-hour charge on 2/4/86, his work and time charges were appropriate, beneficial to the Class and will be allowed.

For Mr. Boyd's work on the litigation, Sachnoff Weaver will receive a lodestar award of $9,765 for 69.75 hours reasonably spent.

### Fay Clayton

Sachnoff Weaver petitions for 55.75 hours at the rate of $150 an hour, for a total lodestar of $8,362.50 for work done by Fay Clayton, a partner. Ms. Clayton's 1984 work involved research regarding defendants' insurance. It will be allowed as requested.

### Lucy Karl

Sachnoff Weaver petitions for 36.75 hours at the rate of $110 an hour, for a total lodestar of $4,042.50 for work done by Lucy Karl, an associate. Aside from a .5 hour discussion in 1984, Ms. Karl's work on a section of plaintiffs' brief in opposition to a motion to dismiss was appropriate and will be compensated. For 36.25 hours of Ms. Karl's work on the litigation in early 1986, Sachnoff Weaver will receive a lodestar award of $3,987.50.

### Carole Cook

Sachnoff Weaver petitions for 21.5 hours at the rate of $120 an hour, for a total lodestar of $2,580 for work done by Carole Cook, an associate. Ms. Cook's time was spent doing research and preparing memoranda in mid–1988 on settlement issues. The work was appropriate and will be allowed as reported.

### Ellen McKnight

Sachnoff Weaver petitions for 7.75 hours at the rate of $160 an hour, for a total lodestar of $1,240 for work done by Ellen McKnight, a partner. Ms. McKnight was an associate in 1983 when she did research on a question regarding service of process. Her compensable time for this task will therefore be paid at an hourly rate of $130.

For Ms. McKnight's work on the litigation, Sachnoff Weaver will receive a lodestar award of $1,007.50 for 7.75 hours reasonably spent to the benefit of Class members.

### Joel S. Feldman

Sachnoff Weaver petitions for 3 hours at the rate of $190 an hour, for a total lodestar of $570 for work done by Joel Feldman, a partner. Mr. Feldman's time charges, in September 1983, when, according to one report, he was an associate, were primarily for brief discussions with other attorneys in the firm on general issues. Time was also charged by the persons with whom Mr. Feldman spoke, and no additional benefit is perceived as having accrued from his brief and superficial involvement. His charges will be disallowed.

### Chuck Watkins

Sachnoff Weaver petitions for 2 hours at the rate of $190 an hour, for a total lodestar of $380 for work done by Chuck Watkins, a partner. Mr. Watkins' charges were for two discussions with Mr. Newkirk and review of a brief. No benefit can be said to have accrued to the Class as a result of this insubstantial involvement.

### Charles J. Ryan

Sachnoff Weaver petitions for 1.5 hours at the rate of $155 an hour, for a total lodestar of $232.50 for work done by Charles Ryan. Mr. Ryan sat in on a telephone call with Class counsel in July 1988 and discussed the subject matter of the call with another individual in the firm. Class members will not be assessed for this involvement.

### Roger M. Huff

Sachnoff Weaver petitions for .75 hour at the rate of $200 an hour, for a total lodestar of $150 for work done by Roger Huff, a partner. In 1984 Mr. Huff charged time to "assist in damage calculation." No one else charged time that day. This isolated and insignificant activity will not be compensated.

### Barry S. Rosen

Sachnoff Weaver petitions for .5 hour at the rate of $210 an hour, for a total lodestar of $105 for work done by Barry Rosen, a partner. In 1983, Mr. Rosen had two brief communications with other counsel. This passing involvement will not be compensated.

### Mitchell D. Goldsmith

Sachnoff Weaver petitions for .5 hour at the rate of $140 an hour, for a total lodestar of $70 for work done by Mitchell Goldsmith, a partner. Mr. Goldsmith's had a discussion with Mr. Block in 1983 concerning the complaint. His attenuated and redundant involvement is not deemed to have benefitted the Class and will be disallowed.

### Jeffrey Rubenstein

Sachnoff Weaver petitions for .25 hour at the rate of $250 an hour, for a total lodestar of $62.50 for work done by Jeffrey Rubenstein, a partner. He made a telephone call on 4/15/84 to a named but unknown person "re: class member." The information is inadequate to permit the Court's approval of any compensation.

### Dean A. Dickie

Sachnoff Weaver petitions for .25 hour at the rate of $190 an hour, for a total lodestar of $47.50 for work done by Dean Dickie, a partner. Mr. Dickie's time, in April 1984, was for a discussion with Mr. Block. The firm will be compensated for Mr. Block's time, and no additional amount will be approved for Mr. Dickie's insignificant participation.

### Marvin A. Tenenbaum

Sachnoff Weaver petitions for .25 hour at the rate of $140 an hour, for a total lodestar of $35 for work done by Marvin Tenenbaum, a partner. Mr. Tenenbaum had a telephone conversation with Mr. Gleeson in October 1983. Presumably the time should have been charged to the Nuveen action. It appears unrelated and will not be allowed here in any event.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Sachnoff Weaver firm.

SACHNOFF WEAVER & RUBENSTEIN, LTD. ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Buckman | 1,244.00 | 1,187.00 | $93,300.00 | $89,025.00 |
| Schatz | 428.00 | 361.50 | 72,760.00 | 61,455.00 |
| Block | 273.50 | 199.50 | 60,170.00 | 43,890.00 |
| Newkirk | 348.75 | 335.25 | 52,312.50 | 43,582.50 |
| Mosh | 97.75 | 97.75 | 15,151.25 | 15,151.25 |
| Gilbert | 76.75 | 76.75 | 14,198.75 | 9,977.50 |
| Gleeson | 75.50 | 0.00 | 12,080.00 | 0.00 |
| Medow | 106.75 | 106.75 | 11,208.75 | 11,208.75 |
| Sachnoff | 33.25 | 28.50 | 10,806.25 | 8,550.00 |
| Boyd | 70.75 | 69.75 | 9,905.00 | 9,765.00 |
| Clayton | 55.75 | 55.75 | 8,362.50 | 8,362.50 |
| Karl | 36.75 | 36.75 | 4,042.50 | 3,987.50 |
| Cook | 21.50 | 21.50 | 2,580.00 | 2,580.00 |
| McKnight | 7.75 | 7.75 | 1,240.00 | 1,007.50 |
| Feldman | 3.00 | 0.00 | 570.00 | 0.00 |
| Watkins | 2.00 | 0.00 | 380.00 | 0.00 |
| Ryan | 1.50 | 0.00 | 232.50 | 0.00 |
| Huff | .75 | 0.00 | 150.00 | 0.00 |
| Rosen | .50 | 0.00 | 105.00 | 0.00 |
| Goldsmith | .50 | 0.00 | 70.00 | 0.00 |
| Rubenstein | .25 | 0.00 | 62.50 | 0.00 |
| Dickie | .25 | 0.00 | 47.50 | 0.00 |
| Tenenbaum | .25 | 0.00 | 35.00 | 0.00 |
| Totals | 2,885.75 | 2,584.50 | $369,770.00 | $308,542.50 |

*Paralegals*

In addition to the hours reported for attorney members of the firm, Sachnoff Weaver applies for an award for the work of six paralegal employees. A total of 119.75 paralegal hours were reported for work performed through December 31, 1989. Rates ranging from $50 to $85 per hour were utilized in determining the lodestar, $8,412.50, for the work of these individuals. Most of the work involved analysis of Official Statements and preparation of deposition abstracts. That work was adequately described and appropriate. Work simply reported as "library research," is not sufficiently described to permit assessment, however. Nor is 3 hours charged to "Proof of Claim Form for Projects 4 & 5." A deduction of 14 hours, with the corresponding lodestar value, will therefore be made.

*Paralegal Award*

For 105.75 hours of paralegal work, Sachnoff Weaver will be awarded a reasonable lodestar of $7,487.50.

*Expenses*

Sachnoff Weaver reports expenses totalling $45,230.43 through December 31, 1989, in connection with the MDL 551 litigation. The largest part of the firm's expenses, $34,720.83, was reported in connection with "Travel, Hotel, Meals, Misc." The firm provided documentation to support the charges. Except for the following, the Court finds them reasonable and reimbursable out of Class funds.

■ A deduction of $200 will be made to offset "per-diem" type charges regularly made by Mr. Buckman for breakfasts and lunches. During the course of discovery, he consistently reported expenses of exactly $5.00, or occasionally $6.00, for those meals. The total amount of such charges is considerable. The Court is not disposed to condone the practice of using recurring approximations to reflect meal expenditures in connection with this litigation. Class members are entitled to greater accu-

racy and precision. The round figure deduction is made to reduce such charges, which, when combined with varying dinner expenditures, produced sometimes unreasonable daily meal charges.

An additional deduction of $834.24 will be made to reduce a number of meal charges for which adequate documentation was not provided. Generally, this figure reflects expenditures for which a date, and occasionally a name, but no purpose was provided.

Sachnoff Weaver also reported $3,397.57 in computer research fees. Approximately half of the amount reported was incurred in July and August 1988 in approximately four days in connection with damages research. The Court believes the amount incurred for the research was excessive. A deduction of $700 will be made to the firm's charges for computer research to reduce the figure to a reasonable amount. Although a larger reduction would not be inappropriate, the Court recognizes that the firm paid for the computer research, however immoderate the activity may have been.

A charge of $497.50 for "Secretarial Overtime" will be disallowed, consistent with the treatment accorded all such charges. So, too, will the firm's unexplained $97.94 "Miscellaneous" charge.

Photocopy charges of $3,158.44 were reported. Since 1984, when the firm contracted for the management of its in-house photocopy operation, the firm has charged 20 cents per copy. A reduction of approximately $775 will be made in the amount requested to reduce the charge to Class members to a reasonable one.

### Expense Award

In accordance with the foregoing, an award of $42,125 will be made to Sachnoff Weaver for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

### WPPSS Litigation Fund

Sachnoff Weaver contributed $12,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

### SAVERI AND SAVERI

The San Francisco law firm of Saveri and Saveri applies for an award of fees for the work of three attorneys whose current rates at the time of the petition ranged from $145 to $300 an hour. When the petition was submitted, the firm reported a total of 4,779.65 attorney hours worked, for a reported attorney lodestar total, as corrected, of $949,342.25. No subsequent work was reported.

The firm's involvement in the litigation began in July 1983 and continued to some degree through the end of 1988. Along with Hallisey & Johnson, Saveri and Saveri is counsel of record for The Doctors Company. The firm's daily time records and documentation supporting its fee petition are exemplary. The Court's review was greatly facilitated because of the records' professional appearance, their legibility, chronological arrangement, and separate reporting of each petitioning attorney's work. Firm members' avoidance of nonstandard abbreviations and sufficient identification of individuals and documents also enhanced the presentation of consistently meaningful work descriptions. Had all firms' petitions been prepared with as much care and foresight as those of the Saveri firm, the time required for the Court's review would have been reduced substantially.

### John Kithas

Saveri and Saveri petitions for 1,893.8 hours at the rate of $195 an hour, for a total lodestar of $369,291.00 for work done by John Kithas, an associate. Mr. Kithas' involvement began in the summer of 1984, when he undertook discovery and deposition work. Throughout his work on the litigation his time charges were moderate, reasonable and, where appropriate, apportioned among different tasks on a given day. Although his work descriptions were typically terse, they were quite specific. Frequently very modest charges (often 6 minutes) were indicated for review of an identified memo or for telephone conversa-

tions. Telephone calls named both the individual with whom he spoke and the subject matter of the call. On days that he travelled his work charges reflected reductions for time spent in transit.

For Mr. Kithas' work on the litigation, Saveri and Saveri will receive a lodestar award of $369,291 for 1,893.8 hours reasonably spent to the benefit of Class members.

*Charles Lamont*

Saveri and Saveri petitions for 1,843.25 hours at the rate of $145 an hour, for a total lodestar of $267,271.25 for work done by Charles Lamont, an associate.

Mr. Lamont was primarily involved in document production, designation and coding of documents, and deposition discovery work. Although he travelled frequently, his work charges appear to exclude the time he spent in transit.

For Mr. Lamont's work on the litigation, Saveri and Saveri will receive a lodestar award of $267,271.25 for 1,843.25 compensable hours reasonably spent to the benefit of Class members.

*Guido Saveri*

Saveri and Saveri petitions for 1,042.6 hours at the rate of $300 an hour, for a total lodestar of $312,780 for work done by

Guido Saveri, a partner. Mr. Saveri was initially significantly involved in the litigation. Like those of other members of his firm, his daily time charges were allocated among as many as 8 to 10 different undertakings in a given day. He worked on the complaint of the Doctors Company, for which the firm was counsel of record, and participated in many other aspects of the litigation. His work descriptions were slightly more general than those of his associates because of the supervisory nature of his involvement. Nonetheless, they were consistently adequate and reflected reasonable expenditures of time. Mr. Saveri charged approximately 34 hours for travel, generally indicating what he worked on en route, and 1.5 hours for preparation of time reports. A deduction of 18.5 hours will be made for these activities, consistent with those made for other firms.

For Mr. Saveri's work on the litigation, Saveri and Saveri will receive a lodestar award of $307,230 for 1,024.1 hours reasonably spent to the benefit of Class members.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Saveri firm.

### SAVERI AND SAVERI ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
| | Request | Award | Request | Award |
| --- | --- | --- | --- | --- |
| Kithas | 1,893.80 | 1,893.80 | $369,291.00 | $369,291.00 |
| Lamont | 1,843.25 | 1,843.25 | 267,271.25 | 267,271.25 |
| Saveri | 1,042.60 | 1,024.10 | 312,780.00 | 307,230.00 |
| Totals | 4,779.65 | 4,761.15 | $949,342.25 | $943,792.25 |

*Paralegals*

Saveri and Saveri does not apply for an award for the work of paralegals or law clerks.

*Expenses*

Saveri and Saveri reports expenses totalling $45,697.61 through December 31, 1989, in connection with the MDL 551 litigation. The firm was required to document $41,437 requested in a single sum for Travel Expenses, Filing Fees, Federal Express, and

Witness Fees. The supporting information provided in response to the Court's order to elaborate on the request was appropriate and sufficient, and the full amount will be allowed.

A reduction of $850 will be made to the $3,487.50 photocopy expense requested by Saveri and Saveri, consistent with reductions made for other firms. The firm charged 20 cents per page throughout the litigation and had minimal outside copying

done. The remaining reasonable expenses will be allowed.

*Expense Award*

In accordance with the foregoing, an award of $44,848 will be made to Saveri and Saveri for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Saveri and Saveri contributed $23,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

### SCHOENGOLD & SPORN, P.C.

The New York law firm of Schoengold & Sporn applies for an award of fees for the work of four attorneys whose current rates at the time of the petition ranged from $85 to $325 an hour. At the time the petition was submitted, the firm reported a total of 1,139.95 attorney hours worked, for a reported attorney lodestar total of $270,520.50. Subsequent reports for work performed in 1989 raised the firm's reported total attorney hours to 1,158.65 and its attorney lodestar to $276,528.25. All of the supplemental reported time related to the primary MDL action, however, and none will be deferred for later consideration.

The firm is counsel of record for plaintiff Jack Schroeder, a class representative. Its involvement in the litigation began in March 1983. Time charges were made through September 1989. The firm's time records are appalling. They indicate the extremely limited role the firm played in the actual conduct of this action, however. Throughout the period of time during which the firm's members charged time to the MDL action, charges were routinely made by two different attorneys for the same activity. Extraordinary duplication of time charges, ranging from slightly over a minute to many hours, for activities that included reading newspaper articles, sitting in on conference calls, and reviewing hundreds of communications and administrative documents, was inappropriate, in view of the firm's minimal work contribution to the action. The redundancy in these charges has been eliminated. Aside from rejection of duplicated time charged for these purely informational pursuits, much of the remaining reported time has been disallowed due to an absence of any conceivable benefit to the class from the indicated activities.

Where necessary, the firm's reported time charges, in minutes, have been converted to decimals.

*Samuel P. Sporn*

■ Schoengold & Sporn petitions for approximately 583.7 hours at the rate of $325 an hour, for a total lodestar of $189,692.75 for work done by Samuel Sporn, a partner. Mr. Sporn began to charge time in March 1983, in connection with the preparation of a complaint on behalf of class representative Schroeder. Schoengold & Sporn reveals in its declaration that Mr. Sporn's requested rate was his "noncontingent billing rate" in August 1988. While his representation in other matters may warrant payment of that sum, his insignificant and subordinate role in this litigation does not. His compensable time will be paid at a reasonable rate of $300 per hour.

Review of Mr. Sporn's work descriptions reveals that he did very little of a productive nature in the litigation. Most of his daily time entries were for intervals ranging from a few minutes to about 2 hours. Hundreds of charges were made for such things as review of correspondence, memoranda, reports, news articles, notices of appearances and conversations with the firm's other attorneys. Many of his time charges are plainly outrageous for a firm with such a minor role in the action. Had Mr. Sporn, or even his firm, been more actively involved, some of these kinds of charges might have been appropriate. Because of the insubstantial nature of the firm's overall involvement, however, Class members will not be assessed for most of the time attributed by Mr. Sporn to such events. An allowance of 18 hours will be permitted to award the firm appropriately for the innumerable documents generated externally in this litigation which were merely received and reviewed by Mr.

Sporn. It is difficult to discern how Class members benefitted from even that amount of his time. A 5 hour allowance will be granted for telephone calls to lead counsel, which were not particularly frequent, and for conference calls. A total of 2 hours will be allowed for the inordinate number of often extended "consultations" with other members of his firm, particularly Mr. Balsam. No other award will be made for the multitude of small charges described above.

The following discussion addresses Mr. Sporn's charges for more significant amounts of time attributed to other activities.

■ Approximately 24 hours were charged by Messrs. Sporn and Balsam for work on the Schroeder complaint. Eight hours of Mr. Sporn's time is a sufficient allowance for his work in the preparation of the 13–page complaint.

Two hours for his attendance at a meeting of co-counsel on 3/23/83 will be allowed.

Four hours will be allowed for a court appearance in June 1983. Although Mr. Sporn charged a lump sum of 22 hours for 6/4—6/5/83 for "travel to Denver, CO re court appearance, then to Spokane, WA, then to Salt Lake City," no indication of what he did in those locations was provided.

No allowance will be given for a 2 hour charge for "memo to SRS fr [omitted] re Background facts," or for an isolated 5.66 hour charge for "Legal Research" that was both unidentified, unconnected to other work and duplicated by a 5.17 hour charge by Mr. Balsam.

Three of five hours charged by Mr. Sporn to prepare a memo regarding suits against Washington municipal corporations will be allowed. The allowance is reasonable, given Mr. Sporn's elevated position.

Five of 9 hours charged to negotiate and prepare a stipulation and transmittal letter on 7/7/83 is a reasonable allowance.

■ Eight hours will be reluctantly allowed for Mr. Sporn's attendance at a Seattle hearing in August 1983. A lump 28

hour charge was made for the four-day period of 8/31—9/3/83 for "Travel, Court Attendance and Meetings." The allowance is made only because the hearing concerned the Court's selection of lead counsel, and the attendance of attorneys from other firms has been permitted. A separate (and presumably duplicate) charge on 9/1/83 for 3.5 hours to "Hearing in Seattle—Background Facts" will be disallowed.

An hour of more than 7 hours charged by Mr. Sporn to "Review Motion to Dismiss" is reasonable. The allowance is generous, in view of the fact that no further activity appears to have taken place within the firm in connection with the motion.

■ None of Mr. Sporn's time on 10/4/83 to write a three hour, forty minute file memo regarding his attendance at a meeting is an appropriate charge. No time will be allowed for "Memo re WPPSS doc in Richland" to which 3 hours 25 minutes was charged. It appears that Mr. Sporn simply read the memo. He did not report any document review before the time charge. One hour charged for "Conference w/SPS" on 11/21/83 will be disallowed. No subject matter was stated, and no work had been done to require such a lengthy in-house conference. Six hours(!) charged to "Memo of Oregon Public Entities re funding of Supply Sys Defense" is plainly offensive and no time will be paid. The appropriate amount of review time for this memo is included in the allowance granted previously. Three hours charged to "Public notice claims for damages against BPA" is equally objectionable. A 5.5 hour charge for "Review of Memo by AE" on 10/7—10/8/87 will be disallowed. It was the only time charge for Mr. Sporn that month. Also rejected are 4 of 6 hours charged in December 1987 for Mr. Sporn's review of a draft reply brief on plaintiffs' motion to compel production of certain documents produced to the SEC. Two of the firm's other attorneys, Mr. Tepper and Mr. Enmark apparently prepared the draft, and reported more than 70 hours for their work. Two hours is a sufficient amount of

time for Mr. Sporn's supervisory involvement in this undertaking, which appears to be one of the few truly palpable endeavors of the firm.

Mr. Sporn charged 3 hours on 1/17/84 for "Prep for document disc." Mr. Balsam charged 3.20 on the same day. Each charged 4 hours for "Meeting of Discovery Comm members" on 1/26/84. Several letters and an Order also had time charges in the interval. On 2/7/84, Mr. Sporn charged 5 hours 50 minutes to "Document Discovery." Mr. Balsam and one of the firm's paralegals also charged larger amounts of time to the same activity (in lump sums) for the period 2/6 to 2/10/84. None of Mr. Sporn's time will be allowed for these activities. The work is inadequately described, and inappropriate, given his billing rate.

A charge of 1.13 hours on 9/22/83 to "Ringler v. M/L—Motion to Vacate" is unacceptable because it has no meaning to the Court and appears to relate to other litigation. A charge of 34 hours for the period 11/19—11/23/84 for "Analysis of M/L role in 4 & 5 bonds & in MITF's" will go unrewarded because the description lacks meaning and was recorded as a single lump sum.

A somewhat incredible 2.5 hour charge on 4/26/85 for "Rev. of class action lawsuit" is rejected. So, too, will a 10.75 hour entry dated 1/85 for "Various dates spent on doc. research (total)."

Six hours charged by Mr. Sporn to review and code mark defendant Moody's documents will be reduced to two hours, a reasonable amount for such work, given his status. No time will be allowed for a 6/25/85 charge of 4.5 hours for "Research for document discovery." The work description is not sufficiently meaningful.

A 46–hour lump sum charge for 4/18—4/23/85 for "Deposition notes of SPS of Schroeder deposition" is assumed to reflect Mr. Sporn's participation in the deposition of the firm's client. The Court will allow as reasonable 32 hours of Mr. Sporn's time during this period, which included a weekend. For deposition preparation, an additional 1.5 hours will be allowed. For work on his client's answers to interrogatories 2.5 of 5.5 hours charged will be allowed. Other charges for client contact, including Mr. Sporn's review of his client's proof of claim and frequent charges for "client contact" with no stated purpose, are deemed not to have accrued to the benefit of the Class and, consistent with the treatment of other firms, will be disallowed.

None of Mr. Sporn's post-petition work will be allowed. Most of it pertained to the fee petition.

The foregoing assessment adequately depicts Mr. Sporn's inconsequential and immaterial role in this action as reflected by his work records. For his work on the litigation, Schoengold & Sporn will receive a lodestar award of $28,800 for 96 hours reasonably spent to the benefit of Class members.

*Moshe Balsam*

Schoengold & Sporn petitions for 322.75 hours at the rate of $125 an hour, for a total lodestar of $40,343.75 for work done by Moshe Balsam, an associate. Much of Mr. Balsam's initial work on the firm's complaint duplicated Mr. Sporn's, and 2 of 10 hours charged will be allowed as a reasonable amount of time for his assistance.

No time will be allowed for Mr. Balsam's review of miscellaneous correspondence, news articles, pleadings, and other papers filed in the litigation, for which, often in tandem with Mr. Sporn, he charged varying amounts ranging upward from .02 hour. A relatively uninvolved associate should not accumulate such charges in litigation such as this. No time will be allowed for "Legal Research" where the subject matter was neither stated nor discernible from surrounding daily entries. No time will be allowed for his redundant participation in conference calls or other events.

The following activities will be awarded in the reasonable amounts indicated:

Document discovery work in January, February and March 1984: 25 of nearly 50 hours charged, several times in lump sum entries covering 4 and 5 day periods.

Document inspection in Seattle in May (again a lump sum entry covering 5 days, including travel): 38 hours.

Document discovery and travel to Portland in July 1984: 26 hours.

Document discovery and review in August and September 1984: 12 hours.

Document review in February and March 1985: 22 hours.

No other amounts will be awarded for time reported by Mr. Balsam. No other charges appear to have been of benefit to Class members.

For Mr. Balsam's work on the litigation, Schoengold & Sporn will receive a lodestar award of $15,625 for 125 hours reasonably spent.

### Miles M. Tepper

Schoengold & Sporn petitions for approximately 131.7 hours at the rate of $275 an hour, for a total lodestar of $36,249.25 for work done by Miles Tepper, Counsel to the firm. Mr. Tepper did not become involved in the action until 1986, and then did so only on a limited basis. In late 1987 he worked on several memos, charging almost 115 hours to their research and preparation. This time charge is unreasonable, given Mr. Tepper's status: an award of $22,000 for 80 hours work will be allowed.

No other time charges are deemed to have benefitted Class members and none will be approved. They consisted largely of reading other memos and discussing the status of the case with Mr. Sporn.

### Anders H. Enemark

Schoengold & Sporn petitions for 120.5 hours at the rate of $85 an hour, for a total lodestar of $10,242.50 for work done by Anders Enemark, an associate. Mr. Enemark's time reporting, like others in the firm, is deficient. With one exception, he reported his time in lump sums for 2 to 5 day periods. His work, which occurred in late 1987, involved preparation of a "Memo of Law for Bernstein Litowitz firm" (40 hours); "Research, writing & proofing a Memo to B/L" (28.5 hours); and research and revisions on a motion that Mr. Tepper drafted (52 hours). The Court will allow a reasonable award for 60 hours of his inadequately described, but presumably beneficial work. For Mr. Enemark's work on the litigation, Schoengold & Sporn will receive a lodestar award of $5,100.

The following table summarizes the foregoing reasonable lodestar awards for compensable work reported by attorneys in the Schoengold & Sporn firm.

SCHOENGOLD & SPORN, P.C.
ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
| | Request | Award | Request | Award |
| --- | --- | --- | --- | --- |
| Sporn | 583.70 | 96.00 | $189,692.75 | $28,800.00 |
| Balsam | 322.75 | 125.00 | 40,343.75 | 15,625.00 |
| Tepper | 131.70 | 80.00 | 36,249.25 | 22,000.00 |
| Enemark | 120.50 | 60.00 | 10,242.50 | 5,100.00 |
| Totals | 1,158.65 | 361.00 | $276,528.25 | $71,525.00 |

### Paralegals

In addition to the hours reported for attorney members of the firm, Schoengold & Sporn applies for an award for the work of two paralegal employees. When the petition was submitted, a total of 304.25 paralegal hours were reported. The figure increased to 306.25 hours with the submission of a supplemental report for work performed through September 30, 1989. Rates of $40 and $60 per hour were used to calculate the lodestar for the work of these employees. Their reported lodestar, as of December 31, 1989, amounted to $17,155.

The timekeeping practices reflecting the work of these two individuals do not meet the requirements for a fee petition. Entries were made, generally on the last day

of the month, for amounts ranging from a few minutes to many hours. Work descriptions indicated activities such as "Document Discovery," "Document Inspection" and, most often, "Paralegal-logging/filing." It is difficult to assess the reasonableness of this improperly reported work, much of which appears clerical in nature.

*Paralegal Award*

For paralegal discovery work that appears to have been done, the Court will allow a reasonable award of $1,800 for 30 hours, approximately half the time indicated for this kind of activity. No award will be made for the remaining tasks.

*Expenses*

■ Schoengold & Sporn reports expenses totalling $6,846.35 through December 31, 1989, in connection with the MDL 551 litigation. Most of the reported expense, $5,235.68, was for travel. The Court will disallow $100 of the $213.74 charged for "hotel, tel. con., cabs, and food" for Mr. Sporn's October/November trip to Seattle. Over the four-day trip, slightly more than 4 hours of work was reported. A $384 charge for Mr. Balsam's travel to Los Angeles from Seattle in May 1984 will also be disallowed. The Court discerns no ostensible purpose for the apparent side trip. Three charges totalling $79.18 will also be disallowed. Two were for local lunches with co-counsel on days when no time was charged to the action. The third was for taxi fare in similar circumstances.

In the absence of appropriate documentation, which should have been provided at the time the petition was submitted, the Court will allow $400 of the firm's reported photocopy charge of $594. This amount is reasonable given the firm's minor role.

The remainder of expenses are reasonable and will be allowed.

*Expense Award*

In accordance with the foregoing, an award of $6,089 will be made to Schoengold & Sporn for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Schoengold & Sporn contributed $19,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## STULL, STULL & BRODY

The New York law firm of Stull, Stull & Brody applies for an award of fees for the work of four attorneys whose rates at the time of the petition ranged from $95 to $295 an hour. When the petition was submitted, the firm reported a total of 393 attorney hours worked, for a reported attorney lodestar total of $97,935. No subsequent reports were submitted.

The firm's involvement in the litigation began in the summer of 1983. It is counsel of record for class representative Lawrence Zucker. The firm's daily time records are disgraceful. Recorded on desk calendars for the most part, the descriptive entries commemorating firm members' work are often meaningless, sometimes illegible, and certainly unprofessional. The Court has, nonetheless, struggled to review the daily entries for each petitioning attorney, and has made the determinations indicated in the following paragraphs.

*Robert A. Stull*

The Stull firm petitions for 219.5 hours at the rate of $295 an hour, for a total lodestar of $64,752.50 for work done by Robert Stull, a partner. Although Mr. Stull indicated his attendance at a meeting and some unspecified document review, his first charges of any substance occurred in February 1984, when he spoke to Mr. Fred Isquith of the Wolf Haldenstein firm, and reported "prep for Blyth Disc." In this connection, he charged approximately 66 hours for contacts with Mr. Isquith and for Blyth document discovery work, including the preparation of a memo. The Court will approve a reasonable allowance of 40 hours for this work, for which Mr. Stull's reported time expenditure, given his rate, was excessive.

On May 8 and 9, 1984, Mr. Stull charged 8 hours for work on a report on BPA oversight. There is no indication of the

purpose of use of this report and the charge will be disallowed. A 2.25 hour charge for "WPPSS" on 5/11/84 is similarly unacceptable.

Cumulative charges totalling 31 hours for "Seattle docs" during the period May 15 through May 18, 1984, are presumed to reflect discovery efforts. The Court will allow 24 hours in lieu of the excessive lodestar amount reported by this partner for the basic discovery work it appears to be. This allowance is generous, given the terse and meaningless description on Mr. Stull's calendar/time record.

A number of subsequent work descriptions are either illegible or inadequate and will not be paid, in accordance with the firm's failure to meet its burden in presenting this petition.

For work done in connection with the deposition of class representative Zucker, Mr. Stull will be allowed 24 hours for preparation, attendance and review. Time related to the deposition of Roslyn Mirotznik, which Mr. Stull appears merely to have attended, will not be allowed. No other reported work will be approved.

For Robert Stull's work on the litigation, Stull, Stull & Brody will receive a lodestar award of $25,960 for 88 hours reasonably spent to the benefit of Class members.

*Jules Brody*

Stull, Stull & Brody petitions for 63.5 hours at the rate of $295 an hour, for a total lodestar of $18,732.50 for work done by Jules Brody, a partner. A sampling of Mr. Brody's deficient time records reads as follows:

7/12/83 Zucker v WPP—1—?
7/14/83 Whoops Rev Doc—4
7/15/83 WPPS Tel Milberg. Off conf class period—2.5
7/25/83 WOOPS meeting—with who? rev file—? —6.5
8/2/83 WPPS—rev docs—4

Unintelligible entries such as these prevail and, except for the following, do not merit any fee award. For work on interrogatories, Mr. Brody will be allowed, commensurate with his status, 6 of 16.5 hours charged.

For Mr. Brody's work on the litigation, Stull, Stull & Brody will receive a lodestar award of $1,770 for 6 hours reasonably spent to the benefit of Class members.

*Linda Levy*

The Stull firm petitions for 90 hours at the rate of $95 an hour, for a total lodestar of $8,550 for work done by Linda Levy, an associate. Unlike the firm's other members, Ms. Levy's hours are recorded on a work sheet that provides space for a record of "time in" and "time out" for a two week period. For the two weeks ended 5/15/87, Ms. Levy indicated a total of 50 hours for "WPPS" over six days, for each of which the worked interval was shown as "8 [to] 6." The following two-week period reflected 4 such days, and a total reported 40 hours. Although this record is insufficient to base any award on, the work had previously been described, on a bi-monthly report submitted by the firm during the course of the litigation, as "Reviewed Claims at Garden City." The Court believes the work was inappropriately assigned to an attorney as opposed to a less costly paralegal. Nonetheless, for Ms. Levy's efforts, some of which presumably accrued to the benefit of the class, Stull, Stull & Brody will receive a reasonable lodestar award of $2,375 for 25 hours.

*Richard J. Stull*

Stull, Stull & Brody petitions for 20 hours at the rate of $295 an hour, for a total lodestar of $5,900 for work reported by Richard Stull, a partner. Mr. Stull's first entry, for 8 hours, reflects attendance at a counsel meeting from 5 to 10 p.m. on July 18, 1983. Thereafter three time charges reflect study of the complaints, review of "documents," and preparation and attendance at another meeting. No other involvement was reported. No award will be made for Richard Stull's superficial and clearly inessential participation.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Stull firm.

## STULL, STULL & BRODY ATTORNEY LODESTAR

| | HOURS | | LODESTAR | |
|---|---|---|---|---|
| Attorney | Request | Award | Request | Award |
| Stull, R.A. | 219.50 | 88.00 | $64,752.50 | $25,960.00 |
| Brody | 63.50 | 6.00 | 18,732.50 | 1,770.00 |
| Levy | 90.00 | 25.00 | 8,550.00 | 2,375.00 |
| Stull, R.J. | 20.00 | 0.00 | 5,900.00 | 0.00 |
| Totals | 393.00 | 119.00 | $97,935.00 | $30,105.00 |

*Paralegals*

Stull, Stull & Brody does not apply for paralegal fees.

*Expenses*

Stull, Stull & Brody reports expenses totalling $4,043.89 through December 31, 1989, in connection with the MDL 551 litigation. Over half the amount was for Travel and Meals. Of the $2,206.06 reported in this single category, $1,792.60 was for Robert Stull's trip to Seattle in May 1984. The combined request for hotel, meals and taxi service for the 4–day period, $1,046.60, is excessive and will be reduced by $400. Additionally, $254 charged for "meals" between 9/83 and 3/85 will be disallowed in the absence of proper supporting information.

Finally, photocopy charges of $1,514.25 will be reduced to a reasonable amount, approximately $650. Throughout the litigation, the firm charged 25 cents a copy.

*Expense Award*

In accordance with the foregoing, an award of $2,525 will be made to Stull, Stull & Brody for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Stull, Stull & Brody contributed $13,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## WOLF, BLOCK, SCHORR & SOLIS–COHEN

The Philadelphia law firm of Wolf, Block, Schorr & Solis–Cohen ("Wolf Block") applies for an award of fees for the work of ten attorneys whose rates at the time of the petition ranged from $185 to $290 an hour. When the petition was submitted, the firm reported a total of 1,338.3 attorney hours worked, for a reported attorney lodestar total of $282,413.50. No subsequent work was reported. The firm's involvement in the litigation began in the summer of 1983 and continued through 1988. Wolf Block is counsel of record for plaintiff Danny S. Fruchter, a class representative. The firm's daily time entries appear in a computer printout.

*James G. Wiles*

Wolf Block petitions for 740.7 hours at the rate of $195 an hour, for a total lodestar of $144,436.50 for work done by James Wiles, an associate. Mr. Wiles' charges for work on the litigation began in July 1983. He prepared a complaint and worked on class interrogatories, class certification and on a portion of plaintiffs' response to motions to dismiss. He was extensively involved with discovery work, did research, prepared a brief on a significant discovery issue, participated in the deposition of class representative Fruchter, and drafted a brief for a matter in the Ninth Circuit.

For the most part Mr. Wiles' time charges adequately describe appropriate work and are reasonable. Several deductions are necessary, however. For travel time charged, a 50% reduction of 13.7 hours will be made. A deduction of 9.5 hours for a duplicate entry on 3/1/87 is required, as is a deduction of 14 hours for a number of "miscellaneous," blank, and excessive charges for supervision of a paralegal employee regarding time reporting matters. Six hours will also be deducted for proof of

claim work that benefitted the firm's client, though not the Class.

For Mr. Wiles' work on the litigation, Wolf Block will receive a lodestar award of $136,012.50 for 697.5 hours reasonably spent to the benefit of Class members.

### Barry F. Schwartz

■■■ Wolf Block petitions for 226.2 hours at the rate of $275 an hour, for a total lodestar of $62,205 for work done by Barry Schwartz, a partner. Mr. Schwartz became involved in the litigation effort in July 1983. Except for his involvement in the deposition of Danny Fruchter, Mr. Schwartz' participation was primarily supervisory. Most of his time charges were for communications, especially with Mr. Wiles and, to a lesser extent, lead counsel and others. Many of his work descriptions simply indicated "conference with Wiles." They frequently lacked any stated purpose or subject matter, precluding an assessment of their significance or reasonableness. While the time charges for these discussions were individually small, cumulatively they accounted for a significant portion of Mr. Schwartz' time. The redundancy inherent in such conversations, as well as the joint attendance of both attorneys (and on at least one occasion, a third from the same firm) at several meetings and conference calls, will be partially offset by a deduction of 34 hours.

In addition, a deduction of 6 hours will be made for time charges for work on the claim of class representative Fruchter, on the fee application and time reports, and for several duplicate entries in August and September 1983. A 5 hour deduction will be made to reduce the modest travel charges reported by Mr. Schwartz.

For Mr. Schwartz' work on the litigation, Wolf Block will receive a lodestar award of $49,830 for 181.2 hours reasonably spent to the benefit of Class members.

### Kevin C. McCullough

Wolf Block petitions for 131.3 hours at the rate of $195 an hour, for a total lodestar of $25,603.50 for work done by Kevin McCullough, an associate. Mr. McCullough did document review and issue coding in Seattle in 1984. After a deduction of 45 of 55.4 hours charged for three round trips, his charges will be allowed.

For Mr. McCullough's work on the litigation, Wolf Block will receive a lodestar award of $16,828.50 for 86.3 hours reasonably spent to the benefit of Class members.

### Patrick Matusky

Wolf Block petitions for 123.7 hours at the rate of $195 an hour, for a total lodestar of $24,121.50 for work done by Patrick Matusky, an associate. Mr. Matusky's did compensable research and drafting in the summer of 1986. Charges in May 1984 in preparation for document discovery work that did not take place will be disallowed.

For Mr. Matusky's work on the litigation, Wolf Block will receive a lodestar award of $22,659 for 116.2 hours reasonably spent to the benefit of Class members.

### Roberta D. Liebenberg

Wolf Block petitions for 38 hours at the rate of $245 an hour, for a total lodestar of $9,310 for work done by Roberta Liebenberg, a partner. Ms. Liebenberg's work was on the litigation was short-lived. She attended several meetings, one of which was also attended by Mr. Schwartz, and worked on a complaint and interrogatories. The Court concludes that 20 hours is a reasonable allowance for her brief and insufficiently described involvement.

For Ms. Liebenberg's work on the litigation, Wolf Block will receive a lodestar award of $4,900 for 20 hours reasonably spent to the benefit of Class members.

### Tristram R. Fall

Wolf Block petitions for 33.1 hours at the rate of $185 an hour, for a total lodestar of $6,123.50 for work done by Tristram Fall, an associate, in 1986. Mr. Fall's work involved research and preparation of memoranda and will be allowed as reported.

### Michele M. Clark

Wolf Block petitions for 23.9 hours at the rate of $190 an hour, for a total lodestar of $4,541 for work done by Michele Clark, an associate. Ms. Clark's work, which consisted almost exclusively of document production, will be compensated as reported.

## Ian A. Strogatz

Wolf Block petitions for 12.5 hours at the rate of $290 an hour, for a total lodestar of $3,625 for work done by Ian Strogatz, a partner. Mr. Strogatz worked on a complaint in July 1983. His work duplicated that of Mr. Schwartz and/or Ms. Liebenberg, and no additional value is perceived as having accrued to the benefit of Class members from Mr. Strogatz' brief participation. No award will be made.

## Seymour Kurland

Wolf Block petitions for 8 hours at the rate of $275 an hour, for a total lodestar of $2,200 for work done by Seymour Kurland, a partner. Mr. Kurland's work, mainly in July 1983, included telephone calls and conversations with other attorneys and unidentified individuals regarding the firm's involvement in the action. No benefit to Class members is presumed to have occurred from his time expenditure, and no fee will be awarded.

## Michael L. Temin

Wolf Block petitions for .9 hours at the rate of $275 an hour, for a total lodestar of $247.50 for work done by Michael Temin, a partner. Mr. Temin's time charges were for discussions with Messrs. Schwartz and Wiles, and his brief participation was redundant. No award will be made.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Wolf Block firm.

## WOLF, BLOCK, SCHORR & SOLIS–COHEN ATTORNEY LODESTAR

| Attorney | HOURS Request | Award | LODESTAR Request | Award |
|---|---|---|---|---|
| Wiles | 740.70 | 697.50 | $144,436.50 | $136,012.50 |
| Schwartz | 226.20 | 181.20 | 62,205.00 | 49,830.00 |
| McCullough | 131.30 | 86.30 | 25,603.50 | 16,828.50 |
| Matusky | 123.70 | 116.20 | 24,121.50 | 22,659.00 |
| Liebenberg | 38.00 | 20.00 | 9,310.00 | 4,900.00 |
| Fall | 33.10 | 33.10 | 6,123.50 | 6,123.50 |
| Clark | 23.90 | 23.90 | 4,541.00 | 4,541.00 |
| Strogatz | 12.50 | 0.00 | 3,625.00 | 0.00 |
| Kurland | 8.00 | 0.00 | 2,200.00 | 0.00 |
| Temin | .90 | 0.00 | 247.50 | 0.00 |
| Totals | 1,338.30 | 1,158.20 | $282,413.50 | $240,894.50 |

## Paralegals

In addition to the hours reported for attorney members of the firm, Wolf Block applies for an award for the work of one law clerk and ten paralegals. A total of 857.8 paralegal hours were reported. Rates ranging from $40 to $84 per hour were utilized in determining the lodestar for the work of these employees. Their reported lodestar, as of December 31, 1989, amounted to $69,432.20.

Most of the work involved research, deposition preparation and assistance in discovery work. No award will be made for 316 hours for one employee's work on time and expense reports or for 14 hours of travel time. An additional deduction of 6.9 hours will also be made for two other employees' work on time and expense reports.

## Paralegal Award

For 520.9 hours reported for paralegal undertakings, Wolf Block will receive a lodestar award of $41,157.

## Expenses

Wolf Block reports expenses totalling $35,663.42 through December 31, 1989, in connection with the MDL 551 litigation. Travel accounted for $14,782.73. Documentation provided in response to the Court's order to support the amount claimed was scarcely adequate. Many discrepancies existed between time and ex-

pense records, and the Court has given the firm the benefit of doubt in regard to a number of reported expenditures. The following expenses will be disallowed, however, for the stated reasons: $200 of $754.79 charged by Mr. Schwartz for a trip to Seattle in August 1984. The Court questions whether the trip was even necessary; half of $192.44 charged by Mr. Wiles for meals in Seattle over a two day period in October 1984; $250 of a total of $946.96 charged for travel, hotel, and meals for Messrs. Wiles and Messerman for a two day trip to New York in October 1984; $450 of a total of $1,250 charged by Mr. McCullough for taxis, meals and hotel over a 4 day period in November 1984 in Seattle; $400 of $565.93 charged for Messrs. Wiles' and Messerman's trip to New York on May 23, 1986. The Court questions even the purpose of this trip, which is not referred to in time records, for either person. The amounts charged for each of the preceding were excessive. An additional charge of $16 for a taxi for Mr. Matusky, presumably at some time in 1984, will be disallowed because it is inadequately explained. A reduction will be made for $69 of $138 charged by Messrs. Wiles and Schwartz for their trip to New York in July 1986. Time records do not support the necessity for the trip, even for one person. An undocumented charge of $6.25 will also be disallowed. A reasonable allowance of $13,310.26 will be allowed for the firm's travel expenses.

Wolf Block reported in-house photocopy expenses of $5,159. The firm's per-page rates gradually increased from 15 cents in 1983 to 25 cents in February 1987. The Court finds that $2,500 is a reasonable allowance for the firm's photocopy expenses.

Wolf Block charged a total of $3,773.92 for "LEXIS/Computer Research" and "Investigation and Search Fees." The Court finds the expenditure excessive, given the firm's limited role, and will allow $2,800 of the reported amount.

The firm's charge of $3,153.85 for "Messenger/Delivery" is also excessive. The charge is in addition to postage, air express mail, telecopy and messenger travel expenses of $2,300. A reduction of $2,350 will be made to convert this extraordinary charge to a reasonable one.

Secretarial overtime of $3,140.50 will be disallowed, consistent with the treatment accorded other firms that charged for this item.

*Expense Award*

In accordance with the foregoing, an award of $25,068 will be made to Wolf Block for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Wolf Block contributed $25,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## WOLF HALDENSTEIN ADLER FREEMAN & HERZ

The New York law firm of Wolf Haldenstein Adler Freeman & Herz ("Wolf Haldenstein") applies for an award of fees for the work of twelve attorneys whose rates at the time of the petition ranged from $85 to $315 an hour. When the petition was submitted, the firm reported a total of 3,415.6 attorney hours worked, for a reported attorney lodestar total of $594,385. No subsequent reports were submitted after the initial petition.

The firm's involvement in the litigation began in July 1983 and continued through 1988, though very little time was charged after 1987. Wolf Haldenstein is counsel of record for class representative Hyman Schein.

*Mark M. Rottenberg*

Wolf Haldenstein petitions for 2,097 hours at the rate of $135 an hour, and 35.5 hours at a rate of $185 an hour, for a total lodestar of $289,662.50 for work done by Mark Rottenberg, a former associate. The 35.5 hours petitioned for at the higher rate were for work reportedly done by Mr. Rottenberg after he left Wolf Haldenstein and joined the firm of Blodnick, Pomeranz, Reiss, Schultz & Abramowitz,

P.C. The Court is in possession of neither time records nor a declaration from any member of the Blodnick firm. It will not, therefore, consider the Wolf Haldenstein request for payment for any of Mr. Rottenberg's work after his departure from Wolf Haldenstein.

Mr. Rottenberg began working on WPPSS matters in July 1983. His initial work included drafting class certification briefs. He was extensively involved in document discovery work, generally in Washington State, for which he consistently recorded daily time entries averaging between 9.5 and 11.5 hours, frequently even greater amounts. The Court considers many of Mr. Rottenberg's time charges for this document review to be excessive, and believes that they reflect clocked intervals rather than productive work periods. Accordingly, a reduction of 86 hours will be made to offset inappropriate and unreasonable overcharges for this discovery work.

A number of days lacked any work description, and several such entries, amounting to 9.7 hours, will be disallowed. Other blank descriptions are assumed to have been for "document review," consistent with surrounding days and will not result in a further reduction. However, a reduction of 44.5 hours will be made to eliminate a number of irregular and excessive entries containing identical work descriptions such as "Draft Brief re: St. Class Cert" and "Document review" for a given day. A reduction of 3 hours for work on time and expense matters will also be made, as will a deduction of 118 hours, approximately 50% of the travel time charged by Mr. Rottenberg.

Mr. Rottenberg also did a great deal of deposition work, including preparation for and attendance at the deposition of class representative Schein. Here again, Mr. Rottenberg's time keeping practices leave too much to the imagination. Countless entries indicate only "Prepare for Depositions" or "Attend Depositions." This haphazard method of recording his endeavors impeded a meaningful review for reasonableness. While the Court does not suggest that work was not done, it is forced to

conclude that a deduction is appropriate to counteract the margin of error reasonably anticipated to inhere as a result of Mr. Rottenberg's repetitive, indifferent and improper timekeeping practices. Therefore, a further reduction of 138 of Mr. Rottenberg's reported hours will be made.

For Mr. Rottenberg's work on the litigation, Wolf Haldenstein will receive a lodestar award of $229,203 for 1,697.8 compensable hours reasonably spent to the benefit of Class members.

*Daniel W. Krasner*

 Wolf Haldenstein petitions for 493.3 hours at the rate of $315 an hour, for a total lodestar of $155,389.50 for work done by Daniel Krasner, a partner. Much of Mr. Krasner's work involved contact with and concerning the firm's client. He was active in the litigation through early 1986, undertaking brief writing, document review and deposition preparation and attendance. Thereafter, Mr. Krasner's work was quite restricted. The limited extent of his involvement in the litigation, along with the subaltern nature of much of his work, warrants payment at a rate somewhat more modest than his normal billing rate. Compensable hours will therefore be paid at a rate of $300.

Even at the reduced rate indicated above, some of Mr. Krasner's time expenditures were somewhat excessive. In 1983, for instance, he spent more than 63 hours working on several briefs. More than 12 hours were charged for his involvement on a brief that Mr. Rottenberg wrote in 1984. A reduction of 25 hours will be made to reflect a time expenditure for such work that is more appropriate to his level.

Time charges in excess of 100 hours for deposition work will not be adjusted, because Mr. Krasner's charges for the work appear to be more moderate than those of lower level counsel for similar work. A reduction of 12 hours will be made, however, to offset a portion of his extensive client contact, much of which is presumed to have rendered no benefit to the Class.

A 15.3 hour entry described only as "Corrected Time" for the period 10/31/84—3/11/85 is incapable of any assessment of

reasonableness and will not be allowed. Two entries, totalling 5.2 hours, lack any description and are impermissible. A 9 hour deduction will be made to offset some of the duplication of charges to the Class resulting from Mr. Krasner's frequent conferences with Mr. Rottenberg regarding discovery and other unnamed subjects, and 5 hours will be deducted for travel and meal conference time charged.

For Mr. Krasner's work on the litigation, Wolf Haldenstein will receive a lodestar award of $126,540 for 421.8 hours reasonably spent to the benefit of Class members.

*Peter C. Harrar*

 Wolf Haldenstein petitions for 379.7 hours at the rate of $160 an hour, for a total lodestar of $60,752 for work done by Peter Harrar, an associate. Early in the litigation, Mr. Harrar did 9 hours of research. He was not yet admitted to the bar, and the work will be paid at a law clerk rate of $50 per hour. In 1987, he worked on depositions and a reply brief. His charges for that work were reasonable and will be allowed as reported.

For Mr. Harrar's work on the litigation, Wolf Haldenstein will receive a lodestar award of $59,762 for 379.7 hours reasonably spent to the benefit of Class members.

*Fred T. Isquith*

Wolf Haldenstein petitions for 147.4 hours at the rate of $275 an hour, for a total lodestar of $40,535 for work done by Fred Isquith, a partner. Mr. Isquith's work descriptions contain little information regarding his efforts. Typically they indicate conferences or telephone calls and usually include the initials of the person with whom communication was undertaken, generally another member of the firm. Frequent charges for "correspondence" appear to indicate merely his review of mail. His time entries rarely include any indication of the subject matter of his reported activities. When a subject was stated it was imprecise. Such entries inhibit appraisal of the reasonableness of his involvement. Occasionally Mr. Isquith indicated revisions to briefs, and he attended several meetings of plaintiffs' counsel. Despite the inadequacy of his timekeeping,

the Court will assume that a small portion of Mr. Isquith's recorded time involved activities that were beneficial and not redundant with other firm members' work. Wolf Haldenstein will receive a lodestar award of $6,875 for 25 hours of Mr. Isquith's time.

*William A. Loeb*

Wolf Haldenstein petitions for 174 hours at the rate of $185 an hour, for a total lodestar of $32,190 for work done by William Loeb, an associate. Supporting entries for only 137.7 hours of Mr. Loeb's work were provided to the Court and no other time will be considered. His work included some assistance in preparing a brief and document inspection. A 7 hour charge for a conference with someone named "Feinstein" regarding the "status of the case" will be denied for vagueness, excessiveness and absence of benefit to the Class. The remainder of his time entries are acceptable.

For Mr. Loeb's work on the litigation, Wolf Haldenstein will receive a lodestar award of $24,179.50 for 130.7 hours reasonably spent to the benefit of Class members.

*Jeffrey G. Smith*

Wolf Haldenstein petitions for 32.4 hours at the rate of $230 an hour, for a total lodestar of $7,452 for work done by Jeffrey Smith, a partner. Mr. Smith was an associate in 1983 and 1984 when he charged time to the litigation. Although he attended several meetings, they were also attended by other firm members whose time has been compensated. His only other time charges were for review of deposition digests, and in one instance "depo." None of his inadequately reported and presumably nonbeneficial activities will be compensated.

*Eric B. Levine*

Wolf Haldenstein petitions for 20.4 hours at the rate of $200 an hour, for a total lodestar of $4,080 for work done by Eric Levine, a partner. In February 1987, he assisted Mr. Harrar in preparing for and conducting a deposition. Eighteen hours will be allowed as reasonable for this work. For Mr. Levine's work on the litigation,

Wolf Haldenstein will receive a lodestar award of $3,600.

### Michael Jaffe

Wolf Haldenstein petitions for 24 hours at the rate of $110 an hour, for a total lodestar of $2,640 for work done by Michael Jaffe, an associate. Mr. Jaffe did research on a Class brief prepared by Mr. Harrar. His work will be allowed as reported.

### Eli Greenberg

Wolf Haldenstein petitions for 8 hours at the rate of $115 an hour, for a total lodestar of $920 for work done by Eli Greenberg, an associate. Mr. Greenberg did research for two Class briefs in 1983, before he was admitted to the bar. His work will be paid at a law clerk rate of $50 per hour. For his work, Wolf Haldenstein will receive a lodestar award of $400.

### Robert L. Davidson

Wolf Haldenstein petitions for 3 hours at the rate of $210 an hour, for a total lodestar of $630 for work done by Robert Davidson, a partner. Mr. Davidson's only time charges involved conferring with other partners and attending a conference on Mr. Krasner's behalf. His work and time charges are reasonable and will be allowed.

### David A.P. Brower

Wolf Haldenstein petitions for .5 hour at the rate of $200 an hour, for a total lodestar of $100 for a 1987 discussion about the progress of settlement between David Brower and an attorney from another Class counsel firm on a plane. The astounding charge is denied.

### Adeline P. Malone

Wolf Haldenstein petitions for .4 hour at the rate of $85 an hour, for a total lodestar of $34 for work done by Adeline Malone, an associate. Ms. Malone reportedly took, or made, a telephone call about document review. No benefit reasonably accrued and no payment will be awarded for her time.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Wolf Haldenstein firm.

### WOLF HALDENSTEIN ADLER FREEMAN & HERZ
### ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
|---|---|---|---|---|
| | Request | Award | Request | Award |
| Rottenberg | 2,132.50 | 1,697.80 | $289,662.50 | $229,203.00 |
| Krasner | 493.30 | 421.80 | 155,389.50 | 126,540.00 |
| Harrar | 379.70 | 379.70 | 60,752.00 | 59,762.00 |
| Isquith | 147.40 | 25.00 | 40,535.00 | 6,875.00 |
| Loeb | 174.00 | 130.70 | 32,190.00 | 24,179.50 |
| Smith | 32.40 | 0.00 | 7,452.00 | 0.00 |
| Levine | 20.40 | 18.00 | 4,080.00 | 3,600.00 |
| Jaffe | 24.00 | 24.00 | 2,640.00 | 2,640.00 |
| Greenberg | 8.00 | 8.00 | 920.00 | 400.00 |
| Davidson | 3.00 | 3.00 | 630.00 | 630.00 |
| Brower | .50 | 0.00 | 100.00 | 0.00 |
| Malone | .40 | 0.00 | 34.00 | 0.00 |
| Totals | 3,415.60 | 2,708.00 | $594,385.00 | $453,829.50 |

### Paralegals

In addition to the hours reported for attorney members of the firm, Wolf Haldenstein applies for an award for the work of two law clerks and 22 paralegal employees. A total of 663.3 paralegal hours, with a lodestar of $37,370, were reported for work undertaken through December 31, 1989. Rates ranging from $50 to $85 per hour were utilized in determining the lodestar.

Nearly one-third of the reported time, recorded by 12 different paralegal employees, entailed preparation of time and ex-

pense reports or else lacked documentation. Additionally, 10 hours reported by one of the law clerks involved calculation of the firm's disbursements. A deduction of 220.6 hours with a lodestar of $12,005 will be made from the reported figures to eliminate these time charges.

*Paralegal Award*

For 442.7 hours of compensable paralegal work, Wolf Haldenstein will be awarded a reasonable lodestar of $25,365.

*Expenses*

Wolf Haldenstein reports expenses totalling $44,550.32 through December 31, 1989, in connection with the MDL 551 litigation. The firm was required to supply supporting documentation for four categories of expenditures totalling nearly $31,000.

The firm initially reported a total of $28,616.60 for "Travel & Hotel Bills" and "Benedict Brothers/Travel Agency." Documentation provided for the combined categories amounted to $28,457.22. An initial reduction of $159.38 in the amount requested will therefore be made. In addition, several other reductions will be made to reduce amounts reported to acceptable levels. A lump sum of $4,874 was reported for Mr. Rottenberg for "hotel, food, travel" during approximately 23 days in the period February 12 through March 21, presumably in 1984, for "3 separate doc rvw trips to Seattle." An additional $1,857 was paid to Benedict Brothers for the three flights to Seattle during the period. A deduction of $1,800 will be made to reduce the inexplicitly described sum of $4,874 requested. The figure appears to include the separately listed charges for air fare. If it does not, it is an excessive amount for meal and accommodation charges.

Similar circumstances exist in connection with Mr. Rottenberg's charges for "travel" ($610) and for "travel, hotel, food" ($1,245) in Seattle over the period 4/22—4/27 (again, presumably in 1984). A deduction of $600 will reduce the total reported expenditures for the five day period to a reasonable amount. During the period 7/21 through 8/31, Mr. Rottenberg charged $2,072 for an unquantified number of "flights to and from Seattle." During the same period, $3,610 was charged by him for "hotel, food." Although the period of time encompassed 41 days, work was not reported after August 18. On August 31, the only work entry in Mr. Rottenberg's time records was for 8.5 hours travel to New York. No other travel was indicated after the July 21 entry for the trip to Seattle. In the absence of adequate and reliable information, the Court assumes that the $2,072 travel charge was for four flights to/from Seattle. It will allow $2,400 of the $3,610 claimed for reasonable meal and hotel expenses for the days on which work was indicated.

The firm provided supporting documentation for "Local Expenses (Travel, Food)" amounting to $2,497.96. It had initially reported $2,230.54 in categories of "Meals" and "Local Carfare." The Court identified $1,604.36 in local meals taken by counsel or staff members that will be disallowed. Some of the amount was derived by allotting a portion of lump sums reported for a combination of meals and carfare. The remaining allowable portion, $893.60, is more than reasonable for the firm's "carfare" expenses.

The Court believes a reduction of $400 is appropriate to reduce the relatively excessive $2,843.65 "express mail/messenger" charge reported by the firm. The deduction lowers the combination of expenses to a total amount reasonable for the firm.

Secretarial overtime charges of $3,613.22 will be disallowed, consistent with the treatment accorded all firms requesting such payment. So, too, will a charge of $143.71 for "miscellaneous."

The firm charged for photocopying at a rate of 20 cents per copy throughout the litigation. A reduction of $990 will be made to the firm's request for $3,738.

*Expense Award*

In accordance with the foregoing, an award of $34,297 will be made to Wolf Haldenstein for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Wolf Haldenstein contributed $17,500 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

## WOLF POPPER ROSS WOLF & JONES

The New York law firm of Wolf Popper Ross Wolf & Jones ("Wolf Popper") applies for an award of fees for the work of nineteen attorneys whose rates at the time of the petition ranged from $125 to $325 an hour. At the time the petition was submitted, the firm reported a total of 4,327.75 attorney hours worked, for a reported attorney lodestar total of $980,767.88. Subsequent reports for work performed after December 31, 1988, raised the firm's reported total attorney hours to 4,393.8 and its attorney lodestar to $998,931.63.

The firm's involvement in the litigation began in February 1983. Wolf Popper is counsel of record for plaintiff class representative Morris Massry. Daily time expenditures were recorded in minutes, and figures have been converted herein to decimals for consistency.

 Virtually all of the firm's supplemental reported time arose from work undertaken to prepare records sufficient to support the firm's petition for attorneys' fees. The requirement for firms engaging in class actions to maintain accurate and informative records of work undertaken by firm members is neither novel nor unduly burdensome. In supplemental declarations, this firm recounted some of the difficulties and inaccuracies it encountered as a result of inadequate recordkeeping procedures that existed throughout the course of the litigation. While the Court is sympathetic that proper presentation of the firm's work necessitated time-consuming reconstruction, it is not disposed to consider such work, for this firm or for any other, an appropriate charge to Class members. Counsel have long been on notice of their burden and the Court is dismayed that a firm with the stature of Wolf Popper, according to its own declaration one of the nationally-recognized leaders in the practice of securities and class action litigation, would either maintain such admittedly inferior records or request payment for reconstructing and readying them to support a fee petition of this size. The supplemental time reported for this work, and the corresponding attorney and paralegal lodestar fees amounting to more than $27,500, will be denied.

*Klari Neuwelt*

Wolf Popper petitions for approximately 1,828.4 hours at the rate of $275 an hour, for a total lodestar of $502,805.33 for work done by Klari Neuwelt, a partner. Ms. Neuwelt's work began in early 1983, when she prepared the complaint of class representative Massry. Her work thereafter was closely coordinated with lead counsel and with a number of attorneys from other class counsel firms. Frequent, almost daily, work entries through 1985 reflect her involvement in brief writing, document discovery, legal and factual research, depositions and a multitude of other activities. Daily time accounts indicate worked intervals ranging from a few minutes to occasional, though not unreasonable, 12 hour days. Explanations of Ms. Neuwelt's activities were consistently concise but meaningful, and invariably included the names of individuals and documents, as well as the subject matter of conversations, research, and reports. Client contact was largely confined to interrogatories, deposition work and other activities essential to the overall litigation effort. By 1987 Ms. Neuwelt's participation was significantly narrowed, though she worked on several important memoranda.

Except for the following, Ms. Neuwelt's hours will be approved as reported. A reduction of 92 hours will be made for work on time and expense matters. This figure includes both post-petition work and time attributed to her supervision of the preparation of time and expense reports throughout the litigation. A reduction of 2.4 hours will be made to offset some client contact regarding Mr. Massry's claim and settlement of the action. Finally, 13 hours will be deducted from the reported total to

reduce by 50% the amount of time charged for travel and for meal meetings with other class counsel.

For Ms. Neuwelt's work on the litigation, Wolf Popper will receive a lodestar award of $473,275 for 1,721 hours reasonably spent to the benefit of Class members.

*Stanley Nemser*

Wolf Popper petitions for approximately 345.85 hours at the rate of $325 an hour, for a total lodestar of $112,395.73 for work done by Stanley Nemser, a partner. Mr. Nemser became involved in the action in February 1983. Nearly all of his work was charged before the end of that year. His involvement was primarily directed towards planning and organizational matters regarding the status, consolidation, and leadership of the action.

A great deal of time was spent by Mr. Nemser conferring with co-counsel, both within and outside his firm. He attended, and participated in, several hearings. While some of his work was of remote but ultimate value to the Class, both the quantity of hours and the rate charged for his participation are considered excessive for an award out of the Class settlement fund. The scope and duration of the action, in which Mr. Nemser was essentially uninvolved; the preliminary nature of most of his work; the length of time attributed to most activities; and the emphasis on matters largely of concern only to counsel all require adjustment of his charges.

For Mr. Nemser's participation through September 1983, for which descriptive daily work entries exist, the firm will be awarded an allowance of 136 hours at a rate of $300. This somewhat generous award recognizes the value from the continued involvement of members of the firm after Mr. Nemser's effective withdrawal.

An allowance of 32 hours will be accorded for work done in connection with plaintiffs' opposition to motions to dismiss during the last three months of 1983. For his post–1983 work, which primarily consisted of frequent brief telephone and personal status conferences with other Class counsel, both within and outside the firm, the firm will be compensated for an additional 24 hours. These allowances, also, will be made at an hourly rate of $300, commensurate with Mr. Nemser's role in the litigation.

For Mr. Nemser's work on the litigation, Wolf Popper will receive a lodestar award of $57,600 for 192 hours reasonably spent to the benefit of Class members.

*Deborah A. Klar*

Wolf Popper petitions for 747.25 hours at the rate of $135 an hour, for a total lodestar of $100,878.75 for work done by Deborah Klar, an associate. Ms. Klar worked on the case for approximately eleven months. She undertook document review and deposition work. Her time charges, although often large and occasionally lumped into three day periods, are reasonable for the reported work. Except for a deduction of 17 hours, approximately 50% of her travel time, her reported work will be compensated.

For Ms. Klar's work on the litigation, Wolf Popper will receive a lodestar award of $98,583.75 for 730.25 hours reasonably spent to the benefit of Class members.

*Stephen D. Oestreich*

Wolf Popper petitions for 301.25 hours at the rate of $300 an hour, for a total lodestar of $90,375 for work done by Stephen Oestreich, a partner. Nearly all of Mr. Oestreich's work was charged during 1983. Most of his work descriptions are prosaic and uninformative. A somewhat typical entry attributes 3 hours, 45 minutes for "TT PB re DG & SR; CWs SN, PJ, BW; TCW SS & PB & SN; CWs KN; TT SR." Other daily entries contain words and are a bit more descriptive. On 5/19/83, for instance, Mr. Oestreich charged 3 hours, 20 minutes to "Review Ds papers re consolidation; new development; review papers of pltff Gold—Cws KN; TT LS; CW SN." Thirty minutes were charged to "CW call Simon re brief;" an hour and a half to "2 TT LS—consolidation; TT SS re order of court & consol;" fifteen minutes were attributed to "TT K & K" and "TT J Clerk" on the same day. On June 1, 1983, six and a half hours were reported for "TT J. Gleason—CWs KN re Bonds; review memos re

Panel of Ds: memo to Ct.; TF Ct.; review order of ct re Chem. action."

Most of Mr. Oestreich's work simply involved review and discussion. Many of his time charges were excessive. He worked on plaintiffs' briefs regarding consolidation of the action, however, and attended several meetings and hearings on behalf of the firm. For that work Wolf Popper will be awarded a fee amounting to $6,900 for 23 hours reasonably spent to the benefit of Class members. No award will be made for the remainder of Mr. Oestreich's involvement because it duplicated that of Mr. Nemser and other partners and provided no separate perceived benefit to Class members.

*Helen Mangano*

Wolf Popper petitions for approximately 449.45 hours at the rate of $125 an hour, for a total lodestar of $56,177.08 for work done by Helen Mangano, an associate. Ms. Mangano worked on document discovery in 1984 and 1985. Her time charges and work descriptions were reasonable and, except for a reduction of 28.25 hours, approximately one-half of her travel time, will be allowed.

For Ms. Mangano's work on the litigation, Wolf Popper will receive a lodestar award of $52,650 for 421.2 hours reasonably spent to the benefit of Class members.

*Sherrie Brown*

Wolf Popper petitions for 227.5 hours at the rate of $175 an hour, for a total lodestar of $39,812.50 for work done by Sherrie Brown, an associate. In 1987 Ms. Brown reviewed documents and attended depositions, did legal research, and drafted a memo in response to a motion to dismiss. He work is well described and a lodestar fee will be awarded as requested after a 1.5 hour deduction for half the travel time she charged.

For Ms. Brown's work on the litigation, Wolf Popper will receive a lodestar award of $39,550 for 226 hours reasonably spent to the benefit of Class members.

*Patricia I. Avery*

Wolf Popper petitions for approximately 130.85 hours at the rate of $250 an hour, for a total lodestar of $32,708.25 for work done by Patricia Avery, a partner. Ms. Avery's compensable work was done in 1983 and 1984 while she was an associate. Her time will accordingly be paid at a rate of $175 per hour. Her work involved research, drafting and communications on a variety of issues. Her work descriptions are adequate, and her time charges reasonable.

After a small deduction for local travel time, Wolf Popper will receive a lodestar award of $22,750 for 130 hours reasonably spent by Ms. Avery to the benefit of Class members.

*Mark Levine*

Wolf Popper petitions for approximately 157.45 hours at the rate of $135 an hour, for a total lodestar of $21,251.25 for work done by Mark Levine, an associate. Mr. Levine primarily did document review and research during 1986. He also worked on a draft in opposition to a motion to dismiss certain claims. Several unrelated charges, amounting to approximately 2 hours in late 1986 are considered unconnected to his work, and will be disallowed, along with 9.25 hours, half of his charged travel time.

For Mr. Levine's work on the litigation, Wolf Popper will receive a lodestar award of $19,737 for 146.2 hours reasonably spent to the benefit of Class members.

*Ellen P. Chapnick*

Wolf Popper petitions for 49.75 hours at the rate of $250 an hour, for a total lodestar of $12,437.50 for work done by Ellen Chapnick, a partner. Ms. Chapnick was an associate in 1984 when she did 41 hours of document discovery work. A reduction of 8.75 hours has been made to eliminate noncompensable travel time and several extraneous charges for meetings and undefined research. Her compensable work will be awarded at an hourly associate rate of $175, commensurate with the type of work she did and with her position at the time.

For Ms. Chapnick's work on the litigation, Wolf Popper will receive a lodestar award of $7,175 for 41 hours.

### Robert A. Skirnick

Wolf Popper petitions for approximately 30.85 hours at the rate of $300 an hour, for a total lodestar of $9,250 for work done by Robert Skirnick, a partner. Mr. Skirnick's involvement occurred in July and August of 1983. None of his endeavors warrant a fee award from settlement funds. All of his activities were superfluous in that they duplicated those of other counsel and provided no independent benefit to Class members.

### Cynthia Stagoff

Wolf Popper petitions for 60.5 hours at the rate of $125 an hour, for a total lodestar of $7,562.50 for work done by Cynthia Stagoff, an associate. Ms. Stagoff's work involved research and drafting. It was well described and will be allowed as reported.

### David L. Weisberg

Wolf Popper petitions for 31.25 hours at the rate of $150 an hour, for a total lodestar of $4,687.50 for work done by David Weisberg, an associate. In mid–1988 Mr. Weisberg researched and prepared a memorandum of law on a timely and important issue. His charges are reasonable and will be allowed.

### Philip Jones

Wolf Popper petitions for approximately 9.1 hours at the rate of $325 an hour, for a total lodestar of $2,951.96 for work done by Philip Jones. Mr. Jones' charges were for telephone calls and in-house conferences with other counsel early in the litigation. No benefit to the Class is considered to have arisen from this partner's limited preliminary communications, although the firm's role was presumably enhanced as a result. No award will be made.

### John Mage

Wolf Popper petitions for 8 hours at the rate of $275 an hour, for a total lodestar of $2,200 for work done by John Mage, a partner. Mr. Mage researched an issue for lead counsel in August 1988 and will be awarded in accordance with his reported time.

### Eric L. Keisman

Wolf Popper petitions for 4.75 hours at the rate of $240 an hour, for a total lodestar of $1,140 for work done by Eric Keisman, a partner. Mr. Keisman's work involved calls and discussions with other plaintiffs' counsel on three different occasions in 1983 and 1984, and a half hour's research on an unnamed topic for an attorney at another firm. No award will be made for his superficially described work, from which no benefit reasonably ensued.

### Lawrence D. Levit

Wolf Popper petitions for approximately 6.9 hours at the rate of $150 an hour, for a total lodestar of $1,037.55 for work done by Lawrence Levit, an associate. Mr. Levit researched the same timely issue as Mr. Mage, and his time will also be allowed.

### Benedict Wolf

Wolf Popper petitions for approximately 2.85 hours at the rate of $325 an hour, for a total lodestar of $920.73 for work done by Benedict Wolf, a partner. Mr. Wolf's three separate undertakings, in 1983, 1984 and 1985, involved consideration and discussion of the firm's role in the action. The Class will not be assessed for these nonbeneficial management deliberations.

### Lester L. Levy

Wolf Popper petitions for approximately .85 hour at the rate of $300 an hour, for a total lodestar of $250 for Lester Levy, for "CW/SDO; CW/SDO & SN re legal research assignment" in August 1988. No fee for these discussions with Messrs. Oestreich and Nemser will be awarded. The time is redundant and the work inadequately described. This partner's minimal involvement certainly provided no benefit for the Class.

### Rosa Borenstein

Wolf Popper petitions for 1 hour at the rate of $90 an hour, for a total lodestar of $90 for work done by Rosa Borenstein, an associate. Ms. Borenstein charged an hour for "Research—WSJ" in February 1983. The cursory and ambiguous task, presumably involving review of the Wall Street Journal, appears to be of negligible legal value. No fee will be awarded.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Wolf Popper firm.

### WOLF POPPER ROSS WOLF & JONES
### ATTORNEY LODESTAR

| Attorney | HOURS Request | HOURS Award | LODESTAR Request | LODESTAR Award |
|---|---|---|---|---|
| Neuwelt | 1,828.40 | 1,721.00 | $502,805.33 | $473,275.00 |
| Nemser | 345.85 | 192.00 | 112,395.73 | 57,600.00 |
| Klar | 747.25 | 730.25 | 100,878.75 | 98,583.75 |
| Oestreich | 301.25 | 23.00 | 90,375.00 | 6,900.00 |
| Mangano | 449.45 | 421.20 | 56,177.08 | 52,650.00 |
| Brown | 227.50 | 226.00 | 39,812.50 | 39,550.00 |
| Avery | 130.85 | 130.00 | 32,708.25 | 22,750.00 |
| Levine | 157.45 | 146.20 | 21,251.25 | 19,737.00 |
| Chapnick | 49.75 | 41.00 | 12,437.50 | 7,175.00 |
| Skirnick | 30.85 | 0.00 | 9,250.00 | 0.00 |
| Stagoff | 60.50 | 60.50 | 7,562.50 | 7,562.50 |
| Weisberg | 31.25 | 31.25 | 4,687.50 | 4,687.50 |
| Jones | 9.10 | 0.00 | 2,951.96 | 0.00 |
| Mage | 8.00 | 8.00 | 2,200.00 | 2,200.00 |
| Keisman | 4.75 | 0.00 | 1,140.00 | 0.00 |
| Levit | 6.90 | 6.90 | 1,037.55 | 1,035.00 |
| Wolf | 2.85 | 0.00 | 920.73 | 0.00 |
| Levy | .85 | 0.00 | 250.00 | 0.00 |
| Borenstein | 1.00 | 0.00 | 90.00 | 0.00 |
| Totals | 4,393.80 | 3,737.30 | $998,931.63 | $793,705.75 |

### Paralegals

In addition to the hours reported for attorney members of the firm, Wolf Popper applies for an award for the work of three law clerks and ten paralegals. When the petition was submitted, a total of 651 paralegal hours were reported. The figure increased to 795.45 hours with the submission of supplemental reports for work performed through December 31, 1989. Rates ranging from $40 to $80 per hour were utilized in determining the lodestar for the work of these individuals. Their reported lodestar, as of December 31, 1989, amounted to $43,882.28.

Much of the reported work involved the compilation of time and expense reports and information necessary to support the firm's fee petition. A deduction of 310.75 hours, with a corresponding lodestar of $19,807.78, will be made for these charges.

### Paralegal Award

For the remaining 484.7 hours of paralegal work, Wolf Popper will be awarded a reasonable lodestar of $24,074.50.

### Expenses

Wolf Popper initially reported expenses totalling $52,359.73 in connection with the MDL 551 litigation. Thereafter, the firm requested an additional $772.54 for expenses incurred from December 31, 1988 through September 30, 1989. The total amount requested by the firm through December 31, 1989 is, thus, $53,132.27.

Wolf Popper's reported expense for travel and meals amounted to $26,998.58. Documentation submitted in support of the expenditures totalled only $24,856.18. Initially, therefore, a deduction of $2,142.40 will be made. In addition, $1,358.83 will be deducted for the reported expense for numerous local meals for attorneys and staff members taken in connection with late, overtime or weekend work. The amounts charged for out-of-town travel expenses of firm members appear to be reasonable and will not be reduced.

A deduction of $3,006.93 will be made for the requested amount for overtime charged

by the firm. So, too, will $3,900 of the $8,697.30 requested for in-house photocopy expenses. The firm initially charged 15 cents per copy and increased the rate to 25 cents in June 1987. The reasons for these deductions have been addressed elsewhere.

Wolf Popper's charge for research services, nearly $8,000, is of some concern. The amount is relatively quite high. The firm's time records indicate that a significant amount of research and drafting was done, however, and the Court does not conclude that the amount requested is unreasonable in the circumstances.

### Expense Award

In accordance with the foregoing, an award of $47,983 will be made to Wolf Popper for the firm's litigation expenses reasonably incurred in this action through December 31, 1989.

### WPPSS Litigation Fund

Wolf Popper contributed $25,000 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund.

### ZWERLING, SCHACHTER & ZWERLING AND PRINCE, KELLEY, NEWSHAM & MARSHALL, P.S.

The New York law firm of Zwerling, Schachter & Zwerling ("Zwerling") applies for an award of fees for its own work, as well as for the work of the Seattle firm of Prince, Kelley, Newsham & Marshall, P.S. ("Kelley") and its predecessor firms.

In its initial petition, Zwerling Schachter applied for an award of fees for the work of four attorneys whose rates ranged from $160 to $250 an hour. At the time the petition was submitted, the firm reported a total of 1,970.8 attorney hours worked, for a reported attorney lodestar total of $491,-227.50. Subsequent reports for work performed after March 10, 1989, raised the firm's reported total attorney hours to 2,297.4 and its attorney lodestar to $572,-853.50. The supplemental work related to the primary MDL 551 action, and therefore none of the firm's reported time, through

December 31, 1989, will be deferred for later consideration.

The Zwerling Schachter firm's involvement in the litigation did not begin until January 1985. Along with Goodkind, the firm is counsel of record for Plaintiff Bonseigneur, as Executrix of the Estate of Paul Bonseigneur.

### Robert S. Schachter

■ Zwerling Schachter petitions for 2,274.7 hours at the rate of $250 an hour, for a total lodestar of $568,675 for work done by Robert Schachter, a partner. Initially, Mr. Schachter worked on depositions, preparing, attending and taking a number of them. His work in this area of the litigation largely supplemented the work of members of the Bernstein Litowitz firm, particularly that of Messrs. Klafter and Bernstein and of Ms. Hansen, as well as members of the Milberg Weiss firm. Mr. Schachter's time charges for this work were not unreasonable, however, and the Court believes the participation of more than one plaintiff attorney at these important depositions was not inappropriate in this litigation.

From the outset of his involvement, Mr. Schachter was responsible for the control of the WPPSS Litigation Fund. His work also involved oversight of plaintiffs' programs for providing assistance to bondholders filing mandatory proofs of claims, coordination with the concerns engaged by Class counsel to process this information, and development of statistical information regarding Class members' claims. Another area in which Mr. Schachter was significantly involved was the preparation of Class Notices regarding both partial and final settlements. His activities were closely coordinated with Mr. Bernstein throughout his involvement.

Several adjustments are necessary to correct the petition for Mr. Schachter's work. A reduction of 82.1 hours will be made to adjust the number of hours requested in the initial petition, for work done through February 28, 1989, to reflect agreement with supporting contemporaneous records. An additional reduction of 214.8 hours is necessary to reflect agree-

ment between contemporaneous daily entries and the number of hours for which payment was requested for work done between March 1 and December 31, 1989. The latter error appears to have occurred as a result of duplicate reporting of hours worked in January and February 1989. The former error appears to stem from a number of discrepancies between bi-monthly hours reported and the documentation submitted in support of those hours. It may be attributed, in part, simply to missing daily records, which the Court cannot be expected to identify.

A reduction of 44 hours will also be made to reduce most of the time charged by Mr. Schachter in connection with his attendance at two settlement hearings, in June 1988 and April 1989. His attendance is deemed to have been unwarranted and extraneous, despite his activities in connection with settlement Notices. In recognition of the difficulty facing counsel regarding their desire to be prepared for all potential events at the hearings, however, the Court has not disallowed all of the time Mr. Schachter charged, and will not disallow reasonable expenses associated with his trips.

 Finally, a reduction of 21 hours will be made to offset Mr. Schachter's work in connection with the WPPSS Litigation Fund, a device that may have facilitated litigation efforts for Class counsel, but which provided no tangible benefits for Class members and complicated and obscured the Court's review of expense petitions.

For Mr. Schachter's work on the litigation, Zwerling Schachter will receive a lodestar award of $478,200 for 1,912.8 hours reasonably spent to the benefit of Class members.

*Susan Salvetti*

Zwerling Schachter petitions for 16.1 hours at the rate of $160 an hour, for a total lodestar of $2,576 for work done by Susan Salvetti, an associate. Ms. Salvetti researched and drafted a memorandum regarding settlement in January and February 1988. Sixteen hours of her work will be allowed as a reasonable expenditure of time on the project. Her other 6 minute

charge for an intra-firm discussion in August 1989 will not be compensated.

For Ms. Salvetti's work on the litigation, Zwerling Schachter will receive a lodestar award of $2,560 for 16 hours reasonably spent to the benefit of Class members.

*Jeffrey C. Zwerling*

Zwerling Schachter petitions for 5.1 hours at the rate of $250 an hour, for a total lodestar of $1,275 for work done by Jeffrey Zwerling, a partner. Mr. Zwerling's charges were for office conferences regarding settlement and status and will not be compensated, no benefit having accrued to the Class from his participation.

*Robin F. Zwerling*

Zwerling Schachter petitions for 1.4 hours at the rate of $225 an hour, for a total lodestar of $315 for work done by Robin Zwerling, a partner. Ms. Zwerling's participation was also limited to non-compensable conversations with counsel.

*Hillary Sobel*

Zwerling Schachter reports .1 hour at the rate of $125 an hour, for a total lodestar of $12.50 for Hillary Sobel's six-minute charge for "Conf w/JCZ, RSS, RFZ & HS" on August 2, 1989. The time charge and request for compensation are improper.

*Kelley Firm and Predecessor Firms*

In addition to the preceding petition for members of the Zwerling Schachter firm, the firm petitions for an award of fees for the work of seven attorney members of the Kelley firm and its predecessor, Wolfstone, Panchot & Bloch, at rates ranging from $50 to $125 an hour. In the fee petition, attorney members of those firms were reported as having worked a total of 88.1 hours, for a lodestar total of $9,580. All work apparently occurred prior to the end of 1988, and no supplemental petition was submitted.

Documentation supporting the Kelley firm work is fragmentary and largely unintelligible. Nonetheless, the Court has grappled with it to reach a fair determination.

*J. Porter Kelley*

Zwerling Schachter petitions for 60.4 hours at the rate of $125 an hour, for a total lodestar of $7,550 for work of J. Porter Kelley. Submitted with the fee petition were bound time records for the Kelley firm consisting of copies of handwritten time tickets for 16.3 hours of work undertaken between March 6, 1985, and July 14, 1988. Some of the tickets reflect work of paralegals in the firm. Only 13.2 hours appear to reflect Mr. Kelley's work.

Work descriptions for the 13.2 hours were not particularly meaningful. They appear to reflect delivery of documents, drafting of letters, telephone calls regarding discovery, and file review. Much of the work was on behalf of the claim of the firm's client, class representative Paul Bonseigneur, who was later replaced by Debra Bonseigneur as executrix of the Estate of Paul Bonseigneur. For these activities of Mr. Kelley, the Court will allow the Zwerling Schachter firm a lodestar award of $1,025 for 8.2 hours of work reasonably undertaken to the benefit of the Class.

During the course of the litigation, Mr. Kelley's predecessor firm, Wolfstone, Panchot & Bloch, submitted summary reports that reflected cumulative worked hours. Although these reports indicated that Mr. Kelley spent a total of 45.9 hours through January 22, 1985, in conferences, preparing pleadings, writing letters, reviewing interrogatories and attending a hearing, no detailed contemporaneous documentation for any of that work was submitted with the fee petition. As a result, no award will be made for the inadequately described, improperly reported, and potentially unreasonable time expenditure.

*Other Wolfstone, Panchot & Bloch Applicants*

Similarly, no award will be made for 27.7 hours petitioned for the reported work of six other attorney members of Wolfstone, Panchot & Bloch, predecessor to the Kelley firm, because of the absence of adequate documentation.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Zwerling Schachter, Kelley, and Wolfstone firms.

ZWERLING SCHACHTER, & ZWERLING AND PRICE, KELLEY, NEWSHAM & MARSHALL, P.S. ATTORNEY LODESTAR

| | HOURS | | LODESTAR | |
| Attorney | Request | Award | Request | Award |
| --- | --- | --- | --- | --- |
| Schachter | 2,274.70 | 1,912.80 | $568,675.00 | $478,200.00 |
| Salvetti | 16.10 | 16.00 | 2,576.00 | 2,560.00 |
| Zwerling, J. | 5.10 | 0.00 | 1,275.00 | 0.00 |
| Zwerling, R. | 1.40 | 0.00 | 315.00 | 0.00 |
| Sobel | .10 | 0.00 | 12.50 | 0.00 |
| Kelley | 60.40 | 8.20 | 7,550.00 | 1,025.00 |
| Others | 27.70 | 0.00 | 2,030.00 | 0.00 |
| Totals | 2,385.50 | 1,937.00 | $582,433.50 | $481,785.00 |

*Paralegals*

In addition to the hours reported for attorney members of the firm, Zwerling Schachter applies for an award for paralegal work in the Zwerling and Kelley firms. When the petition was submitted, a total of 2,715.9 hours were reported for the work of one paralegal in the Zwerling firm. The figure increased to 3,655.8 hours with the submission of supplemental reports for work performed through December 31, 1989. A rate of $60 per hour was utilized in determining the reported lodestar, $219,-348, for the work of this employee, Jane Nykolyn. Ms. Nykolyn's work initially concerned discovery activities. Thereafter, her work entailed administration of the WPPSS litigation fund and the "Bondhold-

ers Assistance Program," which related to the accumulation and compilation of claim information required to be submitted by Class members. Largely because the WPPSS Litigation Fund was established and operated for the benefit of counsel rather than Class members, a reduction of 5 percent of Ms. Nykolyn's time will be made.

The few documented charges of work for paralegals in the Kelley firm appear to relate to time and expense reports, and no award will be made for 33.9 hours with a lodestar of $1,366 that were reported.

*Paralegal Award*

A reasonable lodestar award of $208,380 will be made for the allowable 3,473 reported paralegal hours of Zwerling Schachter.

*Expenses*

Zwerling Schachter reports expenses totalling $14,832.35 through December 31, 1989, in connection with the MDL 551 litigation. This figure includes approximately $6,000 in expenses reportedly incurred subsequent to the submission of the initial petition. The Kelley firm reported expenses of $1,406.38 incurred during its work in the action. Together the firms' requests total $16,238.73.

The Court required documentation to support the amounts claimed by Zwerling Schachter for Local and Long Distance Travel, Meals and Conference Expense. A review of the documentation resulted in the Court's determination that deductions should be made for $1,083.01 of $1,219.26 reported for local meal expenses, and for $207.32 of $432.87 reported for food in the form of "conference expenses." These expenditures were either associated with routine working sessions or were otherwise insufficiently documented.

Overtime expenses of $399.32 will be deducted, and photocopy charges of $2,904.64 will be reduced by $1,250. Zwerling Schachter charged 25 cents per copy throughout its involvement in the litigation.

An unexplained charge of $16.99 for "Miscellaneous" will also be disallowed.

A reduction of $324.59 will also be made to reduce the Kelley firm's photocopy expense to a reasonable level and to eliminate a $24.59 charge for "Miscellaneous."

The remainder of expenses reported for the two firms will be allowed.

*Expense Award*

In accordance with the foregoing, an award of $12,958 will be made to Zwerling Schachter for litigation expenses reasonably incurred in this action through December 31, 1989.

*WPPSS Litigation Fund*

Zwerling Schachter contributed $7,500 to the WPPSS Litigation Fund. It recovered no reimbursements from the Fund during the course of the litigation. Thus, the firm is due a refund. The Kelley firm made no contribution and received no payments from the fund.

## WPPSS LITIGATION FUND

The WPPSS Litigation Fund was established by Plaintiffs' Executive Committee, headed by Mr. Bernstein. Law firms that intended to participate actively in the litigation were required by lead counsel to tender assessments into the Fund, which was used to finance certain litigation expenses. The Fund was maintained by Robert Schachter, of Zwerling Schachter. Mr. Schachter's fees for his Litigation Fund work are included in that firm's fee petition.

Twenty-three Class counsel firms together contributed a total of $479,780.43 to the Fund.[37] At the time the petition was submitted, the request submitted by Mr. Schachter on behalf of the WPPSS Litigation Fund indicated that a total of $470,058.91 had been disbursed. Counsel requested that the Court reimburse $353,192.90 of this amount. The remainder of reported disbursements, $116,866.01, represents amounts paid by Class counsel to Chemical Bank during the litigation, pursu-

---

**37.** The figure reported in the petition was overstated by $369.90, the amount of an overpayment made by the Fund to Shidler McBroom that was subsequently repaid to the fund.

ant to their Agreement with counsel for Chemical Bank regarding operation of Data Base facilities. The WPPSS Litigation Fund has not requested reimbursement for that amount in this petition. The amount is included in the reimbursement request submitted by Chemical Bank for the cost of its operations. It is discussed more fully in the section dealing with Chemical's expense reimbursement request.

A supplemental request for the period January 1, 1989 through January 22, 1990 reported additional Litigation Fund disbursements of $147,564.04 (as corrected). The same document indicated contributions to the Fund by settling defendants to defray certain costs of the April 1988 Settlement Notice amounting to $134,949.14. It also reported a reimbursement of a prior overpayment by the Fund amounting to $2,491.64. Net new expenses reported at that time, thus, amounted to $10,123.31. The reimbursement request submitted to the Court, however, was for $10,003.31. The $120 difference was not explained.

Both of these preceding petitions were amended by an affidavit submitted by Mr. Schachter in April 1990. That affidavit was forthcoming in response to the Court's order requesting additional information in support of expense reimbursement requests. The affidavit includes an itemized listing of all payments made by the Litigation Fund. Those payments total $622,906.72. A separate schedule listed $144,256.50 in contributions to the Fund by defendants and other non-Class counsel. The difference between these two figures, after deduction of the $116,866.01 paid to Chemical Bank, which Class counsel do not petition for here, is $361,784.21. Reimbursement of that amount was requested in the April 1990 affidavit by the Fund. Reimbursement of that amount will be contemplated herein.

In June 1990 the Court was advised, by letter, of a final $4,152.94 disbursement by the Litigation Fund. This disbursement,

also, will be considered in connection with the Fund's expense reimbursement petition at this time. The total net amount of the Litigation Fund's request for reimbursement is, thus, $365,937.15.

Disbursements from the Litigation Fund, aside from the payments to Chemical Bank, were of two types. First, reimbursement was made to five Class counsel firms for expenses they reported to the Fund in connection with litigation expenses paid or reported by them. The recipient firms and amounts of such reimbursements have been identified in the respective foregoing sections.[38] The Court's decisions regarding the reasonableness of those expenses, previously reimbursed by the Litigation Fund, have been indicated within those sections. Some of the expenses were found to have been improper objects for payment out of Class members' settlement funds. Recovery was therefore disallowed by the Court. The firms themselves, and not the Litigation Fund, will bear the cost of such disallowed expenses. The fact that the Litigation Fund chose to reimburse firms for such things is of no consequence to the Court. While such a Fund may serve as a convenient device for financing litigation expenses, it may not act as a means of deterring the Court's authorization for payment of expenses out of Class funds. The method that was used to report reimbursed firms' expenses complicated the Court's work, and presumably counsel's as well. It also distorted Counsels' reporting of expenses. Accordingly, the reimbursement request submitted by the Litigation Fund has been reduced by $237,622.70, the amount previously reimbursed by the Fund to five firms.

A second type of payment was made by the Litigation Fund to various third parties. The amount requested by the Fund for such payments is $128,314.45, the difference between the total net amount of the Litigation Fund's request for reimbursement, $365,937.15, and the amount previously reimbursed to Class counsel firms by

---

**38.** Those reimbursements, excluding the Fund's $369.90 overpayment to Shidler McBroom, are as follows: Bernstein Litowitz, $133,681.43; Shidler McBroom, $91,621.53; Graham & Dunn, $11,776.54; Goodkind, $147.95; and Greenfield, $395.25.

the Fund, $237,622.70. The Court has assessed only such disbursements in its review of the Litigation Fund reimbursement request.

Litigation Fund expenditures of this type break down into the following general categories: Notice costs, Court reporting and transcripts, photocopying and microfilming, courier services, news service bulletins and other documents, and other litigation support services. Notice costs account for the vast majority of these expenses. The Court has reviewed the itemized listings of disbursements memorializing all of these expenses and finds that they were reasonable and acceptable litigation expenditures.

*Expense Award*

The Court approves reimbursement to the WPPSS Litigation Fund of the amount requested for third-party expenditures, $128,314.45, from the settlement fund.

Concurrent with the repayment of excess reimbursements due the from Bernstein Litowitz and Shidler McBroom, the WPPSS Litigation Fund is to reimburse all other firms, at a minimum, their contributions. In the cases of Graham & Dunn, Goodkind, and Greenfield, the balance of each firm's contribution not previously reimbursed is to be repaid.

## SUMMARY OF CLASS COUNSEL AWARDS

The following chart contains a summary of the foregoing lodestar amounts reported by and determined to be reasonable for work of attorneys in petitioning Class counsel firms undertaken prior to December 31, 1989, in connection with the primary MDL 551 action.

### ATTORNEY LODESTAR SUMMARY—CLASS COUNSEL FIRMS

| | HOURS | | LODESTAR | |
|---|---|---|---|---|
| Firm | Request | Award | Request | Award |
| Bernstein | 30,775.25 | 26,802.50 | $ 7,090,526.25 | $ 6,190,062.50 |
| Milberg | 35,660.35 | 31,761.20 | 9,016,624.25 | 7,655,343.00 |
| Shidler | 28,116.40 | 27,077.20 | 4,455,061.50 | 4,293,866.50 |
| Barrack | 2,147.10 | 1,380.25 | 381,128.75 | 209,991.25 |
| Berger | 4,914.35 | 2,557.25 | 1,081,108.50 | 546,621.25 |
| Gold | 9,620.75 | 9,043.25 | 1,381,270.00 | 1,234,485.00 |
| Goodkind | 2,090.40 | 1,560.00 | 406,039.90 | 287,709.50 |
| Graham | 7,488.40 | 7,242.00 | 995,517.00 | 941,702.00 |
| Greenfield | 830.75 | 170.00 | 304,725.00 | 49,500.00 |
| Hallisey | 255.75 | 114.50 | 41,992.50 | 18,840.00 |
| Kaufman | 557.50 | 296.25 | 157,386.25 | 84,491.25 |
| Meredith | 1,831.00 | 1,726.25 | 390,396.25 | 368,211.25 |
| Molloy | 2,036.90 | 1,947.40 | 310,377.00 | 293,632.00 |
| Much | 1,597.40 | 1,394.00 | 291,055.50 | 238,101.00 |
| Peckel | 6,555.00 | 5,057.00 | 1,934,260.00 | 986,115.00 |
| Pomerantz | 1,691.10 | 1,510.15 | 311,369.25 | 267,985.00 |
| Sachnoff | 2,885.75 | 2,584.50 | 369,770.00 | 308,542.50 |
| Saveri | 4,779.65 | 4,761.15 | 949,342.25 | 943,792.25 |
| Schoengold | 1,158.65 | 361.00 | 276,528.25 | 71,525.00 |
| Stull | 393.00 | 119.00 | 97,935.00 | 30,105.00 |
| Wolf Block | 1,338.30 | 1,158.20 | 282,413.50 | 240,894.50 |
| Wolf Haldenst. | 3,415.60 | 2,708.00 | 594,385.00 | 453,829.50 |
| Wolf Popper | 4,393.80 | 3,737.30 | 998,931.63 | 793,705.75 |
| Zwerling, etc. | 2,385.50 | 1,937.00 | 582,433.50 | 481,785.00 |
| Totals | 156,918.65 | 137,005.35 | $32,700,577.03 | $26,990,836.00 |

In addition to the foregoing, cumulative increases ranging from 10 percent to 50 percent of certain individuals' lodestar awards have been awarded to the following six firms.

| | |
|---|---|
| Bernstein Litowitz | $1,892,473.00 |
| Milberg Weiss | 2,176,737.75 |
| Shidler McBroom | 1,011,883.80 |
| Graham & Dunn | 97,729.00 |
| Molloy Jones | 39,312.00 |
| Allen Peckel | 246,528.75 |
| Total | $5,464,664.30 |

The following chart contains a summary of the lodestar amounts reported by and determined to be reasonable for work of paralegals and law clerks in petitioning Class counsel firms undertaken prior to December 31, 1989, in connection with the primary MDL 551 action.

PARALEGAL LODESTAR SUMMARY—CLASS COUNSEL FIRMS

| Firm | HOURS Request | Award | LODESTAR Request | Award |
|---|---|---|---|---|
| Bernstein | 2,441.25 | 1,823.50 | $ 129,640.00 | $ 105,380.00 |
| Milberg | 3,820.05 | 3,323.95 | 226,331.50 | 195,484.50 |
| Shidler | 6,820.10 | 6,820.10 | 352,336.50 | 332,336.50 |
| Barrack | 146.50 | 114.50 | 8,790.00 | 6,870.00 |
| Berger | 748.60 | 300.00 | 35,318.50 | 15,000.00 |
| Gold | 138.50 | 72.50 | 7,016.25 | 3,385.00 |
| Goodkind | 2,158.10 | 2,030.30 | 106,728.00 | 101,073.00 |
| Graham | 304.75 | 276.55 | 12,394.00 | 11,534.00 |
| Greenfield | 9.00 | 8.00 | 540.00 | 480.00 |
| Hallisey | 5.50 | 5.50 | 275.00 | 275.00 |
| Kaufman | 193.75 | 150.00 | 9,687.50 | 7,500.00 |
| Meredith | 0.00 | 0.00 | 0.00 | 0.00 |
| Molloy | 652.40 | 604.50 | 23,976.50 | 22,100.50 |
| Much | 101.20 | 100.60 | 5,568.00 | 5,531.00 |
| Peckel | 33.00 | 24.00 | 990.00 | 720.00 |
| Pomerantz | 103.80 | 94.50 | 6,204.00 | 5,670.00 |
| Sachnoff | 119.75 | 105.75 | 8,412.50 | 7,487.50 |
| Saveri | 0.00 | 0.00 | 0.00 | 0.00 |
| Schoengold | 306.25 | 30.00 | 17,155.00 | 1,800.00 |
| Stull | 0.00 | 0.00 | 0.00 | 0.00 |
| Wolf Block | 857.80 | 520.90 | 69,432.20 | 41,157.00 |
| Wolf Haldenstein | 663.30 | 442.70 | 37,370.00 | 25,365.00 |
| Wolf Popper | 795.45 | 484.70 | 43,882.28 | 24,074.50 |
| Zwerling, etc. | 3,689.70 | 3,473.00 | 220,714.00 | 208,380.00 |
| Totals | 24,108.75 | 20,805.55 | $1,322,761.73 | $1,121,603.50 |

Finally, the following table summarizes the expense requests and awards of Class counsel firms and of the WPPSS Litigation Fund.

EXPENSE REIMBURSEMENT SUMMARY—
ALL CLASS COUNSEL FIRMS

| Firm | Amount Requested | Amount Awarded |
|---|---|---|
| Bernstein Litowitz | $ 386,425.40 | $ 350,930.00 |
| Milberg Weiss | 819,240.85 | 671,748.00 |
| Shidler McBroom | 454,103.25 | 432,623.00 |
| Barrack Rodos | 19,552.00 | 15,414.00 |
| Berger & Montague | 79,284.55 | 74,459.00 |
| Gold | 87,131.57 | 79,880.00 |
| Goodkind | 31,595.51 | 25,465.00 |
| Graham & Dunn | 64,388.52 | 60,486.00 |
| Greenfield | 10,622.85 | 8,285.00 |
| Hallisey & Johnson | 2,460.74 | 2,002.00 |
| Kaufman Malchman | 3,425.89 | 2,740.00 |
| Meredith & Cohen | 15,537.84 | 15,161.00 |
| Molloy Jones | 48,923.28 | 43,223.00 |
| Much Shelist | 26,796.22 | 24,275.00 |
| Peckel | 39,540.95 | 39,541.00 |
| Pomerantz Levy | 13,837.51 | 11,701.00 |
| Sachnoff Weaver | 45,230.43 | 42,125.00 |
| Saveri and Saveri | 45,697.61 | 44,848.00 |
| Schoengold & Sporn | 6,846.35 | 6,089.00 |
| Stull Stull | 4,043.89 | 2,525.00 |
| Wolf Block | 35,663.42 | 25,068.00 |
| Wolf Haldenstein | 44,550.32 | 34,297.00 |
| Wolf Popper | 53,132.27 | 47,983.00 |
| Zwerling Schachter & Kelley | 16,238.73 | 12,958.00 |
| WPPSS Litigation Fund | 128,314.45 | 128,314.45 |
| TOTAL | $2,482,584.40 | $2,202,140.45 |

## CHEMICAL BANK EXPENSES

At the time the initial fee and expense petitions were presented, Lead counsel for Class Plaintiffs petitioned for payment to Chemical Bank of $51,402,778.65 out of settlement funds. This amount was requested to reimburse expenses advanced by Chemical. The amount advanced increased, as a result of additional expenses reported through December 31, 1989, to $51,733,093.82. This section contemplates reimbursement of that amount.

Background

On March 1, 1984, counsel for Class Plaintiffs, on behalf of the Class, entered into an agreement ("Agreement") with counsel for Chemical Bank, on behalf of Chemical, representing Bondholders. The Agreement was amended several times. The final Agreement was signed on June 17, 1988. The Agreement was intended to provide coordination of the needs of both Class members and Chemical Bank to handle and process the massive amount of documents and discovery materials accumulating in the consolidated actions.

Under the Agreement, Chemical was to establish and operate a Data Center for the computerized management of documents, depositions and other materials. Chemical was to advance payment for the costs of establishing and operating the Data Center, including direct costs incurred in connection with the production of documents, depositions and other discovery activities. The final amended Agreement extended the original Agreement by providing for the design, establishment, maintenance, and operation of Trial Site Facilities.

The Agreement required that, subject to Court approval, the proceeds of any recovery by the Class would first be used to reimburse Chemical for all Data Center and Trial Site Facilities costs incurred by it that had not been previously reimbursed. For a period of time the Agreement required Class counsel to pay Chemical 5% of

the costs of establishing and operating the Data Center upon receipt of a copy of a periodic statement provided to Chemical by the Data Center. In accordance with this provision, Class counsel paid Chemical, out of the WPPSS Litigation Fund, the sum of $116,866.01. According to the Agreement, Class counsel will receive credit for, or refund of, any amounts that the Court approves for payment out of settlement funds when such amounts have previously been paid by Class counsel to Chemical.

Under the final amended Agreement, to the extent that Court approval is not obtained for reimbursement of the total cost incurred by Chemical, Class counsel are to reimburse Chemical, "by making an advance on behalf of their clients," 5% of the shortfall, less any amounts previously paid.

### The Data Base Management Center

Chemical fulfilled the terms of the Agreement concerning the establishment, maintenance and operation of the Data Center through the Seattle law firm of Betts, Patterson & Mines ("Betts Patterson"). Betts Patterson retained the accounting firm of Price Waterhouse to design and manage the Center. Ms. Mary Anne Baggaley, initially an associate of Price Waterhouse, managed the Seattle Data Center throughout the period of its operations. In 1985, Ms. Baggaley left Price Waterhouse and formed Baggaley & Associates, Inc., through which she managed the operations of the Data Center until 1989.

Data Center operations entailed sophisticated and complex manual and computer procedures for information identification and document encoding, storage and retrieval. It is estimated that more than 200,000,000 pages were produced in this action. The contents of nearly 280,000 documents were stored and made accessible in Data Center document data bases. Pertinent documents were identified, retrieved and processed in connection with depositions, pre-trial statements, briefs and trial. The Data Center provided paralegal assistance in numerous litigation activities, including research and writing, transcription of tape recordings, and verification of tape transcripts. From December 1984 until September 1988, the Data Center employed between 13 and 37 Paralegals. A skeleton force sustained necessary operations thereafter. Data Center personnel and operations were interactive with counsel in the field.

From 1985 until the end of 1988, the Data Center staff, excluding paralegal personnel, ranged from 30 to more than one hundred individuals. At one point, over 1,000,000 photocopies a month were produced by the Data Center. For some time the operation was reputedly the second largest customer of Federal Express in Seattle. The Data Center rented its facilities and utilized independent outside vendors for its computer processing needs. A satellite operation, known as MDL 551, Inc., functioned for several years in New York to facilitate depositions taken there. Deposition facilities were also leased in Seattle and Portland.[39]

### The Trial Site Facilities

Towards the end of 1987, a site was selected for the establishment of trial support activities in Tucson, Arizona. Operation of the Trial Site Facility got underway in January 1988. The litigation support facility provided storage and retrieval services for documents, trial exhibits, depositions, pleadings, trial transcripts and other litigation materials for plaintiffs' counsel. It also provided database management, administrative, logistical and other support services during the course of the next thirteen months. As many as 36 persons were employed at the Trial Site Facility at one time. The Facility was closed in March 1989.

### The Cost of the Two Facilities

The total amount requested for the cost of operations through December 31, 1989, for the Data Center and its satellite locations is $38,512,739.76. For Trial Site Facility operations, petitioners seek an additional $13,220,354.06. General ledger expense records of the two facilities, including MDL 551, Inc., were provided to sup-

---

**39.** The term "Data Center," as used herein, encompasses all the facilities.

port the amount of the petition. Chemical's request is based on the amount it reimbursed the two facilities for their recorded expenses. In addition to payments that were disbursed through Data Center and Trial Site accounts, the amounts requested include approximately $482,200 for disbursements made directly by Chemical Bank that do not appear in the expense records of either facility. Those expenditures are included in the following discussion.

*Benefit to Class Members*

 Chemical Bank funded these expenses through the Bond Fund. Unless the expenses are deemed to have been incurred to the benefit of Class members, however, the expenses may be considered inappropriate for reimbursement out of Class settlement funds.

Class members undeniably benefitted as a result of the operations of the Data Center and Trial Site Facility. So, too, did Bondholders, both Class and non-Class members, who have been allocated a substantial share of the settlement proceeds. The operations provided a sophisticated means of organizing and managing the complex and comprehensive information characteristic of litigation of this magnitude. Similarly, expenditures made through the facilities' accounts for litigation needs outside their operation, such as consultant fees, likewise benefitted both Class members and Bondholders.

Just as plaintiffs benefitted by the arrangement, the interests of Class counsel were served by it. Because Chemical, through the Bond Fund, assumed the burden of payment, it was not necessary, throughout the course of the litigation, for Class counsel to advance out of pocket the extraordinary amount sought here. This advantage, in some respects, was also ben-

eficial to Class members: it is readily conceivable that Class counsel would have been unable, or unwilling, to advance such sizeable sums on their own. Without the expenditures, settlement might well have been unattainable.

Any apportionment of these expenses between Bondholders and Class members would, in the Court's opinion, be artificial and imprecise. Under the circumstances, it would also be inappropriate. With a few exceptions, explained henceforth, the Court cannot say that each of these expenditures, assuming its reasonableness, would not have been necessary to the successful prosecution of this litigation, had it been undertaken by either of the two groups of litigants on its own. The Court concludes, thus, that the benefit to Class members from these expenditures was mutual and inextricably merged with that of Bondholders. It has therefore contemplated for reimbursement the full sum requested.

*Data Center Expenses*

Comprehensive documentation was submitted to evidence the expenses of the Data Center, which billed Chemical Bank bi-monthly for its costs. Initially, detailed monthly general ledger income statements were provided with the petition. Supplemental explanatory information for certain expenses reflected on those statements was provided later at the Court's request. The Court has carefully reviewed the reported information to assess the reasonableness of the expenditures in the context of this complex and massive litigation.[40]

As percentages of the Center's total reported expenses, expenditures reported through the Data Center's financial records may be summarized approximately as follows:

**40.** The cumulative expense total initially reported by the Data Center was subsequently corrected by letter. The cumulative total developed in the course of the Court's analysis of reported expenses, according to the income statements provided, did not agree to either the amount initially reported or to the corrected amount of total expenses subsequently reported. The Court's analysis indicated a slightly higher fig-

ure than the one(s) reported. Because no cumulative figures, by type of expense, were submitted by counsel, expense figures developed in the course of the Court's analysis have been used to facilitate discussion in this Order. However, the total amount reported by Chemical as having been reimbursed to the Data Center has been used as a ceiling in determining the amount recoverable herein.

| | |
|---|---|
| Personnel | 28% |
| Consultant Fees | 18% |
| General and Administrative Overhead | 13% |
| Operations | 11% |
| External Costs | 11% |
| Computer Costs | 10% |
| Facilities and Equipment | 9% |
| All other | – % |

*Trial Support Services Expenses*

Similar documentation was provided to delineate expenses of the Trial Site Facility. Because settlement occurred early in the trial stage of the litigation, the expenses of the operation were significantly less than those of the Data Center. In terms of percentages, the expenses reported for the Trial Site Facility were approximately as follows:

| | |
|---|---|
| Consultant Fees | 50% |
| Personnel | 19% |
| Operations | 12% |
| Facilities & Equipment | 12% |
| External Costs | 5% |
| Computer Costs | 1% |
| All other | 1% |

*Personnel*

Data Center personnel costs were approximately $10,700,000. Included in this category were the compensation, payroll taxes, and medical and insurance benefits paid to or on behalf of employees of the Data Center. Position descriptions and organization charts provided in support of the expense reimbursement request indicate the vast range of skills and numbers of individuals necessary to the operation of the Center. They show that, as the litigation evolved and changed, so, too did the Center's staffing needs. Income statements for each month of the Center's operations reflect the expenses associated with these personnel requirements. Although monthly personnel expenses were often high during the litigation, sometimes in excess of $200,000, the Court finds that they were reasonable for the work undertaken, which included an unspecified, but clearly significant, amount of paralegal work.

Personnel expenses of the Trial Site Facility ranged dramatically over its abbreviated life. In August 1988, the month prior to trial, personnel expenses for some 150 employees approached $300,000. In the early and final months of the Facility's operation, more modest expenses were incurred, in keeping with the greatly reduced scale of operations. In all, approximately $2,500,000 was expended by the Facility for personnel costs.

The personnel expenses of both locations, adequately reflected on the monthly financial reports submitted, and satisfactorily explained in the accompanying information, are deemed reasonable.

*Operations*

For day to day operations of the facilities, a total of approximately $4,200,000 was reported by the Data Center and its satellites. Somewhat more than $1,600,000 was reported by the Trial Site. Included in this category were normal operating expenses of all locations, such as supplies, photocopying, telephone and telecopy, postage, messenger services, insurance, taxes, and document destruction. The category also included significant transcript expenses incurred in connection with depositions at the satellite locations.

 Also reflected for both the Data Center and Trial Site Facility in this classification is more than $620,000 in expenses related to housing, travel, transportation and meals for attorneys and staff who worked at or in connection with the Data Center, and for attorneys and staff members who resided in Tucson before and during trial. Class members have been assessed for similar expenses incurred by Class counsel. They should not, and will not, also be assessed analogous expenses attributable to the representation of counsel for Chemical Bank. A reduction of $400,000 of the above reported amount will accordingly be made. The reasonable amount that remains, approximately $220,-000, is presumed to have been expended by Chemical to the mutual benefit of Class members and Bondholders. Some of the expenses clearly related to depositions and to direct operational requirements of the two facilities. The amount that has been allowed for reimbursement out of Class settlement funds is ample to accommodate

such expenditures. The remainder is not to be paid out of Class funds.

Reimbursement of the remaining expenses included in this category will be allowed.

## Facilities and Equipment

The cost of leasing and purchasing facilities and equipment, including that of satellite locations, was approximately $3,600,000 for the Data Center and $1,800,000 for the Trial Site. These costs include leasing and maintenance expenses for office and storage locations; purchase, repair and maintenance of furniture and equipment; and office relocation expenses. Approximately $300,000 was recovered through the sale of assets acquired by the Trial Site Facility. The Court approves reimbursement of the net amount of expenses reported in this category.

## External Costs

Both the Data Center and the Trial Site Facility reported a variety of expenses related to document production, microfilming, Court reporting and other Court-ordered costs. The Data Center spent more than $4,000,000 for such services, obtained from outside sources. The Trial Site Facility incurred approximately $630,000 in expenses for similar externally acquired services. Although the category included computer costs in the two facilities' income and expense statements, the Court has extracted such expenses here. The reporting of these expenditures, which included significant payments for Court-ordered Masters, proof of claim procedures, and more than $550,000 for work done in connection with the Bondholder Assistance Project, is sufficient. The expenses appear to be reasonable and the Court approves recovery of them.

Reimbursement will also be approved for the following direct payments, which fit into this category but which were not paid by or reported in the expense records of either facility: $27,367 paid by Chemical Bank to the Supply System for document copying; $25,000 deposited with the Court in connection with the proof-of-claim process; and $113,000 that Chemical paid directly to Peat Marwick for the firm's work in connection with the proof-of-claim procedures.

## Computer Costs

For computer costs incurred by the Data Center and the Trial Site Facility, slightly more than $4,000,000 was reported. Reimbursement of the requested amount, which reflects both on-line charges and payments made to external vendors for computer services, will be permitted. The vast majority of these expenses were incurred by the Data Center. The expenses are adequately reflected in the income statements of both facilities, however, and appear to be reasonable in these circumstances.

Consultant Fees

Approximately $7,000,000 was paid by the Data Center to individuals retained by plaintiffs to provide testimonial and other expert opinions and advice. A slightly smaller expense was reported by the Trial Site Facility for similar expenditures. In addition, Chemical separately reported direct payment of $311,031.60 to one consulting firm, QED. That expenditure will be considered in this section, along with the other Consultants fees and expenses.

The information accompanying the reporting of these expenses was initially insufficient to permit the Court to draw any conclusion regarding the nature or the reasonableness of this substantial expense. In response to inquiries regarding the amounts reported, the Court received complete and explicit explanatory information from counsel for Class plaintiffs and Chemical Bank regarding the reported expenditures. Except for a small element, this category does not, in fact, reflect expenses of either the Data Center or the Trial Site Facility. The expenses were, however, paid at counsel's request and were reported in the expense records of the two facilities.

The documentation provided in response to the Court's request described $13,911,812 in payments advanced by the Bond Fund to a variety of individuals, groups and other entities for various services rendered throughout the course of the litigation. Of that amount, $11,455,485, was paid to experts and consultants retained by

plaintiffs. These payments included approximately $4 million paid to one group and associated individuals that provided energy related economic research and analysis regarding litigation issues; $3.2 million paid to a second group of economists who aided in the preparation of plaintiffs' damages analysis and loss calculations; and $3.3 million paid to a third group of economists who assisted plaintiffs with their preparation for expert testimony and cross-examination, and with the development and operation of plaintiffs' econometric model. Together, twenty-three other experts and consultants received approximately $890,000 in fees and expenses for their professional assistance and advice. The Court has reviewed the descriptive information supplied in connection with these substantial expenditures and finds that the above amounts were reasonably incurred in connection with plaintiffs' mutual litigation needs. It approves recovery of the amount reported.

A second type of payment, reported in the "Consultant" category of the Data Center and Trial Site Facility, was also described in the information provided to the Court. The Data Base expended some $1,314,382 among 19 different individuals and entities for various services. The expenditures ranged from $658,840 paid to Baggaley & Associates for its direction of the Data Center operations to $50 paid to one paralegal Data Center consultant. Also included in the category was $459,619 paid to Price Waterhouse for assistance in the management of the Data Center and for consulting services related to operation of the computer data bases and to establishment of the Trial Site Facility. A variety of payments to various individuals and entities for data processing services accounted for most of the remaining amount, less than $200,000. The Court approves the reimbursement of these expenses.

Approximately $18,400 expended by the Trial Site Facility for similar purposes, primarily accounting services, was also reported in the "Consultants" category. These types of services were necessary to the management of the Facility, and the

Court finds the payments for them to have been reasonable.

A third group of payments, amounting to slightly under $1 million, was made for services directly connected with the trial. The services provided charts and graphs used at trial and jury research associated with plaintiffs' presentation of their case. Reimbursement will be allowed.

■ A few sundry payments were also reported in the "Consultants" category. More than $164,000 was spent in lobbying efforts aimed at obtaining federal and state legislation that would have been favorable to plaintiffs. The accounting firm of Peat, Marwick & Main received $45,255 for work on the Class certification Notice and in connection with the Bondholder Assistance Project. A small amount of duplicating costs, reimbursed to a defense firm, were also accounted for in this classification. The Court approves reimbursement of these sundry expenditures.

The reasonableness of the foregoing expenses, paid to third parties, has been satisfactorily demonstrated, and the Court approves their reimbursement. The total amount approved herein is accordingly $14,222,843.65.

*General and Administrative Overhead Charge*

■ The next classification of expenditures appeared only in the records of the Data Center, not in those of the Trial Site Facilities. An expense of approximately $4,875,750 was recorded under several different headings in the general ledger accounts of the Data Center. One heading referred to the expense as "GAO." An alternative description referred to it as "Paid to Betts, Patterson & Mines." These descriptions lacked meaning, and no information was initially provided to explain the expenditures. In response to the Court's request, a comprehensive explanation was forthcoming for the reported expense.

The charge was a computed amount intended to represent "general administrative overhead" experienced by the law firm of Betts Patterson & Mines for the "incremental general and administrative costs of

absorbing the large number of additional employees hired by Betts to staff the [Data Center]." Those incremental costs included: management services provided by Betts Patterson, the use and/or integration of the firm's telephone, computer, word processing and related systems, potential liabilities for employee practices, and the handling of personnel problems and conflicts. No information was provided to evidence increases, if any, in the operating costs of Betts Patterson which these payments were intended to defray.

The amount charged for the "GAO expense" was computed at a rate of 50% of the total compensation (including payroll taxes and insurance) paid to all Data Center employees. This percentage was based on the advice of Price Waterhouse.

In addition to this amount, Betts Patterson received additional sums from Chemical Bank for its representation that have not been petitioned for. They included, among other things, a differential between the amount that Betts Patterson normally charged for similar paralegal services and the sum of the amount actually paid for the services of Data Center paralegal employees plus the GAO surcharge.

Several circumstances lead the Court to its decision to disallow most of the amount sought for the GAO surcharge. One reason is the absence of any substantiation of any "incremental" costs that were reputedly experienced by the Betts Patterson firm. Betts represented Chemical Bank in the litigation. Betts was responsible for "oversight" of the Data Center. It hired paralegal and support personnel to work at the Data Center. It is, at best, appropriate to characterize any increased expenses associated with the hiring of the Data Center personnel, and with the reputed costs of "absorbing" them, as intangible. The Data Center leased its own facilities. Data Center personnel were paid by the Data Center. Significant expenses related to telephone, computer, word processing and related systems were reflected in the records of the Data Center. The Court has allowed recovery of those reasonable expenses, and of virtually all other expenses incurred in the Data Center's operation, most of which were paid to employees or to third parties. The Court does not perceive that the vast sum sought to defray "incremental" costs, if any, incurred by Betts Patterson in connection with the essentially independent operation of the Data Center should be paid out of Class members' funds, however. The Court has no reason to assume that such expenses would have been incurred, had a more independent operation provided the same services that the Data Center did. Its management, Baggaley & Associates, along with Price Waterhouse, received in excess of $1 million for running the Data Center. The Court has approved reimbursement of those payments. The accounting firm's approval of the 50% surcharge does not persuade the Court of its propriety in this situation. The requested additional $4,875,750 surcharge to Class members is simply not justified.

The Court finds a second aspect of this request troubling and sufficient in its own right to constrain disallowance of the GAO surcharge. Obscured in the financial reports of the Data Center that were provided to the Court is payment for an unspecified amount of paralegal work. Personnel records supplied do not reflect the breakdown of expenses between paralegal and other support positions. Incorporated in the Court's authorization for reimbursement of the payroll expense of Data Center employees is its tacit approval of payment for all of the work that paralegal employees did. The independence of the Data Center and the relatively moderate rates paid to its paralegal employees (as evidenced by the existence of a differential, after the GAO surcharge, that was paid to Betts by Chemical) enabled the Court to approve payment for the work without finding a necessity to review paralegal time records, which were not submitted. Given this independence and moderation, the Court does not find it disturbing that reimbursement for some perhaps inappropriate, and potentially disallowable, undertakings may be included in the allowed payment. Increasing Chemical's reimbursement by allowing the GAO surcharge that was based upon paralegal (and other) work

would, however, be tantamount to approving, without reviewing, time records and Betts Patterson rates for the paralegal employees. The Court will not do so.[41]

Further, the effect of allowing the requested amount to be recovered out of settlement proceeds would be to increase the amount of attorney and paralegal fees petitioned for and approved herein for payment by Class members by $4,875,750 *plus* the unspecified sum of compensation and benefits actually paid to or on behalf of Data Center paralegal employees.[42]

The Court finds that a surcharge equal to ten percent of the requested amount is both reasonable and sufficient to cover any indefinite and indeterminate incremental expenses that may have been incurred by Betts Patterson for its oversight role in connection with the operation of the Data Center. An award of $485,575 will accordingly be made. Reimbursement of the remaining amount requested, $4,370,175, out of Class members' share of the Settlement fund is disallowed.

Other

A few expenses have not been classified above. They include $97,266.88 of plaintiffs' share of the costs for printing, collating, mailing and publicizing the Notice of Settlement. This expenditure was made by the Data Center in the last quarter of 1989. Other payments made by the Data Center during that period are reflected above. Expenses of operating the Trial Site Facility in Tucson during the period after settlement was reached, not included in the preceding figures, amounted to $97,139.15. Finally, tax refunds and income from the sale of Trial Site Facility assets totalling $1,380.64 were received in the final quarter of 1989. For these transactions, a net amount of $193,025 will be awarded.

Payment of $36,673.15 made by the Trial Site Facility and reported as an expense in the month ended February 28, 1989, has not been approved for reimbursement out of settlement funds. The payment was for reimbursement of allowed expenses of the Data Center. The amount will not be counted twice. Similarly, a payment of $5,821.43 made by Chemical in March 1987 to balance the Data Center's ledger has not been approved for reimbursement for obvious reason.

In conclusion, an award of $46,920,424.24 will be made to Class counsel, for payment to Chemical Bank, for Chemical's reasonable expenses incurred and paid in connection with this litigation.

### AMBAC INDEMNITY CORPORATION COUNSEL

 The Milwaukee, Wisconsin law firm of Foley & Lardner petitions for an award of fees for the work of eight attorneys whose rates at the time of the petition ranged from $120 to $220 an hour. At the time the petition was submitted, Foley & Lardner reported a total of 1,563.1 attorney hours worked, for a reported attorney lodestar of $229,513.50. No subsequent work was reported. The firm represented AMBAC Indemnity Corporation (formerly MGIC Indemnity Corporation), which insured $24,000,000 worth of WPPSS 4/5 Bonds, in the litigation.

Foley & Lardner submitted lodestar reports throughout the litigation. The firm does not request compensation for all work that was reported, however, because firm members determined that only some work was deemed appropriate for allowance out of the proceeds of the settlement. Foley & Lardner undertook work at the request of lead counsel and seeks an award only for services that were directed toward achieving benefits for the entire Class. For such services Foley & Lardner reports 769.4 attorney hours with a requested lodestar value of $131,430. No fee is requested for the work of attorneys in the firm of Montgom-

---

**41.** Betts Patterson has already been paid by Chemical, at the law firm's normal rates, for all of the paralegal work done. The use of the GAO factor, charged to the Class settlement fund and paid to Betts, plus the supplemental payment by Chemical of the differential, after the GAO sur- charge, resulted in Betts' receipt of precisely 100% of such normal charges.

**42.** The Court believes that a figure between $4,000,000 and $6,000,000 is not an unrealistic estimate of this expenditure.

ery, Purdue, Blankinship & Austin, local counsel for Foley & Lardner, although lodestar reports submitted for that firm indicated more than 144 hours worked at a reported lodestar of $15,242.50.

Foley & Lardner's involvement in the litigation began in June 1984 and continued into 1988. The information submitted with the firm's fee application was comprehensive and informative. Daily time records contained adequate descriptions of all work done by members of the firm in connection with the litigation. In addition to submitting its contemporaneous daily records, Foley & Lardner summarized its work into five broad categories and indicated the work performed and petitioned for by each attorney on individual dates within each of the five categories. The resulting document greatly facilitated a meaningful assessment of the nature and reasonableness of firm members' work. No request was made for work done in connection with the preparation of the firm's fee petition.

### Gilbert W. Church

Foley & Lardner petitions for 490.9 hours at the rate of $180 an hour, for a total lodestar of $88,362 for work done by Gilbert Church, a partner. Mr. Church was involved in all phases of the work undertaken by Foley & Lardner. He reviewed documents in Seattle; prepared for and represented Class Plaintiffs' interests in depositions; worked on a draft brief, interrogatories, and researched and prepared a memorandum regarding the possibility of an SEC action under § 17(a) of the Securities Act of 1933. He also undertook responsibility for AMBAC plaintiffs in connection with the required proof-of-claims procedures, for which he charged fewer than 35 hours. Because the work relieved lead counsel of much of the burden for these class members' claims, the moderate amount of time charged will not be disallowed. Mr. Church maintained communication and coordination with lead counsel throughout his involvement. His time charges were consistently modest, and an award will be made for all of his reported time except 13.5 hours, approximately 50% of the travel time he charged.

For Mr. Church's work on the litigation, Foley & Lardner will receive a lodestar award of $85,932 for 477.4 hours reasonably spent to the benefit of Class members.

### James L. Huston

Foley & Lardner petitions for 125.1 hours at the rate of $120 an hour, for a total lodestar of $15,012 for work done by James Huston, an associate. Mr. Huston divided his time between document production and legal research. All of his work was of potential benefit to the Class and will be allowed as reported.

### Frederick C. Geilfuss

Foley & Lardner petitions for 87.4 hours at the rate of $170 an hour, for a total lodestar of $14,858 for work done by Frederick Geilfuss, a partner. Mr. Geilfuss was an associate in 1984, when he conducted document discovery in Seattle. Mr. Geilfuss' discovery work is described in the firm's summaries as well as in contemporaneous time records. Most of his work was initially recorded in two large block entries, both of which appear to include travel time. Aside from a reduction of 9 hours for travel, the Court will allow Mr. Geilfuss' time, which is moderate and reasonable for the type of work he undertook. His work will be paid at an associate rate of $150 per hour, however.

For Mr. Geilfuss' work on the litigation, Foley & Lardner will receive a lodestar award of $11,760 for 78.4 hours reasonably spent to the benefit of Class Members.

### Marvin E. Klitsner

Foley & Lardner petitions for 33.6 hours at the rate of $220 an hour, for a total lodestar of $7,392 for work done by Marvin Klitsner, a partner. Mr. Klitsner's time was largely devoted to coordination of the firm's activities with MDL 551 lead counsel. A number of charges for meetings and communication with Mr. Bernstein occurred during the first four years of the firm's involvement in the litigation. His activities are deemed reasonable and of benefit to Class Members. His work will be allowed as requested.

*Paul E. Cooney*

Foley & Lardner petitions for 30.1 hours at the rate of $180 an hour, for a total lodestar of $5,418 for work done by Paul Cooney, a partner. Mr. Cooney was an associate in 1984 when he reviewed documents, did research and prepared a memorandum at the request of lead counsel. His reasonable time charges for the work will be allowed, though at an associate rate of $150 an hour. For Mr. Cooney's work on the litigation, Foley & Lardner will receive a lodestar award of $4,515.

*R.E. Porter*

Foley & Lardner petitions for 1 hour at the rate of $120 an hour, for a total lodestar of $120 for work done by Mr. R.E. Porter in connection with the firm's work on a brief concerning constitutional issues. The charge, though isolated, is reasonable and will be allowed.

*F. Anthony Maio*

Foley & Lardner petitions for .8 hour at the rate of $210 an hour, for a total lodestar of $168 for work done by Anthony Maio, a partner. Mr. Maio's time was charged for various office conferences during a three-day period. The Court does not find Mr. Maio's involvement substantial enough to have provided any probable benefit to Class members. No fee for his time will be awarded.

*William J. Willis*

Foley & Lardner petitions for .5 hour at the rate of $200 an hour, for a total lodestar of $100 for work done by William Willis, a partner. Mr. Willis assisted Mr. Church in identifying documents for use in a deposition in January 1987. Payment will be allowed.

The following table summarizes the foregoing reasonable lodestar awards for compensable work of attorneys in the Foley & Lardner firm.

FOLEY & LARDNER ATTORNEY LODESTAR

| Attorney | HOURS Request | Award | LODESTAR Request | Award |
|---|---|---|---|---|
| Church | 490.90 | 477.40 | $ 88,362.00 | $ 85,932.00 |
| Huston | 125.10 | 125.10 | 15,012.00 | 15,012.00 |
| Geilfuss | 87.40 | 78.40 | 14,858.00 | 11,760.00 |
| Klitsner | 33.60 | 33.60 | 7,392.00 | 7,392.00 |
| Cooney | 30.10 | 30.10 | 5,418.00 | 4,515.00 |
| Porter | 1.00 | 1.00 | 120.00 | 120.00 |
| Maio | .80 | 0.00 | 168.00 | 0.00 |
| Willis | .50 | .50 | 100.00 | 100.00 |
| Totals | 769.40 | 746.10 | $131,430.00 | $124,831.00 |

*Paralegals*

In addition to the reimbursement requested for the work of attorney members of the firm, Foley & Lardner applies for an award for the paralegal work of five employees. A total of 83.6 hours work, at rates ranging from $25 to $45 per hour were reported for these individuals. All of the reported and documented time pertained to compensable paralegal work.

*Paralegal Award*

For 83.6 hours of paralegal work Foley & Lardner will receive a reasonable lodestar award of $3,454.

*Expenses*

The law firm of Foley & Lardner petitions for out-of-pocket expenses totalling $9,964 in connection with their reimbursable efforts in the litigation. Just as the firm requested compensation for only a portion of the hours its members worked on the litigation, it petitions for a like portion of its total expenditures. The methodology employed by the firm to determine the amount of its request is therefore inexact. While other methods might have been employed to compute the firm's requested reimbursement, however, each would have

been similarly deficient. The Court believes that the amount requested is reasonable. At least ten out-of-town trips, for periods ranging between one and eight days, were taken by firm members in connection with compensable activities. Substantial communication, research and reproduction outlays were similarly required. The amount requested will therefore be reimbursed from Class settlement funds.

## HABERMAN COUNSEL

■■■ Six law firms seek payment of fees and expenses in connection with their representation of some individual class plaintiffs in litigation in the Washington State courts. Four of the firms—Jaffe & Schlesinger; Ginsburg, Feldman, and Bress; Ferguson & Burdell; and Weinstein, Hacker, Yost, Berry & Matthews— represented a number of individual plaintiff bond purchasers in state court proceedings in the action captioned *Haberman v. Washington Public Power Supply System.* The other two firms, Winthrop, Stimson, Putnam & Roberts and Smith, Smart, Hancock, Tabler & Middlebrooks, represented plaintiff intervenors, American Express and U.S. Trust, in the *Haberman* action and also in MDL 551, where both are Class members.

The six firms urge that their activities— or, more precisely, the effects of their activities—in the *Haberman* litigation entitle them to recover fees and expenses out of the MDL settlement fund. Specifically, *Haberman* Plaintiffs' Counsel assert that the following things, which "advanced the interests" of MDL 551 plaintiffs and "helped create a fund for the benefit of the MDL 551 class," entitle them to a share of the MDL 551 settlement proceeds:

(a) Their activities eliminated any potential for *res judicata* or collateral estoppel defenses that might be raised as a result of the Washington State Supreme Court's decision in *Chemical Bank v. Washington Public Power Supply System ("Chemical Bank II"),* 102 Wash.2d 874, 691 P.2d 524 (1984), *cert. den. Haberman v. Chemical Bank,* 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985), *and cert. den. Chemical Bank v. Public Utility Dist. No. 1,* 471 U.S. 1075, 105 S.Ct. 2154, 85 L.Ed.2d 510 (1985).

(b) They established an expansive definition of "seller" for purposes of the Washington State Securities Act (WSSA) that would encompass the Supply System, its 23 members, the 88 participating utilities, and professional defendants, and ensure the Act's applicability to them in MDL 551.

(c) They were first to name Ernst & Whinney, in May 1984, as a party defendant in either action. Later sued in MDL, as well, this defendant contributed $6.5 million in settlement.

(d) They alleged derivative negligence claims against the Professional defendants that were eventually assigned to Class Plaintiffs in MDL as part of the settlement.

(e) They helped organize the WPPSS 4/5 Bondholders' Committee which later brought an action, known as *Hoffer v. State,* against the State of Washington. In *Hoffer* the Washington Supreme Court, relying in large part on its prior *Haberman* decision, held that bondholders had the right to establish liability against the State on certain claims. As a result, the State later contributed $10 million to the settlement of MDL 551.

(f) They supported state appellate arguments by counsel for the *Haberman* Intervenors concerning common law negligent misrepresentation and fraud claims. Such claims were later certified in MDL 551.

(g) They challenged the constitutionality of the "Scienter Amendment" to the WSSA before the Washington State Supreme Court and the United States Supreme Court, preserving the issue for review in the event plaintiffs (in MDL 551 or in *Haberman*) were unsuccessful in establishing liability under a scienter standard.

Counsel for the *Haberman* Intervenors urge that the following circumstances, because they inured to the benefit of the MDL Class, entitle them to a share of the settlement proceeds:

(a) They alone asserted state common law fraud and negligent misrepresentation claims in *Haberman.* Such claims were later certified in MDL 551.

(b) The *Hoffer* decision, discussed in (e) above, relied particularly on the State Court's earlier ruling on their negligent misrepresentation and fraud claims.

(c) They named Ernst & Whinney in their amended complaint, prior to MDL 551 plaintiffs' suit against the same defendant.

(d) *Haberman* established the existence of a broad right of action under WSSA, and tested the constitutionality of the Scienter Amendment;

(e) *Res Judicata* or collateral estoppel effects on MDL 551 were foreclosed by the Court's ruling in *Chemical Bank II.*

Counsel for the *Haberman* Intervenors also note that they were urged by Chemical Bank to enter the Washington State action in order to pursue certain claims that could not be asserted in the federal forum.

*Haberman* Intervenors' Counsel also performed work in connection with the MDL 551 litigation, with the knowledge and approval of co-lead Counsel. The existence of a fee entitlement out of the MDL settlement fund for such work is analogous to the entitlement of non-lead counsel firms in MDL 551 for work they undertook prior to consolidation of the action. The situation is different, however, with respect to any entitlement for fees for the remainder of the work of *Haberman* Intervenors' Counsel, and for all of the work of *Haberman* Plaintiffs' Counsel, in the *Haberman* litigation.

The determinative factor in the Court's consideration of fee awards is whether the efforts of counsel benefitted Class members. Historically, district courts have awarded fees to counsel in class action litigation even where counsel were not appointed by the court to lead class counsel roles. This principle was confirmed in *Lindy II,* where the court explained that "the

propriety of a particular award for an attorney's services from a common fund depends on whether the specific services benefited the fund—whether they tended to create, increase, protect or preserve the fund." *Lindy II,* 540 F.2d at 112. The principle has been embraced in this circuit. *See, e.g., Equity Funding,* 438 F.Supp. 1303; *Capital Underwriters,* 519 F.Supp. 92. Noting that they were not appointed as lead counsel in the MDL action, the *Haberman* applicants contend that this principle entitles them to a fee award.

The fact that they were not appointed lead counsel is not determinative of these applicants' petitions. Indeed, the activities of most of the firms whose petitions have been considered today under the umbrella of "Class counsel" were not appointed lead counsel. Nonetheless, many of those firms' activities have been found to have provided a benefit to Class members and have therefore been approved for payment out of settlement funds.[43] Here, however, *Haberman* counsel were neither lead counsel *nor* even participants in the consolidated MDL 551 action.[44]

Presumably to overcome the latter defect, these applicants cite a number of cases in which courts awarded fees for counsels' activities in "related" actions. The most significant case involved the *Delaware Valley* litigation. The Supreme Court, in *Delaware Valley I,* affirmed the lower court's award of attorney fees for work done in several phases of the litigation in state courts, observing that compensable "work must be 'useful and of a type ordinarily necessary' to secure the final result obtained from the litigation." *Delaware Valley I,* 478 U.S. at 546, 106 S.Ct. at 3088. The state court work that was remunerated in that action involved petitioning counsels' undertakings to protect and enforce the terms of a consent decree that was the subject and substance of the primary federal action. The *same* counsel

**43.** Although much of the remunerated work was done under the direction of co-lead counsel, much of it was also undertaken prior to consolidation and to the Court's appointment of co-lead counsel.

**44.** This discussion is limited, insofar as Intervenors' Counsel are concerned, to their involvement in the *Haberman* action.

had undertaken representation in both courts. Here, *different* attorneys petition for work in a different action in a different forum. The situation is clearly dissimilar.

Additionally, it is doubtful that the *Haberman* litigation was "a type ordinarily necessary" to achieve the final result in MDL 551. The relationship of the "related" action to the primary litigation in *Delaware Valley,* and in other cases cited by the *Haberman* petitioners,[45] was inexorably and immediately connected to the attorneys' conduct of the primary action. As the district court noted in the *Delaware Valley* litigation, plaintiffs were "required to partake in activities which, while not directly required under the consent decree, were *sufficiently related to its goals and the ongoing litigation* that such efforts should ... be compensated for in some reasonable degree." *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 581 F.Supp. 1412, 1419 (E.D.Pa. 1984) (emphasis added) *affd. in part and revd. in part Delaware Valley I,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) *and revd. Delaware Valley II,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), *on remand Delaware Valley Citizens' Council for Clean Air v. PA,* 826 F.2d 238 (3rd Cir.1987) (emphasis added).

Here, on the other hand, the state court proceeding was an independent, somewhat parallel action[46] in a different forum. It was not undertaken by MDL Counsel. It was not waged on behalf of the entire Class, and the entire Class would not have shared all potentially attainable benefits. The two actions were distinct and detached. Thus, while the cases may have been "related," the relationship was attenuated.

Counsel attempt to demonstrate that the decisions in *Sprague v. Ticonic Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), and its progeny, also support their claim.

The *Sprague* court determined that successful litigation entitled plaintiffs' counsel to a fee award out of earmarked funds because of the incidental *stare decisis* effects upon other similarly situated individuals. The decision does not constrain payment of fees from a settlement fund derived in a separate action simply because the decisions of one court have a salutary effect on litigation in the forum in which the fund later arises. Thus the citation to *Sprague* is wide of the mark.

The Court finds that the work undertaken by the attorneys in the *Haberman* litigation was not sufficiently related to the MDL litigation to warrant payment out of the MDL settlement fund. Although benefits may have accrued to the entire Class as a result of the *Haberman* litigation, the action was not pursued for the purpose of providing a benefit to the Class. The Court does not believe the authorities cited by counsel compel a contrary conclusion under these circumstances. No fees will be awarded.

As indicated, some of the work performed on behalf of the *Haberman* plaintiff intervenors was done in connection with MDL 551 at the behest of Class counsel. Consideration of that work follows.

## WINTHROP STIMSON PUTNAM & ROBERTS

 In July 1984, Winthrop Stimson Putnam & Roberts ("Winthrop Stimson") filed a notice of appearance on behalf of its client, American Express, in MDL 551. Thereafter Winthrop Stimson directly participated in the MDL 551 litigation in connection with the production of documents, the preparation of responses to interrogatories and the preparation and defense of an important deposition witness. The work done by Winthrop Stimson counsel in con-

---

**45.** In *Capital Underwriters* the attorney petitioners had represented different investors whose cases were resolved as part of a "global" settlement of the multi-district action. In *Rothfarb,* related proceedings were initiated in bankruptcy court in order to allow the primary case to proceed. *Moore v. Matthews* sustains the principle that work related to unsuccessful claims

may be remunerated out of common funds. It is not, therefore, helpful on this issue.

**46.** *Haberman* Plaintiffs' counsel also seek fees for work done in connection with their intervention in the *Chemical Bank II* litigation. This discussion also contemplates any fee entitlement for such work.

nection with these discovery activities aided the litigation effort as a whole and directly benefitted Class members.

Although Winthrop Stimson did not prepare bi-monthly lodestar reports during the litigation, the firm was evidently not informed of the requirement by Class counsel, who were consulted and presumably aware of the firm's intent to apply for fees.

Winthrop Stimson has not requested payment for time spent in attorney conferences, whether in-house, with local counsel, or with Class counsel. The application of Winthrop Stimson also excludes duplicative time and work that was not deemed by members of the firm to have benefitted the Class. No multiplier is sought by the firm for its work. Payment for certain services has previously been made by the firm's client, American Express. Reimbursement is to be made to the client where payment has previously been received by Winthrop Stimson for the work that is approved for payment herein.

The following discussion concerns only the work described and petitioned for in five of nine categories described in the Winthrop Stimson petition. The other categories reflect work done in connection with the *Haberman* litigation. In accordance with the foregoing discussion, the work reported in those four categories will not be considered further. Approximately 20% of the reported lodestar of all work petitioned for by the firm is accordingly contemplated for a fee award in the following sections.

### John B. Daniels

Winthrop Stimson petitions for 297.5 hours at the rate of $310 an hour, for a total lodestar of $92,225 for work done by John Daniels, a partner, in connection with activities directly related to the MDL 551 action. Mr. Daniels' work included contact with MDL counsel, the court and the firm's client; supervision of document production and interrogatory response activities; extensive involvement in connection with the deposition of an American Express witness; and review and negotiation associated with the preparation of a discovery stipulation and settlement agreement. The time spent

in connection with each of the foregoing undertakings is well-documented, appropriately summarized, and reasonable. Consistent with the treatment given other counsel, Mr. Daniels' allowable time, all of that reported for these activities, will be paid at a rate of $300 per hour.

For Mr. Daniel's work on the MDL litigation, Winthrop Stimson will receive a lodestar award of $89,250 for 297.5 hours reasonably spent to the benefit of Class members. The remainder of work included in the firm's fee petition for Mr. Daniels pertained to the *Haberman* action. As indicated previously, no fee will be awarded for those activities.

### David G. Keyko

Winthrop Stimson petitions for 277.5 hours at rates ranging from $200 to $235 an hour, for a total lodestar of $57,397.50 for work done by David Keyko, a partner, in connection with activities directly related to the MDL 551 action. Mr. Keyko was an associate when almost all of his work on the MDL 551 litigation was performed. His compensable activities will therefore be awarded at a rate of $210 per hour, his last associate rate, consistent with the treatment accorded Class counsel firms. Mr. Keyko participated in many of the same types of activities as did Mr. Daniels. His time is admirably documented and entirely reasonable.

For Mr. Keyko's work on the MDL litigation, Winthrop Stimson will receive a lodestar award of $58,275 for 277.5 hours reasonably spent to the benefit of Class members. The remainder of work included in the firms' fee petition for Mr. Keyko pertained to the *Haberman* action. No fee will be awarded for those activities.

### Susan J. Kohlmann

Winthrop Stimson petitions for 161.25 hours at rates ranging from $118 to $175 an hour, for a total lodestar of $21,606 for work done by Susan Kohlmann, an associate, in connection with activities directly related to the MDL 551 action. Ms. Kohlmann did research, document discovery, and prepared responses to interrogatories. Her work is properly documented and will

be allowed, consistent with the treatment of Class counsel firms, at the current associate rate of $175 per hour. For Ms. Kohlmann's work on activities related to the MDL litigation, Winthrop Stimson will receive a lodestar award of $28,218.75 for 161.25 hours reasonably spent to the benefit of Class members. The remainder of work included in the firms' fee petition for Ms. Kohlmann pertained to the *Haberman* action. As indicated previously, no fee will be awarded for those activities.

### Christopher R. Wall

Winthrop Stimson petitions for 20 hours at the rate of $185 an hour, for a total lodestar of $3,700 for work done by Christopher Wall, an associate, in connection with the MDL action. Mr. Wall's time charges for this work stem from early research and analysis. The time will be allowed as petitioned for. The remainder of his work pertained to the *Haberman* action and will not be paid.

### Stephen A. Weiner

Winthrop Stimson petitions for 10.75 hours at a rate of $310 an hour, for a total lodestar of $3,332.50 for work done by Stephen Weiner, a partner, in connection the class action. The charges were primarily for Mr. Weiner's communications with Messrs. Weiss and Bernstein regarding the Underwriters settlement. They will be allowed at a rate of $300 per hour, commensurate with the ancillary role of Mr. Weiner relative to that of lead counsel, in the overall MDL litigation effort.

For Mr. Weiner's work on the litigation, Winthrop Stimson will receive a lodestar award of $3,225 for 10.75 hours reasonably spent to the benefit of Class members. The remainder of Mr. Weiner's work pertained to the *Haberman* action and will not be compensated out of settlement funds.

The following table summarizes the foregoing reasonable lodestar awards for attorneys in the Winthrop Stimson firm for compensable work done in connection with the MDL 551 litigation.

### WINTHROP STIMSON PUTNAM & ROBERTS ATTORNEY LODESTAR

| Attorney | HOURS | | LODESTAR | |
| | Request | Award | Request | Award |
| --- | --- | --- | --- | --- |
| Daniels | 297.50 | 297.50 | $92,225.00 | $89,250.00 |
| Keyko | 277.50 | 277.50 | 57,397.50 | 58,275.00 |
| Kohlmann | 161.25 | 161.25 | 21,606.00 | 28,218.75 |
| Wall | 20.00 | 20.00 | 3,700.00 | 3,700.00 |
| Weiner | 10.75 | 10.75 | 3,332.50 | 3,225.00 |
| Totals | 767.00 | 767.00 | $178,261.00 | $182,668.75 |

### Paralegals

In addition to the reported hours worked by attorney members of the firm, Winthrop Stimson applies for an award for the work of a number of paralegal employees. A total of 673.25 paralegal hours were reported in connection with activities directly related to the MDL 551 litigation. A rate of $65 per hour was utilized in determining the lodestar for the work of these employees. The reported paralegal lodestar, for the five categories of work contemplated for a fee award out of settlement funds, amounted to $43,761.25. Nearly all of the work entailed document production and deposition preparation. The use of lower cost paralegal employees for these activities was appropriate, and the work was reasonable and satisfactorily documented in the firm's time records.

### Paralegal Award

An award of $43,761.25 will be made for work undertaken by paralegals in the Winthrop Stimson firm.

### Expenses

Winthrop Stimson petitions for an expense reimbursement of $173,558. Many

of the firm's reported expenses were associated with work that the Court has determined not to be compensable. A schedule accompanying the firm's petition indicates that expenses totalling $31,971 were attributable to the MDL 551 litigation.

■■■ Winthrop Stimson states in its petition that its billing rates do not include certain overhead expenses. No similar—or contrary—statement was made by petitioning Class counsel firms. The Court consistently disallowed certain expenses, such as word processing, overtime and secretarial services, for Class counsel firms that requested reimbursement for such expenses in their petitions. The Court's decision to do so was based on the conclusion that the firms' reported rates reasonably encompassed such overhead expenses. The Court similarly finds, for purposes of this litigation, that the rates of Winthrop Stimson were sufficient to provide coverage for such expenses. Consistent with the treatment of petitioning Class counsel firms, such expenses will therefore be disallowed for this firm. Specifically, $16,220 reported for word processing costs and $1,500 of the total $3,581 reported for Miscellaneous expenses will be disallowed. The amount allowed for expenses reported in the latter category is for court fees, court reporting, and paralegal help included therein. The firm's photocopy rates, 10 cents until 1987 and 15 cents thereafter, were reasonable on average, and the modest charges will not be disturbed. The firm's remaining reported expenses are likewise reasonable.

*Expense Award*

In accordance with the foregoing, an award of $14,251 will be made to Winthrop Stimson for the firm's expenses reasonably incurred in connection with this action through December 31, 1989.

## SMITH SMART HANCOCK TABLER & MIDDLEBROOKS

Smith, Smart, Hancock, Tabler & Middlebrooks ("Smith Smart"), in association with Winthrop Stimson, represented American Express in the *Haberman* action. Smith Smart also represented U.S. Trust in *Haberman*. Although the form and presentation of the firm's fee petition and supporting documentation are exemplary, the work that is petitioned for is not eligible for a fee award in this action. Unlike Winthrop Stimson, Smith Smart expended essentially all of its efforts in connection with the *Haberman* litigation. In accordance with the Court's discussion regarding such activities, therefore, no award will be made for the firm's work.

## GORDON THOMAS HONEYWELL

■■■ One final expense item remains to be dealt with. The law firm of Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, defendants' lead and liaison counsel in MDL 551, was ordered to reproduce and distribute to defendants' counsel correspondence received by the Court from Class members and Bondholders early in 1989. The Court hereby allows recovery out of Class settlement funds of $2,800, a portion of $3,361.92 requested for expenses incurred in connection with the firm's fulfillment of that task. A reduction has been made in the firm's rate of 15 cents per page, in conformity with the allowances made to plaintiffs' counsel for similar charges, in determining the award for this uncomplicated reproduction assignment.

## AWARDS

The following chart recapitulates the total amount awarded herein for attorneys' fees, paralegal fees and expenses, through December 31, 1989, in this action.

| | |
|---|---|
| Class Counsel for Payment to Chemical Bank | $46,920,424.24 |
| Milberg Weiss Bershad Specthrie & Lerach | 10,699,313.25 |
| Bernstein Litowitz Berger & Grossman | 8,538,845.50 |
| Shidler McBroom Gates & Lucas | 6,070,709.80 |
| David B. Gold | 1,317,750.00 |
| Allan K. Peckel | 1,272,904.75 |
| Graham & Dunn | 1,111,451.00 |
| Saveri & Saveri | 988,640.25 |
| Wolf Popper Ross Wolf & Jones | 865,763.25 |
| Zwerling, Schachter/Prince, Kelley | 703,123.00 |
| Berger & Montague, P.C. | 636,080.25 |
| Wolf Haldenstein Adler Freeman & Herz | 513,491.50 |
| Goodkind, Labaton & Rudoff | 414,247.50 |
| Molloy, Jones & Donahue | 398,267.50 |
| Meredith & Cohen | 383,372.25 |
| Sachnoff, Weaver & Rubenstein | 358,155.00 |
| Wolf, Block, Schorr & Solis–Cohen | 307,119.50 |
| Pomerantz Levy Haudek Block & Grossman | 285,356.00 |
| Much Shelist Freed Denenberg Ament & Eiger | 267,907.00 |
| Winthrop, Stimson, Putnam & Roberts | 240,681.00 |
| Barrack, Rodos & Bacine | 232,275.25 |
| Foley & Lardner | 138,249.00 |
| WPPSS Litigation Fund | 128,314.45 |
| Kaufman, Malchman & Kirby | 94,731.25 |
| Schoengold & Sporn | 79,414.00 |
| Harvey Greenfield & Franco Asia | 58,265.00 |
| Stull, Stull & Brody | 32,630.00 |
| Hallisey & Johnson/O'Brien & Hallisey | 21,117.00 |
| Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim | 2,800.00 |
| **TOTAL FEE AND EXPENSE AWARD** | **$83,081,398.49** |

----

## INTEREST

Counsel are to receive interest on these fee and expense awards in an amount to be determined by applying to the total amount awarded the rate of interest earned by the settlement fund, from January 1, 1990, until such time as the awards are distributed.

It is HEREBY ORDERED that distribution of the aforesaid fee awards and expense reimbursements be made out of the proceeds received in final settlement of this litigation.

The Court reserves jurisdiction to decide awards for work undertaken and expenses paid or incurred subsequent to January 1, 1990, in connection with this litigation, and for amounts discussed herein which have been explicitly deferred for future consideration.

A single, final fee petition may be filed and submitted directly to the Court by each firm that has undertaken activity or incurred expenses since January 1, 1990, in connection with this litigation, and/or that has had an award for reported work specifically deferred herein. At a minimum, such petition is to include, for each firm, narrative descriptions of all work undertaken for which payment is sought. The work performed by each attorney and paralegal is to be separately described, and total time expenditures are to be indicated for all separate and distinct undertakings of each such attorney or paralegal to which more than 10 hours of time was devoted. In addition, legible and orderly contemporaneous time records are to be submitted directly to the Court with each petitioner's final petition. Requests for reimbursement of expenses are to contain sufficient information regarding the expenditure to provide complete understanding of the nature and purpose of each reimbursement requested.

Counsel who may petition for compensation in the future are ORDERED to continue to submit quarterly "Lodestar Reports," under seal, directly to the Court. The following have reported approximately $470,000 in lodestar fees and expenses for work performed during the first three quarters of 1990, which work has not been contemplated herein: Bernstein Litowitz, Milberg Weiss, Graham & Dunn, Molloy Jones, Zwerling Schachter and Chemical Bank. This work may be petitioned for, in accordance with the foregoing guidelines, in the future.

The amount previously ordered to be set aside in connection with the development of a Plan of Allocation, $175,000,000, is to be reduced to $90,000,000. The total amount awarded herein is to be paid out of that sum. The balance, $85,000,000 is to be distributed, in accordance with the terms of the Allocation Plan, to Class members.

The conditional motion of "Appellant Bondholders" to intervene for the limited purpose of filing a protective appeal to aspects of this Order that approve awards of attorneys' fees and litigation expenses aggregating in excess of $30 million to claimants other than Chemical Bank (as Bond Fund Trustee) or that otherwise adversely affect "Appellant Bondholders" is hereby DENIED.

The petition for reimbursement of reproduction/photocopy costs submitted by Mr. Dwight Halstead, attorney for defendant Benton Rural Electric Association in this action is similarly DENIED.

It being expressly determined that there is no just reason for delay, the Court hereby DIRECTS entry of FINAL JUDGMENT pursuant to Rule 54(b), Federal Rules of Civil Procedure, on all matters decided herein.